SCANNED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS

------------------------------------------------------------------X

SHERRANCE HENDERSON,

                Plaintiff,

          -against-

JURY

GOLDEN CORRAL SYSTEMS, INC., TD BANK, SMALL BUSINESS
ADIM OFFICE OF THE UNITED STATES,
LANCE TRENARY, NIRAL PATEL, ANTHONY
SEGRETI, JANE DOE, AND JOHN DOE,

                Defendants.

------------------------------------------------------------------X

Index No.: **19 cv 2878**

**COMPLAINT AND**

**DEMAND**

Plaintiff Sherrance Henderson, *pro se*, complaining of the Defendants, Golden Corral Systems, Inc., TD Bank, Lance Trenary, Niral Patel, Anthony Segreti, and Jane Doe and John Doe hereby alleges the following:

## JURISDICTION AND PARTIES

1.    This court has Jurisdiction pursuant to CPLR section 301 and 302, and venue is proper pursuant to CPLR section 503.

2.    Plaintiff Sherrance Henderson (hereinafter referred to as "Plaintiff") is and at all times hereinafter mentioned is a resident of Gwinnett County, State of Georgia.

3.   Upon information and belief, Defendant Golden Corral Systems, Inc. (hereinafter referred to as "GC") is a domestic business corporation organized under the laws of the United States, with a principal place of business in North Carolina.

4.   Upon information and belief, Defendant TD Bank (hereinafter referred to as "TD") is a domestic corporation organized under the laws of the State of New York, and does banking in Canada.

5.   Upon information and belief, Defendant Lance Trenary (hereinafter referred to as "Trenary") is an individual and resides in North Carolina .

6.   Upon information and belief, Defendant Niral Patel (hereinafter referred to as "Patel") is an individual, and resides in New York.

7.   Upon information and belief, Defendant Anthony Segreti (hereinafter referred to as "Segreti") is an individual and resides in New York.

8.   Upon information and belief, Defendant John Doe (hereinafter referred to as "John Doe") is an individual and resides in New York, Georgia, North Carolina and or Canada.

9.   Upon information and belief, Defendant Jane Doe (hereinafter referred to as "Jane Doe") is an individual and resides in New York, Georgia, North Carolina and or Canada.

## BACKGROUND

10.   Upon information and belief, on or about March 2013, Defendants Golden Corral Systems, Inc., TD Bank, Lance Trenary, Niral Patel, Anthony Segreti and Jane and John Doe caused Plaintiff injury and the Plaintiff seeks to recover

damages from said injury in the form compensatory damages in the sum of $350,000.000, as well as declaratory and/or judgement.

11.    Plaintiff Henderson is a proud African American female and single parent to two (2) children greatly impacted with Autism, has a spinal cord injury and has invested her life savings and time into Golden Corral Restaurant Systems.

12.    Upon information and belief, on or about March 2013, Defendant Golden Corral Systems, Inc. presented Plaintiff Henderson, with a written Franchise agreement known to the Plaintiff as the Franchise Disclosure Document (hereinafter referred to as "FDD").

13.    That Plaintiff, without sufficient legal knowledge and without the advice of any counsel, accepted the FDD and signed the agreement.

14.    Irwin Roberts, Vice President of Franchise Sales issued said document FDD at Hotel lobby at Atlanta airport Marriott, (hereinafter referred to as "Roberts") with GC told/informed/instructed Plaintiff to acquire two other people, preferably men, to share her franchise license with Restaurant experience because Plaintiff could not aid in managing the business due to her disability and because she is a woman who has never operated a business of this type. Roberts asked Plaintiff if she was married, if she has children at the time of the exchange of the FDD. As a result of Roberts' instruction, Plaintiff issued five percent (5%) ownership of her franchise GC license to each Darren "Chip" Joyner (hereinafter referred to as "Joyner") and Milton A. Dewar (hereinafter referred to as "Dewar"). Plaintiff retained ninety percent (90%) ownership.

COT AND DEMAND FOR JURY TRIAL - 3

15.     Upon information and belief, on or about June 2014, Sam Starling (hereinafter referred to as "Starling"), Vice President at that time of Franchisee Finance instructed/told/ordered Plaintiff to use TD Bank (hereinafter referred to as "TD") for "ONLY" a Small Business Administration (hereinafter referred to as "SBA") loan because Plaintiff had "good credit," in excess of 2 million (2,000,000) dollars in cash and no mortgage on her 1.7 million dollar home in Sugarloaf Country Club, TPC community in Duluth, Georgia. Starling, told Plaintiff that she must use TD because GC has a partnership with them and TD will approve the SBA loan. Starling, instructed Plaintiff to search the internet to find a business proposal company to develop a business plan to supply for her SBA loan application. Brian Misenheimer (hereinafter referred to as "Misenheimer"), TD's SBA Loan Officer, gave Plaintiff EBITDA numbers knows as "a b company's earnings before interest, taxes, depreciations and amortization", which is the profit of predictions over a period of five (5) years. Misenheimer informed Plaintiff that the numbers had to be right so the SBA would approve of the loan. TD marked the loan as preapproved and Plaintiff, Joyner, and Dewar were required to attend a week meeting at GC Raleigh Durham.

16.     Upon information and belief, on or about September 2014,Plaintiff, Joyner, and Dewar were in an informal meeting in GC's board room with GC's lead legal counsel, Chappell Phillip, Esq. (hereinafter referred to as "Phillip"). Plaintiff was asked by Phillip why she and Dewar had not married and were cohabiting as a common law married couple.

17.    Upon information and belief, on or about May 2015, TD changed Plaintiff's loan amount over three (3) times and thus cash contribution amounts changed from $460,000.00 to 1 million plus dollars. Plaintiff was instructed by Marybeth Lewis, SBA CLS Supervisor II and Jeffery Appleton, SBA Lender to cover other costs of pre-construction, travel and lodge, cost of training managers, supplies, meeting costs for Joyner, Dewar, and Managers, which totaled closed to $700,000.00. Plaintiff was informed that the amount for the above expenses which were paid at the instruction of the above mentioned SBA agents would not be used as "credit towards Plaintiff's SBA loan. See attached Exhibit "A."  On or about July 10, 2016, Plaintiff closed her loan at Donnie Solon at Davidson, Fuller and Sloan, in Johns Creek, Georgia. See Exhibit "APate."

18.    Upon information and belief, on or about May 5, 2016, Plaintiff requested to train to become a GC Certified manager and was clearly informed by Toney Sewell that they were not training for owners and it would be too difficult for Plaintiff due to her disability and her use of a single prong cane.

19.    Upon information and belief, from May 2016 through November 2016 Plaintiff communicated with different GC store owners to receive some time of training. See attached Exhibit "B."

20.    Upon information and belief, on or about August 11, 2016, Patel offers Kitchen and General Managers continued training/real life work experience one at his Buffalo stores and General Manager training at the Saratoga Store. See attached Exhibit "B."

21.    TD did not offer/share/inform Plaintiff of any products under the SBA loan product umbrella which likely could have reduced her Cash Contribution Cost.

22.    Plaintiff was led by her attorney, Donnie Solon, to sign a bogus and baseless leasing agreement with Afran Reality owned by Anthony Segreti (hereinafter referred to as "Segreti"). See attached Exhibit "C."

23.    Upon information and belief, on or about October 21, 2017, Patel denied offering kitchen manager full time employment during the downtime and at said store in Poughkeepsie, Patel offered Kitchen Manager full-time permanent employment at his Buffalo store. Patel also offered to train Plaintiff with a customized training package which will "NOT" offer the opportunity to be a certified store manager at GC.  See attached Exhibit "B."

24.    Segreti told Plaintiff that she must pay an additional cost of $65,000.00 in advance if she is to lease land at 2345 South Road because she did not have experience in rent commercially. See attached "C" of lease, option to purchase and required lease for $65,000.00. See attached Exhibit "C&D."

25.    That Plaintiff built the GC store from raw land from ground up. TD was late in paying NCC BuildersConstructions every draw and therefore cause hostility amongst the general contractor and sub-contractors, Poughkeepsie Town planning board, and stimulated a untrusting tone in general within the community's eyes. See attached Exhibit "E."

26.     That Plaintiff, from May 2016 through September 7, 2017, complained about the construction cost of the GC to NCC Builders/Construction Construction a certified builder and is a relative of GC executive.

27.     Upon information and belief, on or about August 12, 2016, TD requested financials from Plaintiff and refused to continue to fund NCD Builders until new financials were submitted. Plaintiff contacted Kugleman, Esq. to aid in communication with TD, specifically Alisha Weicker, Credit Analyst II, Construction Specialist to block the re-evaluation of Plaintiff's credit worthiness after the closing of the SBA loan issued by TD.

28.     TD was late funding payment to NCD builders. From May 2016 to March 2017, TD was either late paying or did not pay NCD Builders. As a result of the late/non-payments, mechanic's liens were put in place by NCD Builders and/or subcontractors.

29.     Upon information and belief, on or about March 21, 2017, Plaintiff's GC store in Poughkeepsie, NY and TD Bank loan had not been finalized/completed and totally fulfilled by TD Bank.

30.     That the actions of TD of not paying on a SBA loan that Plaintiff was already funded, increased disdain among NCD, subcontractors, and Poughkeepsie Town board community people.

31.     That the actions of TD ensured that Plaintiff could never return to do any type of business in Poughkeepsie, nevertheless her franchise, Golden Corral.

32. Upon information and belief, on or about May 2016 through September 2017, NCC Builders/Construction Construction and TD failed and refused to provide Plaintiff sufficient response to requests for a specialized construction Forensic Accountant but suggested that she employ a "Project Manager" to oversee construction cost.

33. Upon information and belief, on or about May 2016 through September 2016 NCC Builders/Construction Construction and TD informed Plaintiff to pay an additional cash contribution cost of $75,000.00 to have her loan increased after the closing and during the construction. The loan was increased by $200,000.00 even though the loan had built in increases that did not support the action of the loan being increased.

34. That on or about December 25, 2016 to March 21, 2017, Plaintiff had less than $1,000.00 in cash. In fact, Plaintiff was once a multi-millionaire but was left penniless and if she and her children did not eat at Golden Corral they could not afford to purchase basic necessities, such as food.

35. That on or about January 2017 Plaintiff opened her store at 2345 South Road, Poughkeepsie, New York.

36. Upon information and belief, from about March 2016 through November 2018, The Poughkeepsie Journal (hereinafter referred to as "PJ") had written over 21 news articles pertaining to Golden Corral and Plaintiff being a franchisee. PJ's actions of news courage were odd in nature and tarnished Plaintiff's name in the public eye. In March 2017, Plaintiff requested that the PJ write a positive story

highlighting Plaintiff's accomplishments, family life, biography, etc. PJ refused but continued to publish news stories to shine a dark light on Plaintiff's professional business character and professional accomplishments. All 21 plus news stories were written by the same writer of the PJ.  No other new chain, franchisee or large retailer was followed, or written about as many times as Plaintiff.

37.    Upon information and belief, on or about February 11, 2017, Plaintiff e-mailed GC requesting help to retrain the team members and express her concerns that John Craig's GC North East Franchise Field Specialists had instructed Plaintiff's kitchen manager to order items that were unnecessary, not supported by the market of Poughkeepsie and/or the store readiness, while ignoring items that were in line for the grand opening.

38.    That John Craig, franchisee field specialist for the Northeast region (hereinafter referred to as "JC") ordered Plaintiff's kitchen manager, Adam Toliver (hereinafter referred to as "Toliver"),  to order 200 plus pork butts and $16,000.00 worth of fruits and vegetables. JC then instructed Toliver to store said fruits and vegetables within a freezer. The excess pork butts and the fruits and vegetables that Toliver was instructed to store the freezer spoiled. JC instructed Toliver to  spend $46,000.00 to mid $50,000.00 every 4 ½ days. This action caused a financial hardship on Plaintiff and said GC store at 2345 South Road, Poughkeepsie, New York.

39.    That JC instructed Plaintiff's store managers to schedule all workers (144) One hundred and forty-for- forty (40) plus hours, which caused a financial

hardship on Plaintiff and said GC store at 2345 South Road, Poughkeepsie, New York.

40.     Upon information and belief, JC gave his cellphone to workers and managers at the store and encouraged them to call him. This was a strategy to undermine Plaintiff's authority in her own store.

41.     Upon information and belief, JC especially lead kitchen manager Anthony Crocc to communicate with him daily about the kitchen, such as if any of the Poughkeepsie workers had any issues of concern.

42.     Upon information and belief, JC worked to undermine Plaintiff's sovereignty within her own business. JC fueled jealousy among Plaintiff's workers and even with Joyner. JC empowered bad disrespectful behavior with workers by skillful leadership of manipulation. JC supported the "A" team leader actions of going to Plaintiff's store register to pay the "A" team their weekly pay. JC had activated a disease of disrespect for the leadership of the Poughkeepsie GC store.

43.     Upon information and belief, on or about February 1, 2017, Plaintiff communicated with GC Vice President of Franchise Development Darryl Web (hereinafter referred to as "Web") and requested some of the "A" team to support the Poughkeepsie store a couple more weeks.

44.     Upon information and belief, on or about February 1, 2017, Dave Webb (hereinafter referred to as "Webb"), Vice President of the North East franchise development instructed to accept 20 year GC veteran Jaymie Aimalefoa (hereinafter referred to as "Aimalefoa") to work with Plaintiff's GC in Poughkeepsie, New York.

45.     Upon information and belief, from about February 1, 2017 until March 15, 2017, Aimalefoa did not offer support of the Poughkeepsie GC store. Aimalefoa was cynical, distrustful, and reported all unfavorable reports back to GC which offered untruth and biased ammunition to enhance GC's professional racketious business plan model. Aimalefoa worked as a direct spy for GC during her tenure at Plaintiff's Poughkeepsie GC store. She too gave workers her telephone number and even went as far to have a love affair with one of the visiting managers.

46.     Upon information and belief, from about February 1, 2017 until February 15, 2017, Aimalefoa would kiss and make other romantic actions to the visiting manager from the Connecticut. When Plaintiff requested that she control her actions with the hospitality manager, Aimalefoa became hostile and withdrawn with Plaintiff.

47.     Upon information and belief, shortly after the closing of Plaintiff's store, Aimalefoa was rewarded with owner the operator/General Manager position in North Carolina with an increase in pay of six figures.

48.     Upon information and belief, Poughkeepsie GC was inundated with personal shoppers/secret shoppers activated by GC headquarter. On or about February 2017, an African American customer spoke to Plaintiff and informed her that she was a secret shopper and worked as a sub contractor to review neighborhood restaurants. The secret shopper further stated that she wanted to inform Plaintiff that her GC was inundated with fake customers. The secret shopper wanted to give

Plaintiff a "headz up" because she felt a sense of pride because like her, Plaintiff is also African American.

49.    Upon information and belief, on or about February 4, 2017 through March 21, 2017, the Poughkeepsie GC location was inundated with complaints. Jamie Apgar, the Division Administrator for Lance Trenary, CEO of Golden Corral Systems, Inc. (hereinafter referred to as "Apgar"), would forward 5 plus company's daily to Web, Webb, JC, Joyner, and Plaintiff.

50.    That Apgar aggressively verbally badgered Plaintiff with insults and threats. Apgar informed customers that the Poughkeepsie GC would issues refunds "even without a receipt". If Plaintiff did not enforce this request from Apgar, Apgar would threaten Plaintiff by saying the GC Store was going to be closed down and the Poughkeepsie store was the worst store and the Poughkeepsie store sales were the lowest in GC franchise store history. See Exhibit CC "1 B"

51.    That on or about the Poughkeepsie store total income for fifty-one (51) days was $771,664.47. On or about January 2017 through March 21, 2017, Apgar informed any and all customers that a cash refund would be issued by the store if they were not satisfied, pleased, and/or content. That on or about January 2017 through March 21, 2017, the news got out that the Poughkeepsie GC was basically giving free food away as long as the customer complained. See Exbibit CC

52.    That Plaintiff requested to speak with Lance Trenary, CEO of Golden Corral Systems, Inc. (hereinafter referred to as "Trenary"), and her request fell upon deaf ears. Trenary refused to communicate with her.  Plaintiff called Trenary on his

personal cell phone and left numerous messages and Trenary ignored her calls and failed and refused to assist her in any way.

53. Upon information and belief, on or about March 28, 2017, Plaintiff, the kitchen manager, and the hospitality manager came in person to Golden Corral headquarters to speak with Trenary. Apgar took notes and informed Plaintiff and her managers that Trenary was not available. Apgar clearly informed Plaintiff and her managers that Trenary had received information from Aimalefoa, JC, Webb, and Web and understood the scope of the Poughkeepsie store.

54. Upon information and belief, on or about February 12, 2017, GC Vice President of Franchise Development Darryl Web (hereinafter referred to as "Web") and David Webb (hereinafter referred to as "Webb") Division President issued Plaintiff a first and final warning. See attached Exhibit CC.

55. Upon information and belief, TD failed to pay the final franchise license cost of $15,000.00 and GC was not able to abstract franchise royalties.

56. Upon information and belief, on or about February 12, 2017 Plaintiff rectified the incorrect JP Morgan Chase Business routing number and GC was able to extract the due and just royalty amounts. TD issued GC a check on or about February 17, 2017 in the amount of $15,000.00 plus.

57. Upon information and belief, on or about March 20, 2017 Plaintiff emailed Webb as per the instruction of Aimalefoe, a 20 plus year GC General Manager Vet who was sent to the Poughkeepsie store to offer assistance but was later

discovered that Aimalefoe was reporting exaggerated reports to GC about the conditions of Plaintiff's store. See attached Exhibit "F."

58.    Upon information and belief, on or about March 20, 2017, Toliver threatened to cause Plaintiff bodily harm. Toliver was terminated by Plaintiff on March 20, 2017.

59.    Upon information and belief, on or about March 21, 2017, Webb called Plaintiff around 8:01 a.m.  and informed her that her franchise license was terminated and that the Poughkeepsie store could not be opened.

60.  GC confirmed termination of franchisee license with a bogus fabrication deceptional lie and misuse use of FDD contract with Plaintiff. See Exhibit "E."

61.    That Golden Corral breached their Franchise agreement by not granting Plaintiff the opportunity to improve/cure Henderson Poughkeepsie GC. Plaintiff, under the Franchise Agreement, was entitled to correct the Poughkeepsie GC infancy growing pains as it was in business for only 51 days. See Exhibit 1C.

62.    Upon information and belief, Middletown, NY/ Town of Wallkill store present similar challenges on all fronts but was afforded a 300 plus days opportunity to remedy the store issues. The owners of this Golden Corral location are white/non-black. Middletown, NY/ Wallkill, NY was opened 2016 and was closed on or about January 10, 2019. Middletown, NY/Wallkill, NY store did not have over 21 news articles written locally and or nationally. See exhibit CC1D

63.    Upon information and belief, Holland Michigan store owned by a 20 year Golden Corral restaurant employee and married to a Golden Corral executive and

was opened in December of 2016. This store experienced growing pains. The Holland Michigan store was owned by "Owner Operated" and part of the purchase was paid by Golden Corral Systems, Inc. the Holland, Michigan store was owned by a non-black/African-American. The store is owned by a "White Couple" In December 2018 the store was closed and Golden Corral Systems afforded this group 300 days to remedy any restaurant management issues. See Exhibit CC 1E

64.   Upon information and belief, the Golden Corral in Cape Coral, FL was closed down by the department of health for observing eighteen (18) live roaches five (5) times during the store's tenure but has always been granted "reopening" opportunities. This store was owned by a Non-African American, white male. *See Ex. K* "

65.   Upon information and belief, on January 23, 2017, four (4) Golden Corrals shut down in Florida City, Pompano Beach,  Royal Palm, Palatka, from customer's complaint. Some of the complaints were live and dead roaches, grease buildup, sewage seeping into the utility dishwashing room, food temperatures not meeting department of health standards, dirty dishes being placed out for dinner use, and last but definitely not least,  workers not cleaning their hands. These locations are all owned by non African-American. Ownership primarily consists of white males.

66.   That Golden Corral Systems, Inc has over 600 plus store with over 50 thousand hourly workers and only one (1) Black/African American franchisee, the Plaintiff, Sherrance Henderson. Plaintiff is not an owner operator.  On July 31, 1999, Plaintiff acquired a spinal cord injury and walks with a cane. Plaintiff has invested over 1.5 million dollars in cash and 1.7 million dollars of her primary residency.

67.    Upon information and belief, on or about April 2, 2017, Nitral Patel (hereinafter referred to as "Patel") and GC propelled himself as the GC approval and authorized buyer of the store and to "save" Plaintiff's house for her disabled children.

68.    Upon information and belief, from June 2016 to December 2017, Patel has been intrinsically involved in Plaintiff's business opportunity with GC even though he is not a business partner. Richard Chase (hereinafter referred to as "Chase"), Vice President of Area Development shared Plaintiff's business plan with Patel without Plaintiff's permission during the time period of 2015 through 2016. *See Ex. I*

69.    That during the time from January 2013 through January 2016, Plaintiff originally entered into a franchise agreement to hold a license. On or about the time period of January 2103 through January 2014, Plaintiff was informed that Newark, NJ was being removed from the approved area list. Plaintiff was then told to find a comparable location from the approved area list. During a time between January 2014 and June 2014, Plaintiff was informed by Irwin Roberts, Senior Vice President of Franchising that Plaintiff could not handle a store in a strip mall/in-line because she was a new franchisee, lack the experience and Henderson finical status only afforded her with the more expensive GC 11. See Exhibit GC11. Let it be noted male franchisee, and "new" owners were offered and do have in-line stores that are also "male/men". Plaintiff chose from the authorized list, South Orange, New Jersey. Both Newark and Orange afforded her new franchise/store tax abatements, 90% minority majority community and she had close community relationships with both Mayors. After being approved by GC, they took Orange, NJ off that approved list and

COT AND DEMAND FOR JURY TRIAL - 16

stated because there was not a location of five (5) acres. GC then informed Plaintiff on or about July 2014 to October 2014 that she had to change her area again. Plaintiff was told to pick Long Island. That on or about July 2014 through November 2014 available property for lease exceeded the price point of $7,000.00. The highest lease amount approved by GC was $8,000.00. The lease price of the available land in the approved areas in Long island was around triple that amount, approximately $20,000.00 - $25,000.00 per month.

70.    Plaintiff then met with Franchise Area Development Vice President Chase from about 8:00 a.m. to 7:30 p.m. Chase informed Plaintiff that if she wanted any area approved she had to call him "DICK." It seemed proper because Richard is Chase's first name and Dick is the nickname for Richard. However Chase required Plaintiff to call him "Big Dick" and to say it in what Chase called her "sexy radio voice". Plaintiff complied. When she need help with any question on GC Pro Forma report she had to call him Big Dick. She was humiliated and sexually harassed, devalued and feared if she expressed her discomfort, she would surely lose any chance of building her GC. Chase shared Plaintiff's business plan with Patel and instructed Plaintiff to work with him on the GC Pro Forma. Patel had all copies of photos, Profit and Loss (P&L) statement, community restaurant sales of the Poughkeepsie area, kept contact information of decision makers at the local university cafeterias, cost and engineering and their bids for building out the GC, traffic studies (cost $22,000.00), Geology studies (cost $17,000.00), and supplemental information.

71.    Upon information and belief, on or about April 28, 2017 to December 2017, Patel communicated with Plaintiff's New Jersey Commercial and GA Bankruptcy Lawyer to map out plans to purchase Plaintiff's store location in Poughkeepsie. See attached Exhibit "H." That on or about May 12, 2017 to December 2017, Patel queried about debt of Plaintiff's Poughkeepsie store location, gathered information about Plaintiff's legal activities, and offered Plaintiff a false sense of hope. See attached Exhibit"H."

72.    That on or about July 31, 2017, Plaintiff filed bankruptcy with Jones Walden Chapter 11 Bankruptcy Law firm. Patel communicated in great lengths with Jones and Walden's Legal Team of Atlanta, GA and William Kugelman Esq of Powell & Roman, LLC of New Jersey who was Plaintiff's commercial Lawyer. Patel identify himself as a franchisee with Golden Corral Systems, Inc of owning multiple locations in both New Jersey and New York with another partner with the same last name. Patel has shared countless emails with both lawyers, has had countless conference calls with With TD bank's lawyers, Golden Corral Systems, Inc. and himself  all at the same time to confirm that he is a franchisee with Golden Corral Systems. On or about April  12, 2017, Patel and William (Bill) Kugelmen, Esq., TD Bank's lead lawyer, have a conference call to confirm that Patel is authorized by Golden Corral to purchase Plaintiff's store in Poughkeepsie.

73.    That on or about July 31, 2017, Plaintiff filed Bankruptcy. On or about December 6, 2017, TD moves to foreclose Plaintiff's residency. Plaintiff was lead to

believe from the countless emails and conversations (refer to exhibits from 4/2017 to12/2018, that Patel was purchasing said business location from Plaintiff.

74.     Upon information and belief, on or about December 6, 2017, TD's Attorney Kenneth B. Franklin of Duane Morris, LLP (hereinafter referred to as "Franklin") contradicted any sense of false hope that Patel gave Plaintiff by stating in the Atlanta Georgia Federal Court that Patel was never authorized to purchase Plaintiff's GC location in Poughkeepsie, did not possess the necessary skill, knowledge or competence to purchase said store as Patel is only a manager, that GC never gave Patel authorization and Franklin, had no knowledge of a Patel as an interest buyer and Patel does not own a Golden Corral.

75.     That on or about December 6, 2017 in Atlanta GA US Federal Court, Franklin informed the court that Plaintiff was not able to handle her debt and she is a poor financial planner and she does not need to live in a 12,000 sq. ft. home and property values of the 27 hole TPC gate private golf club community property values are decreasing daily.

76.     Patel on December 7th, 2017 on or about requested for Plaintiff's court minutes and audio recording. Plaintiff did not provide Patel with either and still has both audio and written notes. See Exhibit H

77.     That on or about December 6, 2017 in Atlanta Georgi US Federal Court, Franklin stepped out of his legal expertise and informed the Court that Michele Collins with 15 years of experience in real estate  and a degree in Industrial

Engineering demoted her ability to express the value of Plaintiff's home at 1.7 million dollars vs. TD's value of 1.2 million dollars.

78.     Upon information and belief, during the term of 2014 through 2017 Plaintiff was the ONLY African American Single Franchise owner out of 600 plus stores. Plaintiff was the only woman that was a single parent and a franchisee in GC's history.

79.     Upon information and belief, GC failed to adhere to their engagement of their FDD rules of why a franchisee license can be terminated. See attached Exhibit CC. GC's FDD failed to state "when" and "what time period" can a franchisee license can be terminated. See attached Exhibit "1B."

80.     Upon information and belief, GC Treated and communicated with Plaintiff like she was an employee and not as an owner, license and/or partner with the brand. It is unusual for an organization to break their own rules of engagement within the FDD, to be hostile, and to set traps to work as a team to cause harm. Golden Corral Systems unconscionably is within violations of Unfair Business Practices, Violations of title VII, breach of a 20 year franchise licensing agreement, ignored ALL rules of the FDD to satisfy the thirst to be racist. TD consciously and willfully delayed payments to NCC Builders/Construction Construction, accepted a bogus lease which compromised Plaintiff's financial sovereignty and stability. TD bank was predatorial in their lending practices and managing/servicing Plaintiff SBA loan.

81. Plaintiff was severed loan default paperwork from SBA on or about November 22, 2018 within Gwinnett County Court requesting for payment of 3.7 millions and stated the loan had not been satisfied and an open judgment was still active.

82. Plaintiff called SBA Attorney General Sophia Davis(hereafter Sophia D.)  on or about November 22, 2018 and requested information if the SBA was going to "NOW" investigate TD? Plaintiff was simply informed by Sophia D. that she was unsure if the SBA would investigate now or even in the future and at this time the SBA was unsure if they would seek finical monies from Plaintiff.

83. Plaintiff had communicated both email, phone calls and countless voicemails with Sophia from time period on or about April 2018 to November 22, 2018 seeking help for Plaintiff SBA loan with TD.

84. Plaintiff SBA Loan from TD was still opened when Plaintiff GC License was terminated on March 21, 2018 to it was satisfied by the SBA on or about November 2018. See Exhibit "1BB.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Harassment, Hostile Workplace, and Quid Pro Quo – Against All Defendants)

79.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs numbered "1" through "78" as if set forth more fully and at length herein.

80. Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 et seq., prohibits sexual harassment in employment. Defendants were Plaintiff's employers within the meaning of those laws.

81. Plaintiff deserved to retain her employment with Defendants and did not do anything to merit discharge or discipline. Nevertheless, Defendants denied Plaintiff the benefit of employment, including all favorable conditions and emoluments thereof and created and allowed to exist a hostile, intolerable workplace based on sexual and racial harassment that imposed upon her by the conduct of its employees and managers, of which they was well aware of and without any non-discriminatory basis therefor. Defendants, who were Plaintiff's employers, supervisors and managers, made unwanted sexual advances to the plaintiff or engaged in other unwanted verbal or physical conduct of a sexual nature and they conditioned job benefits, terms and/or conditions, by words or conduct, on Plaintiff's acceptance of the sexual advances or harassing conduct, and/or employment decisions affecting the plaintiff were made based on the plaintiff's acceptance or rejection of the harasser's sexual advances or conduct.

82. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

83. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered adverse employment consequences. Plaintiff was caused to suffer lost past and future wages, professional opportunities, other valuable benefits and

emoluments of employment as well as to endure severe emotional pain and trauma, all to her detriment. Her workplace became intolerable.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Discrimination – Against All Defendants)

84.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs numbered "1" through "83" as if set forth more fully and at length herein.

85.     Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law §290 et seq. prohibit gender discrimination in employment. Defendants were Plaintiff's employers within the meaning of those laws.

86.     Plaintiff deserved to retain her employment with Defendants and did not do anything to merit discharge or discipline. Nevertheless, Defendants denied Plaintiff the benefit of employment, including all favorable conditions and emoluments thereof, and constructively discharged her, because of hostility to Plaintiff based on her gender (female) and race (African American) and without any non-discriminatory basis thereof. Other employees who were male or not African American were not subject to the same acts of discrimination.

87. Defendants' actions were taken under circumstances giving rise to an inference of discrimination. Worries of discrimination by franchisors against franchisees are well established in the law. "Congress. . . passed the P[etroleum] M[arketing]P[ractices] A[ct in 1978] to ensure that franchisees would not suffer arbitrary or discriminatory treatment at

the hands of the more powerful franchisor." *Koylum, Inc. v Peksen Realty Corp.*, 223 F Supp 2d 405, 406 (EDNY 2002).

88. Although the franchise at issue here is not a gas related franchise the basic principles of protecting the individual franchisee from arbitrary and/or discriminatory treatment by the more powerful franchisor ought to be applied here because of the inherent inequities of power that exist in the franchisor and franchisee relationship.

89. In addition, Plaintiff can prove an "affirmative link to causally connect the actor with the discriminatory action'" in order to establish individual liability for employment discrimination under Section 1981." *Evans v Port Auth.*, 192 F Supp 2d 247, 281 (SDNY 2002). Plaintiff can establish a pattern of deliberate and continuous discrimination by both TD bank and Golden Corral in their pursuit to ensure her franchise failed


90.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered adverse employment consequences. Plaintiff was caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well as to endure severe emotional pain and trauma, all to her detriment.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress - Against All Defendants)**

91.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs numbered "1" through "88" as if set forth more fully and at length herein.

92.   Defendants, knowing that Plaintiff was psychologically and financially vulnerable, and solely for their own personal gratification, intentionally inflicted egregious emotional trauma upon Plaintiff.

93. Under D'Arcy v. Union Oil Co., 1991 U.S. App. LEXIS 15779 (9th Cir July 11, 1991), the Ninth Circuit Court of Appeals found Union Oil Company guilty of infliction of emotional distress in its termination of the franchisee's lease as "from the beginning of the franchise relationship, Union Oil expressed an intent to terminate D'Arcy's lease by any means possible." D'Arcy was also told by the Union Oil retail representative "that one of his responsibilities was to eliminate D'Arcy as a Union dealer. . .[and that] he was going to make D'Arcy's life miserable." *Id.* at *9.

94. Like in D'Arcy Golden Corral and its representatives have gone out of their way to harass, humiliate and undermine Plaintiff at every opportunity so as to ensure her franchise failed.

95.   As a direct and proximate result of Defendants' actions, Plaintiff sustained a serious psychological injury. Defendants' actions caused extreme emotional trauma.

## AS AND FOR A FOURTH CAUSE OF ACTION

**(RICO - Racketeer Influenced and Corrupt Organizations - Against All Defendants)**

96.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs numbered "1" through "91" as if set forth more fully and at length herein.

97.    Any group convened to carry out a crime meets the definition of an enterprise, even if it was only created for that purpose. *Boyle v. United States*, 556 U.S. 938 (2009).

98.    Defendants' actions were taken under circumstances giving rise to an inference of RICO.

99. In order to establish a prima facie case for a RICO claim, the plaintiff must establish that there is an enterprise that involves interstate commerce, defendants are either employed by or connected to the enterprise, that the defendant participated in the enterprise, and that the defendants participated in a pattern of such activities comprised of at least two actions.

100.    Like in *Emess Capital, LLC v Rothstein*, 2011 US Dist LEXIS 162983, at *9-10 SD Fla Dec. 21, 2011 "TD Bank has committed the following three predicate acts: [*10]  (1) wire fraud, in violation of 18 U.S.C. § 1343; (2) interstate transportation of property obtained by fraud, in violation of 18 U.S.C. § 2314; and (3) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), 1957" in the their dealings with the Golden Corral by knowingly giving out business loans to franchisees that would

either never be fully disbursed or for which time sensitive disbursements were chronically late.

101.    In addition to the required two acts of racketeering activity, "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at *10. Here the Plaintiff can prove that the conduct of TD Bank and Golden Corral was pervasive and continuing against her in an effort to cause her franchise                                        to                                        fail.


102.    The plaintiff can prove the continuality element as either conduct that is still ongoing or prior repeated conduct known as a closed period. Such a period can be proved by showing "a series of related predicates extending over a substantial period of time. . .[p]redicate acts extending over a few weeks or months and threatening no criminal conduct does not satisfy this requirement." *Id.* at *10-11. Here the conduct of TD Bank and Golden Corral were carried out against the plaintiff over an extended period of time and therefore continuality is established.

103.    In addition, the individuals involved in the loan scheme between TD bank and Golden Corral can all be held liable for corporate violations and the damage done to the plaintiff because they"(1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, [were] recklessly indifferent to the truth or falsity of the misrepresentations, or [were] aware of a high probability of fraud and intentionally

avoided learning the truth." *FTC v AMG Servs.*, 2017 US Dist LEXIS 66689, at *17

(D            Nev            Apr.            30,            2017)

104.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered adverse employment consequences. Plaintiff was caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well as to endure severe emotional pain and trauma, all to her detriment.

PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against the Defendants:

(a)   On the First, Second, Third, and Fourth Cause of Action enter judgment against the named defendants in the amount of $350,000,000.00 and an award of compensatory damages for back pay, front pay, past and future employment benefits, damages for emotional distress, punitive and/or exemplary damages, pre and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, in an amount to be determined at trial by the jury, and further relief as this Honorable Court deems just, equitable and proper;

(b)   Plaintiff demands judgment against Defendants for punitive damages in a sum to be set by this Court; and

(c)   For all causes of action interest from the date of judgment and the costs and disbursements of this action. This is particularly important becausewhen a person like the Plaintiff engages in the court process pro se, "[sh]e  [lacks. . .]the

judgment of independent third party in framing the theory of the case, evaluating

alternative methods of presenting the evidence, cross-examining hostile witnesses,

formulating legal arguments, and in making sure that reason, rather than emotion,

dictates the proper tactical response to unforeseen developments in the courtroom. "

*Kay v Ehrler*, 499 US 432, 437 (1991). Therefore the pro se plaintiff should be entitled

to the costs of pursuing the litigation.; and

(d)     For such other and further relief as may be just and proper in the

premises.


Dated: *3/12/2019* Georgia
        March *12*, 2019




_____
Sherrance Henderson, Plaintiff
*Pro Se*

81. Plaintiff was severed loan default paperwork from SBA on or about November 22, 2018 within Gwinnett County Court requesting for payment of 3.7 millions and stated the loan had not been satisfied and an open judgment was still active.

82. Plaintiff called SBA Attorney General Sophia Davis(hereafter Sophia D.) on or about November 22, 2018 and requested information if the SBA was going to "NOW" investigate TD? Plaintiff was simply informed by Sophia D. that she was unsure if the SBA would investigate now or even in the future and at this time the SBA was unsure if they would seek finical monies from Plaintiff.

83. Plaintiff had communicated both email, phone calls and countless voicemails with Sophia from time period on or about April 2018 to November 22, 2018 seeking help for Plaintiff SBA loan with TD.

84. Plaintiff SBA Loan from TD was still opened when Plaintiff GC License was terminated on March 21, 2018 to it was satisfied by the SBA on or about November 2018. See Exhibit "1B.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Harassment, Hostile Workplace, and Quid Pro Quo - Against All Defendants)

79.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs numbered "1" through "78" as if set forth more fully and at length herein.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF _Dutchess_
--------------------------------------------------------------

_Sheddance Henderson_

(Names of Plaintiff(s)/Petitioner(s))

VS

_Golden Corral Systems,_
_Inc. TD Bank, Lunie Trenory,_
_Anthony Segreth, Niral Patel Jane & John Doe_

(Names of Defendant(s)/Respondent(s))

Summons

Index No. _____

To the Person(s) Named as Defendant(s) Above:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: _____. 20___

(Date of Summons)

_Sheddance Henderson_ Pwy
(Plaintiff(s) name - person bringing on lawsuit)
_Goldencorale/oaf Pwy #400-343_
(Plaintiff(s) street address)
_Duluth, GA 30097_
(Plaintiff(s) city, state, zip)
~~(404) 256-8390~~
(Plaintiff(s) telephone no.)
_404-220-9517_

_Golden Corral System, Inc._
(Defendant(s) name - person(s) sued)
_5151 Glenwood Ave_
(Defendant(s) street address)
_Raleigh, NC 27612_
(Defendant(s) city, state, zip)

Venue:   Plaintiff(s) designate(s) _Dutchess_ County as the place of trial.  The basis of this designation is: (Enter County above; then select one category below, listing specific County)

☐   Plaintiff(s)' Residence in _____ County.
☐   Defendant(s)' Residence in _____ County.
☑   Other -- Describe: _Injury & Damages in Dutchess County._

**NOTE:  THIS FORM OF SUMMONS MUST BE SERVED WITH A COMPLAINT**

TD Bank

| | |
|---|---|
| Job or Title | NA |
| Street Address | 1701 Route 70 East |
| City and County | Cherry Hill,  Camden County |
| State and Zip Code | New Jersey, 08034 |
| Telephone Number | 888-751-9000 |
| E-mail Address | Chairmansservicecenter@td.cm |

Defendant No. 3

| | |
|---|---|
| Name | U. S. Small Business Administration |
| Job or Title | U. S. States Government |
| Street Address | 409 3rd St., SW |
| City and County | Washington |
| State and Zip Code | District of Columbia |
| Telephone Number | 800-827-5722 |
| E-mail Address | support@us-sla.atlassian.net |

Defendant No. 4

| | |
|---|---|
| Name | LANCE TRENARY |
| Job or Title | President of Golden Corral |
| Street Address | 5151 Glenwood Ave., |
| City and County | Raleigh, Wake County |
| State and Zip Code | North Carolina 27612 |
| Telephone Number | 800-284-5673 |

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☑    State or local officials (a § 1983 claim)

☑    Federal officials (a *Bivens* claim)

3

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ **0.00** .

I declare under penalty of perjury that this information is true.


Date: _____               _____

                                    *Server's signature*


                                    _____

                                    *Printed name and title*


                                    _____

                                    *Server's address*

Additional information regarding attempted service, etc:

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☐   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

Title VII, ADA Law 110-325, 18 U.S.C.
The Organized Crime Control Act of 1970 - RICO
Rocketeer Influenced and Corrupt Organizations
Act. 18 U.S.C, Bait-Switch, Fraud, Breach of contract
+ etc.

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff, __Sherrance Henderson__ , is a citizen of the State of
(Plaintiff's name)

__New Jersey & GA__
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:  *Niral Patel,*

The defendant, *Lance Trenary, Anthony Segreti*, is a citizen of the State of
(Defendant's name)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

*Golden Corral Systems, Inc + TD Bank*

If the defendant is a corporation:

The defendant(s) *G. C - North Carolina* is incorporated under the laws of

the State of *TD Bank*

and has its principal place of business in the State of *G C North Carolina*

or is incorporated under the laws of (foreign state) *Toronto, Canada*

and has its principal place of business in *East Coast in United State*

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

*Sherrance                Henderson*
First Name          Middle Initial          Last Name

*6600 Sugarloaf Parkway 4603413*
Street Address

*Duluth              GA          30097*
County, City                State          Zip Code

*404-220-9517*          *SherranceHenderson @*
Telephone Number          Email Address (if available)
                              *gmail.com*

Page 3

See Compliant

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Fiancially and economically destroyed, diagnosed with Severe depression / manic depression, credit score injury, not able to obtain gainful employment due News stories, internet news and tarnished my reputation which cause hostility + biases within public opinion

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Seeking Judgement awarded - $350,000.000 Three-hundred-and-fifty-million-dollars

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Please see Claim Sheet

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Mantary    Please Claim Sheet

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated: 3/15/2019                          Plaintiff's Signature

First Name: Sherrance          Middle Initial          Last Name: Henderson

Street Address: 6600 Sugarloaf Pwy 400-343

County, City: Duluth          State: GA          Zip Code: 30097

Telephone Number: 400-220-9517          Email Address (if available): Sherrance Henderson

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

# Defendant(s) sheet list of address

1.  Golden Corral Systems, Inc.
    c/o Chappell Philips, Esq
    5151 Gleenwood Avenue
    Raleigh, North Carolina 27612

2.  Lance Trenary, CEO
    Golden Corral Systems, Inc.
    5151 Glenwood Avenue
    Raleigh, North Carolina 27612

3.  United States Small Business Administration
    409 3rd. Street South West
    Washington District of Columbia 20416

4.  Anthony Segreti
    145 Blue Hill Road
    Hopewell Junction, New York 12533

5.  Niral Patel
    170 old Gick Road
    Saratoga Springs, New York 12866

    And/or

    Golden Corral
    Niral Patel, Franchisee
    2345 South Rd.
    Poughkeepsie, New York 12601

6. TD Bank
   1701 Route 70 East
   Cherry Hill, Camden New Jersey 08034

7. Golden Corral Systems, Inc.
   John Craig
   5151 Glenwood Avenue
   Raleigh, North Carolina 2762

## III. STATEMENT OF CLAIM

**Place(s) of occurrence:** Atlanta, GA, Raleigh, North Carolina, Gwinnett County Court House, GA, Poughkeepsie, New York, Fishkill, New York, and Duluth GA.

**Dates:** May 2013-November 2018

## Facts:

State here briefly the FACTS that support your case. Describe what happen, how you were harmed, and what each defendant did personally did or failed to do that harmed you.

The very first day of Golden Corral executive meeting me their business plan model was to defraud me out of my money and to have a location built in accordance to their company's needs. Erwin Roberts VP of Franchise Sales, Express discomfort when he saw me walk with my single prom came and that I was also African-American and alone. He was very upset and flustered but I did not have a team with me, he also expressed his concern about my disability and lack of restaurant experience and he wanted to know if I was Black American or of a different nationality. He suggested for my very first meeting that I have to get to male partners because I was a single woman. I financially qualified, educationally qualified, professional business experience of 20 years of more qualified, and with an impressive credit score. I acquired two male Partners to share 5% of my license as per instruction from Roberts.

Sam Sterling the Sr. VP Franchise Finance instructed me to use TD Bank only because GC has a relationship with the bank and I can "only get" an SBA loan. Finical Numbers of Profit Loses(P&L) and what percentage "MY GC would make within a five year. These numbers were given to me and it was an enhancement of numbers. I was told by Sam Starling that I had to use a professional business writer to ensure success of the plan in an addition of doing other research within the community to support the business plane. I purchased my Golden Corral franchise license for the area of Newark, N.J. which is a 80% minority area. I purchased that area because of my relationship with the community, the relationship with the mayor of Newark NJ and other tax and financial benefits as being an African American female franchisee owner who will be employing more than a hundred people. That license was revoked by Golden Corral because I could not find 5 acres of land and they would not grant me the opportunity to do what is called an inline. I was told I could not do this by Erwin Roberts because I didn't have restaurant experience and I had Stella credit and excess amount of cash of 2 + million dollars. It didn't make sense but I moved forward in change to South Orange, NJ. I have a relationship with the mayor in South Orange NJ other relationships with the city planning board and it would be tax abatements and tax credits it would be afforded to me due to me being a minority business and giving employment of a hundred people are more. Golden Corral said the same thing that I need 5 acres and that license was rejected after I had transferred it and it was accepted and it was on the approved franchise location list of Golden Corral. I then chose Long Island where I would not receive any tax credit or consideration and I had no relationship with the community and the community was 90% on minority white majority. Golden Corral rejected that area because the land lease cost was between $15,000 to $25,000 per month. I've been met an executive who is named Richard Chase, who instructed me to take the Poughkeepsie, NY area and I had to call him by the name "Dick." he said that if I didn't call him "Big Dick" I would what also have this territory of Poughkeepsie to be rejected even if I had done a pro-forma of the community. I called him this as he required. I was also instructed to say "Big Dick" in a very sultry radio voice. I cooperated and my area was approved. Chase also shared my pro forma, business plan to a franchisee in a neighboring community of New York. This is N. Patel. I never gave Chase the permission to do that but he said that this franchisee would help me. I didn't feel comfortable because your business plan and pro-forma basically is the prediction of money to be made within a particular area and also shares other confidential information pertaining to income of other businesses within the area. Patel basically became a sore and my thigh and was relentless to be very involved in my business as if he was a partner.

I meant Anthony Segreti through a real estate agency and Anthony's land was 5 Acres and on a main road. Segreti wanted around of about $13,000 per month for land lease and Golden Corral only approved $8,900 or so. Anthony Segreti informed me that I would need to pay 5 years of the difference up front since I had no commercial land lease experience and I needed to meet the goal of Golden Corral's approval. Doing this time of several months of negotiation Anthony Segret requested to be first in line if I failed he would supersided TD Bank and to become a franchisee himself. Segreti battled with my lawyer that have this request placed in the lease for over 6 months. Eventually, TD Bank reject the offer and I am unsure what deal was made with Golden Corral and TD Bank. My lease was bias, and with many bad terms. I was forced into a pvt lease which was titled "Escrow Account."

Anthony Segreti\ told me not to tell anyone about the secret second lease for the amount $65,000. Segreti was ties to illegal mobster relationships within Hudson County. Segreti told me that if I didn't cooperate that it wouldn't work well for me. Simply stated, it was just business. Segreti, would come on the land as it's being built by the contractor, walk in the store while we were putting different fixtures and

other equipment, took pictures of the entire restaurant and Equipment, spoke with different subcontractors Define exactly what they were doing and continuously was menacing to me personally and laughing at me and making fun of me and "calling me a poor disabled girl."

During this time TD Bank constantly changed my loan amount, change my cash contributions amount, didn't offer me any consideration or any of the SBA programs for minority women and would never give me information about what will be the cats contribution amount. TD Bank also required that I fund almost $1000000 of subcontract work because they informed me I did not qualify for the excess money for the needed work performed by subcontractors. I also did not receive cash contribution credit to my SBA loan because it exceeded the SBA loan requirement. My loan was for 3.2 million dollar but I spent including cash contribution of almost 2.2 million dollars. This is classic predatorial leading.

Store was built and every single draw to pay the contractor was late or missing. When my store in Poughkeepsie New York was closed by Golden Corral bogus excuse which their own contract my SBA loan had not been finalized and my contractor and many subcontractors had not had been paid.

Rebecca Acevedo of TD Bank gave me a call threatening me that I was going to lose my home, I'd already lost my Golden Corral business and equipment and capital Improvement and she wanted to know if I had any money to pay for the debt. I am formed her that after my loan I was left penniless and if I wanted to eat I would have to eat at my Golden Corral. I didn't have to read pennies to rub together. She then informed me that I was going to lose my home. I'd asked her if they were going to accept the buyer who is or who was at that time Mr. Patel the franchisee I've Golden Corral in the New York and New Jersey areas. She said she would let me know but never did reply.

My commercial lawyer in New Jersey William Kugelman and my bankruptcy attorney Matt and Lesley spoke with Mr Patel working out multiple deals with Patel, Golden Corral in TD Bank for over 7 months. Patel befriended me untruth fully to get information, to statistically plan my demise at his success and worked with a team with Golden Corral and TD Bank to basically steal from me in layman's terms. TD Bank comes to federal court with the landlord's attorney and informs the court that Patel is a manager and not a franchisee, had never gotten approval to purchase my store and was not so naturally capable to purchase my store. Lasley TD Banks lawyer stated that he had never heard of Patel until that day in court and he had no knowledge that I even had a buyer and Us wish to seek possession of my family home. Furthermore he did not acknowledge my real estate agent that I brought to court who assess my home at 1.7 million dollars. Please note my home did not have a mortgage it was purchased in cash from my awarded judgment from my Spotify cord injury. Nevertheless TD Banks lawyer said that my Sugarloaf Country Club home and a TPC Community was depreciating and value and did not hold value and my customized adaptation like an elevator and customized sensory room for my two artistic children was devaluing my home. He stated that the real estate agent Michelle Colin was not competent to give her professional opinion even though she has 15 years of real estate sales experience with in Sugarloaf Country Club and she holds an undergraduate degree as an industrial engineer. Anthony should Gratis attorney presented to the court that should be ready and offered to buy the property and capital Improvement and equipment for $350,000 but TD Bank requested for more $500,000 and TD Bank was

going to accept the offer. TD Banks lawyer requested for the judge to release my home for them to sell and to accept the offer of $500,000. The federal judge approve the sale.

November 2018 in Gwinnett Court I was served papers from TD Bank to solidify the closing of my loan so they could get payment from the SBA. I had called the SBA in May or so 2017 pertaining to an investigation on TD Bank and Golden Corral. I spoke several times which I have included emails to support some of the conversations that TD Bank and Golden Corral acted with rocket icious and illegal behaviors and breach of contract. I was told that the SBA hadn't decided they were going to investigate or not. I also called and spoke with the SBA in November 2018 and I was informed that my loan had not been satisfied by them and it was still open. I then asked if they were going to investigate and I was informed again that the SBA was unsure. The sp8 did not protect me in any way even though I had paid for an insurance with using the SBA for their protection.

I have been mistreated because I am black, I'm a woman and my disability. Golden Corral and TD Bank use team members to steal from me and it was a part of their business plan. I built the store not for my financial advancement with a partnership of working with Golden Corral as an owner franchisee and I borrow from TD Bank but they used my cash, time and effort to build a store to benefit their business plan. It is simple racketeering. I was treated with great hostility at Golden Corral. Out of almost 600 plus stores I am the only African-American single woman with children and not married who is a franchisee owner. This is not reflective in any American franchisee product. Executives walk by me and not speak, I was not offered the respect of communications when I had express my discomfort and racial discrimination with the CEO. I was badgered by the CEO secretary and insulted on a Continuum. Golden Corral's co-secretary instructed customers that they could get cash refunds at the store even without receipts all they simply had to do was complain. It was Golden Corral's plan to steal from me and to tarnish my name and public opinion so they could steal for me without any obstruction. TD Bank was their partner. It is also their business plan that's why I was instructed by Sam Sterling to use TD Bank. If I didn't use TD Bank according to Sam Starling I would not be able to keep my franchisee license.

Harm: emotionally I almost committed suicide, I developed extreme outbreaks of psoriasis and eczema all at the same time,  I am on psychiatric medications to maintain our normal sea of life, I've had extreme bouts of weight gain and weight loss, my hair is falling out and I have bald spots, I almost became homeless and without the help of my mother my children and I would have been sleeping in a car or shelter. My children have not had there since the very experiences at home and dust they have had outbreaks that I have never experienced before in their lifetime like playing with their feces and hitting their heads on the wall. I am eating with the use of food stamps. I have sold everything I could have value to eat and to live! I don't even have the money to pay an accountant to do my taxes. This has never been my case in my entire 50 years of life! I am in financial ruin my credit score is 400 or less I can't even get a job because they do a credit run. I am embarrassed, humiliated, ashamed beyond words that I can write. Golden Corral in TD Bank succeeded. They stole from me, ruined my name, destroyed my credit and left me destitute so I could not even fight.

&#9787;     ReplyForward

1

Sherrance Henderson, Pro Se
6600 Sugarloaf Parkway, 400-343
Duluth, GA 30097
Phone 404-220-9517
Email: SherranceHenderson@gmail.com

2

3

4

5

6

7

8

9

10

11

12

13

14

# Exhibit A

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sherrance Henderson, Pro Se

PLEADING TITLE - 1

## ALLONGE TO PROMISSORY NOTE

WHEREAS, Pursuant to that certain Loan Authorization issued by the U.S. Small Business Administration ("SBA") to Lender, dated July 22, 2015, SBA Loan Number PLP █████50-09 (the "Authorization"), Lender extended a U.S. Small Business Administration 7(a) loan in the amount of Three Million Six Hundred Four Thousand Dollars ($3,604,000.00) (the "Loan") to the undersigned ("Borrower"), which is evidenced by an SBA Form 147 Note executed by Borrower in favor of Lender (as amended, restated or otherwise modified from time to time, the "Note").

WHEREAS, the Authorization, the Note, and all instruments, documents and agreements executed in connection therewith, or related thereto, as amended, restated or otherwise modified from time to time are referred to herein are collectively referred to as the "Loan Documents." All capitalized terms not defined herein, shall have the meaning set forth in the Loan Documents.

WHEREAS, Borrower have entered into the First Omnibus Amendment dated as of the date hereof (as amended, restated or otherwise modified from time to time, the "Amendment") whereby Lender has agreed to provide additional funding to Borrower in the amount of One Hundred Sixty One Thousand Two Hundred and 00/100 Dollars ($161,200.00), for a amended principal loan amount of Three Million Seven Hundred Sixty Five Thousand Two Hundred and 00/100 Dollars ($3,765,200.00) ("New Loan Amount");

NOW THEREFORE, with the foregoing Background hereinafter deemed incorporated by reference herein and made part hereof, the parties hereto, intending to be legally bound, promise and agree as follows:

1.      Notwithstanding anything to the contrary contained in the Note, the parties hereto agree that as of the effective date of this Allonge:

      a.      the New Loan Amount shall be the amount due and owing under the Note; and

      b.      the Loan shall be repaid in consecutive monthly principal and interest payments of $27,247.57 at the initial rate of 5.75% per year. Said monthly payments shall commence on February 1, 2017 and continue on the same day of each month thereafter, until December 22, 2020, which is the "change period" referenced in the Note. Thereafter, the monthly principal and interest payments will adjust to 2.50% over the Prime Rate as of

{00904655.v3 }

December 22, 2020, and Borrower will continue to make principal and interest payments on the first day of each month thereafter, until the final payment, due at maturity (December 22, 2035, unless otherwise accelerated), for all amounts then due and owing to Lender under the Note.

2.      Any reference to "Note" in the Loan Documents shall mean the Note as modified by this Allonge, any reference to "Loan" in the Loan Documents shall mean the New Loan Amount and any reference to the Loan Documents shall include the Amendment, Allonge and any other document, instruments or agreements related thereto.

3.      The execution and delivery of this Allonge does not evidence or represent a refinancing, repayment, accord and/or satisfaction or novation of the Loan.  All of Lender's obligations to Borrower with respect to the increase to be made concurrently herewith or after the date hereof are set forth in the Amendment, Allonge, and the other Loan Documents.  All liens and security interests previously granted to Lender, pursuant to the Loan Documents are acknowledged and reconfirmed and remain in full force and effect and are not intended to be released, replaced or impaired.

4.      Except as modified herein, the Note and all of the terms, conditions and provisions thereof, shall in all respects remain unmodified and unchanged and the mortgage liens, if any, and collateral positions created thereby shall not be affected or impaired in any way.

[signature page follows]

{A0304655.v5 }

IN WITNESS WHEREOF, the parties signed this Allonge to Promissory Note the
_16ᵗʰ_ day of February 2017.

**BORROWER:**

BORROWER:

Cornucopia Queen, Inc.

By: _____
Sherrance Henderson, President

GUARANTORS:

_____
Sherrance Henderson, Individually

_____
Geraldine Poteat, Individually

Imperious Publishing, LLC

By: _____
Sherrance Henderson, Member

LENDER:

TD Bank, N.A.

By: _____
Name: KEITH BROWN
Title: V. P.

[Signature Page to Allonge]

{00904655.v5 }

FILED: DUTCHESS COUNTY CLERK 06/29/2017 01:16 PM   INDEX NO. 2017-51219

NYSCEF DOC. NO. 7                                                    RECEIVED NYSCEF: 06/29/2017

Cornucopia Queen, Inc.
April 11, 2017
Page | 2

affects ability to pay Note. Also, as a result, the Bank's Collateral and Leasehold Mortgage are in jeopardy.

All other defaults are reserved.

As a result of the defaults, the Bank has accelerated the balance of payments due on the Note and demands payment. The amounts owed on the Note as of April 3, 2017 are as follows:

| | |
|---|---|
| Principal | $3,346,738.81 |
| Interest | 33,822.47 |
| Late Fees | 1,304.04 |
| Discharge Fee | 100.00 |
| Termination Fee | 30.00 |
| Prepayment Fee | 100,402.16 |
| Total | $3,482,397.48 |

Per diem interest is $534.50 after April 10, 2017.

Please note that the Bank is in the process of obtaining SBA approval to advance $313,452.12 the final construction advance and retainage which will increase the principal balance which Borrower approved. We will advise you of this amount shortly which will be added to the principal under advance. There are no additional advances under the Note due to the default.

Please make payment of the balances due directly to the Bank within ten (10) days hereof. In addition to the unpaid principal, accrued interest, late charges and reimbursable expenses, Borrower is also required to pay all of the Bank's attorneys' fees, collection costs, and all interest and late charges which subsequently accrue in accordance with the terms of the Note and the other applicable loan documentation. Borrower will also be responsible for any protective advances by the Bank to protect its Leasehold Mortgage and Collateral. You may contact my office for our attorneys' fees and additional payoff figures.

The Bank has filed an UCC-1 Financing Statement which perfects its security interest in the business assets of Borrower. If payment in full is not made and the Collateral not immediately turned over, the Bank reserves all rights and remedies under the loan documents, including repossession of its Collateral. If you are unable to make this payment, we are demanding that, pursuant to the applicable loan documents, the business premises be made available immediately for an inspection and evaluation of all Collateral subject to the Bank's lien and that all Collateral be assembled and made available for immediate possession and sale by the Bank. You may contact me directly when the Collateral is available. If we do not hear from you in ten (10) days, we will assume that you are not willing to cooperate and are denying the Bank peaceful possession of its Collateral. The Bank reserves all rights to setoff any accounts or other collateral in its possession.

The Bank reserves all rights to make protective advances to cure the existing lease defaults, and to assume rights given to the Bank under the Assignment of Leases. In such event,



**TD Bank**

America's Most Convenient Bank®
SBA/USDA Data Sheet

**Estimated Project Costs**

| | |
|---|---|
| *Land Acquisition | $ 0 |
| New building construction and/or purchase | $ 1.772,278.00 |
| *Land and construction soft costs | $ 312,500.00 |
| Building improvements or repairs | $ 0 |
| Acquisition of machinery/equipment | $ 750,000 |
| Inventory purchase | $ 70,000 |
| Working capital (including accounts payable) | $ 165,000 |
| Acquisition of all or part of existing business | $ 0 |
| Payoff SBA loan | $ 0 |
| Payoff bank loan (Non-SBA associated) | $ 0 |
| Other debt payments (Non-SBA associated) | $ 0 |
| Closing Costs for SBA Loan | $ 13,000 |
| Other Costs | $ 390,000 |
| Total Estimated Project Amount | $ 3.472,778.00 |
| LESS Own Funds to be used in project | $ 561,151.00 |
| **Total Estimated Loan Amount Requested for Project** | $ 2.911,627.00 |

*Are the proceeds of the loan intended for business purposes?   Yes ☑    No ☐

*page 2 of 2*

1

6600 Sugarloaf Parkway, 400-343
Duluth, GA 30097

2

Phone 404-220-9517
Email: SherranceHenderson@gmail.com

3

4

5

6

7

8

9

10

# Exhibit B

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 2

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 4:09 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: |

-----Original Message-----
From: Sherrance Henderson <sheronceh@aol.com>
To: Sherrance Henderson <sherrancehenderson@gmail.com>
Sent: Mon, Oct 24, 2016 08:04 PM

Niral Petal:

Firstly I would like to commend you on your eagerness to offer real life training to my kitchen manager Adam and my general manager Nanci. At first I was somewhat leery of your intentions because your actions were of such oddity with another franchisee within your organization that I was uncertain of the outcome. Would my managers meet your expectations; would my managers learn quickly and be an attribute to your organization and make myself as well as you proud; what my managers be trustworthy and lastly would the manager be professional as well as the other supervising managers within your franchise. Needless to say, I was worried and proceeded cautiously. Please look/read below...

8.2.2Area Developer shall not employ or seek to employ, either directly or indirectly including through an affiliate/subsidiary, any person who is employed, or within the timeframes described below had been employed, by any other area developer or franchisee of Franchisor, or by Franchisor, or by any affiliate/subsidiary of Franchisor. As used in this Section 8.2.2., "person" shall mean an individual who, within (a) the prior six (6) months was employed in any management or supervisory position; and/or (b) the prior twelve (12) months was a member of an "A-team" designated by Franchisor to provide opening assistance at any new restaurant location or was part of any group of at least three (3) employees working in the same restaurant location, regardless of their areas of responsibility. Franchisee shall not directly or indirectly seek to induce such person to leave his or her employment for the purpose of becoming an employee of Area Developer.

Acknowledge your email but frankly there is no need for communications about clear and precise expectations and rules from our franchisor. There is no need for us to be on the "same page" because it is not appropriate or timely. I have invested a great deal of money as all of us have and I have the right to succeed and to achieve greatness within the organization. I am not here to compete with my fellow franchisees and thus I would seek the same behaviors, alike. Adam cannot request anything but it is how it is address. On page 18, paragraph line 8.2.2. There are procedures and protocol on how to deal with an employee and a franchisee when seeking new employment for their store or for themselves alike. I do not wish to communicate about this in the future unless Adam has been released over the period of six months. Certainly he will communicate his departure and then you will decide if you wish to employ him after the time frame after 6 months.

1

If you feel after the above correspondence that you are able to offer me a quick week exposure training it would be most appreciative. Ideally this is a learning experience and we should move forward. Thank you and I wait your reply.

Best,

Sherrance Henderson

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 4:03 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Fwd: Adam Toliver/Franchisee Training |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: sherrancehenderson <sherrancehenderson@gmail.com>
Sent: Mon, Mar 18, 2019 06:25 AM
Subject: Fwd: Adam Toliver/Franchisee Training

-----Original Message-----
From: Niral Patel <niralapatel@gmail.com>
To: Sherrance Henderson <sherrancehenderson@gmail.com>; Sherrance Henderson <sheronceh@aol.com>
Cc: Tony Sewell <tsewell@goldencorral.net>; Ken Houck <khouck@goldencorral.net>
Sent: Mon, Oct 24, 2016 03:02 PM
Subject: Adam Toliver/Franchisee Training

Hi Miss Henderson,

We discussed a few different things during our call earlier and while I leave the matter of Election Day out, I thought it would be beneficial to all if I memorialized our conversation on the "Subject" topics with all related parties.

Lets discuss your desire to get better acclimated. I will develop a training agenda for you to gain the understanding you require. As a franchisee, I believe we share a common thread on the importance of not being a hostage in your own business. The agenda will include, opening checklists, running checklists, and closing checklists to ensure you're able to operate the restaurant satisfactorily from a Golden Corral Franchising standpoint. In addition, I will make sure you are witness to the daily and weekly accounting practices. November 2nd happens to be the end of our account period 11 so the timing of this is great. Lastly, I will make sure Kevin walks you through the closing process proficiently to ensure you are able to complete a Daily Cash Report, Submit credit cards, and edit any time keeping that may be required. Personally, when this is all wrapped up, I am happy to come down and work with you on the other areas of exposure we all face to outside audits and liabilities.

Now on to the "stickier" issue of Adam Toliver. When I spoke to you today, my understanding was that Adam had already addressed this with you and I thought I was merely advancing conversation but quickly learned that no discussions have taken place between you and Adam about his personal challenges. As a franchisee, the last thing I would intentionally do is compromise your ability to execute, let alone open a new restaurant. As I told

1

you the very first day we spoke, your success is of HIGH importance to me and I've demonstrated that throughout our discussions to date. Any franchisee failing is concerning but especially somebody so close to my home. Adam came to me expressing a desire to explore other opportunities with me citing changes in his personal life which may prompt his untimely departure from Poughkeepsie. I advised him that I would need to speak to his franchisee prior to any discussions with him to which he replied without any reservation with a green light. I will not be speaking to him about opportunities moving forward until you and I are on the same page on the issue. The page that I'm currently on is that you have a restaurant to open inside of two months and that is priority above all, period! His current state is critically important to both of us. He's currently a resident in a hotel that we are paying for and a functioning manager in one of my restaurants. Soon is to be called back to the very tall order of opening a new restaurant for you. I sensed a shift in our conversation when we started discussing the Adam matter and I just want to make sure I'm clearing the matter up with you as well as the Franchisor. Tony, Ken, and any member of senior management at Golden Corral can speak to my professionalism so I hope the shift in today's tone is more a function of what I can describe as the obvious blind siding and not something that I said.

I look forward to your feedback.

Thanks,

Niral

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 4:10 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Re: Contact person in my absence |

-----Original Message-----
From: Sherrance Henderson <sheronceh@aol.com>
To: Chip Joyner <chipjoyner@gmail.com>
Sent: Sun, Aug 7, 2016 06:41 AM
Subject: Re: Contact person in my absence

Good morning Chip,
Nanic's tel is 407-474-0888
John's tel is 845-420-2230
Adam tel is 845-518-4202

Please note that Adam is working for Patel in upstate New York. He is being house by Mr. Patel's company and will be at the kitchen manager for him. I believe he starting Monday or Tuesday of next week.

Sent from my iPhone

On Aug 6, 2016, at 9:10 AM, Chip Joyner <chipjoyner@gmail.com> wrote:

> Please send me a contact sheet name and number, email for each
> ---------- Forwarded message ----------
> From: **Sherrance Henderson** <sherrancehenderson@gmail.com>
> Date: Friday, August 5, 2016
> Subject: Contact person in my absence
> To: Nanci Sanfilippo <oopsceramic2@optonline.net>, atoliver23 <atoliver23@yahoo.com>,
> "jontorres23@gmail com" <jontorres23@gmail.com>, Chip Joyner <chipjoyner@gmail.com>
>
>
> Good morning team,
> Please contact Chip Joyner on his cell or email address listed about. His direct cell tel is 404-372-7169. Please feel free to contact Mr.Joyner with any questions concerns etc
> S.Henderson
>
>
>
> --
> Sent from Gmail Mobile

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "C"

## LEASE

This Agreement of Lease is made as of this _____ day of March 2015, by and between 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 (hereinafter referred to as "Landlord"); and Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 (hereinafter referred to as "Tenant")

### WITNESSETH:

Landlord and Tenant, for themselves, their legal representatives, successors and permitted assigns, hereby agree as follows:

**Article I.     Agreement to Lease; Premises Demised; Condition of Premises; Conditions Precedent**

**1.1 Lease:** Subject to the Terms and conditions of this Lease, Landlord Leases to Tenant, and Tenant Leases from Landlord, the real property described below for a Term that shall commence on the Commencement Date and end on the Expiration Date (as such Term may be extended from time to time pursuant to the Terms of this Lease) (the "Term"), subject to earlier termination pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law.

**1.2 Premises:** The Premises demised hereunder (hereinafter "Premises") is described as follows: all that certain plot, piece or parcel of land located in the Town of Poughkeepsie, County of Dutchess and State of New York known as 2345 Route 9, Poughkeepsie New York 12601, said land consisting of approximately 4.7 acres which such land is more particularly described in Schedule A attached hereto and made part hereof. The demise provided for by this Lease shall also include the ability of the Tenant to utilize any and all rights, privileges, easements, and appurtenances to the land and the right and obligation to improve the Premises as provided herein.

**1.3 Condition of Premises upon Demise; Landlord's Work:** The Tenant has been provided with full opportunity to investigate and examine the Premises and to conduct Tenant's due diligence in connection with the Premises and the development potential of the Premises. Solely in reliance thereon, Tenant accepts possession of the Premises in its "AS IS" condition on the Commencement Date except that, within 60 days after the Tenant submits its application for municipal and regulatory approvals necessary for the development of the Premises as provided for below, the Landlord will, at Landlord's sole cost and expense, (i) remove any and all existing structures, fences, vehicles, broken concrete or other debris; and (ii) remove any tenants then occupying the Premises or any portion thereof. In addition thereto, the Landlord represents that all available utilities will be stubbed to Tenant's building pad site prior to the date upon which the Tenant receives its final approval for construction of its restaurant facility as provided for below. Such utilities shall include gas, sewer, electric, water and cable, as available. Subject to the foregoing, from and after the Commencement Date: (a) Tenant has full responsibility for the condition, alteration, maintenance, management, repair and replacement of the Premises; and (b) Landlord has no obligation whatsoever to perform any work or make any repairs with respect to the Premises, to furnish any services with respect to the Premises, or to incur any expenses with respect to the Premises; and (c) Landlord has no responsibility with respect to the condition of the Premises (including any latent defects). Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease. Without limiting the generality of the preceding provisions, Tenant, by taking possession of the Premises or any portion thereof, shall conclusively be deemed to have agreed that the Premises were in satisfactory condition as of the Commencement Date.

1

**1.4 Conditions Precedent.** Notwithstanding anything herein, the binding force of this Lease shall be subject to and contingent upon fulfillment, within not more than twelve (12) months after the date of execution hereof, ("Condition Date") unless specifically extended or shortened in each subparagraph, of the following conditions precedent, and Landlord shall use reasonable efforts to aid in any applications for necessary approvals as described below and to take all such actions as may be reasonably necessary to aid Tenant in obtaining the approval of any such application. All of the conditions precedent will be deemed to be waived unless the Tenant terminates this Lease in writing by the close of business on the Condition Date, except that, with respect to any of the conditions precedent which shall have an earlier date for their satisfaction as provided in the following subparagraphs, the condition precedent subject to such earlier date shall be deemed to be waived unless Tenant terminates this Lease in writing by the close of business on such earlier date as provided in such subparagraph. Unless waived in writing by Tenant, the obligation of Tenant to lease the Leased Premises in accordance with the provisions of the Lease is expressly made subject to the following conditions precedent:

**1.4.1**  All of the covenants, representations and warranties of Landlord set forth in this agreement are true and continue to be true, through and including the Condition Date, all of them being continuing in nature, and that Landlord complies with and properly performs all of Landlord's obligations under this Lease to be performed by Landlord;

**1.4.2**  Landlord shall deliver to Tenant's institutional lender waiver of Landlord's lien as to Tenant's personal property and all fixtures and non-disturbance and attornment agreements consistent with Article X below. All lenders of both Landlord and Tenant shall consent to these documents. If the Tenant fails to provide copies of any proposed leasehold mortgage or other financing document or the waiver of lien, nondisturbance and the attornment agreement prior to the date of execution of this Lease, then Landlord's obligations under this Lease shall be subject to the Landlord's consent to the content of such documents in Landlord's sole and unbridled discretion, it being understood in this regard that, consistent with the terms of this Lease, such documents shall not involve or purport to impose any impairment of Landlord's interest in the fee title to the Premises nor require any subordination of Landlord's interest in the fee title to the Premises or of any mortgage that the Landlord may now or hereafter make in respect of the Landlord's interest in the fee title to the Premises, it being understood in this regard that any loan obtained by the Tenant, whether same be in the nature of a leasehold loan or construction financing shall at all times be subordinate to the interest of the Landlord in the fee title to the premises and any loan or mortgage in respect thereof obtained by the Landlord now or in the future;

**1.4.3**  Tenant has received all consents and approvals (as defined below) pursuant to any and all zoning, building and subdivision ordinances, rules and regulations and all restrictive covenants and conditions affecting the Premises necessary for Tenant to construct and operate a Golden Corral restaurant on the Premises such approvals to be obtained within nine (9) months of the Term Commencement Date. The Tenant shall, at Tenant's sole cost and expense, diligently prosecute the approval of the applications necessary to obtain such consents and approvals. If in any way required by the nature of the approvals sought or if otherwise deemed appropriate by the parties hereto, Landlord shall be entitled to be a co-applicant with Tenant in connection with such applications, provided, however, that unless Tenant has elected to terminate this Lease as otherwise provided for herein, Tenant shall control in all respects and be solely responsible for the application process. With respect to the obtaining of such consents and approvals as are provided for herein, Tenant shall diligently prosecute applications for each and every permit or approval as referenced herein to conclusion. The parties hereto agree that the obligation to diligently prosecute applications for each and every permit or approval to conclusion shall mean that the Tenant shall diligently prosecute each such application so as to obtain a final determination from each such municipal or regulatory agency to which Tenant has made application, excluding any judicial

2

determination following a final determination by the municipal agency having jurisdiction thereover, unless Tenant elects to pursue same. Tenant shall, however, give landlord notice of Tenant's intention to either pursue or not pursue judicial review of any municipal or regulatory determination within 10 days of the issuance of such determination so as to allow landlord, if landlord so desires, to pursue such judicial review in Tenant's name, but at landlord's sole cost and expense. Time shall be of the essence with respect to the giving of such notice. In any and all events, if the Tenant elects not to pursue construction of the restaurant as provided for herein, any and all professional work product produced for the benefit of the Tenant shall become the property of the landlord and the Tenant shall execute all documents necessary to effectuate the foregoing.

**1.4.4** Tenant has received a commitment, (the "Financing Commitment"), from an institutional lender acceptable to Tenant in its sole discretion within ninety (90) days of the Term Commencement Date.

**1.4.5** Tenant's institutional lender funds a construction loan within ninety (90) days of Tenant obtaining all Approvals.

**1.4.6** Tenant shall, at its election, obtain a leasehold title insurance commitment, with Tenant as named insured, setting forth that the Premises are owned beneficially and of record by Landlord and that the Premises are free and clear of encumbrances, to the title which will prevent or impair Tenant's use of the Premises as herein contemplated. Tenant shall furnish Landlord with a current ALTA survey of the Premises showing that there are no boundary disputes or encroachments which would interfere with Tenant's use of the Premises as herein contemplated. Fulfillment of the above conditions shall be a condition precedent to Tenant's obligations hereunder, unless waived in writing by Tenant. Such title insurance commitment shall be shall be obtained by the tenant within ninety (90) days of the Term Commencement Date.

**1.4.7** The Lease has been approved by Golden Corral and Tenant's institutional lender which such approvals shall be obtained by the Tenant within ninety (90) days of the date of the Term Commencement Date,

**1.4.8** The Tenant shall receive an environmental report satisfactory to the Tenant in its sole discretion that the Premises are (i) free of any contaminants; and (ii) free of significant risk for migration of contaminants onto the Premises, which such environmental report shall be obtained by the Tenant within ninety (90) days of the date of the Term Commencement Date ;

**1.4.9** Landlord shall reasonably cooperate to aid Tenant in Tenant's compliance with all the conditions precedent in this Lease provided however that such reasonable efforts shall not require the Landlord to expend any money or incur any cost in connection therewith., .

**Article II      Term of Lease; Commencement of Term; Rent; Additional Rent Commencement of Rent; Payment of Rent**

**2.1     Term of Lease:** The initial Term of this Lease shall be 15 years. The Term of this Lease shall commence upon the execution of the Lease by the Landlord following Tenant's execution of the Lease ("Term Commencement Date").

**2.2     Rent:** The fixed minimum annual Base Rent for the Term of this Lease shall be as set forth below:

| | |
|---|---|
| Years 1 through 5 inclusive - | $88,000 per year |
| Years 6 through 10 inclusive - | $90,000 per year |
| Years 11 through 15 inclusive | $110,000 per year |

3

**2.3    Additional Rent**: This is an absolutely net Lease.  Accordingly, Landlord shall receive a net return from the Premises equal to the Base Rent, without deduction for any expense or charge for the Premises (except as otherwise expressly provided in this Lease). Tenant shall pay as Additional Rent  all expenses, of every kind and nature, relating to or arising from the Premises, including impositions and expenses arising from the leasing, management, operation, maintenance, repair, use, or occupancy of the Premises and all construction relating to the Premises, except as otherwise expressly provided in this Lease. By way of specification but not by way of limitation, Tenant shall pay as Additional Rent hereunder (a) all real estate taxes, all special assessments and all other property assessments, including all assessments for public improvements or betterments, to the extent same become due and payable within the Term of this Lease; provided that taxes and impositions for the first and last years of the Term shall be prorated between the parties based upon the beginning and ending dates of the Lease; (b) all ad valorem, sales and use taxes; (c) all rent and occupancy taxes and all similar taxes; (d) all personal property and other taxes on any personal property; (e) all water, sewer, and other utility charges imposed by any Governmental Authority or other service provider; (f) all fines, fees, charges, penalties, and interest imposed by any Governmental Authority or utility except to the extent caused by Landlord; and (g) all other governmental charges and taxes, in each case of any kind or nature whatsoever, general or special, foreseen or unforeseen, ordinary or extraordinary, which are at any time during or with respect to the Term assessed, levied, charged, confirmed or imposed with respect to the Premises, any personal property on the Premises or the use, leasing, ownership or operation thereof, or become payable out of or become a lien upon the Premises, the sidewalks or streets adjoining the Premises, or the Personal Property or the rents or income therefrom.  If at any time during the Term the present method of real estate taxation or assessment is changed so that there is substituted for the type of impositions presently being assessed or imposed on real estate, or in lieu of any increase in such impositions, a tax that is imposed solely on owners of real estate, such substitute taxes shall be deemed to be included within the term Additional Rent

Additional Rent shall be paid by the Tenant (a) to the Landlord, if the item of Additional Rent is billed to the Landlord; or (b) to the person or entity assessing the impositions or charges, taxes, sewer or water charges or rents; and in all cases, shall be paid in a timely fashion so as to not result in any late charges or penalties.  With respect to Additional Rent in the form of real estate taxes, the Tenant shall provide proof of payment to the Landlord within ten (10) days of payment being made to the taxing authority.

With respect to real estate taxes, at Landlord's option subject to any rights reserved by any Leasehold Lender (as defined below), Landlord may at any time during the Term of this Lease elect to assume payment of such real estate taxes and bill the Tenant for such real estate taxes on a monthly basis by dividing the total amount of real estate taxes payable during any Lease year by 12 and adding such amount to the Base Rent otherwise payable pursuant to section 2 (b) above. If Landlord assumes the responsibility to pay real estate taxes, it shall pay all taxes timely and provide Tenant proof of payment within ten (10) days of payment being made to the taxing authority.

 In the event that the Landlord receives any bill for any item of Additional Rent referenced above, Landlord shall promptly provide the Tenant with notice and a copy of such bill in time sufficient for the Tenant to make any payment required to be made within a specified period of time.  Notwithstanding the foregoing, Landlord's delay in rendering, or failure to render, any statement or bill for Additional Rent for any period shall not waive Landlord's right to render a statement or collect such Additional Rent for that or any subsequent period; provided that Landlord shall be liable to Tenant for any late charges or penalties imposed as a result of any such delay or failure of Landlord. Subject to notice requirements of 15.1(i) below, any failure of the Tenant to make payments as hereinabove provided for shall be deemed an event of default and shall allow the Landlord to commence an action to recover the Premises by summary proceeding or to commence any other proceeding law or equity to address the event of default or to pursue any other remedy provided for herein Where an item of Additional Rent may, if unpaid,

4

result in a lien or other form of imposition against the Premises, the Landlord may, but shall be under no obligation whatsoever pay any outstanding item of Additional Rent and seek recovery from the Tenant in any appropriate proceeding at law or in equity.

**2.4    Commencement of Rent**:  Rent shall commence upon the earlier to occur of the following events;

      a.    the opening of the Tenant's restaurant (hereinafter described);

      b.    the expiration of 18 months from the Term Commencement Date:

Such date shall hereafter be referred to as the "Rent Commencement Date". Notwithstanding the foregoing, from and after the date which is 12 months from the Term Commencement Date, the Tenant shall be required to pay the sum of $5000 per month until the Rent Commencement Date to compensate the Landlord for expenses incurred by the Landlord with respect to the Premises during such time period (hereinafter "Landlord's Expense Reimbursement")

**2.5    Payment of Rent**:  During the Term, Tenant shall pay Landlord the Base Rent, in equal monthly installments, in advance, on the first day of each month during the Term, without notice, bill or demand.  Notwithstanding the foregoing, Tenant shall not be required to pay Base Rent or Additional Rent from the Commencement Date until the Rent Commencement Date but Tenant shall be required to pay amounts in respect of Landlord's Expense Reimbursement as referenced above.  If the Rent Commencement Date is not the first day of a month, the Base Rent and Additional Rent for the month in which the Rent Commencement Date occurs shall be apportioned according to the number of days in that month.  Rent payable to Landlord shall be paid to Landlord at Landlord's Address (as set forth above) in lawful money of the United States of America by good check or, at Landlord's request, by wire transfer. All Rent shall be paid without notice, demand, deduction, abatement or setoff, except as otherwise expressly provided in this Lease. Landlord shall provide account information for Tenant to make electronic payments of Rent.

**2.6    Late Payments**:  If any installment of Base Rent or any Additional Rent is not paid within five (5) days of the date due under this Lease, Tenant shall pay Landlord, as Additional Rent, a late charge equal to five percent (5%) of the overdue amount for, among other things, defraying the expenses incident to handling such delinquent payments.  Such charge shall be in addition to, and not in lieu of, any other remedy Landlord may have.  If any installment of Base Rent or any Additional Rent (hereinafter sometimes collectively referred to as "Rent") is not paid within fifteen (15) days of the date due under this Lease, Tenant shall pay Landlord, as Additional Rent, in addition to the above-described late charge, interest on the overdue amount at an interest rate equal to the prime rate of interest as charged by Citibank NA plus 2%. Such overdue Rent shall bear interest from the date first due (without regard to any grace period) until the date such Rent is paid. Such interest shall be in addition to, and not in lieu of, any other remedy Landlord may have.

**Article III    Tenants Improvements; Approvals; Construction Financing**

**3.1    In General**:   Tenant proposes to construct on the Premises a new restaurant building with associated and necessary appurtenant improvements including parking facilities, curbs, drainage, access to public streets, landscaping and all associated improvements for the purpose of conducting at the Premises the operation of a restaurant (hereinafter, collectively, "The Improvements").  It is understood and agreed in this regard however that the Tenant shall be solely and exclusively responsible for all costs and expenses involved in the seeking and obtaining of all municipal and regulatory approvals necessary for the construction of the Improvements (hereinafter referred to as the "Approvals") and all costs and expenses involved in the   construction of the Improvements and shall, in this regard, construct such Improvements without in any way encumbering the Premises whether by means of mortgage, mechanics lien or any other form of lien or encumbrance.  Tenant affirmatively acknowledges this limitation and prohibition and affirmatively represents that the Tenant shall finance the construction of the

and shall refrain from interfering with the construction or protection of the Improvements in any manner. Landlord's rights under this paragraph shall be in addition to, and not in lieu of, any other remedy Landlord may have.

**4.5    Quality of Construction:** The materials, fixtures, machinery and equipment to be installed as part of the construction of the Improvements shall be new and of first rate quality. If required by Landlord, Tenant shall furnish reasonably satisfactory evidence to Landlord as to the kind and quality of materials, fixtures, machinery and equipment. All construction work associated with the Improvements shall comply in all material respects with the requirements of the final plans and specifications approved by Landlord. All work in connection with the construction of the Improvements shall be prosecuted with reasonable dispatch, subject to Unavoidable Delays and subject to the Timetable (to the extent applicable).

**4.6    Temporary Certificate of Occupancy:**   If Tenant initially obtains a temporary certificate of occupancy for the Improvements, Tenant shall keep such temporary certificate of occupancy in full force and effect until the date that a permanent certificate of occupancy is issued for the Improvements, and Tenant shall obtain and deliver to Landlord a permanent certificate of occupancy for the Improvements within twelve (12) months after issuance of the initial temporary certificate of occupancy, subject to reasonable extension of such time period for Unavoidable Delays.

**4.7    Delivery of Final Documents:**   Tenant shall deliver the following documents to Landlord, promptly after the Improvements are Substantially Completed: (i) copies of the "as built" plans for the Improvements, including CAD drawings if requested by Landlord; (ii) a survey of the Premises showing the Improvements as constructed and certified to Landlord by a licensed surveyor; (iii) all permits, certificates, and sign-offs required to be issued by applicable legal requirements in connection with the construction of the Improvements; and (iv) when issued, any temporary or permanent certificate of occupancy issued with respect to the Improvements.

### Article V Post Occupancy Alterations

**5.1    Alterations:**  Any material alteration that either changes the location of any exterior wall or cost in excess of Two-Hundred-Fifty Thousand Dollars ($250,000.00) proposed to be made to the Premises subsequent to the completion of the Improvements and occupancy of the Premises shall be subject to the same procedures as set forth above for the original construction of the Improvements.

### Article VI       Insurance; Compliance with Insurance Requirements

**6.1    Applicable Terms:** The following basic terms, as used in this Lease and in all amendments to the Lease (unless otherwise specified or unless the context otherwise requires), shall have the following meanings: A "Customary" form of policy or amount of coverage or endorsement or other aspect of insurance is that form of policy, amount of coverage, endorsement or other aspect that is then customarily required by prudent Institutional Lenders for similar properties in the vicinity of the Premises (the "Comparison Area").

**6.2    Tenant's Minimum Insurance Requirements:**   Tenant, at Tenant's sole expense, shall maintain at all times during the Term (except as otherwise specifically provided below), and after the Term for so long as Tenant, or any Person holding through or under Tenant, remains in possession of the Premises, the following insurance:

      i.    *Liability Insurance.*  Tenant shall maintain a policy of commercial general liability insurance in Customary form (the "Liability Policy") protecting Tenant against

**9.2     Leasehold Mortgages**. Tenant may, from time to time, grant to any institutional lender providing financing or refinancing to Tenant with respect to the improvement of the Premises as otherwise provided for herein a mortgage lien encumbering Tenant's interest in the Premises *solely and only limited to the Tenant's interest in this Lease, together with an assignment of leases and rents and a security interest in any Personal Property owned by Tenant*, in order to secure the repayment of such financing, including interest thereon, and the performance of all of the terms, covenants and agreements on the Tenant's part to be performed or observed under all agreements executed in connection with such financing or refinancing (collectively, a "Leasehold Mortgage"; and each holder of a Leasehold Mortgage, a "Leasehold Lender"). *No such Leasehold Mortgage, lien or security interest shall attach to Landlord's interest in this Lease or the Premises or to any real or personal property owned by Landlord nor shall any such assignment affect Landlord's interest in this Lease, or in any leases and rents or other proceeds from the Premises, it being understood in this regard that any loan obtained by the Tenant, whether same be in the nature of a leasehold loan or construction financing shall at all times be subordinate to the interest of the Landlord in the fee title to the premises and any loan or mortgage in respect thereof obtained by the Landlord now or in the future.*

### Article X Leasehold Lender Protections

**10.1     Notice:** Tenant shall give Landlord prompt notice of each Leasehold Mortgage, together with contact information for notices to the Leasehold Lender (such notice and/or any notice given by Lender to Landlord of its contact information, collectively, the "Lender Notice"). Tenant promptly shall furnish Landlord with a complete copy of each Leasehold Mortgage (including all documents and instruments comprising the Leasehold Mortgage) and all amendments, extensions, modifications and consolidations thereof, certified as such by Tenant.

**10.2     Landlord To Provide Notice Of Default To Leasehold Lender:** After receipt of a Lender Notice, Landlord shall give such Leasehold Lender, in the manner provided by the notice provisions of this Lease, a copy of each notice of default given by Landlord to Tenant, at the same time that Landlord gives such notice of default to Tenant or promptly thereafter. No such notice of default given by Landlord to Tenant shall be effective unless and until a copy of such notice shall have been so given to each such Leasehold Lender at the last address furnished to Landlord. Notice to a Leasehold Lender shall be deemed given on the date received by the Leasehold Lender. The Leasehold Lender shall have the right, but not the obligation (except as provided in the next section), to cure such default or to cause such default to be cured, within the time periods set out below.

**10.3     Leasehold Lender's Right to Cure:** Landlord shall not exercise its right to terminate this Lease following a default by Tenant if:

    i.    As to a monetary default, the Leasehold Lender cures such default on or before the date that is the later of (i) thirty (30) days after the date such default is required to be cured by Tenant under the terms of this Lease and (ii) thirty (30) days after the date Leasehold Lender is given notice of Tenant's default; and

    ii.    As to a non-monetary default, (i) Landlord receives written notice from the Leasehold Lender (the "Lender Cure Notice"), within thirty (30) days after Leasehold Lender is given Landlord's notice of Tenant's default, that Leasehold Lender agrees to remedy the default, and (ii) Lender cures such default on or before the date that is the later of (A) sixty (60) days after the date such default is required to be cured by Tenant under the terms of this Lease, and (B) sixty (60) days after the date Leasehold Lender is given

notice of Tenant's default, provided, however, that if any non-monetary default is not capable of being remedied by the Leasehold Lender within such time period, Leasehold Lender shall have such greater period of time as is necessary to cure such default if Leasehold Lender shall:

1) commence to remedy the default within such period and shall diligently continue to prosecute such cure to completion; or

2) if possession of the Premises is required in order to cure such default, institutes judicial or non-judicial foreclosure proceedings within such sixty (60) day period and diligently prosecutes such proceedings in order to obtain possession directly or through a receiver, and, upon obtaining such possession, commences promptly to cure the default and diligently prosecutes the same to completion, provided that, during the period in which such action is being taken and any foreclosure proceedings are pending, all of the other obligations of Tenant under this Lease, to the extent they are reasonably susceptible to being performed by Leasehold Lender, shall be performed.

If such non-monetary default is of such a nature that it cannot be cured by Leasehold Lender (for example, the bankruptcy of Tenant), and if Leasehold Lender succeeds Tenant to the position of tenant hereunder, Landlord shall not terminate this Lease by reason of such default unless   the Leasehold Lender consents in writing to such termination.

**10.4    Abandonment by Leasehold Lender:** At any time after the delivery of the Lender Cure Notice, Leasehold Lender may notify Landlord, in writing, that it has relinquished possession of the Premises, or that it will not institute foreclosure proceedings, or, if such proceedings have been commenced, that it has discontinued or will discontinue such proceedings, and that it relinquishes all right to a New Lease (the "Abandonment Notice"). In such event, Leasehold Lender shall have no further obligation to cure Tenant's default(s). Landlord may, at any time after receipt of such Abandonment Notice or upon Leasehold Lender's failure to comply with the requirements of Section 10.3 above, terminate this Lease in accordance with the terms thereof, without any obligation to give Leasehold Lender a New Lease.

**10.5    Leasehold Lender's Liability:** Subject to the preceding sections, no Leasehold Lender shall become liable under the provisions of this Lease, or any lease executed pursuant to this Article, unless and until such time as it becomes, and then only for as long as it remains, the tenant under the leasehold estate created by this Lease.

**10.6**    Subject to Section 10.3, Leasehold Lender has no obligation to cure any default of Tenant under the Lease.

**10.7    Notice of Termination by Landlord; New Lease:** If this Lease is terminated for any reason, or if this Lease is rejected or disaffirmed pursuant to any bankruptcy, insolvency or other law affecting creditors' rights, Landlord shall give prompt notice thereof to the then Leasehold Lender whose contact information Landlord has received in a Lender Notice, in the manner provided by the notice provisions of this Lease. Landlord, upon written request of any such Leasehold Lender made any time within thirty (30) days after the giving of such notice by Landlord, shall promptly execute and deliver to such Leasehold Lender a new lease of the Premises (the "New Lease"), naming such Leasehold Lender or its designee as the tenant under this Lease (provided that such Leasehold Lender guarantees the financial obligations of its designee), for the remainder of the Term upon all of the terms, covenants, and conditions of this Lease (including options to extend the term of this Lease, if any) except for such provisions that must be modified to reflect such termination, rejection or disaffirmance and the passage of time, if such Leasehold Lender shall pay to Landlord, concurrently with the

16

delivery of such New Lease, all unpaid Rent due under this Lease up to and including the date of the commencement of the term of such New Lease. Leasehold Lender or its designee shall execute and deliver to Landlord such New Lease within thirty (30) days after delivery of such New Lease by Landlord to Leasehold Lender. Upon execution and delivery of such New Lease and as a condition precedent to Landlord's execution of same, Leasehold Lender shall cure or cause to be cured all defaults existing under this Lease which are capable of being cured by such Leasehold Lender or its designee promptly and with diligence after the delivery of such New Lease.

**10.8   New Lease Subject To Fee Mortgage:** The New Lease and the leasehold estate thereby created shall, subject to the terms and conditions of this Lease, have the same rights as provided for this Lease with respect to any mortgage, including any Fee Mortgage, of the Premises or any leasehold interest therein or any other lien, charge or encumbrance thereon, whether or not the same shall then be in existence it being understood in this regard that any such New Lease shall at all times be subordinate to the interest of the Landlord in the fee title to the premises and any loan or mortgage in respect thereof obtained by the Landlord now or in the future. Landlord shall execute, and shall cause any Fee Lender to execute, any instruments reasonably necessary to acknowledge such rights. Concurrent with the execution and delivery of such New Lease, Landlord shall pay (or shall cause any depository or Fee Lender to pay) to the tenant named in the New Lease, any moneys (including insurance and condemnation proceeds) then held by Landlord (and/or such depository or Fee Lender) that would have been payable to Tenant as of the date of execution of the New Lease but for the termination of this Lease. With respect to any moneys held by Landlord under the terms of this Lease that would not be payable to Tenant if the Lease had not been terminated, Landlord shall continue to hold, and to disburse such moneys, in accordance with the terms of this Lease.

**10.9   Subtenants:** If a Leasehold Lender has timely requested a New Lease, Landlord shall not, between the date of termination of this Lease and the date of execution of the New Lease, without the written consent of such Leasehold Lender, terminate any sublease, disturb the occupancy, interest or quiet enjoyment of any subtenant, or accept any cancellation, termination or surrender of such sublease (unless such termination or disturbance shall be effected as a matter of law on the termination of this Lease or is pursuant to the provisions of such Sublease(s)) or enter into any lease of all or part of the Premises (other than a new lease with a subtenant entitled to a new lease pursuant to the terms of a subordination, non-disturbance and attornment agreement or similar agreement), which consent of such Leasehold Lender shall not be unreasonably withheld, conditioned or delayed. Upon the execution and delivery of a New Lease under this Article, all security deposits of subtenants and all prepaid rent moneys of subtenants that are in Landlord's possession shall be transferred to the tenant under the New Lease, and all such leases that have been made by Landlord, shall be assigned and transferred, without recourse, by Landlord to the tenant named in such New Lease.

**10.10   Survival of Provisions:** Landlord's agreement to enter into a New Lease with Leasehold Lender shall be unaffected by the rejection of this Lease in any bankruptcy proceeding by either Landlord or Tenant. The provisions of this Article shall survive the termination, rejection or disaffirmance of this Lease and shall continue in full force and effect thereafter to the same extent as if this Article were a separate and independent contract made by Landlord, Tenant and Leasehold Lender. The provisions of this Article are for the benefit of Leasehold Lender and may be relied upon and shall be enforceable by Leasehold Lender as if Leasehold Lender were a party to this Lease.

**10.11   Interest in Subtenancies:** Until each Leasehold Lender has been given a Lender Cure Notice and this Lease has been terminated, Landlord shall have no right and expressly waives any right arising under applicable Law in and to the rentals, fees, and other

17

amounts payable to Tenant under any Sublease, to the extent such rentals and fees are assigned by Tenant to Leasehold Lender.

**10.12  Restrictions on Modification and Termination:** If a Leasehold Mortgage is in effect, then, without the prior written consent of every Leasehold Lender that has delivered the Lender Notice to Landlord: (i) this Lease shall not be modified, amended or terminated by the parties hereto, and (ii) the Premises shall not be surrendered by Tenant, and Landlord shall not accept any such surrender of this Premises by Tenant. Notwithstanding the foregoing, (1) this Lease may be terminated by the parties, and the Premises surrendered by Tenant in connection with such termination, in connection with a casualty or condemnation in accordance with the terms of this Lease, and (2) Landlord may terminate this Lease by reason of Tenant's default in accordance with the terms and conditions of this Lease, subject to the Leasehold Lender's rights under this Article. If a Leasehold Lender becomes the owner of the leasehold estate, such Leasehold Lender shall not be bound by any modification, amendment, or termination of this Lease made subsequent to the date of its Leasehold Mortgage and delivery to Landlord of the Lender Notice except for (x) a termination effected in connection with a casualty or condemnation in accordance with the terms of this Lease, and (y) a termination occurring by reason of Tenant's default in accordance with the terms and conditions of this Lease, subject to the Leasehold Lender's rights under this Article, and (z) a modification or amendment effected with such Leasehold Lender's consent.

**10.13  Assignment of New Lease by Leasehold Lender:** If and when a Leasehold Lender or it designee succeeds Tenant as the tenant under this Lease or becomes the tenant under a New Lease, as the case may be, it may assign this Lease and/or sublease all or part of the Premises, but only with the consent of Landlord, which such consent shall not be unreasonably withheld provided that either (i) the Leasehold Lender agrees to guarantee the obligations of the assignee under the New Lease; or (ii) the Landlord, after reviewing the certified financial statements of the proposed assignee, determines that the financial condition of the proposed assignee is acceptable to the Landlord without the necessity for a guarantee of such assignee's obligations by the Leasehold Lender.

**10.14  Estoppel Certificate:** Landlord shall, within ten (10) days after it receives the request of any Leasehold Lender or prospective Leasehold Lender, provide an estoppel certificate as to such matters pertaining to this Lease as are reasonably requested by such Leasehold Lender or prospective Leasehold Lender.

**10.15  Leasehold Lender's Rights upon Damage or Destruction to Improvements:** Leasehold Lender shall have the right to participate in the adjustment of losses with any insurance company with respect to any damage or destruction of the Premises or any improvements thereon and Leasehold Lender shall have the right to supervise and control the receipt and disbursements of all insurance proceeds; *provided however* that all such insurance proceeds shall be applied to restore the Premises, subject to Leasehold Lender's right to supervise and control receipt and disbursement of all insurance proceeds in accordance with the terms of the Leasehold Mortgage. Unless this Lease is terminated pursuant to the terms hereof, Tenant shall be entitled to the balance of any insurance proceeds available after full restoration of the Premises and payment of the debt secured any Leasehold Mortgage.

**10.16  Taking; general:** If there is a Taking, Leasehold Lender shall have the right to participate in any condemnation proceedings and settlement discussions and shall have the right to supervise and control the receipt and disbursement of all Awards payable to Tenant. All Awards payable to Tenant shall be applied in accordance with the terms of the Leasehold Mortgage.

**10.17  Taking; Substantial:** If a Substantial Taking occurs, Tenant's share of the Award shall be at least equal to the total Award less the Value of the Fee Estate; and Tenant

18

shall only be entitled to the balance of the Award available (if any) after payment of the debt secured by all Leasehold Mortgages and after payment to Landlord of the portion of the Award payable to Landlord.

**10.18  Taking; Partial:** If there is a Partial Taking, the Award shall first be applied to effect the Condemnation Restoration, subject to Leasehold Lender's right to supervise and control receipt and disbursement of the proceeds of the Award in accordance with the terms of the Leasehold Mortgage. The balance of the Award (if any) shall be allocated between Tenant and Landlord as follows: (i) Landlord shall be entitled to claim and recover from the condemning authority the diminution in the Value of the Fee Estate, (ii) Tenant shall be entitled to claim and recover from the condemning authority the diminution in Value of the Leasehold Estate, and (iii) the balance of the Award, if any, shall be paid to Landlord.

**10.19  Taking; Temporary:** If there is a Temporary Taking that does not extend beyond the then Expiration Date, this Lease shall continue and the entire Award shall be payable to Tenant, subject to the provisions of the Leasehold Mortgage. If there is a Temporary Taking of a portion of the Premises for a period that will end after the then Expiration Date but such Taking is not a Substantial Taking, the portion of the Award allocable to periods after the Expiration Date shall be paid to Landlord and the portion of the Award allocable to the period prior to the Expiration Date shall be paid to Tenant, subject to the provisions of the Leasehold Mortgage. If there is a Temporary Taking that extends beyond the then Expiration Date (without taking into account any Extension Options) and such Taking is a Substantial Taking, this Lease shall terminate as of the date the condemning authority or its designee takes occupancy of the Premises, as fully and completely as if such date was the stated Expiration Date of this Lease, and Landlord shall be entitled to the entire Award.

**10.20  Participation in Arbitration:** If any dispute under this Lease is required to be resolved by arbitration, every Leasehold Lender that has delivered the Lender Notice to Landlord shall have the right to participate in such proceeding and shall be given notice of its commencement at least twenty (20) days prior thereto.

**10.21  No Merger of Estates:** There shall be no merger of this Lease or the leasehold estate created by this Lease with a fee interest in the Premises by reason of the fact that the same Person may acquire, own or hold, directly or indirectly, this Lease or the leasehold estate created by this Lease and the fee estate in the Premises, unless and until such Person and every Leasehold Lender and Fee Lender shall join in a written instrument expressly providing for such merger and such instrument is recorded.

**10.22  Further Instruments:** Landlord and Tenant shall each, from time to time, execute, acknowledge and deliver such further instruments, and perform such additional acts, as the other and/or a Leasehold Lender may reasonably request in order to effectuate the intent and purposes of this Article.

### Article XI    Casualty Damage and Destruction

**11.1  Damage or Destruction:** If the Premises are damaged or destroyed by fire or other cause (ordinary or extraordinary), Tenant shall give Landlord prompt notice of such event and, except as provided in Section 11(c), shall repair such damage and restore the Premises to the condition existing prior to such damage or destruction and to a standard and quality no less than the construction of the original Improvements (the "Restoration"). Such repair and restoration shall be effected with reasonable diligence, subject to reasonable delays for adjustment of the insurance loss. Subject to Section 11(c), such obligation shall survive any termination of this Lease. Rent (including Base Rent and Additional Rents) shall not be abated by reason of any such damage or destruction and Tenant's obligations under this Lease shall not be affected by reason of such damage or destruction. Except as provided in Section 11 (c) this Lease shall not terminate solely by reason of such damage or destruction.

19

**11.2    Insurance Proceeds:** Unless Tenant terminates this Lease pursuant to Section 11(3), the proceeds of any Property Damage Policy shall be disbursed as follows, subject to the rights of the Leasehold Lenders:

  i.    If the reasonably estimated cost of the Restoration is less than $500,000.00, all proceeds of the Property Damage Policy shall be paid to Tenant, to be used for the repair and restoration of the Premises.

 ii.    If the reasonably estimated cost of the Restoration equals or exceeds $500,000.00, the proceeds of the Property Damage Policy shall be paid to a commercial bank or trust company selected by Landlord that is subject to supervision and regulation by state or federal Governmental Authority and that has capital, surplus, and undivided profits in an amount at least equal to the product of $1,000,000,000.00 (the "Depository"), to be disbursed to Tenant in reimbursement of Tenant's repair and restoration costs in accordance with the following provisions:

  1)    No disbursements shall be made unless and until the following conditions have been met;

  2)    Tenant delivers to Landlord and Depository a final and complete set of plans and specifications for the Restoration and a certification of the estimated cost of the Restoration by an architect or cost estimator approved by Landlord, such approval not to be unreasonably withheld or delayed;

  3)    If the net insurance proceeds available for the Restoration are less than the reasonably estimated cost of Restoration, Tenant shall deliver to the Depository sufficient funds to make up the deficiency;

  4)    Tenant delivers to Landlord and the Depository copies of all permits, approvals, and authorizations required by the Building Department and all other Governmental Authorities for the Restoration.

iii.    Once the foregoing conditions have been met Depository shall disburse the insurance proceeds to Tenant, subject to a 10% retainage, from time to time as the Restoration progresses in accordance with Depository's customary construction loan advance procedures, provided:

  1)    There is no Event of Default under this Lease.

  2)    With respect to each disbursement, Tenant delivers to Depository and Landlord (i) a certification of Tenant's architect that the sums requested have been earned and are due, the Restoration is being completed substantially in accordance with the plans and specifications given to Landlord, and the amounts requested are then due and payable, and (ii) releases and waivers of mechanic's lien, in form and substance reasonably satisfactory to Depository, executed by each of (A) the Major contractors and (B) as applicable, the general contractor, construction manager, and/or design-builder, in each case for periods prior to and covered by the disbursement then requested.

20

3) If at any time Landlord reasonably determines that the funds then held by the Depository are insufficient to fund the balance of the Restoration and provides written notice thereof to Tenant and Depository, progress payments shall cease until Tenant delivers to the Depository sufficient funds to make up the deficiency;

4) No mechanic's lien or similar lien or other encumbrance, other than a permitted Leasehold Mortgage, have been filed against the Premises, and no stop notices have been issued by any Governmental Authority to Landlord or Tenant, that have not been discharged by bonding or otherwise;

5) The final disbursement of the insurance proceeds and Tenant's funds shall not be made until (y) Restoration is Substantially Completed, and (z) Tenant has complied with Depository's other customary construction loan advance procedures.

iv. Tenant shall pay all of the Depository's fees and all out-of-pocket costs incurred by Landlord in connection with such Restoration, including any out-of-pocket fees incurred by Depository and Landlord for architectural and engineering review and/or revisions of Tenant's plans and specifications and inspection of the work site and the Restoration. All such fees and costs shall be paid to Landlord and Depository within twenty (20) days after Tenant is billed for same. No such review or inspection shall be deemed a warranty or representation that such plans and specifications or the Restoration complies with applicable Legal Requirements or with the provisions of this Lease.

**11.3   Substantial Damage within 5 Years of Expiration Date:** Notwithstanding the foregoing, if the Premises are damaged or destroyed by fire or other cause during the last five (5) years of the Term and such damage or destruction was not caused by the misconduct of Tenant and the cost to restore the Premises, as reasonably estimated, would equal or exceed 50% of the Full Replacement Cost of the Improvements, Tenant may, at its option, terminate this Lease by notice given to Landlord no later than thirty (30) days after such fire or other causal event, provided all of the following conditions are met:

i. Tenant is not in default of this Lease, which default is not cured within the applicable cure period (if any), and

ii. Tenant has paid all Rent then due, and

iii. Tenant has maintained in full force and effect any insurance required by Section 6 (b) (ii) of this Lease and the insurance maintained by Tenant fully covers the damage, and

iv. Tenant pays Landlord an amount equal to such policy's deductible, and

v. Tenant assigns to Landlord all of its right, title and interest in the proceeds of any insurance covering the loss and reasonably cooperates with Landlord's efforts to obtain such insurance proceeds (which obligation to assign and cooperate shall survive any termination of this Lease), and

vi. no Leasehold Lender or Person claiming through Tenant has a claim upon any insurance proceeds covering the loss, and

21

vii.  Tenant has completed the Casualty Termination Work (hereinafter defined) in a good and workmanlike manner and in compliance with all Laws, and

viii.  There are no Subtenants whose leases or occupancy agreements have not been validly terminated by reason of such damage or destruction; and

ix.  All insurance proceeds covering the loss are paid to Landlord, subject to the right of any Fee Lender.

If such notice is given, this Lease shall cease and come to an end as of the later of the date forty five days after the date Landlord receives such notice and the date all of the foregoing conditions are met. Subject to the requirements of Section, Tenant shall not be required to repair such damage or destruction if the foregoing conditions are met. Tenant shall continue to pay all Base Rent and Additional Rent until all insurance proceeds covering the Loss are paid to Landlord (subject to the right of any Fee Lender). If, for any reason, all insurance proceeds are not paid to Landlord (or the Fee Lender) or if the insurance company refuses to pay the insurance proceeds to Landlord, Tenant's termination notice shall be void and this Lease shall be deemed in full force and effect.

**11.4   Casualty Termination Work:** If Tenant exercises its option to terminate this Lease pursuant to Section 11.3 of this Lease, Tenant, at Tenant's sole expense, shall demolish the Improvements (except as otherwise directed in writing by Landlord, which direction shall be given to Tenant within thirty (30) days after Landlord receives Tenant's notice of termination pursuant to Section 11.3, remove all debris, grade the Land, and adequately secure the site during such remediation work (collectively, the "Casualty Termination Work").

### Article XII Condemnation

**12.1   Terminology:** The following basic terms, as used in this Lease and in all amendments to this Lease (unless otherwise specified or unless the context otherwise requires), shall have the meanings set forth below:

i.  The term "Taking" shall mean a taking during the Term of all or any part of the Premises, or any interest therein or right accruing thereto including any right of access, by or on behalf of any Governmental Authority or by any entity granted the authority to take property through the exercise of a power of eminent domain granted by statute, any agreement that conveys to the condemning authority all or any part of the Premises as the result of, or in lieu of, or in anticipation of the exercise of a right of condemnation or eminent domain, or a change of grade affecting the Premises. The date of the Taking shall be deemed to be the date that title vests in the condemning authority or its designee.

ii.  The term "Award" shall mean the condemnation award and/or proceeds of the Taking, including any interest earned on the Award.

iii.  The term "Value of the Fee Estate" means the Market Value of Landlord's fee estate in the Premises, determined as if (1) the Premises were unimproved, encumbered by this Lease, and unencumbered by any lien representing a monetary obligation (such as a Subjected Fee Mortgage (if any) or a Fee Mortgage), and (2) all Extension Options had been exercised, and (3) no Taking was pending, threatened or under consideration. The Value of the Fee Estate shall be determined immediately prior to title vesting in the condemning authority or its designee.

22

iv.     The term "Value of the Premises" means the Market Value of the Premises, determined as if

1) the Premises were encumbered by this Lease, and unencumbered by any lien representing a monetary obligation (such as a Fee Mortgage), and

2) all Extension Options had been exercised, and

3) no Taking was pending, threatened or under consideration.

The Value of the Premises shall be determined immediately prior to title vesting in the condemning authority or its designee.

v.      The term "Value of the Improvements" means the Value of the Premises less the Value of the Fee Estate. The Value of the Improvements shall be determined immediately prior to title vesting in the condemning authority or its designee.

**12.2    Notices:** Landlord and Tenant shall each notify the other if it becomes aware of a threatened or possible Taking (including any letter of interest from the condemning authority or its designee), or the commencement of any proceedings or negotiations which might result in a Taking. Landlord and Tenant shall have the right to appear in such proceedings, as their interests may appear, and be represented by their respective counsel.

**12.3    Substantial Taking:** If there is (i) a Taking of the entire Premises or of more than twenty (20)% of the rentable area of the Improvements, or (ii) a Taking (if the Premises include a parking lot or parking facility) that results in the loss of more than twenty (20)% of the number of parking spaces available at the Premises, or (iii) that results in Golden Corral terminating franchise rights of Tenant for the Premises (each, a "Substantial Taking"), the Term of the Lease shall cease and terminate on the date of the Taking as fully and completely as if such date were the originally stated Expiration Date of this Lease. The Award for a Substantial Taking (other than a Temporary Taking that involves a Substantial Taking, which is dealt with below) shall be allocated as follows:

i.      Landlord shall be entitled to claim and recover from the condemning authority the Value of the Fee Estate;

ii.     Tenant shall be entitled to claim and recover from the condemning authority an amount equal to the Value of the Improvements multiplied by a fraction, the numerator of which is the number of months (and any fractional part thereof) occurring between the date of the Taking and the Expiration Date (determined as if all Extension Options had been exercised) and the denominator of which is the number of months (and any fractional part thereof) occurring between the Commencement Date and the Expiration Date (determined as if all Extension Options had been exercised);

iii.    The balance of the Award, if any, shall be paid to Landlord.

**12.4    Temporary Taking** If all or any portion of the Premises is taken temporarily (a "Temporary Taking"), the following shall apply. If (i) the Temporary Taking (whether or not a Substantial Taking) ends prior to the then Expiration Date or (ii) a portion of the

23

**8.  Situs:**  This Agreement shall be interpreted and enforced under the laws of the State of New York without reference to choice of law provisions or authorities and the parties hereto consent to jurisdiction for enforcement of this agreement in Dutchess County New York.

**9.  Binding Effect:**  This Agreement shall be binding upon the parties hereto, their heirs executors and assigns.

**10. Merger:**  This Agreement and the Escrow Agreement contain all of the agreements between the parties hereto relating to the subject matter hereof and may only be modified by a writing executed by the parties hereto with the same formalities as the within Agreement.

**11. Attorney's Fees:**  In the event that any party to this Agreement is required to commence or otherwise commences litigation to enforce such party's rights under the terms of this Agreement, then the party prevailing in such litigation shall be entitled to collect his or her's attorney's fees from the non-prevailing party.

**12. Notices: Notice Is to Be in Writing; Where sent:**  Except as may be provided in this Agreement, any notice or other communication under this Agreement, shall be in writing and shall be sent by United States express mail or by a nationally recognized overnight delivery service that provides receipts or by hand delivery addressed to the party for whom intended at it's the address set forth above ("Notice Address"). Any such notice or other communication shall be deemed given and received when delivered or refused or when delivery is attempted on a Business Day during normal business hours. Either party may, by notice to the other party, designate a different address (or addresses) for notices and other communications intended for it, which designation shall become effective on the date such notice is received.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of _____, 2015.

**82 ANFRAN REALTY, INC.**

By: _Antty P. Segret_

Name: _Anthony P. Segreti_

Title: _President_

**CORNUCOPIA QUEEN, INC.**

By: _____     3/10/15

Sherrance Henderson

Title: President

Proper acknowledgments for state of execution need to be inserted upon finalization

WITNESS WHEREOF, the parties have executed this Amendment as of the day first written.

TENANT:

**CORNUCOPIA QUEEN, INC.**

By:
Sherrance Henderson
President

STATE OF GEORGIA         )

COUNTY OF FULTON        )

I hereby Certify that on this day, before me an officer duly authorized to administer oaths and take acknowledgments, personally appeared Sherrance Henderson, known to me to be the person described in and who executed the foregoing Option; Right of First Refusal and Seller Financing Agreement on March 10, 2015, who acknowledged before me that she executed same.

Witness my hand and official seal in the County and State last aforesaid this 10th day of

_____, A.D. 2015.

_____
Notary Signature

_HAVEN K. Hix_
Printed Notary Signature

[SEAL}

HAVEN K HIX
MY COMMISSION EXPIRES
OCT. 31 2015
GWINNETT CO., GEORGIA
NOTARY PUBLIC

## MEMORANDUM OF LEASE

This Memorandum of Lease dated the 3/ st day of December, 2015 is by and between 82 Anfran Realty, Inc., a New York corporation, ("Landlord") and, Cornucopia Queen, Inc. a Delaware corporation d/b/a/ Golden Corral, ("Tenant").

## W I T N E S S E T H

WHEREAS, on the 29th day of April, 2015, Landlord and Tenant entered into a written lease agreement (hereinafter referred to as "Lease") for certain premises (the "Premises") in the town of Poughkeepsie, County of Dutchess and State of New York, known as 2345 Route 9, Poughkeepsie New York 1260, which said land consisting of approximately 4.7 acres, as more particularly set forth in the Lease and described on Exhibit "A" attached hereto; and

WHEREAS, the parties wish to place their interests in the lease as a matter of record.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and the parties intending to be legally bound thereby, the parties agree as follows:

1. The term of the Lease (the "Term") will be for fifteen (15) years beginning on the "Commencement Date" as set forth in the Lease and ending on the last day of the 180th full calendar month following the Commencement Date.

2. Landlord has granted to Tenant the right and option to extend the Term for six (6) additional period(s) of 60 months each upon the terms, covenants and conditions set forth in the Lease.

[SIGNATURES ON FOLLOWING PAGES]

CORNUCOPIA    QUEEN,    INC.,    a
Delaware corporation

By: _____

Sherrance Henderson
President

STATE OF _Georgia_         )

COUNTY OF _Fulton_         )

I hereby Certify that on this day, before me an officer duly authorized to administer oaths and take acknowledgments, personally appeared _Sherrance Henderson_, known to me to be the person described    in    and    who    executed    the    foregoing    Memorandum    of    Lease on _December 31_____, 2015, who acknowledged before me that he/she executed same.

Witness my hand and official seal in the County and State last aforesaid this _31_ day of _December_, A.D. 2015.

Notary Signature

_HAVEN K. HIX_
_____
Printed Notary Signature

3

remises is Taken for a period that will end after the then Expiration Date but such Taking is not a Substantial Taking, then:

i.    This Lease shall remain in full force and effect, including as to the portion Taken and there shall be no change in Tenant's obligations under this Lease; and

ii.   There shall be no reduction in Rent; and

iii.  If clause (i) applies, the entire Award shall be paid to Tenant; and

iv.   If clause (ii) applies, the portion of the Award allocable to the period prior to the Expiration Date shall be paid to Tenant and the portion of the Award allocable to the period after the Expiration Date shall be paid to Landlord.

If, however, the Temporary Taking involves a Substantial Taking and the term of the Temporary Taking extends beyond the then Expiration Date, Tenant may, at its option, but subject to the rights of the Leasehold Lender, terminate this Lease as of the date of the Taking, by notice given prior to the date of the Taking, in which event this Lease shall be terminated as of the date of the Taking as fully and completely as if such date were the stated Expiration Date of this Lease and Landlord shall be entitled to the entire Award. If Tenant does not so elect to terminate this Lease, this Lease shall remain in full force and effect, there shall be no reduction in Rent and this section shall govern the distribution of the Award.

    12.5    **Partial Taking**  If the Taking is not a Substantial Taking or a Temporary Taking (a "Partial Taking"), this Lease shall remain in full force and effect; provided, however, that on the date of such Taking this Lease shall terminate as to the portion of the Premises taken, which portion shall no longer be deemed part of the Premises. From and after the date of such Partial Taking, the Base Rent shall be reduced to reflect the loss of use of the Premises. Whether or not the Award is sufficient to restore the Improvements, Tenant shall promptly restore the Improvements, to the extent reasonably practicable given the nature and scope of the Taking and the requirements of applicable Law, to their condition immediately prior to such Partial Taking in accordance with the provisions of this Lease and to a standard and quality no less than the construction of the original Improvements (the "Condemnation Restoration"). The Award for the Partial Taking shall be allocated as follows:

i.    If the Partial Taking includes any of the Improvements (including any parking area), the Award shall first be applied to effect the Condemnation Restoration. The balance of the Award (if any) shall be allocated between Tenant and Landlord as follows:

    1)    Landlord shall be entitled to an amount equal to the diminution in the Value of the Fee Estate;

    2)    Tenant shall be entitled to an amount equal to the diminution in the Value of the Improvements; and

    3)    The balance of the Award, if any, shall be paid to Landlord.

If there is a Leasehold Lender, the portion of the Condemnation Award to be applied to Condemnation Restoration shall be paid to the Leasehold Lender and applied to such restoration in accordance with the procedures established in the Leasehold Mortgage, and Tenant's portion of the Award shall be paid in

24

accordance with the provisions of the Leasehold Mortgage. If no Leasehold Mortgage encumbers the Premises at the time of the Partial Taking, then (y) if the cost of the Condemnation Restoration, as reasonably estimated, is less than $500,000.00, the portion of the Award needed to effect the Condemnation Restoration shall be paid to Tenant, who shall effect the Condemnation Restoration, and (z) if the cost of effecting the Condemnation Restoration is equal to or greater than $500,000.00, the portion of the Award needed for restoration of the Improvements shall be paid to a Depository, who shall distribute such portion of the Award to Tenant as the Restoration progresses in the same manner as provided in section 11.2 with respect to insurance proceeds and subject to the same conditions.

    ii.    If the Partial Taking does not include any portion of the Improvements, the entire Award shall be paid to the Landlord.

**12.6    Miscellaneous:** Notwithstanding the foregoing: To the extent any Award is allocated to reimbursement for real estate taxes and assessments that have been paid with respect to periods after the date title vests in the condemning authority or its designee, such portion shall be paid to the party who paid such taxes and assessments. To the extent any Award is allocated to reimbursement of prepayment penalties, such portion shall be paid to (a) Tenant with respect to any Leasehold Mortgage, (b) Landlord with respect to any Fee Mortgage, and (c) Tenant with respect to any Subjected Fee Mortgage.

**12.7    Rights Subordinate:** Landlord's and Tenant's rights under this Article shall be subject and subordinate to the rights of all Lenders.

**12.8    Return of Prepaid Rent:** If this Lease terminates pursuant to this Article, Landlord, within ten (10) Business Days after this Lease terminates, shall return to Tenant all Rent previously paid that is attributable to the period after such termination. The termination of this Lease shall not affect those obligations and liabilities of Tenant under this Lease that accrued before the termination of this Lease or that relate to periods before such termination, which obligations shall survive termination.

**12.9    Limitation of Application:** Nothing in this Article is included for the benefit of the condemning authority, the intent being only to set out the respective rights of the parties hereto.

**Article XIII    Estoppel Certificates**

**13.1**    Landlord and Tenant shall, at any time and from time to time, within ten (10) Business Days following receipt of written request from the other party, execute, acknowledge and deliver a written statement certifying: that this Lease is in full force and effect and unmodified (or, if modified, stating the nature and date of such modification); the Commencement Date; the then Expiration Date; whether any Extension Options have been exercised and describing the Extension Term(s) to which such option(s) relate; the dates to which the Rent reserved hereunder has been paid and the amount of such Rent; whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Lease (and, if so, specifying each such default of which the signer shall have knowledge); if the signer is the Tenant, that Tenant is not in default of any of its obligations under this Lease; and as to such other matters regarding this Lease as may reasonably be requested. Failure to deliver such statement within said ten (10) Business Days' period shall be conclusive as to the facts stated in the requested certification and binding upon the party who failed to deliver such certification.

**Article XIV Special Franchisor Provision**

25

**14.1   Special Provisions Relating to Franchise:** Tenant intends to operate the Premises pursuant to a franchise agreement (the "Franchise Agreement") to be entered into with Golden Corral Franchising Systems, Inc. ("Franchisor"). Anything contained in this Lease to the contrary notwithstanding, the following provisions shall control:

i.    The Permitted Use of the Premises during the term of the Franchise Agreement shall be limited solely to the operation of a Golden Corral® restaurant franchised under the Franchise Agreement, so long as the Franchise Agreement is coterminous with the Term of the Lease.   Any termination of the Lease shall render this limitation to be void and of no effect.

ii.    Any (i) sublease or assignment, of all or any part of Tenant's rights to the Premises, which may be permitted by Landlord under this Lease and (ii) extension and/or renewal of the Term of this Lease shall, in each case, be prohibited without Franchisor's written consent.

iii.    Tenant is granted the right to use Franchisor's Proprietary Marks and such signage as Franchisor may prescribe for the Permitted Use. For purposes of this Sublease, the term "Proprietary Marks" means all trade names, service marks, trademarks, logos, emblems and indicia of origin, including but not limited to the mark "GOLDEN CORRAL," and such other trade names, service marks, and trademarks as are now or hereafter designated by Franchisor for use in connection with its system (the "System") of opening and operating family-oriented buffet style restaurants.

iv.    Franchisor is granted the right to enter the Premises without assuming the Lease to make any modifications necessary to protect the Proprietary Marks, the System and/or to cure any default of Tenant under this Lease.  Notwithstanding the foregoing, to the extent that any contemplated modifications are of such a nature as to require issuance of a building permit, the ability of the Franchisor to make such modifications shall be subject to the Landlord's consent following Landlord's receipt and review of the plans and specifications for such modifications, which such consent shall not be unreasonably withheld.

v.    The initial term of the Lease, or the initial term together with any renewal terms (for which the Rent is set forth in this Lease), shall be for not less than fifteen (15) years.

vi.    Landlord shall concurrently provide Franchisor with a copy of any written notice of breach or default under the Lease sent to Franchisee.   Franchisor shall provide Landlord with any notices of default of the Tenant/Franchisee under the Franchise Agreement, including any termination of the Franchise Agreement.

vii.    Franchisor shall have the continuing right, but not the obligation, to cure any breach or default under the Lease within fifteen (15) days after the expiration of the period in which Franchisee may cure the applicable breach or default.

viii.    Upon Tenant's default under this Lease or under the Franchise Agreement:

    1.  Franchisor shall have a continuing right (but not obligation) of entry into the Premises limited however to the right of entry referred to in subparagraph c above;

    2.  Franchisor shall have the right but not the obligation to assume in writing the Lease in Franchisor's own name and to operate on the Premises a Golden Corral® restaurant in accordance with the terms and provisions

26

of this Lease. If, following such assumption, Franchisor desires to assign the Lease or sublet the entire Premises to a third party franchisee which will operate on the Premises a Golden Corral® restaurant in accordance with the terms and provisions of this Lease, unless Franchisor agrees to guarantee such proposed assignee's performance of the terms and conditions of this Lease, Franchisor's ability to assign this Lease shall be subject to Landlord's written consent and the Landlord shall not be required to give Landlord's consent if, based upon review of certified financial statements and business background information to be provided by the proposed assignee, Landlord reasonably believes that the proposed assignee may not have the requisite financial resources to fulfill the obligations of the Tenant under the terms of this Lease.

**14.2   Franchisor's Rights Subordinate:** The rights of the franchisor as hereinabove provided are, at all times, subject and subordinate to the superior rights of any Fee Lender or Leasehold Lender.

**Article XV     Default; Insolvency Events; and Conditions of Limitation**

**15.1   Events of Default** This Lease and the term and estate thereof are subject to the conditional limitation set forth below.  If any of the following events occur (each, an "Event of Default"):

    i.    If Tenant fails to pay Base Rent to Landlord or Additional Rent to the party entitled to receive same when the same is due and payable under the terms of this Lease and such failure continues for a period of ten (10) days after written notice thereof is given to Tenant, or

    ii.    Tenant fails to timely perform its obligations pertaining to the construction of the Improvements and the timetable with respect to same which continues for a period of twenty (20) days after written notice thereof is given to Tenant; or

    iii.    Tenant fails to discharge any mechanic's or other lien that is its obligation to discharge under the terms of this Lease for a period of twenty (20) days after written notice thereof is given to Tenant; or

    iv.    Tenant, whether by action or inaction, fails to timely perform or observe any of the other terms, covenants or conditions of this Lease and such default is not remedied within twenty (20) days after written notice thereof is given to Tenant, provided that if such default cannot, with reasonable diligence, be fully remedied within such 20-day period, Tenant shall have as long as is reasonably necessary to cure such default, but in no event longer than three (3) months after the date such default notice is given to Tenant, provided Tenant commences compliance within such 20-day period (or as promptly as reasonably possible in an emergency) and thereafter pursues compliance to completion with reasonable diligence; or

    v.    A receiver is appointed for Tenant or any property of Tenant in any action, suit, or proceeding by or against Tenant and such appointment is not vacated or annulled within one hundred twenty (120) days, or

    vi.    The interest of Tenant in this Lease or the rents from the Premises is sold under execution or other legal process;

27

then Landlord may, subject to the rights of Franchisor and any Lenders, at any time during the continuance of such Event of Default, give Tenant notice of termination of this Lease and, upon the date five (5) days after service of such notice, this Lease and the term and estate thereof (whether or not the Commencement Date shall have occurred) shall terminate and end with the same force and effect as if that day were the day herein definitely fixed for the end and expiration of this Lease, but Tenant shall remain liable for damages as provided in this Lease and Landlord may resort to and enforce any of the remedies provided in Article XVI below.

**15.2    Insolvency Events of Default:** This Lease and the term and estate thereof are subject to the further conditional limitation that if any of the following events occur ("Insolvency Events"):

i.    Tenant makes an assignment for the benefit of its creditors, or

ii.    If an involuntary petition is filed against Tenant under any bankruptcy or insolvency law or under the reorganization provisions of any law of like import, and such petition is not dismissed within one hundred twenty (120) days after the date filed; or

iii.    Tenant shall file a voluntary petition under any bankruptcy or insolvency law, or whenever any court of competent jurisdiction shall approve a petition filed by Tenant under the reorganization provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a petition shall be filed by Tenant under the arrangement provisions of the United States Bankruptcy Act or under the provisions of any law of like import; or

iv.    Any guarantor of some or all of Tenant's obligations under this Lease, during the period that the guaranty is in effect, dies or becomes incapacitated, is dissolved or liquidated, makes an assignment for the benefit of his/her/its creditors, is the debtor named in a voluntary petition in bankruptcy, is the debtor named in an involuntary petition in bankruptcy which petition is not discharged within 120 days, has a receiver appointed for his/her/its assets which receivership is not vacated or annulled within one hundred twenty (120 days), or is the subject of any other insolvency proceeding and such insolvency proceeding is not dismissed within one hundred twenty (120) days;

then Landlord may, subject to the rights of Franchisor and any Lenders, at any time during the continuance of such Insolvency Event, give Tenant notice of termination of this Lease and, upon the date five (5) days after service of such notice, this Lease and the term and estate thereof (whether or not the Commencement Date shall have occurred) shall terminate and end with the same force and effect as if that day were the day herein definitely fixed for the end and expiration of this Lease, but Tenant shall remain liable for damages as provided in this Lease and Landlord may resort to and enforce any of the remedies provided in Article XVI below.

### Article XVI Remedies

**16.1    Remedies upon Termination or Landlord's Re-entry:** Subject to the rights of Franchisor and any Lenders to the extent of and limited by the terms of this Lease, if (i) this Lease is terminated pursuant to Article XV, or (ii) Landlord reenters or obtains possession of the Premises by summary proceedings or any other action or proceeding, or (iii) Landlord reenters or obtains possession by any other legal act (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises if this Lease is

28

acknowledging that any and all other policies of insurance procured independently by Franchisor or Golden Corral Corporation in the normal course of its/their business(es) shall be deemed excess to all such primary coverage afforded to Franchisor and Golden Corral Corporation by Franchisee in a manner consistent with the terms and provisions of this Agreement. The evidence of insurance shall include a statement by the insurer that the policy or policies will not be cancelled or materially altered without at least thirty (30) days prior written notice to Franchisor and Golden Corral Corporation.

12.5    Franchisee's Additional Insurance Needs:   No requirement for insurance contained herein shall constitute advice or guarantee by Franchisor that only such policies, in such amounts, are necessary to protect Franchisee from losses in connection with the franchised business.   Franchisee shall be responsible to make its own independent judgment of its insurance needs in addition to the insurance required pursuant to this Agreement.

12.6    Franchisor's Right to Secure Insurance on behalf of Franchisee:   Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as revised from time to time by the Manuals or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation to do so), immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acquiring the policy or policies, shall be payable by Franchisee immediately upon notice.   The foregoing remedies shall be in addition to any other remedy Franchisor may have.

## 13.    TRANSFER OF INTEREST

13.1    Transfer by Franchisor:   Franchisor shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity. With respect to any assignment which results in the subsequent performance by the assignee of all of Franchisor's obligations under this Agreement, the assignee shall expressly assume and agree to perform such obligations, and shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment. In addition, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Franchisor may sell its assets, its Proprietary Marks, or its System; may sell its securities in a public offering or in a private placement, may merge, acquire other corporations, or be acquired by another corporation; and may undertake a refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

13.2    Transfer by Franchisee:

13.2.1 Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's business skill, financial capacity, and personal character. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this franchise nor any individual, partnership, corporation, or other legal entity, which directly or indirectly controls Franchisee shall sell, assign,

transfer, convey or give away, any direct or indirect interest in Franchisee or in this franchise without the prior written consent of Franchisor. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Section 14.2 of this Agreement. The transfer restrictions described in this Section 13.2 shall apply to any sale, assignment, transfer, conveyance, or donation of any ownership interest in Franchisee (except for a Franchisee which is a corporation registered under the Securities and Exchange Act of 1934) by any holder of such interest to any party.

13.2.2 Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee or in this franchise; provided, however, that if a transfer, alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring a controlling interest in the franchised business, Franchisor may, in its sole discretion, require as a condition of its approval that:

13.2.2.1      All of Franchisee's monetary obligations to Franchisor and all or any of its affiliates under this and any other agreements between Franchisee and Franchisor or any affiliate have been satisfied, and all other outstanding obligations related to the franchised business shall have been satisfied;

13.2.2.2      Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates;

13.2.2.3      The transferor shall have executed a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders, and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances;

13.2.2.4      The transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) shall enter into a written assignment, under seal and in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement;

13.2.2.5      The transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) shall demonstrate to Franchisor's satisfaction that transferee meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the business franchised herein (as may be evidenced by prior related business experience, the franchise application, or otherwise); has adequate financial resources and capital to operate the business; has no conflicting or competing business interest; and satisfies such other criteria and conditions that Franchisor shall reasonably impose;

13.2.2.6    At Franchisor's option, the transferee shall execute (and/or, upon Franchisor's request, shall cause all interested parties to execute), for a term ending on the expiration date of this Agreement and with such renewal term as may be provided by this Agreement, the standard form franchise agreement then being offered to new System franchisees and other ancillary agreements including, but not limited to guaranties, as Franchisor may require for the franchised business, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty rate and advertising contribution;

13.2.2.7    The transferee shall, at transferee's expense and upon the reasonable request of Franchisor, upgrade the restaurant to conform to the then-current standards and specifications for System restaurants, and shall complete the upgrading and other requirements within the time specified by Franchisor;

13.2.2.8    Franchisee shall remain primarily liable for all obligations of the franchised business and all covenants to be kept or performed by Franchisee and Franchisee shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

13.2.2.9    At transferee's expense, transferee or transferee's managers shall complete any training programs then in effect for franchisees upon such terms and conditions as Franchisor may reasonably require; and

13.2.2.10    Except in the case of a transfer to a corporation formed for the convenience of ownership, a transfer fee shall be paid by Franchisee to Franchisor in an amount equal to five percent (5%) of the then-current standard initial franchise fee being charged by Franchisor for a restaurant utilizing the restaurant design franchised hereunder (or, if such design is not then offered, such fee for the restaurant design closest in interior square footage to the restaurant).

13.2.2.11    Franchisee agrees that if, in the opinion of Franchisor, the price to be paid for the restaurant or franchised business appears to be excessive or is likely to result in there being an unsatisfactory return on investment or there being an insufficient cash flow to meet obligations, Franchisor may, without liability to Franchisee, review such opinions with any such prospective transferee/purchaser.

13.2.2.12    The transferee must at the time of the proposed transfer meet Franchisor's requirements to have an Operations Principal that has been approved by Franchisor.

13.3    <u>Security Interest in Franchisee's Business or Assets</u>:  Franchisee shall grant no security interest in the franchised business or in any of its assets unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option to purchase the rights of the secured party upon payment of all sums then due to such secured party, except such amounts which may have become due as a result of any acceleration of the payment dates

based upon the Franchisee's default.

13.4   <u>Franchisee Acknowledgement of Need for Restrictions on Transfer</u>: Franchisee acknowledges and agrees that each condition which must be met by the transferee franchisee is necessary to assure such transferee's full performance of the obligations hereunder.

13.5   <u>Transfer to Franchisee's Corporation</u>:   In the event Franchisee is a corporation formed by Franchisee for the convenience of ownership, Franchisor's consent to such transfer shall, in addition to the requirements set forth in Section 13.2 of this Agreement, be conditioned upon the following requirements:

13.5.1 Franchisee shall be the owner of all the voting stock of the corporation; and, if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

13.5.2 Corporate resolutions and minutes shall be furnished to Franchisor prior to the transfer, and the transferee shall comply with all the terms and conditions set forth in Sections 5 and 6 of this Agreement.

13.6   <u>Securities Offerings By Franchisee</u>: 13.6.1 Securities or partnership interests in Franchisee may be sold, by private offering or otherwise, only with the prior written consent of Franchisor, as required in Sections 13.2 hereof. All materials required for such offering by federal or state law shall be submitted to Franchisor for review prior to their being filed with any government agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating as an underwriter, issuer, or offeror of Franchisee's or Franchisor's securities; and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of Ten Thousand Dollars ($10,000), or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section 13.6.

13.6.2 Franchisor shall not unreasonably withhold its consent to a proposed public offering of securities interests in Franchisee; provided, however, that Franchisor may, in its sole discretion, require as a condition of its approval that Franchisor or a company controlling Franchisor has previously made a public offering of Franchisor's or such company's securities. (For the purposes of this Section 13.6, a "public offering" shall mean any offering requiring registration under any state or federal securities laws, and any offering exempt from registration but requiring disclosure under any federal law or regulation.)

13.7    Right of First Refusal:

13.7.1 If any party holding any interest in Franchisee or in this Agreement desires to sell or transfer such interest (the transfer of which interest would have the effect of transferring a controlling interest in the franchised business), or if Franchisee desires to accept any bona fide offer from a third party to purchase such interest or the premises of the franchised business, the seller shall notify Franchisor in writing of the terms of such offer, and shall provide such information and documentation relating to the offer as Franchisor may require; and Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor or such later date as may have been provided in the offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 13.7.1 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 13 with respect to a proposed transfer.

13.7.2 In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest in the franchised business proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor, and his determination shall be binding.

13.8    Transfer Upon Death or Mental Incompetency:  Upon the death or mental incompetency of any person with a controlling interest in the franchise or in Franchisee, the transfer of which requires the consent of Franchisor as provided in Section 13.2 hereof, the executor, administrator, personal representative, guardian, or conservator of such person shall transfer such interest within six (6) months after such death or mental incompetency to a third party approved by Franchisor. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section 13, the personal representative of the deceased person shall have a reasonable time to dispose of the deceased's interest in the franchise, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement. If the interest is not disposed of within a reasonable time, Franchisor may terminate this Agreement.

13.9    Non-Waiver of Claims:  Franchisor's consent to a transfer of any interest in the franchise granted herein shall not constitute a waiver of any claims Franchisor may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

13.10  Transfer by Bankruptcy – Right of First Refusal:  If, for any reason, this Agreement is not terminated pursuant to Section 14.1, and this Agreement is assumed or assignment of the same to any person or entity who has made a bona fide offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment and assumption, setting forth (a) the name and address of the proposed assignee, (b) all of the terms and conditions of the proposed assignment and assumption, and (c) the adequate assurance of proposed assignee's future performance of the Agreement (which shall incorporate the relevant prerequisites applicable to other proposed transferees pursuant to Section 13.2 of this Agreement) referred to in Section 365(b)(3) of the Bankruptcy Code shall be given to Franchisor within twenty (20) days after receipt of such proposed assignee's offer to accept assignment of this Agreement, and, in any event, within ten (10) days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption.  Franchisor shall have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the bona fide offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.

## 14.  DEFAULT AND TERMINATION

14.1  Termination Without Notice and Without Opportunity To Cure:  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee; if Franchisee is adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); if execution is levied against Franchisee's business or property;  if suit to foreclose any lien or mortgage against the premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of Franchisee's restaurant shall be sold after levy thereupon by any sheriff, marshal, or constable.

14.2  Termination With Notice But Without Opportunity To Cure:  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events;

14.2.1 If Franchisee fails to obtain a site for the franchised business as required in the Site Selection Addendum (Attachment A hereto), prepare the premises, and commence the franchised business as required in Section 5 hereof, or if Franchisee loses its lease, sublease, or its right to occupy the premises, ceases to operate or otherwise abandons the franchised business or otherwise forfeits the right to do or transact business in the jurisdiction where the restaurant is located; provided, however, that if any such loss of possession results from the governmental exercise of the power of eminent domain, or if, through no fault of Franchisee, the premises are damaged or destroyed, then Franchisee shall have thirty (30) days after either such event in which to apply for Franchisor's approval to relocate or reconstruct the premises, which approval shall not be unreasonably withheld;

14.2.2 If Franchisee or any principal or officer of Franchisee is convicted, or enters a plea with adjudication of guilt withheld or suspended, involving a felony, a crime involving moral turpitude, or engages in conduct that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

14.2.3 If Franchisee or any partner or shareholder of Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee to any third party without Franchisor's prior written consent, contrary to the terms of Section 13 of this Agreement;

14.2.4 If Franchisee fails to comply with the in-term covenants in Section 16 hereof or fails to obtain and provide Franchisor with the covenants required by Section16.9 hereof;

14.2.5 If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein contrary to Section 7 hereof, intentionally discloses the contents of the Manuals to any unauthorized person, or violates in any way the trade secrets and confidential information provisions of Section 8 hereof;

14.2.6 If an approved transfer, as required by Section 13.8 hereof, is not effected within a reasonable time following the death or mental incompetency of a person with a controlling interest in the franchise or in Franchisee;

14.2.7 If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor;

14.2.8 If Franchisee is declared in default by Franchisor under any provision of any other franchise agreement between the parties, any amendment thereof or successor thereto, or is in default of any provision of any sublease agreement, equipment purchase agreement, any promissory note (a) with Franchisor or an affiliate or (b) to which franchisor or any affiliates is a guarantor, or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates.

14.2.9 If Franchisee, after either (i) curing a default under this Agreement pursuant to a Notice of Termination; or (ii) after receipt of any other writing from Franchisor advising Franchisee that a default occurred regardless of whether such writing constituted a Notice of Termination, commits another default under this Agreement within 24 months following the earlier default;

14.2.10 If an imminent threat or danger to the public health or safety results from the operation of the restaurant.

14.3   Termination With Notice and Opportunity to Cure:  Except as provided in Sections 14.1 and 14.2 of this Agreement, Franchisee shall have thirty (30) days after its receipt from Franchisor of a written Notice of Termination within which to remedy any default hereunder and provide evidence thereof to Franchisor.  If any such default is not cured within that time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon expiration of the thirty (30) day period or such longer period as applicable law may require.  Franchisee shall be in default hereunder for any failure to comply substantially with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Manuals, or to carry out the terms of this Agreement in good faith.  Such defaults shall include, for example, without limitation, the occurrence of any of the following events:

14.3.1 If Franchisee fails, refuses, or neglects promptly to pay when due any monies owing to Franchisor or its subsidiaries or affiliates, or to the Funds, or to submit the financial information or other reports required by Franchisor under this Agreement;

14.3.2 If Franchisee fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing or fails to have an operations principal and/or to have an Operations Principal, if required;

14.3.3 If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent, as required by this Agreement;

14.3.4 If Franchisee, directly or indirectly, commences or conducts any business operation, or markets any service or product under any name or proprietary mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

14.3.5 If Franchisee, by act or omission, suffers a continued violation, in connection with the operation of the restaurant, of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administrative or judicial forum for relief therefrom.

14.4   Termination of Area Development Agreement Because of Franchise Agreement Default  Default under this Franchise Agreement shall constitute a default under any Development Agreement between the parties pursuant to which this Franchise Agreement was executed.

## 15.    OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Agreement:

15.1    Cessation of Restaurant Operations:  Franchisee shall immediately cease to operate the business franchised under this Agreement and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.  Franchisee shall immediately return to Franchisor all confidential materials provided to Franchisee by Franchisor and/or Franchisor's designee(s), which confidential materials include without limitation, the Manuals and any translations thereof.

15.2    Cessation of Use of Confidential Information and Proprietary Marks: Franchisee shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any format, confidential methods, procedures, and techniques associated with the System; the Proprietary Mark "Golden Corral" and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, trade dress or devices associated with the System.  In particular, without limitation, Franchisee shall cease to use all signs, equipment, advertising materials, forms, and any other articles which display the Proprietary Marks; provided, however, that this Section 15.2. shall not apply to the operation of any other franchise under the System which may be granted by Franchisor to Franchisee.

15.3    Cancellation of Assumed Name Registration:  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Golden Corral" or any other service mark or trademark of Franchisor; and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

15.4    Assignment of Lease/Modification of Premises:  Franchisee shall, at Franchisor's option (which such option may be exercised within thirty (30) days after termination or expiration), assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises of the franchised business.  In the event Franchisor does not elect to exercise its option to purchase the premises pursuant to Section 15.8, or to acquire the lease or sublease for the premises of the franchised business pursuant to Section 15.4, Franchisee shall make such modifications or alterations to the premises operated hereunder (including, without limitation, the changing of the telephone number and trade dress) immediately upon termination or expiration of this Agreement as may be necessary to prevent the operation of any business thereon by itself or others in derogation of this Section 15 and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 15, Franchisor shall have the right to enter upon the premises where Franchisee's franchised business was conducted, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.  Further, Franchisee shall not use any reproduction, counterfeit copy, or

colorable imitation of the Proprietary Marks either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's exclusive rights in and to the Proprietary Marks; and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor.

15.5 _Franchisor's Right of First Refusal for Franchisee Sale_: If Franchisee owns an interest in the premises of the franchised business and, at any time prior to the termination or expiration of this Agreement, Franchisee desires to accept any bona fide offer from a third party to purchase Franchisee's interest in the premises of the franchised business, then Franchisee shall notify Franchisor in writing of the terms of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require, including information as to the condition of title to the restaurant premises; and Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to Franchisee that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor intends to purchase Franchisee's interest, closing on such purchase must occur within sixty (60) days from the date of notice to Franchisee of the election to purchase by Franchisor or such later date as may have been provided in the offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 15.5 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 15.5, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest in the premises of the franchised business proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor, and his determination shall be binding.

15.6 _Payment of Monies Due_: Franchisee shall promptly pay all sums owing to Franchisor and its affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages (including future royalty fees that otherwise likely would have been paid from the termination date through the end of the initial term but for the early termination of the Agreement), costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and on any and all premises operated hereunder at the time of default. The value of "future royalty fees" shall be calculated as the present value of the average monthly Royalty Fees that Franchisee was obligated to pay pursuant to Section 4.2 of this Agreement during the 12-month period immediately preceding the month that the Franchise Agreement is terminated, multiplied by the number of months remaining in the initial Franchise Agreement term at the date of termination. Franchisee hereby appoints Franchisor as its attorney in fact, with full power and authority to execute on Franchisee's behalf such

of this Lease. If, following such assumption, Franchisor desires to assign the Lease or sublet the entire Premises to a third party franchisee which will operate on the Premises a Golden Corral® restaurant in accordance with the terms and provisions of this Lease, unless Franchisor agrees to guarantee such proposed assignee's performance of the terms and conditions of this Lease, Franchisor's ability to assign this Lease shall be subject to Landlord's written consent and the Landlord shall not be required to give Landlord's consent if, based upon review of certified financial statements and business background information to be provided by the proposed assignee, Landlord reasonably believes that the proposed assignee may not have the requisite financial resources to fulfill the obligations of the Tenant under the terms of this Lease.

**14.2   Franchisor's Rights Subordinate:** The rights of the franchisor as hereinabove provided are, at all times, subject and subordinate to the superior rights of any Fee Lender or Leasehold Lender.

### Article XV   Default; Insolvency Events; and Conditions of Limitation

**15.1   Events of Default** This Lease and the term and estate thereof are subject to the conditional limitation set forth below.  If any of the following events occur (each, an "Event of Default"):

    i.    If Tenant fails to pay Base Rent to Landlord or Additional Rent to the party entitled to receive same when the same is due and payable under the terms of this Lease and such failure continues for a period of ten (10) days after written notice thereof is given to Tenant, or

    ii.    Tenant fails to timely perform its obligations pertaining to the construction of the Improvements and the timetable with respect to same which continues for a period of twenty (20) days after written notice thereof is given to Tenant; or

    iii.    Tenant fails to discharge any mechanic's or other lien that is its obligation to discharge under the terms of this Lease for a period of twenty (20) days after written notice thereof is given to Tenant; or

    iv.    Tenant, whether by action or inaction, fails to timely perform or observe any of the other terms, covenants or conditions of this Lease and such default is not remedied within twenty (20) days after written notice thereof is given to Tenant, provided that if such default cannot, with reasonable diligence, be fully remedied within such 20-day period, Tenant shall have as long as is reasonably necessary to cure such default, but in no event longer than three (3) months after the date such default notice is given to Tenant, provided Tenant commences compliance within such 20-day period (or as promptly as reasonably possible in an emergency) and thereafter pursues compliance to completion with reasonable diligence; or

    v.    A receiver is appointed for Tenant or any property of Tenant in any action, suit, or proceeding by or against Tenant and such appointment is not vacated or annulled within one hundred twenty (120) days, or

    vi.    The interest of Tenant in this Lease or the rents from the Premises is sold under execution or other legal process;

then Landlord may, subject to the rights of Franchisor and any Lenders, at any time during the continuance of such Event of Default, give Tenant notice of termination of this Lease and, upon the date five (5) days after service of such notice, this Lease and the term and estate thereof (whether or not the Commencement Date shall have occurred) shall terminate and end with the same force and effect as if that day were the day herein definitely fixed for the end and expiration of this Lease, but Tenant shall remain liable for damages as provided in this Lease and Landlord may resort to and enforce any of the remedies provided in Article XVI below.

**15.2    Insolvency Events of Default:** This Lease and the term and estate thereof are subject to the further conditional limitation that if any of the following events occur ("Insolvency Events"):

    i.    Tenant makes an assignment for the benefit of its creditors, or

    ii.    If an involuntary petition is filed against Tenant under any bankruptcy or insolvency law or under the reorganization provisions of any law of like import, and such petition is not dismissed within one hundred twenty (120) days after the date filed; or

    iii.    Tenant shall file a voluntary petition under any bankruptcy or insolvency law, or whenever any court of competent jurisdiction shall approve a petition filed by Tenant under the reorganization provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a petition shall be filed by Tenant under the arrangement provisions of the United States Bankruptcy Act or under the provisions of any law of like import; or

    iv.    Any guarantor of some or all of Tenant's obligations under this Lease, during the period that the guaranty is in effect, dies or becomes incapacitated, is dissolved or liquidated, makes an assignment for the benefit of his/her/its creditors, is the debtor named in a voluntary petition in bankruptcy, is the debtor named in an involuntary petition in bankruptcy which petition is not discharged within 120 days, has a receiver appointed for his/her/its assets which receivership is not vacated or annulled within one hundred twenty (120 days), or is the subject of any other insolvency proceeding and such insolvency proceeding is not dismissed within one hundred twenty (120) days;

then Landlord may, subject to the rights of Franchisor and any Lenders, at any time during the continuance of such Insolvency Event, give Tenant notice of termination of this Lease and, upon the date five (5) days after service of such notice, this Lease and the term and estate thereof (whether or not the Commencement Date shall have occurred) shall terminate and end with the same force and effect as if that day were the day herein definitely fixed for the end and expiration of this Lease, but Tenant shall remain liable for damages as provided in this Lease and Landlord may resort to and enforce any of the remedies provided in Article XVI below.

**Article XVI Remedies**

**16.1    Remedies upon Termination or Landlord's Re-entry:** Subject to the rights of Franchisor and any Lenders to the extent of and limited by the terms of this Lease, if (i) this Lease is terminated pursuant to Article XV, or (ii) Landlord reenters or obtains possession of the Premises by summary proceedings or any other action or proceeding, or (iii) Landlord reenters or obtains possession by any other legal act (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises if this Lease is

terminated pursuant to Article XV), all of the provisions of this Section shall apply (in addition to any other applicable provisions of this Lease):

1. Tenant shall immediately vacate the Premises and surrender the Premises to Landlord in good order, condition and repair, excepting reasonable wear and tear and damage that is not Tenant's obligation to repair; and, if Tenant fails to surrender the Premises in such condition, Tenant shall reimburse Landlord for all costs incurred by Landlord to restore the Premises to such condition.

2. Landlord, at Landlord's option, may (i) relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, and Landlord use commercially reasonable efforts to mitigate its damages, provided that the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this Lease, and (ii) make any changes to the Premises as Landlord, in Landlord's judgment, considers advisable or necessary in connection with a reletting, without imposing any liability or obligation on Landlord or relieving Tenant of any obligation or liability under this Lease.

3. Tenant shall pay Landlord the following amounts:

   a. All Rent payable to the date on which this Lease is terminated or Landlord reenters or obtains possession of the Premises; and

   b. Any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the periodic Additional Rent for each year thereof to be the same as was payable for the 12 month period immediately preceding the termination, re-entry or obtaining of possession); and (ii) the rents, if any, applicable to that period collected under any reletting of any portion of the Premises; and Tenant shall pay any such deficiency in monthly installments on the days specified in this Lease for payment of installments of the Base Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. Tenant shall not be entitled to any rents payable (whether or not collected) under any reletting, whether or not those rents exceed the Rent.

   In lieu of any further deficiency pursuant to this subparagraph (b), Landlord may recover from Tenant, and Tenant shall pay Landlord, on request, as liquidated damages for such further deficiency, the amount by which (i) the unpaid Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the 12-month period immediately preceding the termination, re-entry or obtaining of possession) exceeds (ii) the then fair market rental value of the Premises, including the Additional Rent for the same period, both discounted to present value at the annual rate of __ percent (__%).

   c. Any costs and expenses incurred by Landlord in connection with the termination, reentry or obtaining of possession, and the reletting of the Premises, including all repossession costs, brokerage commissions, reasonable attorneys' fees and disbursements, alteration costs and other expenses of preparing the Premises for reletting.

4. Tenant shall deliver to Landlord all sums held by Tenant with respect to Subtenants of the Premises, including prepaid rents, estimated prepayments relating to real estate taxes, operating expenses, and other expenses; all security deposits; and all guaranties of Subtenant obligations (whether full or partial guaranties); and shall transfer to Landlord at Tenant's expense any letters of credit, bonds and other security instruments issued to Tenant on behalf of such Subtenants in accordance with the requirements of the issuer thereof.

5. Nothing contained in this Lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Law.

**16.2   Waiver by Tenant:** Subject to the rights of Franchisor and any Lenders, to the extent of and limited by the terms of this Lease, Tenant hereby waives (a) the service of any notice of intention to re-enter or obtain possession of the Premises or to institute any legal action in connection therewith, and (b) on its own behalf and on behalf of all persons claiming under Tenant, including all creditors, any rights Tenant and all such persons might otherwise have under any Law to redeem the Premises, to re-enter or repossess the Premises, or to restore this Lease, after (i) Tenant is dispossessed pursuant to any Law or by any Authority, (ii) Landlord reenters or obtains possession of the Premises pursuant to any legal act, action or proceeding, or (iii) the date of termination of this Lease, whether by operation of law or pursuant to this Lease.

**16.3   No Election of Remedies:** Either party may seek to enjoin any breach or threatened breach of any provision of this Lease. The right of any party to exercise any particular remedy available under this Lease, at law or in equity, shall not preclude such party from exercising any other remedy it might have pursuant to this Lease, in law or in equity. Each right and remedy specified in this Lease and each other right or remedy that may exist at law, in equity or otherwise upon breach of any provision in this Lease, shall be deemed distinct, separate and cumulative; and no right or remedy, whether exercised or not, shall be deemed to be in exclusion of any other unless otherwise expressly provided in this Lease.

**16.4   Waiver of Counterclaim:** If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**16.5   Landlord's Right To Reimbursement In The Event Of Cure By Landlord:** Upon five (5) days written notice to Tenant, if (i) there is then an Event of Default, or (ii) if Tenant fails to comply with any obligation under this Lease which in Landlord's reasonable opinion creates an emergency, Landlord may, but is not obligated to, cure the default. Tenant shall reimburse Landlord, as Additional Rent, for all Liabilities incurred by Landlord in connection therewith, within ten (10) days after Tenant is billed for such Liabilities.

**16.6   Landlord's right to reimbursement for expensed incurred due to Tenant's Default:** Tenant shall reimburse Landlord, as Additional Rent, for all costs and expenses incurred by Landlord in connection with any default by Tenant, after the running of any applicable grace or cure periods provided for herein, in the performance or observance of any of the terms, covenants or conditions on Tenant's part to be observed or performed under this Lease, including all costs and expenses incurred in interpreting and enforcing Landlord's rights

30

the validity thereof and without regard to any objection by Tenant. The amount so paid and costs incurred by Landlord shall be deemed Additional Rent under this Lease payable within thirty (30) days after Tenant is billed therefor. Nothing in this Lease shall be deemed in any way to: (i) constitute Landlord's consent or request, express or implied, that any contractor, subcontractor, laborer or materialmen provide any labor or materials for any alteration, addition, improvement or repair of the Premises; or (ii) evidence Landlord's agreement to subject its fee estate to any such lien.

## Article XX   Quiet Enjoyment

**20.1   Landlord's Covenant:** Landlord covenants that if and so long as Tenant observes and performs each and every covenant, agreement, term, provision and condition of this Lease on the part of Tenant to be observed and performed, Tenant shall quietly enjoy the Premises without hindrance or molestation of Landlord or any Person acting through Landlord subject to the covenants, agreements, terms, provisions and conditions of this Lease.

## Article XXI   Limitation of Landlord Liability

**21.1   Sale or Assignment by Landlord:** If Landlord shall sell, assign, or otherwise transfer (whether by operation of law or otherwise) all or part of its or their interest in the Premises or this Lease (i) the transferor shall be relieved of all obligations and liabilities of Landlord under this Lease accruing after the effective date of the transfer, and (ii) the transferee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer.

**21.2   Limitation of Landlord Liability:** Landlord, its partners, members, shareholders, officers, directors and principals, disclosed and undisclosed, shall have no personal liability under or in connection with this Lease. Tenant shall look only to Landlord's interest in the Premises and this Lease for the satisfaction of Tenant's remedies or to collect any judgment requiring the payment of money by Landlord or such persons under or in connection with this Lease. No other assets of Landlord or such persons shall be subject to lien, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies or the collection of any judgment under or in connection with this Lease. If Tenant acquires a lien on such other property or assets by judgment or otherwise, Tenant shall promptly release that lien by signing, acknowledging and delivering to Landlord any instrument, prepared by Landlord, required for the lien to be released.

**21.3 Environmental:** Prior to the date of execution of this Lease, the Landlord has provided to the Tenant (a) authorization to the Tenant to conduct a Phase I environmental site assessment with respect to the property and (b) access to the if the Phase I environmental site assessment previously conducted on behalf of Landlord with respect to the Premises. If, on the basis of the Tenant's review of the Phase I environmental site assessment to be conducted on behalf of the Tenant, the Tenant desires to conduct a Phase II environmental site assessment, the Landlord shall consent to such additional testing. In view of the foregoing, the Tenant shall rely solely on the on the results of such testing and the Landlord shall make no representation in connection with or in relation to the environmental condition of the Premises.

## Article XXII   Waiver of Jury Trial

**22.1   Waiver of Jury Trial:**   LANDLORD AND TENANT EACH WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE OR OCCUPANCY OF

34

THE PREMISES, INCLUDING ANY CLAIM OF INJURY OR DAMAGE, AND ANY EMERGENCY AND OTHER STATUTORY REMEDY WITH RESPECT THERETO.

### Article XXIII   Notices

**23.1   Notice Is to Be in Writing; Where sent:** Except as may be provided in this Lease, any notice or other communication under this Lease, other than any Rent bill, shall be in writing and shall be sent by United States express mail or by a nationally recognized overnight delivery service that provides receipts or by hand delivery addressed to the party for whom intended at its Notice Address. Any such notice or other communication shall be deemed given and received when delivered or refused or when delivery is attempted on a Business Day during normal business hours. Rent bills to Tenant may be sent in the manner set forth above or may be sent by first class mail; provided that nothing contained in this Section shall be deemed to require Landlord to bill or otherwise make demand on Tenant for the payment of Rent, except where this Lease expressly requires billing.

**23.2   Change of Notice Address:** Either party may, by notice to the other party, designate a different address (or addresses) for notices and other communications intended for it, which designation shall become effective on the date such notice is received.

### Article XXIV End of Term

**24.1   Surrender of Premises:** On the Expiration Date or such earlier date that this Lease terminates or expires, Tenant shall peaceably and quietly surrender the Premises to Landlord vacant (except for those Subtenants occupying under leases with Landlord), broom clean, in good order, condition and repair excepting reasonable wear and tear and damage that is not Tenant's obligation to repair, free and clear of all Subleases, liens, and other encumbrances (except for liens and encumbrances caused or expressly consented to by Landlord), and with all Personal Property acquired (or leased) by Tenant or Tenant's Affiliates and all personal property of Subtenants (except for the property of Subtenants occupying under leases with Landlord) removed. Tenant shall deliver to Landlord, on or before the Expiration Date or such earlier date that this Lease terminates or expires, upon Landlord's request, all licenses, permits, warranties, and guaranties then in effect for the Premises (and shall, to the extent they are assignable, assign same to Landlord upon Landlord's request). Tenant shall cooperate with Landlord to achieve an orderly transition of the Premises to Landlord's control. Landlord and Tenant shall, prior to the Expiration Date, (i) adjust for Impositions and all other appropriate expenses and income of the Premises, and (ii) if a Memorandum of Lease has been recorded, execute a document in recordable form evidencing the termination of this Lease and all amendments thereto.

**24.2   Personal Property Deemed to Be Abandoned:** Any personal property of Tenant or any Subtenant which shall remain on the Premises after the Expiration Date or such earlier date that this Lease terminates or expires, may, at the option of Landlord, be deemed to have been abandoned and either may be retained by Landlord as its property or be disposed of, without accountability, in such manner as Landlord may see fit. Tenant shall reimburse Landlord, as Additional Rent, for all costs and expenses incurred by Landlord in connection with disposing of such property.

**24.3   Tenant's Liability for Failure to Vacate** If the Premises are not vacated and surrendered in accordance with this Lease on the Expiration Date or sooner termination of this Lease, Tenant shall be liable to Landlord for (i) all Liabilities incurred by Landlord in connection with such holdover, including Liabilities incurred in connection with any summary proceedings, action or proceeding to recover possession of the Premises from Tenant and any Subtenants, and (ii) per diem use and occupancy in respect of the Premises equal to the fair rental value of the Premises, and (iii) all damages incurred by

Landlord in connection with such holdover, including any lost opportunity damages incurred by Landlord. If only a portion of the Premises is timely vacated and surrendered, Tenant shall nevertheless remain liable for per diem use and occupancy with respect to the entire Premises, but any reletting proceeds received by Landlord during the period of Tenant's holdover shall be credited against Tenant's liability for use and occupancy for the entire Premises. In no event shall this Section be construed as permitting Tenant (or other occupants) to remain in possession of the Premises after the Expiration Date or sooner termination of this Lease. Tenant shall indemnify, defend and hold harmless Landlord against all claims made by any succeeding tenants to the extent such claims arise by reason of the failure of Tenant (and all other occupants) timely to vacate and surrender the Premises (or any portion thereof) in accordance with this Lease. Landlord may recover amounts due it under this Section in any summary proceeding and/or any separate action or proceeding.

**24.4    No Implied Acceptance of Surrender:** No act or thing done by Landlord or Landlord's agents (including receipt of keys) during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord.

## Article XXV Extension Option(s)

**25.1    Grant of Options to Extend:** Tenant is granted the option to extend the term of this Lease for seven (7) successive additional terms of five (5) years each (each such additional term being referred to as an "Extension Term," and each such option being referred to as an "Extension Option") provided all of the following conditions (the "Extension Conditions") are met with respect to each Extension Term: (a) Tenant gives Landlord notice (the "Extension Notice") at least seven (7) months prior to commencement of the Extension Term to which such notice relates, that it is exercising the Extension Option, and (b) at the date the Extension Option is exercised, and at the commencement of the Extension Term to which such option relates, Tenant is not in default of its obligations under the Lease, unless such default is cured within the applicable cure period. Each such Extension Term shall commence at the expiration of the prior term. If any Extension Option is not timely exercised or if the Extension Conditions are not met with respect to any Extension Term, such Extension Option or Extension Term and all further Extension Options and Extension Terms shall be deemed null and void. TIME IS OF THE ESSENCE WITH RESPECT TO THE GIVING OF EACH EXTENSION NOTICE.

**25.2    No Options If Lease Terminated:** If this Lease is terminated or expires for any reason, the Extension Options granted in this Article with respect to periods subsequent to such termination or expiration shall be deemed null and void.

**25.3    Terms of Extension:** Each such Extension Term shall be upon all of the terms and conditions of this Lease, except as follows and as otherwise hereinafter provided:

i.    Any rent concession granted in this Lease shall not apply to any Extension Term.

ii.   At the end of the seventh Extension Term the provisions of this Article shall be deemed null and void and there shall be no further extension of the term of this Lease pursuant to this Article.

iii.  The Base Rent payable during the first Extension Term shall be One Hundred Fifteen Thousand Dollars ($115,000.00) per year and the Base Rent payable during the second extension term shall be One Hundred Twenty Thousand Dollars ($120,000.00) per year;

36

iv.  The Base Rent payable for the third through the seventh Extension Term shall be determined in the following manner: Base Rent for the third through the seventh extension terms shall be the Fair Market Rental Value of the Premises which shall in be determined by negotiations between the parties commencing upon the giving of the Tenant's renewal notice which shall be given not less than one hundred eighty (180) days prior to the expiration of the last year of the then current Extension Term.  If negotiations between the parties do not result in agreement on the Fair Market Rental Value within sixty (60) days, the parties shall, within ten (10) days, attempt to agree upon a single appraiser (who shall be impartial and shall have a minimum of ten (10) years' experience in commercial leasing or real estate appraisal in Dutchess County, New York) and such person shall determine the market rate of rental within fifty (50) days of being so appointed.  In the event that the parties are unable to agree upon a single appraiser to determine the Fair Market Rental Value as aforesaid within the ten (10) day period hereinabove specified, then and in that event each party shall have the right, within five (5) days thereafter, to appoint such party's appraiser (who shall each meet the qualifications referenced above) and the two appraisers as selected by the parties shall endeavor to agree upon the Fair Market Rental Value within fifty (50) days of being so appointed.  In the event that the two appraisers as selected by the parties are unable to agree upon the fair market rental value for the then applicable Extension Term within such fifty (50) day period as referenced above, then the two appraisers shall, within ten (10) days, agree upon a third appraiser who shall determine the Fair Market Rental Value for the then applicable Extension Term, provided that the Fair Market Rental Value as determined by the third appraiser shall not be lower than the lower of the two Fair Market Rental Values made by the parties' appraisers nor higher than the higher of the two Fair Market Rental Values made by the parties' appraisers.  In the event that the Fair Market Rental Value as determined by the third appraiser is lower than the lower of the two Fair Market Rental Values made by the parties' appraisers or higher than the higher of the two Fair Market Rental Values made by the parties' appraisers, then the Fair Market Rental Values for the option term shall be the Fair Market Rental Value made by one of the original two appraisers which is closest in amount to the market rate of rental as determined by the third appraiser. Notwithstanding the foregoing, under no circumstances shall the Base Rent the first year of the each subsequent Extension Term be less than an amount equal to 90% of the Base Rent in effect with respect to the last year of the most recently than expiring Extension Term.

## Article XXVI  Miscellaneous

**26.1  No Oral Modification:** This Lease may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

**26.2  Acceptance of Rent Not a Waiver:** Receipt or acceptance of Rent by Landlord and payment of any Rent by Tenant shall not be deemed to be a waiver of any default under the covenants, agreements, terms, provisions and conditions of this Lease, or of any right which Landlord or Tenant, as the case may be, may be entitled to exercise under this Lease. Failure to insist upon the strict performance of any of the provisions of this Lease or to exercise any right, remedy or election herein contained or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future of such provision, right, remedy or election, but the same shall continue and remain in full force and effect. The waiver by either party of any breach of this Lease shall not be deemed a waiver of any future breach.

**26.3   Landlords Consents:** Unless otherwise stated herein, when Landlord's consent is requested or required, such consent shall not unreasonably be withheld, conditioned or delayed, and a failure to respond to any request within thirty (30) days of request shall constitute consent. Any consent required or Consent of Landlord to any act or matter must be in writing and shall apply only with respect to the particular act or matter to which such consent is given and shall not relieve Tenant from the obligation wherever required under this Lease to obtain the consent of Landlord to any other act or matter. If Tenant requests Landlord's consent or approval and Landlord fails or refuses to give such consent or approval, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent or approval, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold or delay its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

**26.4   No Implied Relationship between Landlord and Tenant:** Landlord and Tenant acknowledge that they are not partners or joint venturers and that, except with respect to casualty insurance proceeds and condemnation awards as provided for above, they do not stand in a fiduciary relationship to one another.

**26.5   Survival of Terms:** If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by Law.

**26.6   Situs:** This Lease is governed by and shall be construed and enforced in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

**26.7   Binding Effect:** The covenants, agreements, terms, provisions and conditions of this Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord and the permitted successors and assigns of Tenant.

**26.8   Post-expiration Obligations:** Upon the expiration of the Term of this Lease, neither party shall have any further obligation or liability to the other except as otherwise provided in this Lease and except for (a) such obligations as by their nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after such expiration, and (b) any liability for Rent, and (c) any liability for acts or omissions occurring during the Term.

**26.9   Representations and Warranties:** Each party represents and warrants (a) that this Lease has been duly authorized, executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, (b) that there are no actions, suits or proceedings pending or, to the knowledge of such party, threatened against or affecting such party, at law or in equity or before any Governmental Authority which would impair such party's ability to perform its obligations under this Lease, and (c) that the consummation of the transactions hereby contemplated and the performance of this Lease will not result in any breach or violation of, or constitute a default under any lease, bank loan or credit agreement. If Tenant is not an individual, Tenant shall provide to Landlord, upon Landlord's request, evidence that the execution and delivery of this Lease have been duly authorized by Tenant and that the person or persons executing and delivering this Lease on behalf of Tenant have been duly authorized to do so, together with a certified copy of Tenant's articles of incorporation, partnership agreement or operating agreement, as applicable, and all amendments thereto.

**26.10  No Merger of Estates:** There shall be no merger of this Lease or the leasehold estate created by this Lease with a fee interest in the Premises by reason of the fact that the same Person may acquire, own or hold, directly or indirectly, this Lease or the leasehold estate created by this Lease and the fee estate in the Premises, unless and until such Person and every Leasehold Lender and Fee Lender shall join in a written instrument expressly providing for such merger and such instrument is recorded.

**26.11  Unavoidable Delay:** If either party is prevented from performing an obligation of such party hereunder, other than the payment of money, by a cause beyond its control, and which cause could not reasonably have been anticipated and avoided ("Unavoidable Delay"), such party's responsibility for performance of such obligation shall be delayed for the duration that such performance is so prevented.  A party's obligation for the payment of money under this Lease shall never be excused or delayed by reason of the operation of this provision.

**26.12  Entire Agreement and Merger:** This Lease represents the entire agreement of the parties with respect to the Premises, and, accordingly, all prior understandings and agreements between the parties with respect to the Premises are merged into this Lease, which alone fully and completely expresses the agreement of the parties.

**26.13  Captions, Headings and Titles:** The captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation.

**26.14  Construction of Provisions:** This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

**26.15  Independent Obligations:** Each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed, shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease.

**26.16  Plural; Gender:** All terms and words used in this Lease shall be deemed to include any other number and any other gender as the context may require.

**26.17  Obligations Predicated Solely upon Executed Lease:** The submission of drafts of  and comments to this Lease, the negotiation of  this Lease, and the exchange of correspondence concerning the negotiation and execution of this Lease shall have no binding force or effect and shall confer no rights nor impose any obligations, including brokerage obligations, on either party. This Lease shall become a binding agreement only after both Landlord and Tenant have executed this Lease and duplicate originals thereof (including any counterparts) shall have been delivered to the respective parties.

**26.18  Execution in Counterparts:** This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this instrument as of the day and year first above written.

[SIGNATURES ON NEXT PAGE]

82   ANFRAN REALTY, INC.

By: _____
Name: _Anthony P. Segheti_
Title: _President_


CORNUCOPIA QUEEN, INC.

By: _____ 3/10/15
Sherrance Henderson
Title: President

40

a.   The amount of such financing shall be up to 100% of the Purchase Price;

b.   The purchase money mortgage will be a purchase money first mortgage and lien applicable to the Premises and will not be subject to or subordinate to any other financing applicable to the improvements constructed on the Premises or any other financing;

c.   The term of such purchase money mortgage shall not be greater than 20 years and the payments required to be made pursuant to such purchase money mortgage shall include principal and interest amortized over the term of the purchase money mortgage so that said purchase money mortgage will be self-amortizing;

d.   The interest rate shall be fixed at the time of the closing of title to the Premises at a rate equal to the prime rate of interest as then charged by Citibank NA plus three (3) percentage points, which such initial interest rate shall be in effect for a period of sixty (60) months from the date of closing. The interest rate shall thereafter be adjusted every sixty (60) months based upon the same formula i.e., the prime rate of interest as then charged by Citibank NA plus three (3) percentage points;

e.   The mortgage will be drawn by the attorney for the Grantor/Seller and the costs for the preparation of such mortgage and all recording fees and taxes applicable to the recording of such mortgage shall be paid for by the Grantee.

**4.   Consideration**: In consideration for the granting of the rights provided for herein including the Purchase Option, the right of first refusal and the option for seller financing, the Grantee agrees to pay to the Grantor the sum of four hundred and sixty-two thousand five hundred ($462,500.00) dollars (" Consideration"). The obligation of Grantee to pay the Consideration shall become effective upon the satisfaction of all conditions precedent in the Lease. Grantee acknowledges that, as the Grantee's Rights as provided for herein are subject to termination only through a default of the Grantee, the consideration due the Grantor pursuant to this Agreement has been and is hereby deemed as earned in full by the Grantor upon the execution of this Agreement by the Grantor. Notwithstanding the foregoing, provided that the payments set forth below (" Conditionally Deferred Payments") are made by the Grantee upon the due date herein below provided for, the Grantor shall forbear from demanding and receiving payment in full of the then unpaid balance. Within ten (10) days of the Rent Commencement Date and annually thereafter upon each anniversary date thereof for a total of twenty-five annual payments, Grantee shall pay Grantor , without interest on the unpaid principal balance the following Conditionally Deferred Payments:

a. $32,500.00 on the Rent Commencement Date and first anniversary thereof which has this date been deposited in Escrow pursuant to the Escrow Agreement referenced below;

b. $32,500.00 annually on the third through tenth anniversary of the Rent Commencement Date;

c. $12,500.00 annually on the eleventh through fifteenth anniversary of the Rent Commencement Date;

d. $10,000.00 annually on the sixteenth through twentieth anniversary of the Rent Commencement Date; and

e. $5,000.00 annually for on the twenty-first through twenty-fifth anniversary of the rent commencement date).

Landlord shall provide account information for Grantee to make electronic payments of the Conditionally Deferred Payments.

The sole and exclusive circumstance under which the Grantee shall be relieved of the payment of the consideration due Grantor shall be if the Grantee purchases the Premises pursuant to the Purchase Option or the right of first refusal, in which case Grantor's entitlement to future payments shall cease as of the date title is vested in the Grantee.

If, beginning with year 3, the Grantee shall default in connection with the Conditionally Deferred Payments set forth above and such default is not cured within ten (10) days of receipt of written notice of such default, then and in that event:

a. All rights conveyed to the Grantee under this Agreement shall cease and be of no further force and effect; and

b. Grantee shall be entitled to full payment of the unpaid balance of the Consideration due hereunder.

5. **Escrow Agreement**: Simultaneously herewith the parties hereto have entered into an escrow agreement ("Escrow Agreement") under the terms of which the Grantee has prepaid the first two (2) annual Conditionally Deferred Payments. The Escrow Agreement is established to pay the first two payments to the Grantor as and when become due.

6. **Recording:** The parties hereto agree that they shall execute a memorandum of agreement relating to this Agreement and that same shall be recorded in the office of the Clerk of the County of Dutchess, State of New York.

7. **Meaning of terms**: The terms "Grantor" and "Grantee", whenever used, although stated and used in the singular includes the plural and refers to all persons herein named.

5

**8. Situs**: This Agreement shall be interpreted and enforced under the laws of the State of New York without reference to choice of law provisions or authorities and the parties hereto consent to jurisdiction for enforcement of this agreement in Dutchess County New York.

**9. Binding Effect**: This Agreement shall be binding upon the parties hereto, their heirs executors and assigns.

**10. Merger**: This Agreement and the Escrow Agreement contain all of the agreements between the parties hereto relating to the subject matter hereof and may only be modified by a writing executed by the parties hereto with the same formalities as the within Agreement.

**11. Attorney's Fees**: In the event that any party to this Agreement is required to commence or otherwise commences litigation to enforce such party's rights under the terms of this Agreement, then the party prevailing in such litigation shall be entitled to collect his or hers attorney's fees from the non-prevailing party.

**12. Notices: Notice Is to Be in Writing; Where sent:** Except as may be provided in this Agreement, any notice or other communication under this Agreement, shall be in writing and shall be sent by United States express mail or by a nationally recognized overnight delivery service that provides receipts or by hand delivery addressed to the party for whom intended at it's the address set forth above ("Notice Address"). Any such notice or other communication shall be deemed given and received when delivered or refused or when delivery is attempted on a Business Day during normal business hours. Either party may, by notice to the other party, designate a different address (or addresses) for notices and other communications intended for it, which designation shall become effective on the date such notice is received.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of _____, 2015.

**82 ANFRAN REALTY, INC.**

By:_____
Name: _____
Title: _____

**CORNUCOPIA QUEEN, INC.**

By:_____        3/10/15
Sherrance Henderson
Title: President

Proper acknowledgments for state of execution need to be inserted upon finalization

**8.** **Situs:** This Agreement shall be interpreted and enforced under the laws of the State of New York without reference to choice of law provisions or authorities and the parties hereto consent to jurisdiction for enforcement of this agreement in Dutchess County New York.

**9.** **Binding Effect:** This Agreement shall be binding upon the parties hereto, their heirs executors and assigns.

**10.** **Merger:** This Agreement and the Escrow Agreement contain all of the agreements between the parties hereto relating to the subject matter hereof and may only be modified by a writing executed by the parties hereto with the same formalities as the within Agreement.

**11. Attorney's Fees:** In the event that any party to this Agreement is required to commence or otherwise commences litigation to enforce such party's rights under the terms of this Agreement, then the party prevailing in such litigation shall be entitled to collect his or hers attorney's fees from the non-prevailing party.

**12. Notices: Notice Is to Be in Writing; Where sent:** Except as may be provided in this Agreement, any notice or other communication under this Agreement, shall be in writing and shall be sent by United States express mail or by a nationally recognized overnight delivery service that provides receipts or by hand delivery addressed to the party for whom intended at it's the address set forth above ("Notice Address"). Any such notice or other communication shall be deemed given and received when delivered or refused or when delivery is attempted on a Business Day during normal business hours. Either party may, by notice to the other party, designate a different address (or addresses) for notices and other communications intended for it, which designation shall become effective on the date such notice is received.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of _____, 2015.

**82 ANFRAN REALTY, INC.**

By:_____
Name: _____
Title: _____

**CORNUCOPIA QUEEN, INC.**

By:_____   3/10/15
Sherrance Henderson
Title: President

Proper acknowledgments for state of execution need to be inserted upon finalization

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day first above written.

**LANDLORD:**

**82 ANFRAN REALTY, INC.**

By:_____
Anthony P. Segreti
President

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day first above written.

**LANDLORD:**

**82 ANFRAN REALTY, INC.**


By:_____
Anthony P. Segreti
President

Improvements hereinabove referred to by means which do not in any way impair or encumber the Premises or in any way which grants any interest in the Premises other than through the Terms of this Lease and, in such case, only through means which do not in any way impair the enforcement of this Lease on the part of the Landlord. Landlord is amenable to the construction of the restaurant subject to the foregoing and other terms and conditions hereof set forth in this Lease.

**3.2   Improvements**:   Attached hereto and made part hereof as Exhibit A are preliminary plans and specifications for the construction of the Improvements. As set forth in such Exhibit A, the Improvements will include a new freestanding building designed to be used as a Golden Corral Restaurant located entirely within the boundaries of the Premises, parking facilities, curbs, drainage, access to public streets, landscaping and other improvements as required by the Approvals. Landlord and Tenant acknowledge that the final version of the plans and specifications for the construction of the Improvements will be deferred until such time as the municipal and regulatory agencies having jurisdiction over the construction of the Improvements have reviewed and approved such plans and specifications and have caused to be issued a building permit in connection with same at which time, such approved plans and specifications shall be substituted for the preliminary plans and specifications attached as Exhibit A. Any variation of the plans and specifications from the plans and specifications attached hereto as Exhibit A shall be submitted to the Landlord for the Landlord's consent, which such consent shall not be unreasonably withheld conditioned or delayed.

**3.3   Approval Process and Timing**: As set forth above, Tenant shall be required to obtain all applicable municipal and regulatory Approvals from Town, State, County and federal boards, agencies and officials, if applicable to the construction of the Improvements, so as to enable the Tenant to obtain a building permit for all of the Improvements referred to in Exhibit A as modified to conform to the terms and conditions of such municipal and regulatory Approvals as are obtained by the Tenant. The Tenant shall be afforded a period of nine (9) months (hereinafter, the "Approval Period") within which to obtain all necessary municipal and regulatory Approvals for the construction of the Improvements.. If Tenant is unable to obtain the necessary Approvals within the allowed time, either party shall have the right to terminate this Lease upon written notice to the other party and, upon such termination, neither party shall have any further liability to the other under this Lease.

**3.4   Post-approval Pre-construction Requirements for Plans and Specifications; Cost Estimates:**  Once the Tenant has obtained the Approvals so as to obtain issuance of a building permit and other required permits, Tenant shall cause to be prepared final plans and specifications for the construction of the Improvements in accordance with the Approvals sufficient, under the municipal regulations pertaining thereto, to cause issuance of a building permit. Said plans and specifications shall thereafter be submitted to the Landlord for the Landlord's consent which such consent shall not be unreasonably withheld conditioned or delayed. Once approved and as set forth above, the final approved plans and specifications shall be substituted for the preliminary plans and specifications annexed hereto as Exhibit A. Thereafter, the Tenant shall cause its architect to prepare bid documents which the Tenant shall cause to be circulated to as many contractors as the Tenant might desire to submit bids for the construction of the Improvements. It is Tenant's present intention to use Construction by J, Inc. whose address is: Attention John Cady, 188 Wind Chime Court, Suite 204, Raleigh NC 27615 as its contractor and Landlord hereby consents to such use provided, however, that such contractor qualifies under applicable local and county regulations to perform such work at the Premises. If Tenant uses any other contractor, such contractor shall be approved by Golden Corral and have a minimum of 5 years' experience as a contractor. When Tenant has obtained a bid which Tenant desires to accept, Tenant shall submit to the Landlord all information relative to the bid and the contractor submitting the bid for Landlord's consent, which such consent shall not be unreasonably withheld conditioned or delayed. In the event that the contractor's bid does not cover 100% of the Improvements, then and in that event the Tenant shall obtain bids from other contractors for those aspects of the Improvements which are not addressed in the bid of the

6

contractor selected by the Tenant and the same process shall follow with respect to each and every contractor until acceptable bids and contractors have been selected for 100% of the Improvements.

**3.5    Financing**: Following Tenant's selection of a contractor as approved by the Landlord and finalization of the construction cost, Tenant shall obtain a financing commitment in an amount of not less than eighty percent (80%) of the amount of the contractor's bid (or the cumulative aggregate of all contractors' bids if multiple contractors are utilized by the Tenant) (hereinafter "Financing Commitment"). Simultaneously with the submission of Tenant's Financing Commitment, Tenant shall provide Landlord with proof of the Tenant's possession of readily available liquid funds in an amount that together with the Financing Commitment equal 115% of the contractor's bid or the cumulative aggregate of all contractors' bids if multiple contractors are utilized by the Tenant. As set forth above, the Tenant is precluded from utilizing any manner of financing which in any way confers on any lender any interest in the Premises except in connection with Tenant's interest in this Lease agreement as provided for below.  In the event that the Financing Commitment is less that required above, Tenant shall provide to the Landlord evidence reasonably satisfactory to the Landlord that the Tenant has sufficient funds available to it to build and complete the Improvements with a 15% contingency amount which such funds shall consist of the funds reflected by the Financing Commitment and the funds to be supplied by the Tenant (hereinafter "Tenant's Construction Funds").  Any financing document issued in connection with Tenant's construction shall provide that the Tenant's receipt of funds shall be predicated upon the Tenant providing lien releases from the general contractor and or subcontractors performing the construction work referred to herein.

### Article IV Tenant's Construction

**4.1    Preconditions to Commencement**: Tenant shall not commence Construction until Tenant has met all of the following conditions:

i.    Tenant has obtained the Financing Commitment and delivered a copy to Landlord; such Financing Commitment is in full force and effect; and Tenant has complied with all of the material terms and conditions of the Financing Commitment; and

ii.    Tenant has furnished to Landlord evidence reasonably satisfactory to Landlord that Tenant has sufficient funds available to it to build and complete the construction of all of the Improvements in the manner referenced above; and

iii.    Tenant has contacted all appropriate utilities and verified the location, depth and nature of all utilities affecting the land and any areas bordering upon the Premises; and

iv.    Landlord has approved the final plans and specifications for the construction of the Improvements; and

v.    Tenant has delivered to Landlord (i) copies of all permits, approvals, and authorizations required by the Building Department of the municipality having jurisdiction over the construction and all other Governmental Authorities for the construction of the Improvements; and (ii) copies of the plans and specifications for the Improvements stamped approved by the Building Department; and

vi.    Tenant has delivered to Landlord a fully executed and delivered construction contract with a general contractor, or a fully executed and delivered design-build contract, together with executed and delivered contracts for each of the major contractors, or a fully executed and delivered construction management contract together with executed and delivered contracts for each of the major contractors (collectively,   the   "Construction   Contracts"),   for   the construction of the Improvements, meeting the requirements of this Lease; and

7

vii.   Tenant has delivered to Landlord fully executed and delivered agreements between Tenant and the architect and engineers engaged to design the Improvements ("Design Contracts") meeting the requirements of this Lease; and

viii.  Subject to the rights of any potential Leasehold Lender (as defined /referred to below), an assignment to Landlord of all of Tenant's right, title and interest in and to (a) the Construction Contracts and Design Contracts, (b) all preliminary, final, and working plans, specifications, and drawings and construction documentation prepared in connection therewith, and (c) all intellectual property rights in any of the foregoing, which assignment shall be in form reasonably satisfactory to Landlord (provided that Landlord shall not exercise its rights as assignee unless and until this Lease has been terminated and any Leasehold Lender has failed to exercise any rights it may have to assume the obligations of the Tenant under this Lease); and

ix.   Tenant has obtained, and has caused its general contractors, construction managers, architects, and subcontractors to obtain, the insurance required by the terms of this Lease and has delivered to Landlord certificates (in form reasonably acceptable to Landlord) evidencing such insurance; and

x.    Tenant's design-builder, construction manager, contractors, and subcontractors shall have furnished to Landlord the indemnification agreement required by this Lease.

**4.2   Use by Landlord of Construction and Design Contracts:**  Each of the Construction Contracts and Design Contracts shall include the following provisions, in form and substance reasonably satisfactory to Landlord:

i.    As to the Design Contracts, a provision, subject to the rights of any Leasehold Lender and Franchisor, permitting Landlord, its successors and assigns, to use the plans and specifications prepared pursuant to such Design Contracts, in connection with the construction, maintenance, operation, alteration of, and addition to the Improvements; and

ii.   An acknowledgement by the architect, engineer, general contractor, design/builder, construction manager, and/or major contractor that the contract has been assigned to Landlord, subject to the rights of any Leasehold Lenders and Franchisor, that such architect, engineer, general contractor, design/builder, construction manager, and/or major contractor consents to such assignment and will perform its obligations under such contract if all sums due under the contract are paid (provided that such assignment shall not be deemed an assumption of such contract by Landlord); and an agreement that such provisions may not be modified without the Landlord's consent. Notwithstanding the foregoing, Landlord shall not exercise any of its rights as assignee unless and until this Lease has been terminated and any Leasehold Lender and Franchisor have failed to timely exercise any rights to assume the Lease.

If any of the Construction Contracts or Design Contracts is materially modified, Tenant shall deliver to Landlord a copy of such modification. Tenant shall not modify any such Construction Contract or Design Contract to limit or negate any of the requirements of this Section.

**4.3   Landlord's Consent to Construction:**  Landlord's approval of the plans and specifications for the construction of the Improvements shall not be unreasonably withheld, conditioned or delayed. If Landlord fails to grant or deny any such request for Landlord's approval within thirty (30) calendar days after Landlord has received Tenant's request for such approval, three (3) complete sets of plans and specifications, and all additional information reasonably

8

acknowledging that any and all other policies of insurance procured independently by Franchisor or Golden Corral Corporation in the normal course of its/their business(es) shall be deemed excess to all such primary coverage afforded to Franchisor and Golden Corral Corporation by Franchisee in a manner consistent with the terms and provisions of this Agreement. The evidence of insurance shall include a statement by the insurer that the policy or policies will not be cancelled or materially altered without at least thirty (30) days prior written notice to Franchisor and Golden Corral Corporation.

12.5   Franchisee's Additional Insurance Needs:   No requirement for insurance contained herein shall constitute advice or guarantee by Franchisor that only such policies, in such amounts, are necessary to protect Franchisee from losses in connection with the franchised business.   Franchisee shall be responsible to make its own independent judgment of its insurance needs in addition to the insurance required pursuant to this Agreement.

12.6   Franchisor's Right to Secure Insurance on behalf of Franchisee:   Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as revised from time to time by the Manuals or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation to do so), immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acquiring the policy or policies, shall be payable by Franchisee immediately upon notice.   The foregoing remedies shall be in addition to any other remedy Franchisor may have.

## 13.    TRANSFER OF INTEREST

13.1   Transfer by Franchisor:   Franchisor shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity. With respect to any assignment which results in the subsequent performance by the assignee of all of Franchisor's obligations under this Agreement, the assignee shall expressly assume and agree to perform such obligations, and shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment. In addition, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Franchisor may sell its assets, its Proprietary Marks, or its System; may sell its securities in a public offering or in a private placement, may merge, acquire other corporations, or be acquired by another corporation; and may undertake a refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

13.2   Transfer by Franchisee:

13.2.1 Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's business skill, financial capacity, and personal character. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this franchise nor any individual, partnership, corporation, or other legal entity, which directly or indirectly controls Franchisee shall sell, assign,

transfer, convey or give away, any direct or indirect interest in Franchisee or in this franchise without the prior written consent of Franchisor. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Section 14.2 of this Agreement. The transfer restrictions described in this Section 13.2 shall apply to any sale, assignment, transfer, conveyance, or donation of any ownership interest in Franchisee (except for a Franchisee which is a corporation registered under the Securities and Exchange Act of 1934) by any holder of such interest to any party.

13.2.2 Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee or in this franchise; provided, however, that if a transfer, alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring a controlling interest in the franchised business, Franchisor may, in its sole discretion, require as a condition of its approval that:

13.2.2.1    All of Franchisee's monetary obligations to Franchisor and all or any of its affiliates under this and any other agreements between Franchisee and Franchisor or any affiliate have been satisfied, and all other outstanding obligations related to the franchised business shall have been satisfied;

13.2.2.2    Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates;

13.2.2.3    The transferor shall have executed a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders, and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances;

13.2.2.4    The transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) shall enter into a written assignment, under seal and in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement;

13.2.2.5    The transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) shall demonstrate to Franchisor's satisfaction that transferee meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the business franchised herein (as may be evidenced by prior related business experience, the franchise application, or otherwise); has adequate financial resources and capital to operate the business; has no conflicting or competing business interest; and satisfies such other criteria and conditions that Franchisor shall reasonably impose;

13.2.2.6     At Franchisor's option, the transferee shall execute (and/or, upon Franchisor's request, shall cause all interested parties to execute), for a term ending on the  expiration date of this Agreement and with such renewal term as may be provided by this Agreement, the standard form franchise agreement then being offered to new System franchisees and  other ancillary agreements including, but not limited to guaranties, as Franchisor may require for the franchised business, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty rate and advertising contribution;

13.2.2.7     The transferee shall, at transferee's expense and upon the reasonable request of Franchisor, upgrade the restaurant to conform to the then-current standards and specifications for System restaurants, and shall complete the upgrading and other requirements within the time specified by Franchisor;

13.2.2.8     Franchisee shall remain primarily liable for all obligations of the franchised business and all covenants to be kept or performed by Franchisee and Franchisee shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

13.2.2.9     At transferee's expense, transferee or transferee's managers shall complete any training programs then in effect for franchisees upon such terms and conditions as Franchisor may reasonably require; and

13.2.2.10     Except in the case of a transfer to a corporation formed for the convenience of ownership, a transfer fee shall be paid by Franchisee to Franchisor in an amount equal to five percent (5%) of the then-current standard initial franchise fee being charged by Franchisor for a restaurant utilizing the restaurant design franchised hereunder (or, if such design is not then offered, such fee for the restaurant design closest in interior square footage to the restaurant).

13.2.2.11     Franchisee agrees that if, in the opinion of Franchisor, the price to be paid for the restaurant or franchised business appears to be excessive or is likely to result in there being an unsatisfactory return on investment or there being an insufficient cash flow to meet obligations, Franchisor may, without liability to Franchisee, review such opinions with any such prospective transferee/purchaser.

13.2.2.12     The transferee must at the time of the proposed transfer meet Franchisor's requirements to have an Operations Principal that has been approved by Franchisor.

13.3     Security Interest in Franchisee's Business or Assets:  Franchisee shall grant no security interest in the franchised business or in any of its assets unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option to purchase the rights of the secured party upon payment of all sums then due to such secured party, except such amounts which may have become due as a result of any acceleration of the payment dates

based upon the Franchisee's default.

13.4   Franchisee Acknowledgement of Need for Restrictions on Transfer: Franchisee acknowledges and agrees that each condition which must be met by the transferee franchisee is necessary to assure such transferee's full performance of the obligations hereunder.

13.5   Transfer to Franchisee's Corporation:   In the event Franchisee is a corporation formed by Franchisee for the convenience of ownership, Franchisor's consent to such transfer shall, in addition to the requirements set forth in Section 13.2 of this Agreement, be conditioned upon the following requirements:

13.5.1 Franchisee shall be the owner of all the voting stock of the corporation; and, if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

13.5.2 Corporate resolutions and minutes shall be furnished to Franchisor prior to the transfer, and the transferee shall comply with all the terms and conditions set forth in Sections 5 and 6 of this Agreement.

13.6   Securities Offerings By Franchise: 13.6.1 Securities or partnership interests in Franchisee may be sold, by private offering or otherwise, only with the prior written consent of Franchisor, as required in Sections 13.2 hereof.  All materials required for such offering by federal or state law shall be submitted to Franchisor for review prior to their being filed with any government agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use.  No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating as an underwriter, issuer, or offeror of Franchisee's or Franchisor's securities; and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor.  Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering.  For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of Ten Thousand Dollars ($10,000), or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering.  Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section 13.6.

13.6.2 Franchisor shall not unreasonably withhold its consent to a proposed public offering of securities interests in Franchisee; provided, however, that Franchisor may, in its sole discretion, require as a condition of its approval that Franchisor or a company controlling Franchisor has previously made a public offering of Franchisor's or such company's securities.  (For the purposes of this Section 13.6, a "public offering" shall mean any offering requiring registration under any state or federal securities laws, and any offering exempt from registration but requiring disclosure under any federal law or regulation.)

                                                   April 2013

13.7   <u>Right of First Refusal</u>:

13.7.1 If any party holding any interest in Franchisee or in this Agreement desires to sell or transfer such interest (the transfer of which interest would have the effect of transferring a controlling interest in the franchised business), or if Franchisee desires to accept any bona fide offer from a third party to purchase such interest or the premises of the franchised business, the seller shall notify Franchisor in writing of the terms of such offer, and shall provide such information and documentation relating to the offer as Franchisor may require; and Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  In the event that Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor or such later date as may have been provided in the offer.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer.  Failure of Franchisor to exercise the option afforded by this Section 13.7.1 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 13 with respect to a proposed transfer.

13.7.2 In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest in the franchised business proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor, and his determination shall be binding.

13.8   <u>Transfer Upon Death or Mental Incompetency</u>:  Upon the death or mental incompetency of any person with a controlling interest in the franchise or in Franchisee, the transfer of which requires the consent of Franchisor as provided in Section 13.2 hereof, the executor, administrator, personal representative, guardian, or conservator of such person shall transfer such interest within six (6) months after such death or mental incompetency to a third party approved by Franchisor.  Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any <u>inter vivos</u> transfer.  However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section 13, the personal representative of the deceased person shall have a reasonable time to dispose of the deceased's interest in the franchise, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement.  If the interest is not disposed of within a reasonable time, Franchisor may terminate this Agreement.

13.9   <u>Non-Waiver of Claims</u>:  Franchisor's consent to a transfer of any interest in the franchise granted herein shall not constitute a waiver of any claims Franchisor may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

13.10  <u>Transfer by Bankruptcy – Right of First Refusal</u>:  If, for any reason, this Agreement is not terminated pursuant to Section 14.1, and this Agreement is assumed or assignment of the same to any person or entity who has made a bona fide offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment and assumption, setting forth (a) the name and address of the proposed assignee, (b) all of the terms and conditions of the proposed assignment and assumption, and (c) the adequate assurance of proposed assignee's future performance of the Agreement (which shall incorporate the relevant prerequisites applicable to other proposed transferees pursuant to Section 13.2 of this Agreement) referred to in Section 365(b)(3) of the Bankruptcy Code shall be given to Franchisor within twenty (20) days after receipt of such proposed assignee's offer to accept assignment of this Agreement, and, in any event, within ten (10) days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption.  Franchisor shall have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the bona fide offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.

## 14.  DEFAULT AND TERMINATION

14.1  <u>Termination Without Notice and Without Opportunity To Cure</u>:  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee; if Franchisee is adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); if execution is levied against Franchisee's business or property;  if suit to foreclose any lien or mortgage against the premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of Franchisee's restaurant shall be sold after levy thereupon by any sheriff, marshal, or constable.

14.2  <u>Termination With Notice But Without Opportunity To Cure</u>:  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events;

14.2.1 If Franchisee fails to obtain a site for the franchised business as required in the Site Selection Addendum (Attachment A hereto), prepare the premises, and commence the franchised business as required in Section 5 hereof, or if Franchisee loses its lease, sublease, or its right to occupy the premises, ceases to operate or otherwise abandons the franchised business or otherwise forfeits the right to do or transact business in the jurisdiction where the restaurant is located; provided, however, that if any such loss of possession results from the governmental exercise of the power of eminent domain, or if, through no fault of Franchisee, the premises are damaged or destroyed, then Franchisee shall have thirty (30) days after either such event in which to apply for Franchisor's approval to relocate or reconstruct the premises, which approval shall not be unreasonably withheld;

14.2.2 If Franchisee or any principal or officer of Franchisee is convicted, or enters a plea with adjudication of guilt withheld or suspended, involving a felony, a crime involving moral turpitude, or engages in conduct that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

14.2.3 If Franchisee or any partner or shareholder of Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee to any third party without Franchisor's prior written consent, contrary to the terms of Section 13 of this Agreement;

14.2.4 If Franchisee fails to comply with the in-term covenants in Section 16 hereof or fails to obtain and provide Franchisor with the covenants required by Section16.9 hereof;

14.2.5 If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein contrary to Section 7 hereof, intentionally discloses the contents of the Manuals to any unauthorized person, or violates in any way the trade secrets and confidential information provisions of Section 8 hereof;

14.2.6 If an approved transfer, as required by Section 13.8 hereof, is not effected within a reasonable time following the death or mental incompetency of a person with a controlling interest in the franchise or in Franchisee;

14.2.7 If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor;

14.2.8 If Franchisee is declared in default by Franchisor under any provision of any other franchise agreement between the parties, any amendment thereof or successor thereto, or is in default of any provision of any sublease agreement, equipment purchase agreement, any promissory note (a) with Franchisor or an affiliate or (b) to which franchisor or any affiliates is a guarantor, or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates.

14.2.9 If Franchisee, after either (i) curing a default under this Agreement pursuant to a Notice of Termination; or (ii) after receipt of any other writing from Franchisor advising Franchisee that a default occurred regardless of whether such writing constituted a Notice of Termination, commits another default under this Agreement within 24 months following the earlier default;

14.2.10 If an imminent threat or danger to the public health or safety results from the operation of the restaurant.

14.3    Termination With Notice and Opportunity to Cure:   Except as provided in Sections 14.1 and 14.2 of this Agreement, Franchisee shall have thirty (30) days after its receipt from Franchisor of a written Notice of Termination within which to remedy any default hereunder and provide evidence thereof to Franchisor.  If any such default is not cured within that time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon expiration of the thirty (30) day period or such longer period as applicable law may require.  Franchisee shall be in default hereunder for any failure to comply substantially with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Manuals, or to carry out the terms of this Agreement in good faith.  Such defaults shall include, for example, without limitation, the occurrence of any of the following events:

14.3.1 If Franchisee fails, refuses, or neglects promptly to pay when due any monies owing to Franchisor or its subsidiaries or affiliates, or to the Funds, or to submit the financial information or other reports required by Franchisor under this Agreement;

14.3.2 If Franchisee fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing or fails to have an operations principal and/or to have an Operations Principal, if required;

14.3.3 If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent, as required by this Agreement;

14.3.4 If Franchisee, directly or indirectly, commences or conducts any business operation, or markets any service or product under any name or proprietary mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

14.3.5 If Franchisee, by act or omission, suffers a continued violation, in connection with the operation of the restaurant, of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administrative or judicial forum for relief therefrom.

14.4    Termination of Area Development Agreement Because of Franchise Agreement Default  Default under this Franchise Agreement shall constitute a default under any Development Agreement between the parties pursuant to which this Franchise Agreement was executed.

## 15.    OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Agreement:

15.1    <u>Cessation of Restaurant Operations</u>:  Franchisee shall immediately cease to operate the business franchised under this Agreement and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.  Franchisee shall immediately return to Franchisor all confidential materials provided to Franchisee by Franchisor and/or Franchisor's designee(s), which confidential materials include without limitation, the Manuals and any translations thereof.

15.2    <u>Cessation of Use of Confidential Information and Proprietary Marks</u>: Franchisee shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any format, confidential methods, procedures, and techniques associated with the System; the Proprietary Mark "Golden Corral" and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, trade dress or devices associated with the System.  In particular, without limitation, Franchisee shall cease to use all signs, equipment, advertising materials, forms, and any other articles which display the Proprietary Marks; provided, however, that this Section 15.2. shall not apply to the operation of any other franchise under the System which may be granted by Franchisor to Franchisee.

15.3    <u>Cancellation of Assumed Name Registration</u>:  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Golden Corral" or any other service mark or trademark of Franchisor; and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

15.4    <u>Assignment of Lease/Modification of Premises</u>:  Franchisee shall, at Franchisor's option (which such option may be exercised within thirty (30) days after termination or expiration), assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises of the franchised business.  In the event Franchisor does not elect to exercise its option to purchase the premises pursuant to Section 15.8, or to acquire the lease or sublease for the premises of the franchised business pursuant to Section 15.4, Franchisee shall make such modifications or alterations to the premises operated hereunder (including, without limitation, the changing of the telephone number and trade dress) immediately upon termination or expiration of this Agreement as may be necessary to prevent the operation of any business thereon by itself or others in derogation of this Section 15 and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 15, Franchisor shall have the right to enter upon the premises where Franchisee's franchised business was conducted, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.  Further, Franchisee shall not use any reproduction, counterfeit copy, or

colorable imitation of the Proprietary Marks either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's exclusive rights in and to the Proprietary Marks; and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor.

15.5   <u>Franchisor's Right of First Refusal for Franchisee Sale</u>: If Franchisee owns an interest in the premises of the franchised business and, at any time prior to the termination or expiration of this Agreement, Franchisee desires to accept any bona fide offer from a third party to purchase Franchisee's interest in the premises of the franchised business, then Franchisee shall notify Franchisor in writing of the terms of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require, including information as to the condition of title to the restaurant premises; and Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to Franchisee that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor intends to purchase Franchisee's interest, closing on such purchase must occur within sixty (60) days from the date of notice to Franchisee of the election to purchase by Franchisor or such later date as may have been provided in the offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 15.5 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 15.5, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest in the premises of the franchised business proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor, and his determination shall be binding.

15.6   <u>Payment of Monies Due</u>: Franchisee shall promptly pay all sums owing to Franchisor and its affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages (including future royalty fees that otherwise likely would have been paid from the termination date through the end of the initial term but for the early termination of the Agreement), costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and on any and all premises operated hereunder at the time of default. The value of "future royalty fees" shall be calculated as the present value of the average monthly Royalty Fees that Franchisee was obligated to pay pursuant to Section 4.2 of this Agreement during the 12-month period immediately preceding the month that the Franchise Agreement is terminated, multiplied by the number of months remaining in the initial Franchise Agreement term at the date of termination. Franchisee hereby appoints Franchisor as its attorney in fact, with full power and authority to execute on Franchisee's behalf such

Agreement Amendments in <u>Exhibit M</u> for further details. You also may wish to consult with your attorney.

## ITEM 18
## PUBLIC FIGURES

Golden Corral does not use any public figures to promote Golden Corral Restaurant franchises.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

Actual results vary from franchise to franchise, and we cannot estimate the results of a particular franchise. A new franchisee's results are likely to differ from the results shown in this Item. We recommend that you make your own independent investigation to determine whether or not the franchise may be profitable, and consult with an attorney and other advisors prior to executing the Area Development Agreement or Franchise Agreement.

Written substantiation for these financial performance representations will be made available to prospective franchisees upon reasonable request.

A.   **STATEMENT OF AVERAGE ANNUAL SALES
     OF FRANCHISED RESTAURANTS**

The following two Tables provide annual sales information for the period December 29, 2011 through January 2, 2013, by building design, about the 338 franchised Restaurants utilizing the GC-10, GC-11S, or GC-11M building designs which had been in operation at least 6 months as of January 2, 2013. The results of 7 other franchised Restaurants which utilized one of these 3 Restaurant designs are not included in the Tables because the Restaurants had not been in operation for at least 6 months as of January 2, 2013.

Each Table divides the franchised Restaurants into three categories based on ranges of annual sales volume within each category of building design. These categories are identified as the "Top 1/3," "Middle 1/3," and "Bottom 1/3." An overall high-low range for each category of building design also appears.

56

## TABLE 1

| | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M:** | High-Low Range: $8,826,189 to $1,553,006 | | | | | |
| Top 1/3 | $4,690,403 | 63 | $8,826,189 | $3,890,614 | 25 | 38 |
| Middle 1/3 | $3,522,583 | 63 | $3,889,663 | $3,080,861 | 33 | 30 |
| Bottom 1/3 | $2,506,919 | 63 | $3,070,258 | $1,553,006 | 36 | 27 |
| Total | $3,566,855 | 189 | | | | |
| **GC-11S:** | High-Low Range: $4,334,229 to $1,161,684 | | | | | |
| Top 1/3 | $3,465,367 | 17 | $4,334,229 | $3,080,760 | 5 | 12 |
| Middle 1/3 | $2,580,616 | 18 | $2,956,196 | $2,235,716 | 9 | 9 |
| Bottom 1/3 | $1,915,066 | 17 | $2,222,440 | $1,161,684 | 10 | 7 |
| Total | $2,651,850 | 52 | | | | |
| **GC-10:** | High-Low Range: $7,741,666 to $2,467,484 | | | | | |
| Top 1/3 | $5,852,177 | 32 | $7,741,666 | $5,048,043 | 12 | 20 |
| Middle 1/3 | $4,470,968 | 33 | $5,008,486 | $3,904,055 | 14 | 19 |
| Bottom 1/3 | $3,179,171 | 32 | $3,853,907 | $2,467,484 | 15 | 17 |
| Total | $4,497,201 | 97 | | | | |

Table 1 includes data from 199 franchised Restaurants that were originally constructed using a specialized equipment package and floor plan ("**Strata Restaurants**"). The following Table 2 describes the results of these 199 Strata Restaurants.

Golden Corral 2013 FDD/PK 65899   04/15/13

## TABLE 2

| | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M Strata:** | High-Low Range: $8,826,189 to $1,553,006 | | | | | |
| Top 1/3 | $4,780,197 | 51 | $8,826,189 | $3,963,208 | 19 | 32 |
| Middle 1/3 | $3,612,337 | 50 | $3,960,956 | $3,172,347 | 26 | 24 |
| Bottom 1/3 | $2,579,404 | 51 | $3,145,273 | $1,553,006 | 29 | 22 |
| Total | $3,649,961 | 152 | | | | |
| **GC-11S Strata:** | High-Low Range: $4,334,229 to $1,961,774 | | | | | |
| Top 1/3 | $3,704,284 | 7 | $4,334,229 | $3,252,076 | 3 | 4 |
| Middle 1/3 | $2,800,984 | 6 | $2,956,196 | $2,629,970 | 3 | 3 |
| Bottom 1/3 | $2,327,641 | 7 | $2,536,066 | $1,961,774 | 3 | 4 |
| Total | $2,952,178 | 20 | | | | |
| **GC-10 Strata:** | High-Low Range: $7,612,469 to $2,467,484 | | | | | |
| Top 1/3 | $5,651,784 | 9 | $7,612,469 | $4,832,259 | 4 | 5 |
| Middle 1/3 | $3,942,629 | 9 | $4,349,005 | $3,471,091 | 4 | 5 |
| Bottom 1/3 | $2,852,587 | 9 | $3,411,501 | $2,467,484 | 3 | 6 |
| Total | $4,133,461 | 27 | | | | |

We have not audited those franchisee-prepared results which have been reported to us by our franchisees, but have no reasonable basis to question their reliability. These Restaurants are located in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Mississippi, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

The above two Tables do not include the results of franchised Restaurants that do not utilize a GC-10, GC-11S, or GC-11M Restaurant design. There are 17 Restaurants which utilize older and smaller Restaurant design configurations that are no longer being built. There are also two units that utilize the new Pavilion building type.

The results of those franchised Restaurants that were open for more than six but fewer than 12 months have been annualized to conform their data to the presentation of the annual results that appear in the two Tables. Two of the 189 GC-11M Restaurants

58

whose results appear in Table 1, and two of the 152 GC-11M Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table. One of the 97 GC-10 Restaurants whose results appear in Table 1, and one of the 27 GC-10 Strata Restaurants whose results appear in Table 2, have had their data annualized. One of the 52 GC-11S Restaurants whose results appear in Table 1, and one of the 20 GC-11S Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table.

The information for franchised Restaurants reflects average annual sales, and does not include the cost of sales, operating expenses, or other costs or expenses that must be deducted from sales in order to determine net income or profit.

*[Remainder of page intentionally left blank]*

requested by Landlord, such approval shall be deemed granted.   Such approved plans and specifications may not be materially modified without Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed.   If Landlord fails to grant or deny any such request for Landlord's approval to any material modification(s) to the approved plans and specifications within seven (7) calendar days after Landlord has received Tenant's request for such approval, three (3) complete sets of the plans and specifications reflecting such material modification(s), and all additional information reasonably requested by Landlord, such approval shall be deemed granted.   No approval by Landlord, and no inspection by Landlord or its representatives of the construction of the Improvements, shall be deemed an assurance or representation by Landlord that any aspect of the construction, or the plans and specifications therefor, comply with applicable legal requirements or with the requirements of this Lease.

   **4.4    Timetable relating to Improvements**:   The following timetable (hereinafter "Timetable") shall apply to the process for the construction of the Improvements.

   i.    Within thirty (30) days of the issuance of the Approvals, Tenant shall complete and submit to Landlord final plans and specifications for the construction of the Improvements;

   ii.   Within thirty (30) days of the issuance of the Approvals, Tenant shall submit to Landlord a certification by Tenant's architect and by Tenant of the reasonably estimated cost of building the improvements, including but not limited to the costs of labor and materials, professional fees, interest on borrowed funds during the construction period and all other construction financing costs, all Impositions and insurance premiums attributable to the construction period, and all costs and expenses of compliance with all applicable Legal Requirements (the "Estimated Construction Cost");

   iii.  On or before the date thirty (30) days after the issuance of the Approvals, Tenant shall have complied with the conditions set forth in Section 4.1 and shall have commenced construction of the Improvements;

   iv.   On or before the date nine (9) months after the issuance of the Approvals, Tenant shall have Substantially Completed the Improvements.

   If Tenant fails to comply with the Timetable, Tenant shall have a period of thirty (30) days to cure such default after Landlord gives Tenant notice of such default. Notwithstanding the foregoing, if Tenant fails to comply with the requirements of the Timetable by reason of any Unavoidable Delay, Tenant's time to perform such obligation shall be extended for such period of time as may be reasonably necessary to perform such obligation. The foregoing shall not, however, affect the Rent Commencement Date or the Landlord's right to receive Base Rent and Additional Rent on and after the Rent Commencement Date.

   Landlord may, at its sole option and subject to the rights of any Leasehold Lender, if Tenant fails to comply with the requirements of the Timetable and to cure such default within the applicable time period provided above, enter upon the Premises for any one or more of the following purposes: to complete construction of the Improvements; to secure any partially completed construction on the Premises; and/or to take any measures Landlord deems necessary to safeguard and protect the Premises, the Improvements thereon, the materials stored thereon, the safety of the public, and the safety of buildings and structures adjacent to the Premises. Tenant agrees to reimburse Landlord, as Additional Rent, for all reasonable costs and expenses of every kind and nature incurred by Landlord pursuant to the preceding sentence.  If Landlord takes over the construction of the Improvements, Tenant promptly shall remove its employees and such of its agents and contractors as Landlord shall specify from the Premises

policies shall include a standard New York mortgagee endorsement with respect to each Fee Lender; and (ii) all proceeds paid under such policies shall be applied in accordance with the requirements of this Lease. If the Premises are encumbered by a Leasehold Mortgage, the provisions of this Lease pertaining to Leasehold Lenders shall govern with respect to loss payee status and application of mortgage proceeds.

**6.6     Cancellation Notice Requirement; Insurance to Be Primary; Waiver of Subrogation:** All insurance policies required by this Article shall (i) contain endorsements that such insurance may not be canceled or amended, except upon not less than thirty (30) days prior written notice to Landlord; and (ii) be written as primary policies not contributing to or in excess of any policies carried by Landlord; and (iii) each contain a Waiver of Subrogation endorsement, in form and substance reasonably satisfactory to Landlord, in favor of the Landlord.

**6.7     Certificate of Insurance Required:** Concurrently with execution of this Lease and thereafter at least fifteen (15) days prior to the expiration of any policy, Tenant shall deliver to Landlord a binding certificate or certificates evidencing the insurance required by this Article in form and content reasonably satisfactory to Landlord, together with evidence of payment of the annual premium for each policy; except that the initial certificate evidencing the Property Damage Policy shall be first delivered on or before the Construction Completion Date. In addition, Tenant shall at any time and from time to time during the Term, promptly upon Landlord's request, furnish Landlord with a copy of the then current paid-up policy, appropriately authenticated by the insurer or, at Landlord's option, the Declarations page of such policy evidencing the required insurance.

**6.8     Consequence of Failure to Obtain or Maintain Insurance:** If Tenant fails to obtain or maintain the insurance required by the foregoing provisions of this Article or to timely furnish to Landlord the required evidence of such insurance and payment of the insurance premiums, Tenant shall be responsible for all liabilities incurred by Landlord with respect to such default, including any liabilities that would have been covered by the insurance Tenant is required to maintain. If Tenant fails to maintain any of the insurance required by this Article, Landlord may after five day notice to Tenant, at its option, in addition to exercising any other remedies available to it under this Lease or at law, obtain the insurance described in this Article, in which event Tenant shall reimburse Landlord, as Additional Rent, within ten (10) days of being billed therefor, for the costs incurred by Landlord to obtain such insurance.

**Article VII     Indemnity**

**7.1     Tenant's Indemnification Obligations:** Tenant shall indemnify and hold harmless the Landlord Parties from and against any and all claims and liabilities (hereinafter collectively "Liabilities") arising from or in connection with all of the following: (i) the Premises and/or any operations or activities thereon during the Term and after the Term for so long as Tenant, or any Person holding through or under Tenant, remains in possession of the Premises, except to the extent such Liabilities arise out of Landlord's negligence or misconduct; (ii) any act, omission, negligence, or misconduct of Tenant and/or any of Tenant's officers, directors, employees, partners, members, agents, contractors, invitees, or Subtenants; (iii) any accident, injury or damage (including death) occurring in, at or about the Premises during the Term and after the Term for so long as Tenant, or any Person holding through or under Tenant, remains in possession of the Premises, except to the extent such Liabilities arise out of the Landlord's negligence or misconduct; (iv) any breach or default by Tenant under this Lease; (v) any claims made by Subtenants during or after the Term (including claims for return of security deposits and prepaid rent), except to the extent such claims arise out of Landlord's negligence or misconduct; and (vi) any holdover by Tenant, or by any Person(s) holding through Tenant, after the Expiration Date. If any action or proceeding is brought against Landlord and/or any Landlord Party by reason of any such claim(s), Tenant, upon notice from Landlord or such Landlord Party, shall resist and

13

defend such action or proceeding by counsel reasonably satisfactory to Landlord or such Landlord Party.

**7.2    Landlord's Indemnification Obligations:** Landlord shall indemnify and hold harmless the Tenant Parties from and against any and all Liabilities arising from or in connection with all of the following: (I) any act, omission, negligence, or misconduct of Landlord and/or any of Landlord's officers, directors, employees, partners, members, agents, or contractors; (ii) any accident, injury or damage (including death) occurring in, at or about the Premises to the extent such Liabilities arise out of the Landlord's negligence or misconduct; and (iii) any breach or default by Landlord under this Lease. If any action or proceeding is brought against Tenant and/or any Tenant Party by reason of any such claim(s), Landlord, upon notice from Tenant or such Tenant Party, shall resist and defend such action or proceeding by counsel reasonably satisfactory to Tenant or such Tenant Party.

### Article VIII Repairs and Maintenance

**8.1    Tenant's Repair and Maintenance Obligation:** Tenant, at its own expense, shall at all times, (i) maintain the Premises in an orderly and safe condition, in a good state of repair, and in a manner consistent with the standards of operation and maintenance of first class properties similar to the Premises, and, at a minimum, in a manner consistent with other properties improved with Golden Corral Restaurant premises, (ii) make such repairs, replacements and Alterations to the Premises as are necessary to keep it in the condition required by the preceding clause, whether such repairs or maintenance pertain to the interior or exterior of the building and other Improvements, are structural or non-structural, are ordinary or extraordinary, are foreseen or unforeseen.

**8.2    Prohibition against Waste:**    Tenant shall not permit any waste of the Premises or permit any nuisance to exist on the Premises.

**8.3    General Cleanliness; Removal of Ice and Snow:** Tenant shall keep the entire Premises, including adjoining sidewalks, substantially free of any accumulation of dirt, rubbish, snow and ice.

**8.4    Landlord under No Obligation:** Unless otherwise expressly provided in this Lease, Landlord is under no obligation to maintain, repair, clean, alter or improve the Premises, to comply with any Requirements, or to provide any service to the Premises.

### Article IX Mortgages; Non Disturbance

**9.1    Fee Mortgages:** Landlord may mortgage its fee interest in the Premises provided that any such mortgage meets the requirements of this Lease and Tenant's rights under this Lease are and shall always be subordinate to Landlord's fee interest and the lien of any mortgages or other security instruments ("Superior Interests or Encumbrances") now or subsequently encumbering the Premises or any part of it, and to amendments, replacements, renewals and extensions of such Superior Interests or Encumbrances, *provided however* that Tenant's use and occupancy of the Premises shall not be disturbed by any mortgagee or other security holder or any other successor in interest to the Landlord whether in title or through leasehold interest ("Landlord's Successor") as long as Tenant is not in default under this Lease beyond any applicable notice and cure periods, including any applicable cure periods accorded Tenant, any Leasehold Lender and Tenant's Franchisor.  Within sixty (60) days after its execution of this Lease, Landlord shall deliver to Tenant either: (i) a non-disturbance agreement, in a form reasonably acceptable to Tenant, executed on behalf of each existing Security Holder of any existing Superior Interests or Encumbrances, or potential Landlord's Successor or (ii) a certification by Landlord that there is no existing Security Holder or Superior Interests or Encumbrances or potential Landlord's Successor.

## OPTION; RIGHT OF FIRST REFUSAL AND SELLER FINANCING AGREEMENT

This Option; Right of First Refusal and Seller Financing Agreement ("Agreement") is hereby entered into by and between 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 ( "Grantor" or "Seller"); and Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 ("Grantee" or "Purchaser").

### WITNESSTH

WHEREAS: The parties hereto have entered into that certain Lease ("Lease") between Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 as Tenant, and 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 as Landlord for all that certain plot, piece or parcel of land herein referred to as the Premises, located in the Town of Poughkeepsie, County of Dutchess and State of New York known as 2345 Route 9, Poughkeepsie New York 12601, said land consisting of approximately 4.7 acres which such land is more particularly described in Schedule A attached hereto and made part hereof; and

WHEREAS: The parties hereto desire to provide Grantee with rights applicable to acquisition of the Premises in accordance with the terms of this Agreement.

NOW THEREFORE, the parties hereby agree as follows:

1. **Grant of Option to Purchase**: Upon the satisfaction of the conditions precedent set forth in the Lease, Grantor hereby grants to Grantee an Option to purchase the Premises (hereinafter "Purchase Option") subject to and upon the terms and conditions set forth herein. Subject to compliance by the Grantee with the conditions hereinafter set forth the Grantor covenants that upon exercise of the Purchase Option by Grantee and upon the payment of the Purchase Price as herein provided (hereinafter "Purchase Price"), the Grantor will convey unencumbered marketable title to the Premises in fee simple and that Grantor will convey title by Bargain and Sale Deed with Covenant against Grantor's Acts subject only to taxes not yet due and payable and general utility easements serving the Premises. The terms and conditions precedent under which this Purchase Option can be exercised include the following;

  a. At any time subsequent to the Purchase Option Exercise Effective Date (defined below) Grantee shall give notice to the Grantor of Grantee's desire to exercise Grantee's Purchase Option in writing (Grantee's Purchase Option Exercise Notice) which shall be sent to the Grantor by certified mail return receipt requested, by overnight delivery service with return receipt or by personal delivery;

  b. At the time of the giving of Grantee's Purchase Option Exercise Notice, Grantee shall not be in default under the terms of the

1

Lease beyond any applicable grace or cure periods contained herein;

c. At the time of the giving of Grantee's Purchase Option Exercise Notice, Grantee shall not be in default in connection with the payments required to be made by the Grantee to the Grantor pursuant to this Agreement beyond any applicable grace or cure periods contained herein;

d. The Purchase Option may not be exercised at any time prior to the second anniversary of the Rent Commencement Date as determined as set forth in the Lease ("Purchase Option Exercise Effective Date");

e. Within twenty (20) business days of Grantor's receipt of Grantee's Purchase Option Exercise Notice, Grantor shall provide a contract of sale for the Premises and the Grantor and Grantee shall execute such contract of sale within 30 days thereafter unless the purchase price shall be required to be determined to be the Fair Market Purchase Price (defined below), in which case the contract of sale shall be executed within 10 days of the determination of the Fair Market Purchase Price. Said contract of sale shall provide that the Premises shall be purchased in its as is condition and shall further provide for a closing of title within 30 days following execution of the contract of sale;

f. If the Purchase Option is exercised within three (3) years of the Purchase Option Exercise Effective Date, the Purchase Price will be $1,700,000;

g. If the Purchase Option is exercised after the third anniversary of the Purchase Option Exercise Effective Date, the Purchase Price shall be the higher of:

    i. $1,700,000; or
    ii. the Fair Market Purchase Price of the Premises as determined in the manner referenced below.

The Fair Market Purchase Price as referred to herein shall be determined by negotiations between the parties commencing upon the giving of the Grantee's Purchase Option Exercise Notice which, as set forth above, shall be given by certified mail return receipt requested or by overnight carrier to the Grantor at the address referenced above. If negotiations between the parties do not result in agreement on the Fair Market Purchase Price within sixty (60) days, the parties shall, within ten (10) days, attempt to agree upon a single appraiser (who shall be impartial and shall have a minimum of ten (10) years' experience in commercial building sales or real estate appraisal in the area in which the Premises are located (Town of Poughkeepsie,

County of Dutchess and State of New York) and such person shall determine the Fair Market Purchase Price within fifty (50) days of being so appointed. In the event that the parties are unable to agree upon a single appraiser to determine the Fair Market Purchase Price as aforesaid within the ten (10) day period hereinabove specified, then and in that event each party shall have the right, within five (5) days, to appoint such party's appraiser (who shall each meet the qualifications referenced above) and the two appraisers as selected by the parties shall endeavor to agree upon the Fair Market Purchase Price within fifty (50) days of being so appointed. In the event that the two appraisers as selected by the parties are unable to agree upon the Fair Market Purchase Price for the option term within such fifty (50) day period as referenced above, then the two appraisers shall, within ten (10) days, agree upon a third appraiser who shall determine the Fair Market Purchase Price provided that the Fair Market Purchase Price as determined by the third appraiser shall not be lower than the lower of the two appraisals made by the parties' appraisers nor higher than the higher of the two appraisals made by the parties' appraisers. In the event that the Fair Market Purchase Price as determined by the third appraiser is lower than the lower of the two appraisals made by the parties' appraisers or higher than the higher of the two appraisals made by the parties' appraisers, then the Fair Market Purchase Price for the option term shall be the Fair Market Purchase Price made by one of the original two appraisers which is closest an amount to the Fair Market Purchase Price as determined by the third appraiser.

2.  **Grant of Right of First Refusal**: If at any time subsequent to the satisfaction of the conditions precedent in the Lease and prior to the exercise of the Purchase Option provided above, Grantor desires to sell the Premises and receives an offer which Grantor intends to accept, before accepting the offer Grantor shall notify Grantee of the offer, which such notice shall be in writing and sent to the Grantee at the address set forth above by certified mail return receipt requested or overnight carrier service. Within ten (10) business days after receipt of such offer, Grantee shall provide written notice to Grantor of its intention to exercise the Right of First Refusal provided for herein. Except for the seller financing as otherwise provided for herein or any financing contingency provided for in the offer received by the Grantor from the third party, if the Grantee exercises its right of first refusal, Grantee, by such exercise, accepts all other terms and conditions of the offer and any variation of such terms and conditions shall be deemed a waiver of this right of first refusal. If Grantee declines to exercise its right of first refusal, Grantor shall have the right, for a period of six (6) months from the date Grantee advises Grantor it declines the offer, to sell the Premises to a third-party purchaser at a price greater than or equal to the price offered to Grantee and otherwise upon terms and conditions not more favorable to the purchaser than those offered Grantee. If a sale does not occur within the six (6) month time period, Grantor shall reoffer Grantee as provided in this section the right to purchase before it shall have the right to sell to a third-party. If Grantee exercises its Right of First Refusal, the parties shall proceed to close the transaction upon the terms and conditions set forth in the offer with respect to which the Grantee has exercise its right of first refusal.

3.  **Agreement to Provide Seller Financing**: If the Grantee exercises the Purchase Option provided for herein or exercises Grantee's right of first refusal as provided for herein, the Grantor shall agree to provide to Grantee purchase money mortgage financing upon the terms and conditions provided for herein. The terms and conditions include the following;

with the operation of the Improvements with a combined single limit for bodily injury and property damage of not less than One Million Dollars ($1,000,000.00).

v. *Insurance Required by Lenders.* To the extent any Leasehold Lender may require Tenant to obtain any insurance coverage not required by this Lease, or require additional insurance coverage, or require a different or more highly rated insurance company to issue the insurance, or impose any requirement relating to Tenant's insurance that is more stringent that the requirements of this Lease, Tenant shall comply with such Leasehold Lender's insurance requirements.

No insurance coverage obtained by Tenant pursuant to this Article shall contain a deductible or self-insured retention in excess of Twenty Thousand Dollars ($20,000.00) without the prior written consent of the Landlord; provided that such maximum deductible or self-insured retention may be increased on the tenth anniversary of the Commencement Date, and every 5-year anniversary thereafter, to equal the product of $20,000.00 increased by a percentage factor equal to the amount of the increase in the Consumer Price Index since the date of the last such increase.

Whenever, in Landlord's reasonable judgment, good business practice and changing conditions indicate a need for additional liability limits or different types of insurance coverage, Tenant shall, within twenty (20) days after Landlord's request, obtain such insurance coverage, at Tenant's expense; provided that the requested amounts and types of coverage are Customary and provided that Landlord shall not require any increase in the limits of coverage of the Liability Policy more than once every five (5) years.

All policies required by this Article shall be issued by insurance companies licensed to do business in the State of New York. All such insurers shall have a claims paying ability rating of no less than "A-8" and a financial class category rating of at least "VIII" by A.M. Best Company (or any successor rating agency or entity reasonably selected by Landlord if A.M. Best Company discontinues publishing ratings of insurance companies or if the rating system is changed). If it is commercially impracticable to obtain insurance from an insurer with an "A-8" rating and a financial size category of at least "VIII" because of changes in the insurance industry or conditions in the Comparison Area, Tenant's insurers shall have a policy holder's rating that is at least equal to the Customarily required rating.

**6.3    If a Blanket Policy:**   Such policies may be carried under a blanket policy covering the Premises and other locations of Tenant and Tenant's Affiliates, if such blanket policy contains an endorsement that guarantees a minimum limit available for the Premises equal to the minimum limits required by this Article and that the minimum limits shall not be reduced for claims made with respect to other properties, and otherwise complies with this Article.

**6.4    Landlord to Be Named As Additional Insured; waiver of subrogation** The Liability Policy shall name Tenant as insured and shall include as additional insureds the Landlord and all Lenders. Notwithstanding the foregoing, to the extent this Section or any other Section of this Lease requires the Landlord Parties and/or Lenders to be (i) included as additional insured in any policy of insurance or (ii) benefited by a waiver of subrogation endorsement, such requirement shall be triggered as to any Fee Lender or as to Landlord's managing agent only when Landlord has advised Tenant of the names and addresses of such entities and requested such inclusion.

**6.5    Insurance Requirements of Leasehold Mortgagee:** If the Premises are not encumbered by a Leasehold Mortgage: (i) the Property Damage Policy shall name Landlord as loss payee as its interest may appear and shall expressly provide that any losses thereunder shall be adjusted with Landlord, Tenant, and any Fee Lender; and such

## OPTION; RIGHT OF FIRST REFUSAL AND SELLER FINANCING AGREEMENT

This Option; Right of First Refusal and Seller Financing Agreement ("Agreement") is hereby entered into by and between 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 ("Grantor" or "Seller"); and Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 ("Grantee" or "Purchaser").

### WITNESSTH

WHEREAS: The parties hereto have entered into that certain Lease ("Lease") between Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 as Tenant, and 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 as Landlord for all that certain plot, piece or parcel of land herein referred to as the Premises, located in the Town of Poughkeepsie, County of Dutchess and State of New York known as 2345 Route 9, Poughkeepsie New York 12601, said land consisting of approximately 4.7 acres which such land is more particularly described in Schedule A attached hereto and made part hereof; and

WHEREAS: The parties hereto desire to provide Grantee with rights applicable to acquisition of the Premises in accordance with the terms of this Agreement.

NOW THEREFORE, the parties hereby agree as follows:

1. **Grant of Option to Purchase**: Upon the satisfaction of the conditions precedent set forth in the Lease, Grantor hereby grants to Grantee an Option to purchase the Premises (hereinafter "Purchase Option") subject to and upon the terms and conditions set forth herein. Subject to compliance by the Grantee with the conditions hereinafter set forth the Grantor covenants that upon exercise of the Purchase Option by Grantee and upon the payment of the Purchase Price as herein provided (hereinafter "Purchase Price"), the Grantor will convey unencumbered marketable title to the Premises in fee simple and that Grantor will convey title by Bargain and Sale Deed with Covenant against Grantor's Acts subject only to taxes not yet due and payable and general utility easements serving the Premises. The terms and conditions precedent under which this Purchase Option can be exercised include the following;

   a. At any time subsequent to the Purchase Option Exercise Effective Date (defined below) Grantee shall give notice to the Grantor of Grantee's desire to exercise Grantee's Purchase Option in writing (Grantee's Purchase Option Exercise Notice) which shall be sent to the Grantor by certified mail return receipt requested, by overnight delivery service with return receipt or by personal delivery;

   b. At the time of the giving of Grantee's Purchase Option Exercise Notice, Grantee shall not be in default under the terms of the

1

Lease beyond any applicable grace or cure periods contained herein;

c. At the time of the giving of Grantee's Purchase Option Exercise Notice, Grantee shall not be in default in connection with the payments required to be made by the Grantee to the Grantor pursuant to this Agreement beyond any applicable grace or cure periods contained herein;

d. The Purchase Option may not be exercised at any time prior to the second anniversary of the Rent Commencement Date as determined as set forth in the Lease ("Purchase Option Exercise Effective Date");

e. Within twenty (20) business days of Grantor's receipt of Grantee's Purchase Option Exercise Notice, Grantor shall provide a contract of sale for the Premises and the Grantor and Grantee shall execute such contract of sale within 30 days thereafter unless the purchase price shall be required to be determined to be the Fair Market Purchase Price (defined below), in which case the contract of sale shall be executed within 10 days of the determination of the Fair Market Purchase Price. Said contract of sale shall provide that the Premises shall be purchased in its as is condition and shall further provide for a closing of title within 30 days following execution of the contract of sale;

f. If the Purchase Option is exercised within three (3) years of the Purchase Option Exercise Effective Date, the Purchase Price will be $1,700,000;

g. If the Purchase Option is exercised after the third anniversary of the Purchase Option Exercise Effective Date, the Purchase Price shall be the higher of:

     i. $1,700,000; or

    ii. the Fair Market Purchase Price of the Premises as determined in the manner referenced below.

The Fair Market Purchase Price as referred to herein shall be determined by negotiations between the parties commencing upon the giving of the Grantee's Purchase Option Exercise Notice which, as set forth above, shall be given by certified mail return receipt requested or by overnight carrier to the Grantor at the address referenced above. If negotiations between the parties do not result in agreement on the Fair Market Purchase Price within sixty (60) days, the parties shall, within ten (10) days, attempt to agree upon a single appraiser (who shall be impartial and shall have a minimum of ten (10) years' experience in commercial building sales or real estate appraisal in the area in which the Premises are located (Town of Poughkeepsie,

2

County of Dutchess and State of New York) and such person shall determine the Fair Market Purchase Price within fifty (50) days of being so appointed. In the event that the parties are unable to agree upon a single appraiser to determine the Fair Market Purchase Price as aforesaid within the ten (10) day period hereinabove specified, then and in that event each party shall have the right, within five (5) days, to appoint such party's appraiser (who shall each meet the qualifications referenced above) and the two appraisers as selected by the parties shall endeavor to agree upon the Fair Market Purchase Price within fifty (50) days of being so appointed. In the event that the two appraisers as selected by the parties are unable to agree upon the Fair Market Purchase Price for the option term within such fifty (50) day period as referenced above, then the two appraisers shall, within ten (10) days, agree upon a third appraiser who shall determine the Fair Market Purchase Price provided that the Fair Market Purchase Price as determined by the third appraiser shall not be lower than the lower of the two appraisals made by the parties' appraisers nor higher than the higher of the two appraisals made by the parties' appraisers. In the event that the Fair Market Purchase Price as determined by the third appraiser is lower than the lower of the two appraisals made by the parties' appraisers or higher than the higher of the two appraisals made by the parties' appraisers, then the Fair Market Purchase Price for the option term shall be the Fair Market Purchase Price made by one of the original two appraisers which is closest an amount to the Fair Market Purchase Price as determined by the third appraiser.

2.  **Grant of Right of First Refusal**:  If at any time subsequent to the satisfaction of the conditions precedent in the Lease and prior to the exercise of the Purchase Option provided above, Grantor desires to sell the Premises and receives an offer which Grantor intends to accept, before accepting the offer Grantor shall notify Grantee of the offer, which such notice shall be in writing and sent to the Grantee at the address set forth above by certified mail return receipt requested or overnight carrier service. Within ten (10) business days after receipt of such offer, Grantee shall provide written notice to Grantor of its intention to exercise the Right of First Refusal provided for herein. Except for the seller financing as otherwise provided for herein or any financing contingency provided for in the offer received by the Grantor from the third party, if the Grantee exercises its right of first refusal, Grantee, by such exercise, accepts all other terms and conditions of the offer and any variation of such terms and conditions shall be deemed a waiver of this right of first refusal. If Grantee declines to exercise its right of first refusal, Grantor shall have the right, for a period of six (6) months from the date Grantee advises Grantor it declines the offer, to sell the Premises to a third-party purchaser at a price greater than or equal to the price offered to Grantee and otherwise upon terms and conditions not more favorable to the purchaser than those offered Grantee. If a sale does not occur within the six (6) month time period, Grantor shall reoffer Grantee as provided in this section the right to purchase before it shall have the right to sell to a third-party. If Grantee exercises its Right of First Refusal, the parties shall proceed to close the transaction upon the terms and conditions set forth in the offer with respect to which the Grantee has exercise its right of first refusal.

3.  **Agreement to Provide Seller Financing**:  If the Grantee exercises the Purchase Option provided for herein or exercises Grantee's right of first refusal as provided for herein, the Grantor shall agree to provide to Grantee purchase money mortgage financing upon the terms and conditions provided for herein. The terms and conditions include the following;

a. The amount of such financing shall be up to 100% of the Purchase Price;

b. The purchase money mortgage will be a purchase money first mortgage and lien applicable to the Premises and will not be subject to or subordinate to any other financing applicable to the improvements constructed on the Premises or any other financing;

c. The term of such purchase money mortgage shall not be greater than 20 years and the payments required to be made pursuant to such purchase money mortgage shall include principal and interest amortized over the term of the purchase money mortgage so that said purchase money mortgage will be self-amortizing;

d. The interest rate shall be fixed at the time of the closing of title to the Premises at a rate equal to the prime rate of interest as then charged by Citibank NA plus three (3) percentage points, which such initial interest rate shall be in effect for a period of sixty (60) months from the date of closing. The interest rate shall thereafter be adjusted every sixty (60) months based upon the same formula i.e., the prime rate of interest as then charged by Citibank NA plus three (3) percentage points;

e. The mortgage will be drawn by the attorney for the Grantor/Seller and the costs for the preparation of such mortgage and all recording fees and taxes applicable to the recording of such mortgage shall be paid for by the Grantee.

**4.  Consideration**: In consideration for the granting of the rights provided for herein including the Purchase Option, the right of first refusal and the option for seller financing, the Grantee agrees to pay to the Grantor the sum of four hundred and sixty-two thousand five hundred ($462,500.00) dollars (" Consideration"). The obligation of Grantee to pay the Consideration shall become effective upon the satisfaction of all conditions precedent in the Lease. Grantee acknowledges that, as the Grantee's Rights as provided for herein are subject to termination only through a default of the Grantee, the consideration due the Grantor pursuant to this Agreement has been and is hereby deemed as earned in full by the Grantor upon the execution of this Agreement by the Grantor. Notwithstanding the foregoing, provided that the payments set forth below (" Conditionally Deferred Payments") are made by the Grantee upon the due date herein below provided for, the Grantor shall forbear from demanding and receiving payment in full of the then unpaid balance. Within ten (10) days of the Rent Commencement Date and annually thereafter upon each anniversary date thereof for a total of twenty-five annual payments, Grantee shall pay Grantor , without interest on the unpaid principal balance the following Conditionally Deferred Payments:

**8. Situs**: This Agreement shall be interpreted and enforced under the laws of the State of New York without reference to choice of law provisions or authorities and the parties hereto consent to jurisdiction for enforcement of this agreement in Dutchess County New York.

**9. Binding Effect**: This Agreement shall be binding upon the parties hereto, their heirs executors and assigns.

**10. Merger**: This Agreement and the Escrow Agreement contain all of the agreements between the parties hereto relating to the subject matter hereof and may only be modified by a writing executed by the parties hereto with the same formalities as the within Agreement.

**11. Attorney's Fees**: In the event that any party to this Agreement is required to commence or otherwise commences litigation to enforce such party's rights under the terms of this Agreement, then the party prevailing in such litigation shall be entitled to collect his or hers attorney's fees from the non-prevailing party.

**12. Notices**: **Notice Is to Be in Writing; Where sent:** Except as may be provided in this Agreement, any notice or other communication under this Agreement, shall be in writing and shall be sent by United States express mail or by a nationally recognized overnight delivery service that provides receipts or by hand delivery addressed to the party for whom intended at it's the address set forth above ("Notice Address"). Any such notice or other communication shall be deemed given and received when delivered or refused or when delivery is attempted on a Business Day during normal business hours. Either party may, by notice to the other party, designate a different address (or addresses) for notices and other communications intended for it, which designation shall become effective on the date such notice is received.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of _____, 2015.

**82 ANFRAN REALTY, INC.**

By: _Antty P. Segret_
Name: _Anthony P. Segreti_
Title: _President_

**CORNUCOPIA QUEEN, INC.**

By: _____   3/10/15
Sherrance Henderson
Title: President

Proper acknowledgments for state of execution need to be inserted upon finalization

STATE OF GEORGIA                )

COUNTY OF FULTON                )

I hereby Certify that on this day, before me an officer duly authorized to administer oaths and take acknowledgments, personally appeared Sherrance Henderson, known to me to be the person described in and who executed the foregoing Option; Right of First Refusal and Seller Financing Agreement on March 10, 2015, who acknowledged before me that she executed same.

Witness my hand and official seal in the County and State last aforesaid this *10th* day of _March_, A.D. 2015.

[SEAL]

_____
Notary Signature

HAVEN K. Hix
_____
Printed Notary Signature

claims of third parties for bodily injury, death, personal injury, and property damage (including personal injury liability covering libel, slander, false arrest and malicious prosecution, and fire and water damage legal liability) occurring in, upon, or about the Premises and any appurtenances thereto. Such policy shall include contractual liability coverage covering Tenant's indemnification obligations under this Lease with respect to covered claims. Subject to Landlord's right (as set forth below) to require Tenant to increase coverage limits, such policy shall have a per occurrence combined single limit of at least Three Million Dollars ($3,000,000.00) annually and per location.

ii.     *Property Insurance.* Effective on and after the Construction Completion Date, Tenant shall maintain property insurance covering the Improvements and Personal Property. The policy shall insure against (a) all risks, including fire, other risks and losses caused by explosion of boilers and other pressurized equipment, insured under the then Customary form of policy (as of the Commencement Date, the required form of policy shall be Causes of Loss -- Special Form) and shall cover increases in costs incurred by reason of changes in ordinances or laws, and (b) loss of rents in an amount at least equal to gross receipts from all sources of income from the Premises, as reasonably estimated, for a period of at least 18 months (but in no event in an amount less than Base Rent and all regularly recurring Additional Rent payments for a period of at least 18 months, as reasonably estimated) notwithstanding that the policy may expire prior to the end of such period, and which coverage shall contain an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired or restored, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss or the expiration of 18 months from the date that the Improvements are repaired or replaced and operations are resumed, whichever first occurs, notwithstanding that the policy may expire prior to the end of such period; and (c) losses due to disruption of utility services originating away from the Improvements (the "Property Damage Policy"). With respect to losses to property, such policy shall be in an amount equal to 100% of the Full Replacement Cost (hereinafter defined) of the Improvements and Personal Property, but such coverage shall be, in any event, at least sufficient to avoid the effect of the co-insurance provisions of the applicable policy or policies. The term "Full Replacement Cost" shall mean the actual replacement cost of the Improvements and Personal Property, including the cost of demolition and debris removal and without deduction for depreciation and excluding the cost of excavation, foundations and footings. Such policy shall not exclude losses caused by flood, mold, fungus or acts of terrorism (including bioterrorism). With respect to losses covered by the insurance described in clause (b), the amount of the rental loss or business income insurance, as applicable, shall be determined initially upon Substantial Completion of the Improvements and at least once each year thereafter based on Tenant's reasonable estimate of the gross income from the Premises for the succeeding period of coverage.

iii.    *Workers Compensation.* Tenant shall maintain workers compensation insurance as required by law and which shall include employer's liability insurance for all employees of Tenant, in accordance with the statutory limits required by Law.

iv.     *Automobile Insurance.* Tenant shall maintain a policy of Automobile Liability insurance on owned, non-owned and hired motor vehicles used in connection

# AMENDMENT TO LEASE

THIS Amendment to Land and Building Lease ("Amendment") is executed, as of the _____ day of December, 2015 by and between 82 Anfran Realty, Inc., a New York corporation ("Landlord"), and Cornucopia Queen, Inc., a Delaware corporation ("Tenant").

## R E C I T A L S:

A. Landlord is the owner of the property located at 2345 South Road, Poughkeepsie, New York 12601, Dutchess County, New York ("Premises");

B. The Premises has been leased to Tenant under that certain Lease dated April 29, 2015 ("Lease");

C. Landlord and Tenant desire to amend the Lease.

**NOW, THEREFORE,** in consideration of ten dollars and no/100 ($10.00) and other considerations, the sufficiency, value and receipt of which are hereby acknowledged, the parties agree as follows:

1.    Section 25.1 shall be amended to read:

"**Grant of Options to Extend:** Tenant is granted the option to extend the term of this Lease for six (6) successive additional terms of five (5) years each (each such additional term being referred to as an "Extension Term," and each such option being referred to as an "Extension Option") provided all of the following conditions (the "Extension Conditions") are met with respect to each Extension Term: (a) Tenant gives Landlord notice (the "Extension Notice") at least seven (7) months prior to commencement of the Extension Term to which such notice relates, that it is exercising the Extension Option, and (b) at the date the Extension Option is exercised, and at the commencement of the Extension Term to which such option relates, Tenant is not in default of its obligations under the Lease, unless such default is cured within the applicable cure period. Each such Extension Term shall commence at the expiration of the prior term. If any Extension Option is not timely exercised or if the Extension Conditions are not met with respect to any Extension Term, such Extension Option or Extension Term and all further Extension Options and Extension Terms shall be deemed null and void. TIME IS OF THE ESSENCE WITH RESPECT TO THE GIVING OF EACH EXTENSION NOTICE."

2.    Except as modified hereby, the Lease shall remain in full force and effect.

[SIGNATURES ON FOLLOWING PAGE]

1

**MEMORANDUM OF LEASE**

This Memorandum of Lease dated the _31 st_ day of December, 2015 is by and between 82 Anfran Realty, Inc., a New York corporation, ("Landlord") and, Cornucopia Queen, Inc. a Delaware corporation d/b/a/ Golden Corral, ("Tenant").

**W I T N E S S E T H**

WHEREAS, on the 29th day of April, 2015, Landlord and Tenant entered into a written lease agreement (hereinafter referred to as "Lease") for certain premises (the "Premises") in the town of Poughkeepsie, County of Dutchess and State of New York, known as 2345 Route 9, Poughkeepsie New York 1260, which said land consisting of approximately 4.7 acres, as more particularly set forth in the Lease and described on Exhibit "A" attached hereto; and

WHEREAS, the parties wish to place their interests in the lease as a matter of record.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and the parties intending to be legally bound thereby, the parties agree as follows:

1.     The term of the Lease (the "Term") will be for fifteen (15) years beginning on the "Commencement Date" as set forth in the Lease and ending on the last day of the 180th full calendar month following the Commencement Date.

2.     Landlord has granted to Tenant the right and option to extend the Term for six (6) additional period(s) of 60 months each upon the terms, covenants and conditions set forth in the Lease.

[SIGNATURES ON FOLLOWING PAGES]

1

CORNUCOPIA   QUEEN,   INC., a
Delaware corporation

By: _____
Sherrance Henderson
President

STATE OF GEORGIA     )

COUNTY OF FULTON     )


I hereby Certify that on this day, before me an officer duly authorized to administer oaths and take acknowledgments, personally appeared SHERRANCE HENDERSON, known to me to be the person described in and who executed the foregoing Memorandum of Lease on December 31 , 2015, who acknowledged before me that he/she executed same.

Witness my hand and official seal in the County and State last aforesaid this 31 day of December , A.D. 2015.

_____
Notary Signature

HAVEN K. Hix
_____
Printed Notary Signature

3

**AMENDMENT TO LEASE**

THIS Amendment to Land and Building Lease ("Amendment") is executed, as of the _____ day of December, 2015 by and between 82 Anfran Realty, Inc., a New York corporation ("Landlord"), and Cornucopia Queen, Inc., a Delaware corporation ("Tenant").

**R E C I T A L S :**

A. Landlord is the owner of the property located at 2345 South Road, Poughkeepsie, New York 12601, Dutchess County, New York ("Premises");

B. The Premises has been leased to Tenant under that certain Lease dated April 29, 2015 ("Lease");

C. Landlord and Tenant desire to amend the Lease.

**NOW, THEREFORE,** in consideration of ten dollars and no/100 ($10.00) and other considerations, the sufficiency, value and receipt of which are hereby acknowledged, the parties agree as follows:

1.  Section 25.1 shall be amended to read:

"**Grant of Options to Extend:** Tenant is granted the option to extend the term of this Lease for six (6) successive additional terms of five (5) years each (each such additional term being referred to as an "Extension Term," and each such option being referred to as an "Extension Option") provided all of the following conditions (the "Extension Conditions") are met with respect to each Extension Term:  (a) Tenant gives Landlord notice (the "Extension Notice") at least seven (7) months prior to commencement of the Extension Term to which such notice relates, that it is exercising the Extension Option, and (b) at the date the Extension Option is exercised, and at the commencement of the Extension Term to which such option relates, Tenant is not in default of its obligations under the Lease, unless such default is cured within the applicable cure period. Each such Extension Term shall commence at the expiration of the prior term. If any Extension Option is not timely exercised or if the Extension Conditions are not met with respect to any Extension Term, such Extension Option or Extension Term and all further Extension Options and Extension Terms shall be deemed null and void. TIME IS OF THE ESSENCE WITH RESPECT TO THE GIVING OF EACH EXTENSION NOTICE."

2.  Except as modified hereby, the Lease shall remain in full force and effect.

[SIGNATURES ON FOLLOWING PAGE]

1

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day first above written.

**TENANT:**

**CORNUCOPIA QUEEN, INC.**

By:

Sherrance Henderson
President

Sherrance Henderson, Pro Se
6600 Sugarloaf Parkway, 400-343
Duluth, GA 30097
Phone 404-220-9517
Email: SherranceHenderson@gmail.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit D

PLEADING TITLE - 4



## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (" Escrow Agreement") is made and entered into as of the __1__ day of February, 2015, by and among 82 Anfran Realty, Inc., a New York corporation with offices at 145 Blue Hill Road, Hopewell Junction, New York 12533 (hereinafter referred to as "Grantor" or "Seller"); and Cornucopia Queen, Inc., a Delaware corporation d/b/a Golden Corral, having an address of 2760 Pebble Hill Trace, Duluth, Georgia 30097 (hereinafter referred to as "Grantee" or "Purchaser") and Charles V. Martabano Esq., 9 Mekeel Street, Katonah, New York (hereinafter referred to as "Escrow Agent")

## W I T N E S S E T H

WHEREAS, Seller and Purchaser have entered into an Option; Right of First Refusal and Seller Financing Agreement dated __3 |16| 20 1S__ , relating to certain real property located at 2345 Route 9, Poughkeepsie New York 12601 (hereinafter referred to as the "Agreement"); and

WHEREAS, Seller and Purchaser desire to have Escrow Agent hold a deposit equal to the first two (2) annual payments due under the Agreement, in escrow pursuant to the terms hereof and of said Agreement.

NOW THEREFORE, in consideration of the premises and of good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the parties hereby covenant and agree as follows:

1.     Seller and Purchaser hereby appoint Escrow Agent to serve as provided herein

2.     Purchaser hereby delivers to Escrow Agent and deposits with Escrow Agent (wired funds) in the amount of Sixty-Five Thousand ($65,000.00) Dollars (the "Deposit") representing the amount required to make the first two (2) annual payments pursuant to the Agreement. Escrow Agent agrees to deposit said Deposit in his Attorney's C B.T.A. account or as otherwise directed by the Purchaser, and to hold and disburse said funds and any interest earned thereon, as provided herein and in the Agreement. Purchaser hereby represents its Federal Taxpayer I.D. Number is 47-3162982.

3.     Escrow Agent shall timely make the first two payments as required by the Agreement.

4.     Upon receipt of a written claim of default of the Option; Right of First Refusal and Seller Financing Agreement by either party, Escrow Agent shall give written notice of such claim of default to the non-claiming party. Should Escrow Agent not receive notice of an objection to such claim of default within fifteen (15) days after receipt of such notice by the non-claiming party, Escrow Agent shall be authorized to disburse the Deposit and any accrued interest thereon to the claiming party. Should Escrow Agent receive any notice of objection from the non-claiming party, Escrow Agent shall continue to hold the Deposit and any accrued interest thereon under the provisions of this Escrow Agreement.

14329865.2

5.  The parties hereto covenant and agree that in performing any of its duties under this Escrow Agreement, Escrow Agent shall not be liable for any loss, costs, or damage which it may incur as a result of serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.

Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in the Escrow Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of the Escrow Agreement. Escrow Agent shall not incur any liability for any loss of fund due to bank or other depository failure, suspension or cessation of business or any action or inaction on the part of the bank or other depository. Escrow Agent is specifically authorized to refuse to act except upon the written instructions of Seller and Purchaser.

Seller and Purchaser each hereby agree to indemnify and hold harmless Escrow Agent against any and all loses, claims, damages, liabilities and expenses, including without limitation, reasonable cost of investigation and reasonable attorneys' fees and disbursements which may be imposed upon or incurred by Escrow Agent in connection with its serving as Escrow Agent hereunder.

In an event of a dispute between any of the parties hereto sufficient in the sole discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender unto the Supreme Court, Dutchess County, State of New York all money or property in its hands held under the terms of this Escrow Agreement, together with such legal pleadings as it deems appropriate, and thereupon be discharged. Escrow Agent shall be paid a reasonable amount for the preparation and filing of documents necessary to effectuate court jurisdiction over the escrow funds and Seller and Purchaser authorize the Escrow Agent to deduct said amount for the funds paid into court.

6.  This Agreement shall terminate at the first to occur of (i) the Lease identified in the Option; Rights of First Refusal and Seller Financing Agreement is terminated by Tenant due to a failure of a condition precedent or (ii) two (2) payments have been made. If this Agreement is terminated due to termination of the Lease, the deposit shall be returned to Grantee within ten (10) days.

7.  All notices required to be given hereunder shall be given in writing and shall be sent by certified mail, return receipt requested or overnight carrier.

8.  This Escrow Agreement shall be interpreted and enforced under the laws of the State of New York without reference to choice of law provisions.

**82 ANFRAN REALTY, INC.**

By: *Anthony P. Segreti*
Name: *Anthony P. Segreti*
Title: *President*


**CORNUCOPIA QUEEN, INC.**

By: _____ 3/10/15
Sherrance Henderson
President


**Charles V. Martabano, Esq**

By: _____
Charles V. Martabano
Escrow Agent


Will require proper acknowledgments.

143298652

STATE OF GEORGIA          )

COUNTY OF FULTON       )

I hereby Certify that on this day, before me an officer duly authorized to administer oaths and take acknowledgments, personally appeared Sherrance Henderson, known to me to be the person described in and who executed the foregoing Escrow Agreement on March 10, 2015, who acknowledged before me that she executed same.

Witness my hand and official seal in the County and State last aforesaid this *10* day of *March*, A.D. 2015.

[SEAL}

_____
Notary Signature

_____
Printed Notary Signature

1   Sherrance Henderson

2   6600 Sugarloaf PKY, 400-343

3   Duluth, GA 30097

4   Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13                          Exhibit CC 1B

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 4

Agreement Amendments in <u>Exhibit M</u> for further details. You also may wish to consult with your attorney.

## ITEM 18
## PUBLIC FIGURES

Golden Corral does not use any public figures to promote Golden Corral Restaurant franchises.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

Actual results vary from franchise to franchise, and we cannot estimate the results of a particular franchise. A new franchisee's results are likely to differ from the results shown in this Item. We recommend that you make your own independent investigation to determine whether or not the franchise may be profitable, and consult with an attorney and other advisors prior to executing the Area Development Agreement or Franchise Agreement.

Written substantiation for these financial performance representations will be made available to prospective franchisees upon reasonable request.

A.  **STATEMENT OF AVERAGE ANNUAL SALES OF FRANCHISED RESTAURANTS**

The following two Tables provide annual sales information for the period December 29, 2011 through January 2, 2013, by building design, about the 338 franchised Restaurants utilizing the GC-10, GC-11S, or GC-11M building designs which had been in operation at least 6 months as of January 2, 2013. The results of 7 other franchised Restaurants which utilized one of these 3 Restaurant designs are not included in the Tables because the Restaurants had not been in operation for at least 6 months as of January 2, 2013.

Each Table divides the franchised Restaurants into three categories based on ranges of annual sales volume within each category of building design. These categories are identified as the "Top 1/3," "Middle 1/3," and "Bottom 1/3." An overall high-low range for each category of building design also appears.

## TABLE 1

| | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M:** | High-Low Range: $8,826,189 to $1,553,006 | | | | | |
| Top 1/3 | $4,690,403 | 63 | $8,826,189 | $3,890,614 | 25 | 38 |
| Middle 1/3 | $3,522,583 | 63 | $3,889,663 | $3,080,861 | 33 | 30 |
| Bottom 1/3 | $2,506,919 | 63 | $3,070,258 | $1,553,006 | 36 | 27 |
| Total | $3,566,855 | 189 | | | | |
| **GC-11S:** | High-Low Range: $4,334,229 to $1,161,684 | | | | | |
| Top 1/3 | $3,465,367 | 17 | $4,334,229 | $3,080,760 | 5 | 12 |
| Middle 1/3 | $2,580,616 | 18 | $2,956,196 | $2,235,716 | 9 | 9 |
| Bottom 1/3 | $1,915,066 | 17 | $2,222,440 | $1,161,684 | 10 | 7 |
| Total | $2,651,850 | 52 | | | | |
| **GC-10:** | High-Low Range: $7,741,666 to $2,467,484 | | | | | |
| Top 1/3 | $5,852,177 | 32 | $7,741,666 | $5,048,043 | 12 | 20 |
| Middle 1/3 | $4,470,968 | 33 | $5,008,486 | $3,904,055 | 14 | 19 |
| Bottom 1/3 | $3,179,171 | 32 | $3,853,907 | $2,467,484 | 15 | 17 |
| Total | $4,497,201 | 97 | | | | |

Table 1 includes data from 199 franchised Restaurants that were originally constructed using a specialized equipment package and floor plan ("**Strata Restaurants**"). The following Table 2 describes the results of these 199 Strata Restaurants.

Golden Corral 2013 FDD/PK 65899                                                                                         04/15/13

### TABLE 2

| | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M Strata:** | High-Low Range: $8,826,189 to $1,553,006 | | | | | |
| Top 1/3 | $4,780,197 | 51 | $8,826,189 | $3,963,208 | 19 | 32 |
| Middle 1/3 | $3,612,337 | 50 | $3,960,956 | $3,172,347 | 26 | 24 |
| Bottom 1/3 | $2,579,404 | 51 | $3,145,273 | $1,553,006 | 29 | 22 |
| Total | $3,649,961 | 152 | | | | |
| **GC-11S Strata:** | High-Low Range: $4,334,229 to $1,961,774 | | | | | |
| Top 1/3 | $3,704,284 | 7 | $4,334,229 | $3,252,076 | 3 | 4 |
| Middle 1/3 | $2,800,984 | 6 | $2,956,196 | $2,629,970 | 3 | 3 |
| Bottom 1/3 | $2,327,641 | 7 | $2,536,066 | $1,961,774 | 3 | 4 |
| Total | $2,952,178 | 20 | | | | |
| **GC-10 Strata:** | High-Low Range: $7,612,469 to $2,467,484 | | | | | |
| Top 1/3 | $5,651,784 | 9 | $7,612,469 | $4,832,259 | 4 | 5 |
| Middle 1/3 | $3,942,629 | 9 | $4,349,005 | $3,471,091 | 4 | 5 |
| Bottom 1/3 | $2,852,587 | 9 | $3,411,501 | $2,467,484 | 3 | 6 |
| Total | $4,133,461 | 27 | | | | |

We have not audited those franchisee-prepared results which have been reported to us by our franchisees, but have no reasonable basis to question their reliability. These Restaurants are located in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Mississippi, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

The above two Tables do not include the results of franchised Restaurants that do not utilize a GC-10, GC-11S, or GC-11M Restaurant design. There are 17 Restaurants which utilize older and smaller Restaurant design configurations that are no longer being built. There are also two units that utilize the new Pavilion building type.

The results of those franchised Restaurants that were open for more than six but fewer than 12 months have been annualized to conform their data to the presentation of the annual results that appear in the two Tables. Two of the 189 GC-11M Restaurants

58

whose results appear in Table 1, and two of the 152 GC-11M Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table. One of the 97 GC-10 Restaurants whose results appear in Table 1, and one of the 27 GC-10 Strata Restaurants whose results appear in Table 2, have had their data annualized. One of the 52 GC-11S Restaurants whose results appear in Table 1, and one of the 20 GC-11S Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table.

The information for franchised Restaurants reflects average annual sales, and does not include the cost of sales, operating expenses, or other costs or expenses that must be deducted from sales in order to determine net income or profit.

*[Remainder of page intentionally left blank]*

1   Sherrance Henderson, Pro Se
    6600 Sugarloaf Parkway, 400-343
2   Duluth, GA 30097
    Phone 404-220-9517
3   Email: SherranceHenderson@gmail.com

4

5

6

7

8

9

10

11

12

13          # Exbibit E

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    PLEADING TITLE - 5

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 3:58 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: RE: CONFIDENTIAL - DO NOT FORWARD |

-----Original Message-----
From: William Kugelman <wkugelman@lawppl.com>
To: Sherrance Henderson <sheronceh@aol.com>
Sent: Mon, Aug 15, 2016 01:58 PM
Subject: RE: CONFIDENTIAL - DO NOT FORWARD

Of course.  Call me at your convenience, I am in the office.

William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com

30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** Sherrance Henderson [mailto:sheronceh@aol.com]
**Sent:** Monday, August 15, 2016 1:57 PM
**To:** William Kugelman <wkugelman@lawppl.com>
**Subject:** Re: CONFIDENTIAL - DO NOT FORWARD


3 PM tomorrow is good but I would like to know if I can speak with you prior to that privately

Sent from my iPhone


On Aug 15, 2016, at 1:46 PM, William Kugelman <wkugelman@lawppl.com> wrote:

Sounds good.  Let's target 3:00 tomorrow afternoon?  Sherrance, is that time good for you?


William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com


30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001


This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** Patrick Parr [mailto:PatrickParr@NCDBuilders.com]
**Sent:** Monday, August 15, 2016 12:59 PM
**To:** William Kugelman <wkugelman@lawppl.com>
**Cc:** Aaron Parr <AaronParr@ncdbuilders.com>; 'Sherrance Henderson' <sheronceh@aol.com>
**Subject:** RE: CONFIDENTIAL - DO NOT FORWARD

Bill,

Aaron is traveling today and will be Raleigh about midnight tonight. Any time tomorrow afternoon should work for us.

Best Regards

---

## Patrick Parr
Project Manager
NCD Builders
National Consulting & Development, Inc.
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
Cell: 251-591-3733
PatrickParr@NCDBuilders.com
www.NCDBuilders.com

On 2016-08-15 10:29, William Kugelman wrote:

All,

I am back in my office today. If it is convenient for everyone, we can have a discussion at 3:00 or so today. If that is not a good time, let me know your respective availability. Thanks,

Bill

William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

3

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com

30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Friday, August 12, 2016 1:02 PM
**To:** William Kugelman <wkugelman@lawppl.com>; 'Sherrance Henderson' <sheronceh@aol.com>
**Cc:** 'Patrick Parr' <PatrickParr@NCDBuilders.com>
**Subject:** CONFIDENTIAL - DO NOT FORWARD
**Importance:** High

CONFIDENTIAL - DO NOT FORWARD

Bill and Sherrance,

We need to have a serious discussion with TD Bank moving forward due to the following:

- I made Alisha and Grace aware on August 1st that I would be out of town for two weeks and I needed the check forwarded to my location in Alabama as the payment was already late.  I just found out the check was sent to Raleigh where no one is at until next week. (Another delay – Funds will not be available until the end of the week)

4

- Alisha recommended that I open a TD Bank account so they could just transfer the money into the account on Tuesday August 9th. I followed up with an email saying I would open the account on both Tuesday the 9th and Wednesday the 10th. I received no response from anyone at TD Bank to the emails. I forwarded the information to TD Bank on Wednesday the 10th and the account was setup by TD Bank on Thursday the 11th. TD Bank went ahead, even though they had the emails, and issued a check to be mailed. Then with the opportunity of UPS not picking up the package, they still didn't attempt to remedy the situation by cancelling the check and transferring the funds or by just depositing the check themselves into the account. The check now will not be deposited until next week and since the account is a new TD checking account it will take a few days to clear per the Branch Manager. The Branch Manager also stated that if the funds would have been transferred they would be available immediately.

- TD Bank is now requesting new financial from Sherrance before the next pay application. I have been holding off on the next pay application as I do not have lien waivers to submit from the one that has been delayed. It looks to me like another delay is imminent.

We have two choices today.

1.  Wait on someone to get back to Raleigh next week and get the check, send to NY to deposit and then wait for it to clear and then get back to work, or

2.  Request TD Bank to cancel the check and transfer the funds into the newly setup NCD checking account at TD Bank as previously requested.

At this point the subcontractors and vendors that have been delayed on getting payment by three weeks are not too happy with the process that has occurred – especially since I have been telling them for the past three weeks that payment was coming anytime based on the emails and communication I received from TD Bank. The concrete supplier is waiting on the check from the last draw for the footing concrete. They will not supply the concrete for the slab until payment is received so this delay will again affect the project.

Let me know your thoughts.

**Aaron Parr**

President

**NCD Builders**

**National Consulting & Development, Inc.**

2474 Walnut Street PMB 326

Cary, North Carolina 27518-9212

919-610-1605 Cell

AaronParr@NCDBuilders.com

www.NCDBuilders.com

**From:** Weicker, Alisha M [mailto:Alisha.Weicker@td.com]
**Sent:** Friday, August 12, 2016 9:54 AM
**To:** William Kugelman <wkugelman@lawppl.com>; Sherrance Henderson <sheronceh@aol.com>
**Cc:** Shannon, Pamela <Pamela.Shannon@td.com>; Rouse, David <David.Rouse@td.com>; Cosgrove, Grace <Grace.Cosgrove@td.com>; Aaron Parr <AaronParr@NCDBuilders.com>; Weiss, Stephanie G <Stephanie.Weiss@td.com>; Patrick Parr <PatrickParr@NCDBuilders.com>; accouting@ncdbuilders.com; Hallock, Elizabeth <Elizabeth.Hallock@td.com>; Devlin, Katie M <Kathryn.Devlin@td.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

The payment requested for the change order has been honored.  The request for payment has been paid as requested.  Nothing is shorted.

Checks have been sent.  A payment in check was the only matter of funding we were able to satisfy for this request.  We could not wire an external bank and the TD account was opened after the checks were cut to insure payment was received by all parties by Thursday.  There was an issue with the checks not going out Wednesday as planned with an error from the UPS pickup but it's resolved now.  Checks are in transit to the GC and Sherrance which delivery guaranteed by 10:30am.

Sherrance,

Before the next advance Beth and I have asked you for updated financials due to annual maintenance of the file.  Our current docs from you are 12 months old.

Upcoming Time Off:  August 24th thru September 5th

Alisha Weicker | AVP | Credit Analyst II - Construction Specialist | SBA Lending Group

**TD Bank, America's Most Convenient Bank**

***New Address: 31 Millbridge Road, Clementon, NJ 08021

***New Phone #: 856 282 6099 | M: 856 296 2390 | F: 855 271 5550

<image001.jpg>

**From:** William Kugelman [mailto:wkugelman@lawppl.com]
**Sent:** Thursday, August 11, 2016 6:27 PM
**To:** Sherrance Henderson
**Cc:** Weicker, Alisha M; Shannon, Pamela; Rouse, David; Cosgrove, Grace; Aaron Parr; Weiss, Stephanie G; Patrick Parr; accouting@ncdbuilders.com
**Subject:** Re: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

This is in direct contradiction to the two previous emails I received earlier in the week from Alisha and Elizabeth and is not in conformance with the Loan Agreement.  Full payment is once again demanded. And, you are a bank so wire the damn funds to Mr. Parr tomorrow

Sent from my iPhone

On Aug 11, 2016, at 6:15 PM, Sherrance Henderson <sheronceh@aol.com> wrote:

Alisha and Jeffrey,

Please one of you offer an explanation why the change order amount will not be honored in payment. Onshore what the rule is pertaining to Communications when this happens but we would like to have an explanation of more detail and professionalism why the requisition is only being paid however the change order is not being paid. We await your reply.

Sherrance

From my BlackBerry - the most secure mobile device

**From:** wkugelman@lawppl.com

**Sent:** August 12, 2016 6:10 AM

**To:** Alisha.Weicker@td.com

**Cc:** AaronParr@NCDBuilders.com; Grace.Cosgrove@td.com; Pamela.Shannon@td.com; sheronceh@aol.com; accouting@ncdbuilders.com; PatrickParr@NCDBuilders.com; David.Rouse@td.com; Stephanie.Weiss@td.com

**Subject:** Re: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

What do you mean "the advance" only?

Sent from my iPhone

On Aug 11, 2016, at 5:19 PM, Weicker, Alisha M <Alisha.Weicker@td.com> wrote:

There was a problem with the UPS packages. This did not get picked out and sent out for delivery as expected.
It has gone out today and it will be delivered to you by 10:30am tomorrow morning.

We are only able to cut a check for the advance at this time.
I am really sorry for the inconvenience.

**Upcoming Time Off:   August 24th thru September 5th**

Alisha Weicker | AVP | Credit Analyst II - Construction Specialist | SBA Lending Group
**TD Bank, America's Most Convenient Bank**
***New Address: 31 Millbridge Road, Clementon, NJ 08021
***New Phone #: 856 282 6099 | M: 856 296 2390 | F: 855 271 5550

<image001.jpg>

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Thursday, August 11, 2016 4:19 PM
**To:** Cosgrove, Grace; Weicker, Alisha M; Shannon, Pamela
**Cc:** 'Sherrance Henderson'; accouting@ncdbuilders.com; 'Patrick Parr'; Rouse, David; Weiss, Stephanie G; 'William Kugelman'
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

Does anyone have an update?  This is beyond frustrating.

Aaron

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Thursday, August 11, 2016 2:28 PM
**To:** 'Cosgrove, Grace' <Grace.Cosgrove@td.com>; 'Weicker, Alisha M'
<Alisha.Weicker@td.com>; 'Shannon, Pamela' <Pamela.Shannon@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; 'accouting@ncdbuilders.com'
<accouting@ncdbuilders.com>; 'Patrick Parr' <PatrickParr@NCDBuilders.com>; 'Rouse, David'
<David.Rouse@td.com>; 'Weiss, Stephanie G' <Stephanie.Weiss@td.com>; 'William Kugelman'
<wkugelman@lawppl.com>

8

**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY
**Importance:** High

We have been discussing, in this same email string since Tuesday, about transferring the funds into a new TD bank checking account that was setup today.  I sent an email Tuesday evening and Wednesday with no response.  I need an answer on status of payment before 3:30pm today.

**Aaron Parr**
President
**NCD Builders**
**National Consulting & Development, Inc.**
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
919-610-1605 Cell
AaronParr@NCDBuilders.com
www.NCDBuilders.com

**From:** Cosgrove, Grace [mailto:Grace.Cosgrove@td.com]
**Sent:** Thursday, August 11, 2016 2:11 PM
**To:** Aaron Parr <AaronParr@NCDBuilders.com>; Weicker, Alisha M <Alisha.Weicker@td.com>; Shannon, Pamela <Pamela.Shannon@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; accouting@ncdbuilders.com; 'Patrick Parr' <PatrickParr@NCDBuilders.com>; Rouse, David <David.Rouse@td.com>; Weiss, Stephanie G <Stephanie.Weiss@td.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

What is this for? I though David sent the check out yesterday.

Grace M. Cosgrove| Com'l Portfolio Loan Spec-Officer|CRE Administration
TD Bank, America's Most Convenient Bank
NY2-099-000 | 703 Main Street, Poughkeepsie  NY 12601
T  845 431 6077 I  F: 845 452 0021

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Thursday, August 11, 2016 1:51 PM
**To:** Weicker, Alisha M; Cosgrove, Grace; Shannon, Pamela
**Cc:** 'Sherrance Henderson'; accouting@ncdbuilders.com; 'Patrick Parr'; Rouse, David
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY
**Importance:** High

Alisha and Grace,

The checking account number for National Consulting and Development, Inc is as follows:

4328341419

Please confirm that the transfer will go in today and will be available.  Thanks,

**Aaron Parr**
President
**NCD Builders**
**National Consulting & Development, Inc.**
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
919-610-1605 Cell
AaronParr@NCDBuilders.com
www.NCDBuilders.com

9

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Wednesday, August 10, 2016 1:01 PM
**To:** 'Weicker, Alisha M' <Alisha.Weicker@td.com>; 'Cosgrove, Grace'
<Grace.Cosgrove@td.com>; 'Pamela.Shannon@TD.com' <Pamela.Shannon@TD.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; 'accouting@ncdbuilders.com'
<accouting@ncdbuilders.com>; 'Patrick Parr' <PatrickParr@NCDBuilders.com>; 'Rouse, David'
<David.Rouse@td.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY
**Importance:** High

I will have the account number this afternoon so the funds can be transferred over into my new TD
checking account today.  Pamela Shannon, in Poughkeepsie, is setting up the account.

Thanks,

**Aaron Parr**
President
**NCD Builders**
**National Consulting & Development, Inc.**
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
919-610-1605 Cell
AaronParr@NCDBuilders.com
www.NCDBuilders.com


**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Tuesday, August 09, 2016 3:02 PM
**To:** 'Weicker, Alisha M' <Alisha.Weicker@td.com>; 'Cosgrove, Grace'
<Grace.Cosgrove@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; 'accouting@ncdbuilders.com'
<accouting@ncdbuilders.com>; 'Patrick Parr' <PatrickParr@NCDBuilders.com>; 'Rouse, David'
<David.Rouse@td.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

Can we get the TD account open by tomorrow?  What needs to be done?  Will a hold be placed on
the funds?

At this point we will have to cancel the pour at the end of the week.

Let me know if it can be setup by tomorrow and what is needed to do so as well as if a hold will
be placed.

Aaron

**From:** Weicker, Alisha M [mailto:Alisha.Weicker@td.com]
**Sent:** Tuesday, August 09, 2016 2:39 PM
**To:** Aaron Parr <AaronParr@NCDBuilders.com>; Cosgrove, Grace <Grace.Cosgrove@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; accouting@ncdbuilders.com; 'Patrick Parr'
<PatrickParr@NCDBuilders.com>; Rouse, David <David.Rouse@td.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

We cannot process a wire.  I have exhausted all avenues to follow for that process and I was
unable to find any way we can process a wire for loan funds advance.

The advance is being processed today late.  Grace is currently waiting for an updated title
endorsement.  This is needed before we process any advance.  We have had it pending and
renewed in pending for weeks.  It is only good for 24 hours so it needs to be received just before

the advance is posted. Since we will be getting it late today- we will not be able to cut the check. The check will be cut first thing tomorrow morning and overnighted to you as usual.

So we have confirmation- you will have check in hand by Thursday afternoon. I will see if they can do morning delivery for the overnight package so you can get the check before noon.

If you had a TD Bank Account- we could process a loan proceeds transfer into a TD Bank checking account. Just an FYI but I'm not making you open an account with us. If you had the TD account- you'd have funds by Wednesday afternoon at the latest I believe.


**Upcoming Time Off:   August 24th thru September 5th**

Alisha Weicker | AVP | Credit Analyst II - Construction Specialist | SBA Lending Group
**TD Bank, America's Most Convenient Bank**
***New Address: 31 Millbridge Road, Clementon, NJ 08021
***New Phone #: 856 282 6099 | M: 856 296 2390 | F: 855 271 5550


<image001.jpg>


**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Tuesday, August 09, 2016 12:47 PM
**To:** Weicker, Alisha M; Cosgrove, Grace
**Cc:** 'Sherrance Henderson'; accouting@ncdbuilders.com; 'Patrick Parr'
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

Any update?

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Tuesday, August 09, 2016 1:10 AM
**To:** 'Weicker, Alisha M' <Alisha.Weicker@td.com>; 'Cosgrove, Grace' <Grace.Cosgrove@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; 'accouting@ncdbuilders.com' <accouting@ncdbuilders.com>; 'Patrick Parr' <PatrickParr@NCDBuilders.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY
**Importance:** High

Thank you.  The wire would work the best as we have material suppliers and subcontractors that are now past due.

The wiring instructions are as follows:

Bank:                         Regions Bank
Wire Transfer Routing Number: 062005690
Account Holder Name:          National Consulting and Development, Inc.
Account Number:               01 4249 6993
Bank Address:                 Regions Bank
                              1900 Fifth Avenue North
                              Birmingham, AL 35203

Call or email with any questions.

Thanks,

**Aaron Parr**
President
**NCD Builders**

11

**National Consulting & Development, Inc.**
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
919-610-1605 Cell
AaronParr@NCDBuilders.com
www.NCDBuilders.com

**From:** Weicker, Alisha M [mailto:Alisha.Weicker@td.com]
**Sent:** Monday, August 08, 2016 5:29 PM
**To:** Aaron Parr <AaronParr@NCDBuilders.com>; Cosgrove, Grace <Grace.Cosgrove@td.com>
**Cc:** 'Sherrance Henderson' <sheronceh@aol.com>; accouting@ncdbuilders.com; 'Patrick Parr'
<PatrickParr@NCDBuilders.com>
**Subject:** RE: NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY

Aaron,
I finally got approval to process the advance as it is requested.
Right now it looks like it's going out tomorrow as a check (which we can overnight to you) but I
am trying to see if I have anyone who can process a wire.
I will update you tomorrow morning.

**Upcoming Time Off:   August 24th thru September 5th**

Alisha Weicker | AVP | Credit Analyst II - Construction Specialist | SBA Lending Group
**TD Bank, America's Most Convenient Bank**
***New Address: 31 Millbridge Road, Clementon, NJ 08021
***New Phone #: 856 282 6099 | M: 856 296 2390 | F: 855 271 5550

<image001.jpg>

**From:** Aaron Parr [mailto:AaronParr@NCDBuilders.com]
**Sent:** Monday, August 08, 2016 4:26 PM
**To:** Weicker, Alisha M; Cosgrove, Grace
**Cc:** 'Sherrance Henderson'; accouting@ncdbuilders.com; 'Patrick Parr'
**Subject:** NEED UPDATE ON PAY APP #4 GOLDEN CORRAL POUGHKEEPSIE, NY
**Importance:** High

Alisha and Grace,

Is there an update on payment today?  I have not heard from anyone concerning this issue.  Please
update today.
Thanks,

**Aaron Parr**
President
**NCD Builders**
**National Consulting & Development, Inc.**
2474 Walnut Street PMB 326
Cary, North Carolina 27518-9212
919-610-1605 Cell
AaronParr@NCDBuilders.com
www.NCDBuilders.com

12

This message and any attachments may contain confidential or privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

This message and any attachments may contain confidential or privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

This message and any attachments may contain confidential or privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Saturday, March 23, 2019 2:56 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Re: Golden Corral Poughkeepsie - Equipment |

Print all pages


-----Original Message-----
From: William Kugelman <wkugelman@lawppl.com>
To: Aaron Parr <aaronparr@ncdbuilders.com>
Cc: sheronceh@aol.com <sheronceh@aol.com>; Judah Bryan <bryan.judah@atritt.com>
Sent: Fri, Jun 9, 2017 01:30 PM
Subject: Re: Golden Corral Poughkeepsie - Equipment


The "send" button was hit accidentally.  Any transaction will, of course, have to address the lien.

I will keep all posted as the transaction progresses

VTY,

Bill Kugelman

Sent from my iPhone

On Jun 9, 2017, at 10:40 AM, Aaron Parr <aaronparr@ncdbuilders.com> wrote:

> Any update on this?   I need to see the LOI ASAP to confirm that NCD will be covered completely in the sale.  Please respond today along with a copy of the LOI.

> Thanks,


> **Aaron Parr**

> President

> **NCD Builders**

> **National Consulting & Development, Inc.**

> 2474 Walnut Street PMB 326

> Cary, North Carolina 27518-9212

1

919-610-1605 Cell

AaronParr@NCDBuilders.com

www.NCDBuilders.com

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Wednesday, June 07, 2017 5:15 PM
**To:** Aaron Parr <aaronparr@ncdbuilders.com>
**Cc:** wkugelman@lawppl.com
**Subject:** Fwd: RE: Golden Corral Poughkeepsie - Equipment

Aaron,
I have forward this email to my lawyer. He will reply accordingly.
Sheer

Sent from AOL Mobile Mail

_____

From: Aaron Parr <aaronparr@ncdbuilders.com>
Date: Wednesday, June 7, 2017
Subject: RE: Golden Corral Poughkeepsie - Equipment
To: sheronceh <sheronceh@aol.com>

Is he buying from you directly?

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Monday, June 05, 2017 10:36 AM
**To:** Aaron Parr <aaronparr@ncdbuilders.com>
**Subject:** RE: Golden Corral Poughkeepsie - Equipment

Thanks Aaron but the store is currently in the process of being sold to N. Patel.

Sent from AOL Mobile Mail

On Monday, June 5, 2017 Aaron Parr <aaronparr@ncdbuilders.com> wrote:

Sherrance,

I have a Franchisee that is interested in buying used equipment for a Golden Corral project I am building.   Are you interested in selling the equipment in Poughkeepsie?  Please let me know one way or the other as we are checking all opportunities for Golden Corral used equipment.

Thanks,

**Aaron Parr**

President

**NCD Builders**

**National Consulting & Development, Inc.**

2474 Walnut Street PMB 326

Cary, North Carolina 27518-9212

919-610-1605 Cell

AaronParr@NCDBuilders.com

www.NCDBuilders.com

1   Sherrance Henderson, Pro Se
    6600 Sugarloaf Parkway, 400-343
2   Duluth, GA 30097
    Phone 404-220-9517
3   Email: SherranceHenderson@gmail.com

4

5

6

7

8

9

10

11

12

13   # Exhibit CC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    PLEADING TITLE - 3

Agreement Amendments in <u>Exhibit M</u> for further details.  You also may wish to consult with your attorney.

## ITEM 18
## PUBLIC FIGURES

Golden Corral does not use any public figures to promote Golden Corral Restaurant franchises.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document.  Financial performance information that differs from that included in Item 19 may be given only if:  (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

Actual results vary from franchise to franchise, and we cannot estimate the results of a particular franchise.  A new franchisee's results are likely to differ from the results shown in this Item.  We recommend that you make your own independent investigation to determine whether or not the franchise may be profitable, and consult with an attorney and other advisors prior to executing the Area Development Agreement or Franchise Agreement.

Written substantiation for these financial performance representations will be made available to prospective franchisees upon reasonable request.

A.    **STATEMENT OF AVERAGE ANNUAL SALES OF FRANCHISED RESTAURANTS**

The following two Tables provide annual sales information for the period December 29, 2011 through January 2, 2013, by building design, about the 338 franchised Restaurants utilizing the GC-10, GC-11S, or GC-11M building designs which had been in operation at least 6 months as of January 2, 2013.  The results of 7 other franchised Restaurants which utilized one of these 3 Restaurant designs are not included in the Tables because the Restaurants had not been in operation for at least 6 months as of January 2, 2013.

Each Table divides the franchised Restaurants into three categories based on ranges of annual sales volume within each category of building design.  These categories are identified as the "Top 1/3," "Middle 1/3," and "Bottom 1/3."  An overall high-low range for each category of building design also appears.

56

04/15/13

*Henderson's Store type*

## TABLE 1

| | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M:** | High-Low Range: $8,826,189 to $1,553,006 | | | | | |
| Top 1/3 | $4,690,403 | 63 | $8,826,189 | $3,890,614 | 25 | 38 |
| Middle 1/3 | $3,522,583 | 63 | $3,889,663 | $3,080,861 | 33 | 30 |
| Bottom 1/3 | $2,506,919 | 63 | $3,070,258 | $1,553,006 | 36 | 27 |
| Total | $3,566,855 | 189 | | | | |
| **GC-11S:** | High-Low Range: $4,334,229 to $1,161,684 | | | | | |
| Top 1/3 | $3,465,367 | 17 | $4,334,229 | $3,080,760 | 5 | 12 |
| Middle 1/3 | $2,580,616 | 18 | $2,956,196 | $2,235,716 | 9 | 9 |
| Bottom 1/3 | $1,915,066 | 17 | $2,222,440 | $1,161,684 | 10 | 7 |
| Total | $2,651,850 | 52 | | | | |
| **GC-10:** | High-Low Range: $7,741,666 to $2,467,484 | | | | | |
| Top 1/3 | $5,852,177 | 32 | $7,741,666 | $5,048,043 | 12 | 20 |
| Middle 1/3 | $4,470,968 | 33 | $5,008,486 | $3,904,055 | 14 | 19 |
| Bottom 1/3 | $3,179,171 | 32 | $3,853,907 | $2,467,484 | 15 | 17 |
| Total | $4,497,201 | 97 | | | | |

Table 1 includes data from 199 franchised Restaurants that were originally constructed using a specialized equipment package and floor plan ("**Strata Restaurants**"). The following Table 2 describes the results of these 199 Strata Restaurants.

04/15/13

## TABLE 2

|  | Average Annual Sales | Number of Restaurants | High | Low | Number Above Average | Number Below Average |
|---|---|---|---|---|---|---|
| **GC-11M Strata:** | High-Low Range:  $8,826,189 to $1,553,006 | | | | | |
|  | | | | | 19 | 32 |
| Top 1/3 | $4,780,197 | 51 | $8,826,189 | $3,963,208 | 26 | 24 |
| Middle 1/3 | $3,612,337 | 50 | $3,960,956 | $3,172,347 | 29 | 22 |
| Bottom 1/3 | $2,579,404 | 51 | $3,145,273 | $1,553,006 | | |
| Total | $3,649,961 | 152 | | | | |
| **GC-11S Strata:** | High-Low Range: $4,334,229 to $1,961,774 | | | | | |
|  | | | | | 3 | 4 |
| Top 1/3 | $3,704,284 | 7 | $4,334,229 | $3,252,076 | 3 | 3 |
| Middle 1/3 | $2,800,984 | 6 | $2,956,196 | $2,629,970 | 3 | 4 |
| Bottom 1/3 | $2,327,641 | 7 | $2,536,066 | $1,961,774 | | |
| Total | $2,952,178 | 20 | | | | |
| **GC-10 Strata:** | High-Low Range: $7,612,469 to $2,467,484 | | | | | |
|  | | | | | 4 | 5 |
| Top 1/3 | $5,651,784 | 9 | $7,612,469 | $4,832,259 | 4 | 5 |
| Middle 1/3 | $3,942,629 | 9 | $4,349,005 | $3,471,091 | 3 | 6 |
| Bottom 1/3 | $2,852,587 | 9 | $3,411,501 | $2,467,484 | | |
| Total | $4,133,461 | 27 | | | | |

We have not audited those franchisee-prepared results which have been reported to us by our franchisees, but have no reasonable basis to question their reliability. These Restaurants are located in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Mississippi, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

The above two Tables do not include the results of franchised Restaurants that do not utilize a GC-10, GC-11S, or GC-11M Restaurant design. There are 17 Restaurants which utilize older and smaller Restaurant design configurations that are no longer being built. There are also two units that utilize the new Pavilion building type.

The results of those franchised Restaurants that were open for more than six but fewer than 12 months have been annualized to conform their data to the presentation of the annual results that appear in the two Tables. Two of the 189 GC-11M Restaurants

58

04/15/13

whose results appear in Table 1, and two of the 152 GC-11M Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table. One of the 97 GC-10 Restaurants whose results appear in Table 1, and one of the 27 GC-10 Strata Restaurants whose results appear in Table 2, have had their data annualized.  One of the 52 GC-11S Restaurants whose results appear in Table 1, and one of the 20 GC-11S Strata Restaurants whose results appear in Table 2, have had their data annualized, but their inclusion did not have any material impact on the results shown in either Table.

The information for franchised Restaurants reflects average annual sales, and does not include the cost of sales, operating expenses, or other costs or expenses that must be deducted from sales in order to determine net income or profit.

*[Remainder of page intentionally left blank]*

B.   **STATEMENT OF AVERAGE ANNUAL SALES, SELECTED EXPENSES AND OPERATING INCOME FOR GCC OPERATED RESTAURANTS**

The following three Tables describe the average annual net sales, operating costs and expenses, and net operating income based upon actual sales for the period December 29, 2011 – January 2, 2013, by building design, for the 101 GCC operated Restaurants utilizing the GC-10, GC-11S, or GC-11M building designs, which had been in operation at least 6 months as of January 2, 2013. The result of 1 other GCC operated Restaurant which utilized one of GC-11M building designs and one of the GC-11S building designs are not included because the Restaurants had not been in operation for at least 6 months as of January 2, 2013. The results of 21 additional GCC operated Restaurants are not included because they represent a new Pavilion building type. The Tables divide the GCC operated Restaurants into three categories based on ranges of annual sales volume within each category. These categories are identified as "Top 1/3," "Middle 1/3," and "Bottom 1/3." Each category reflects the average annual results for the Restaurants within that category.

The 19 GC-10 Restaurants are located in the states of Alabama (2); Florida (4); New Mexico (1); North Carolina (2); Ohio (1); Oklahoma (1); and Texas (8). The 12 GC-11S Restaurants are located in the states of Florida (1); Georgia (1); Kentucky (1); Nebraska (1); New Mexico (1); North Carolina (3); Oklahoma (2); and Texas (2). The 70 GC-11M Restaurants are located in the states of Alabama (4); Arizona (1); Florida (5); Indiana (8); Iowa (1); Kentucky (6); Louisiana (3); New Mexico (2); North Carolina (5); North Dakota (2); Ohio (19); Pennsylvania (4); Oklahoma (2); South Carolina (1); Tennessee (1); Texas (5); Virginia (1); and West Virginia (1).

The Tables in this section were prepared from data obtained from the unaudited profit and loss statements prepared by GCC in accordance with generally accepted accounting principles for the period December 29, 2011 through January 2, 2013.

The Notes following Tables 3-6 form an integral part of this summary statement.

*[Remainder of page intentionally left blank]*

60                                        04/15/13

## TABLE 3

### GC-10 Restaurants (Note 1)

| | Top 1/3 Dollars | Percent | Middle 1/3 Dollars | Percent | Bottom 1/3 Dollars | Percent |
|---|---|---|---|---|---|---|
| Net Sales (Note 2) | $4,593,247 | 100.00% | $3,563,793 | 100.00% | $3,098,286 | 100.00% |
| Operating Costs and Expenses: | | | | | | |
| Food Cost | $1,758,416 | 38.28% | $1,450,336 | 40.70% | $1,249,821 | 40.34% |
| Labor Related Expenses (Note 3) | 1,102,825 | 24.01% | 873,489 | 24.51% | 794,798 | 25.66% |
| Controllable Expenses (Note 4) | 551,126 | 12.0% | 519,802 | 14.58% | 459,314 | 14.82% |
| Total Operating Costs and Expenses | $3,412,367 | 74.29% | $2,843,627 | 79.79% | $2,503,933 | 80.82% |
| Net Operating Income (Note 5) | $1,180,880 | 25.71% | $ 720,166 | 20.21% | $ 594,353 | 19.18% |
| Number of Units | 6 | | 7 | | 6 | |
| Net Sales: | | | | | | |
| Highest | $5,458,888 | | $3,734,795 | | $3,280,455 | |
| Lowest | $3,840,866 | | $3,338,685 | | $2,802,461 | |
| Number Above Average | 3 | | 3 | | 3 | |
| Number Below Average | 3 | | 4 | | 3 | |
| Operating Costs and Expenses: | | | | | | |
| Number Above Average | 3 | | 4 | | 3 | |
| Number Below Average | 3 | | 3 | | 3 | |
| Net Operating Income: | | | | | | |
| Number Above Average | 3 | | 4 | | 3 | |
| Number Below Average | 3 | | 3 | | 3 | |

04/15/13

Golden Corral 2013 FDD/PK 65899

## TABLE 4
## GC-11S Restaurants
### (Note 1)

| | Top 1/3 Dollars | Top 1/3 Percent | Middle 1/3 Dollars | Middle 1/3 Percent | Bottom 1/3 Dollars | Bottom 1/3 Percent |
|---|---|---|---|---|---|---|
| Net Sales (Note 2) | $3,132,618 | 100.00% | $2,686,724 | 100.00% | $2,303,259 | 100.00% |
| Operating Costs and Expenses: | | | | | | |
| Food Cost | $1,207,702 | 38.55% | $1,077,037 | 40.09% | $922,062 | 40.03% |
| Labor Related Expenses (Note 3) | 832,835 | 26.59% | 712,541 | 26.52% | 658,523 | 28.59% |
| Controllable Expenses (Note 4) | 403,828 | 12.89% | 371,051 | 13.81% | 329,272 | 14.30% |
| Total Operating Costs and Expenses | $2,444,365 | 78.03% | $2,160,629 | 80.42% | $1,909,857 | 82.92% |
| Net Operating Income (Note 5) | $ 688,253 | 21.97% | $ 526,095 | 19.58% | $ 393,402 | 17.08% |
| Number of Units | 4 | | 4 | | 4 | |
| Net Sales: | | | | | | |
| Highest | $3,464,393 | | $2,844,322 | | $2,372,741 | |
| Lowest | $2,910,401 | | $2,546,731 | | $2,167,805 | |
| Number Above Average | 2 | | 2 | | 3 | |
| Number Below Average | 2 | | 2 | | 1 | |
| Operating Costs and Expenses: | | | | | | |
| Number Above Average | 2 | | 1 | | 3 | |
| Number Below Average | 2 | | 3 | | 1 | |
| Net Operating Income: | | | | | | |
| Number Above Average | 2 | | 2 | | 2 | |
| Number Below Average | 2 | | 2 | | 2 | |

62

04/15/13

### TABLE 5
### GC-11M Restaurants
### (Note 1)

| | Top 1/3 Dollars | Percent | Middle 1/3 Dollars | Percent | Bottom 1/3 Dollars | Percent |
|---|---|---|---|---|---|---|
| Net Sales (Note 2) | $3,981,404 | 100.00% | $3,254,420 | 100.00% | $2,573,291 | 100.00% |
| Operating Costs and Expenses: | | | | | | |
| Food Cost | $1,577,379 | 39.62% | $1,285,996 | 39.52% | $1,018,348 | 39.57% |
| Labor Related Expenses (Note 3) | 969,196 | 24.34% | 852,875 | 26.21% | 728,902 | 28.33% |
| Controllable Expenses (Note 4) | 494,943 | 12.43% | 426,557 | 13.10% | 383,100 | 14.89% |
| Total Operating Costs and Expenses | $3,041,518 | 76.39% | $2,565,428 | 78.83% | $2,130,350 | 82.79% |
| Net Operating Income (Note 5) | $ 939,886 | 23.61% | $ 688,992 | 21.17% | $ 442,941 | 17.21% |
| Number of Units | 23 | | 24 | | 23 | |
| Net Sales: | | | | | | |
| Highest | $4,795,285 | | $3,529,655 | | $2,815,152 | |
| Lowest | $3,551,989 | | $2,898,406 | | $1,986,656 | |
| Number Above Average | 7 | | 14 | | 12 | |
| Number Below Average | 16 | | 10 | | 11 | |
| Operating Costs and Expenses: | | | | | | |
| Number Above Average | 8 | | 12 | | 12 | |
| Number Below Average | 15 | | 12 | | 11 | |
| Net Operating Income: | | | | | | |
| Number Above Average | 14 | | 11 | | 14 | |
| Number Below Average | 9 | | 13 | | 9 | |

63

04/15/13

1    6600 Sugarloaf Parkway, 400-343
     Duluth, GA 30097
2    Phone 404-220-9517
     Email: SherranceHenderson@gmail.com

3

4

5

6

7

8

9

10

11

12

13

# Exhibit F

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 7

**usa0840@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Friday, March 22, 2019 11:20 PM |
| **To:** | usa0840@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Fwd: Fwd: Jayme H. Print |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: sherrancehenderson <sherrancehenderson@gmail.com>
Sent: Fri, Mar 22, 2019 08:52 PM
Subject: Fwd: Fwd: Jayme H. Print

-----Original Message-----
From: Sherrance Henderson <sherrancehenderson@gmail.com>
To: Sherrance <sheronceh@aol.com>
Sent: Sun, Apr 23, 2017 01:16 AM
Subject: Fwd: Jayme H.

Sherrance Henderson
---------- Forwarded message ----------
From: "Sherrance Henderson" <sherrancehenderson@gmail.com>
Date: Mar 20, 2017 7:04 AM
Subject: Jayme H.
To: "Webb, David" <dwebb@goldencorral.net>
Cc:

Good morning Mr. Webb,

At the store and myself are going over our missed actions, critical, and other issues that was presented during visits of both John as well as Ecorsure I am embracing some/parts of the conditional corporate assistance.

Certainly you can appreciate the fact that this is my business and I can certainly appreciate that this is your brand. Systems need to be put into place and also needs to be reinforced daily and consistently for at least 30 to 45 days. It is not just any systems and or methodologies but it must be of the brand systems and methodologies to ensure success.

I would be open to discussion and the possibility of having Jayme for 30-45 days to assist the store and becoming Stella. We have a great team of people that are very dedicated to the store and want to see the success of the Golden Corral Poughkeepsie, New York. I eagerly await your reply.

1

Sherrance Henderson

1    Sherrance Henderson

2    6600 Sugarloaf PKY, 400-343

3    Duluth, GA 30097

4    Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13

14    # Exhibit CC1D

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 2

Golden Corral reopening in Town of Wallkill ...

# recordonline.com
### TIMES HERALD-RECORD

# Golden Corral reopening in Town of Wallkill with new owner



**Heather Yakin Times Herald-Record @HeatherYakin845**
Feb 8, 2019 at 6:48 PM

TOWN OF WALLKILL - The Golden Corral restaurant at 360 Route 211 in the Town of Wallkill will reopen next month under new ownership, the corporate office announced Friday.

The new franchisee, BME Group, issued a statement late Friday saying it is "in the final stages of completing minor renovations to the restaurant interior and looks forward to serving the Middletown community."

Golden Corral reopening in Town of Wall... recordonline.com ... Page 2 of 2

The Route 211 location closed on Jan. 10, without warning to employees or the public, and without giving the workers their last paychecks.

The former owners operated the business for about 18 months before the closure.

BME Group said it has paid all of the employees the wages owed them by the previous franchisee, and has offered all of the previous employees the chance to reapply for their old jobs.

https://www.recordonline.com/news/20190208/golden-corral-reopening-in-town-of-wallkil...    2/25/2019

1    Sherrance Henderson

2    6600 Sugarloaf PKY, 400-343

3    Duluth, GA 30097

4    Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13

14

# Exhibit CC1E

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 2

Golden Corral in The Shops at Westshore now closed

## holland sentinel.com

# Golden Corral in The Shops at Westshore now closed

**By Austin. Metz**
**@hollandsentinel.com, (616) 546-4290**
Posted Jan 23, 2018 at 2:07 PM
Updated Jan 23, 2018 at 2:34 PM

First opened in Dec. 2016, the 400-seat restaurant was locally owned by Nadine Hassan and was located at 12420 Felch St. in front of The Shops at Westshore.

HOLLAND TWP. — Holland's Golden Corral is now closed for business according to a sign posted on the door of the restaurant.

First opened in Dec. 2016, the 400-seat restaurant was locally owned by Nadine Hassan and was located at 12420 Felch St. in front of The Shops at Westshore. It served as another restaurant option along West Shore Drive.

Golden Corral in The Shops at Westshore now closed...    Page 2 of 3



There are numerous posts on Facebook and Google in reference to the recent closing including a review from Phil Donahue that stated that Hassan closed the Golden Corral permanently in the middle of the night. According to Donahue, Hassan told employees nothing leading up to the closing.

Hassan would not return numerous phone calls or respond to messages from The Sentinel. The only statement from Hassan was the sign in the window of the restaurant.

"To our valued guests, this location is now closed," said the sign. "Thank you for your business and we hope to serve you at another location very soon."

The Golden Corral Facebook page remains active at this time but is no longer receiving messages and the phone at the restaurant remains unanswered.

Golden Corral in The Shops at Westshore now closed...

There is no word yet on why the restaurant closed but according to Ottawa County's Department of Public Health, the restaurant was issued a number of health code violations a month and a half after opening.

Violations include priority violations involving raw chicken being stored above vegetables, food thermometers being used without being properly sanitized before and after use and employees using equipment without washing hands or switching gloves. A follow-up inspection performed four days later showed no violations.

Despite the restaurant's proximity to The Shops at Westshore, the Golden Corral location is not technically owned by The Shops at Westshore and general manager Jean Ramirez would only say by email that the mall and the restaurant were good neighbors. She said she could not comment more because she does not "know the situation."

According to county property records, Golden Corral Corp. purchased the property on June 1, 2016, and then sold the property to GC Holland LLC on December 5, 2016.

— Follow this reporter on Twitter @SentinelAustin or @BizHolland.

# What's for dinner tonight?

Not sure? Come on in and have a look at our collection of over 700 favorite Southern recipes.

Search phrase…

powered by S**O**UTHERN
K**I**TCHEN

See all recipes    SEARCH

Sherrance Henderson, Pro Se
6600 Sugarloaf Parkway, 400-343
Duluth, GA 30097
Phone 404-220-9517
Email: SherranceHenderson@gmail.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit K

PLEADING TITLE - 13

By Susan Salisbury
**Monday**

Posted Dec 4, 2017 at 12:01 AM Updated Dec 5, 2017 at 5:29 PM
**Share**

Golden Corral, a popular Royal Palm Beach buffet-style all-you-can-eat restaurant, was temporarily closed Friday after a state inspector cited it for 20 violations, including small flying insects and live roaches.

The restaurant at 10100 Fox Trail Road South, was closed for five hours while the violations were corrected, general manager Brad Morin said Monday.

WHAT YOU NEED TO KNOW ABOUT ROACHES IN RESTAURANTS

A Florida Department of Business and Professional Regulation report states the restaurant re-opened the same day, although seven violations remained.

Morin said he was not there the day of the inspection, so he was not "100 percent sure" about what occurred, but went over the violations with kitchen managers. The kitchen manager who was in charge that day is no longer employed at the restaurant, he said.

Violations ran the gamut from food not being held at hot or cold enough temperatures to dirty ceiling tiles and floors, the report states.

V&M Food Enterprises, LLC, a Golden Corral Franchise, issued the following statement Tuesday: "We are aware of the report regarding our location at 10100 Fox Trail South in Royal Palm Beach, Florida. We closed briefly to address the matter and were cleared to re-open that same day. The well-being of our guests is our top priority."

A DBPR inspector noted six high-priority violations which could contribute directly to a food-borne illness or injury, as follows:

–Live, small flying insects in kitchen, food prep or food storage area. Two insects were found near a preparation table.

–Roach activity present as evidenced by live roaches found — nine roaches on trash can dolly under trash can in dish-washing room. Manager killed some. Employee cleaned the dolly.

–Potentially hazardous temperature control. Cold food held at greater than 41 degrees. Smoked sausage at 55 degrees on ice at breakfast station.

–Hot food held at less than 135 degrees or above. Chicken soup at 103 and 110. Employee turned stove on.

–Raw animal food stored over or with ready-to-eat food in reach-in freezer. Not all products commercially packaged. Raw shrimp over onion rings and French fries.

–Toxic substance stored by or with food. Quick color spray cans stored on ice machine. Manager removed.

Intermediate violations, those which, if not addressed, could lead to risk factors that contribute to food-borne illness or injury, in the report included:

–Encrusted material on can opener blade. Employee cleaned.

–Potentially hazardous temperature control. Food covered while cooling including baked beans, corned beef hash and pulled pork. Manager moved food to freezer to cool quickly.

Basic violations are due to best practices not being followed. Those cited included:

–Ceiling/ceiling tiles/vents soiled with accumulated food debris, grease, dust or mold-like substance.

–Cove molding at floor/wall juncture broken/missing. Broken tiles throughout.

–Cutting board has cut marks and is no longer cleanable.

–Dead roaches on premises, including more than 10 under a hand-washing sink near the ice machine. Employee cleaned.

–Fan cover in walk-in cooler/freezer has an accumulation of dust or debris.

–Floor soiled/has an accumulation of debris behind and on the side of coolers in the kitchen.

–Floors not constructed to be easily cleanable. Grout missing throughout.

–Grease accumulated on kitchen floor and/or under cooking equipment throughout.

–Used wet wiping towel under cutting board.

–Reach-in freezer shelves rusted.

–Single-service articles not stored inverted or protected from contamination. Black plastic cups in dry food storage area. Manager inverted.

–Brown sugar in dry food storage area not labeled. Manager labeled the container.

https://www.palmbeachpost.com/news/golden-corral-cited-for-violations-including-live-roaches/zUK2czj7juAVBfeSDfjYQJ/

Sherrance Henderson, Pro Se
6600 Sugarloaf Parkway, 400-343
Duluth, GA 30097
Phone 404-220-9517
Email: SherranceHenderson@gmail.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit I

**usa0287@fedex.com**

| | |
|---|---|
| From: | sheronceh@aol.com |
| Sent: | Saturday, March 23, 2019 2:57 PM |
| To: | usa0287@fedex.com |
| Subject: | [EXTERNAL] Fwd: RE: Purchase order agreement |

Print all pages and separate them nice you like you did before with the green paper.

-----Original Message-----
From: William Kugelman <wkugelman@lawppl.com>
To: Niral Patel <npatel@northeastdl.com>; Sherrance Henderson <sheronceh@aol.com>
Cc: mtokajer@joneswalden.com <mtokajer@joneswalden.com>
Sent: Tue, Aug 15, 2017 07:54 AM
Subject: RE: Purchase order agreement

There were emails to Bank's counsel.

William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com

30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

1

**From:** Niral Patel [mailto:npatel@northeastdl.com]
**Sent:** Tuesday, August 15, 2017 5:57 AM
**To:** Sherrance Henderson <sheronceh@aol.com>
**Cc:** mtokajer@joneswalden.com; William Kugelman <wkugelman@lawppl.com>
**Subject:** Re: Purchase order agreement


Morning Miss Henderson,


We never reached the point of an official offer or purchase agreement. Our respective attorney's had numerous exchanges with TD Bank's Bill Fiore via both email and conference calls which included the pertinent details described below. If those emails suffice, I'm sure Mr. Kugelman can provide those to you.


Thanks,


Niral


On Aug 14, 2017, at 4:38 PM, sheronceh@aol.com wrote:


Hi Mr. Petel,

Throughout our many weeks and months of conversation I believe that you offered is known as a purchase offer agreement to the bank and it was accepted which contained servicing interest-only of 3.7 million dollars and the remaining dollar amount I would be paying interest only for 18 months. Is there any form of documentation of that offer or purchase agreement that you can provide for me? The bankruptcy attorney wants to review that and to validate if it even exists and they are able to submit it.  Can you forward this to me today or by no later than 10:30 a.m. tomorrow? As always you can feel free to give me a call on my cell with any questions or concerns at 404 769-2029. Thank you

Sent from AOL Mobile Mail

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 4:01 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Fwd: Call Petel? |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: sherrancehenderson <sherrancehenderson@gmail.com>
Sent: Fri, Aug 10, 2018 08:55 AM
Subject: Fwd: Call Petel?

Sent from AOL Mobile Mail

-----Original Message-----
From: Leslie Pineyro <lpineyro@joneswalden.com>
To: sheronceh <sheronceh@aol.com>
Cc: Matthew Tokajer <mtokajer@joneswalden.com>
Sent: Mon, Sep 25, 2017 11:29 AM
Subject: RE: Call Petel?

I checked with Matt and he said the lawyer did not give him permission to speak directly with Patel – I am guessing there was a miscommunication with Mr. Patel. However, Mr. Patel's lawyer did send Matt deal terms today, which is what we were trying to accomplish anyhow. I have included the terms below. Please look over them and call me to discuss. Thanks, Leslie

TD Bank:

1. Interest Only for 24 months on 3.7mm

2. Assumption of 3.2mm after 24 months over a 25 year term.

3. No prepayment penalty

4. Interest rate locked for ten.

LL:

1

1. Reset the ground lease

2. Option to Buy at anytime in first five year for 2.0mm

3. Rent fixed at 60k for 24 months. (NNN)

Contingencies:

1. No assumption of existing obligations

2. Satisfactory Inspection (Building/Site)

3. All equipment required to operate GC still in place

4. Golden Corral Franchise Agreement

These are the bullet points of the basic terms that my client would be willing to enter into a deal.   Sorry for the delay in getting this to you. I was traveling last week. I am returning today available by email and in the office tomorrow.   Thanks
Tony


Leslie Pineyro, Esq.

Jones & Walden, LLC

21 8th Street NE

Atlanta, GA 30309

404-564-9300 (phone)

404-564-9301 (fax)

lpineyro@joneswalden.com


www.joneswalden.com


NOTICE: THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION AND ANY DOCUMENTS ATTACHED HERETO MAY CONTAIN CONFIDENTIAL INFORMATION WHICH IS LEGALLY PRIVILEGED AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM THE TRANSMISSION IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE PERSON RESPONSIBLE FOR CONVEYING THE INFORMATION TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF ANY INFORMATION CONTAINED IN THIS TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR REPLY BY E-MAIL AND DESTROY THIS TRANSMISSION. THANK YOU.

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Monday, September 25, 2017 11:00 AM
**To:** Leslie Pineyro
**Subject:** Call Petel?


Good morning Leslie did you have a chance to call Patel? If so what were the fines of the conversation? I wait your response. Thank you

Sent from AOL Mobile Mail

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 3:54 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Re: Golden Corral |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: npatel <npatel@northeastdl.com>
Cc: lpineyro <lpineyro@joneswalden.com>; mtokajer <mtokajer@joneswalden.com>
Sent: Wed, Oct 18, 2017 03:09 PM
Subject: Re: Golden Corral

Petel I have given you the outstanding amounts.  They are embedded in the email. Please review and reply swiftly because I am due in court this Tuesday. Thank you graciously in advance for your time you consideration.

Sent from AOL Mobile Mail

On Wednesday, October 18, 2017 Niral Patel <npatel@northeastdl.com> wrote:

Thank you. I think we can all agree that we don't have time for any surprises so I am just trying to get my hands around the entire picture for everybody's benefit. Please update us on the outstanding amounts  as they relate to these liabilities when you're able.

On Oct 18, 2017, at 12:28 PM, sheronceh@aol.com wrote:

Please read below
. NYS Sales Tax is paid in full.
It is not

2. NYS Employee Income Taxes are paid in full
It is not

3. NYS Unemployment Insurance is paid in full.
It is not

OK I will contact my tax guy about the below. Thank you

Sent from AOL Mobile Mail

1

On Wednesday, October 18, 2017 Niral Patel <npatel@northeastdl.com> wrote:

Sherrance,

Please clarify:

1. NYS Sales Tax is paid in full.
2. NYS Employee Income Taxes are paid in full
3. NYS Unemployment Insurance is paid in full

These issues will be triggered at the time of a Bulk Sale Notice and it's better to definitively know now. You may want to engage your CPA on this matter.

Thanks,

Niral Patel

> On Oct 18, 2017, at 10:27 AM, sheronceh@aol.com wrote:

Good Morning Petel,

The state tax for NY est will zero out once I file my taxes. The $8,000 I received from my lawyer that is why I shared that the number.

-----Original Message-----
From: Niral Patel <npatel@northeastdl.com>
To: Sherrance Henderson <sheronceh@aol.com>
Cc: lpineyro <lpineyro@joneswalden.com>; mtokajer <mtokajer@joneswalden.com>; Anthony Cardona <tony@maguirecardona.com>
Sent: Wed, Oct 18, 2017 9:26 am
Subject: Re: Golden Corral

Morning Miss Henderson,

This sum is a lot more than the $8,000 you mentioned during our phone call. That stated, I need you to address the following questions so that I can recalibrate my underlying deal:

2

1. It's highly unlikely that we will be transacting period to the 11/3/17 deadline stated below. Is somebody working to get this balance locked in for a more accommodating timeframe?

Lisle could you address this question? Please copy me directly when you communicated with Mr. Petel.

2. How will the respective employer IRS/NYS withholding taxes be addressed?

Petel I not sure what your asking. Can you re-phase your questions? Are you referring to payroll income taxes?

3. What is the current NYS Sales Tax liability including interest and penalty?

I forwarded that to you. Could you check your email box and I wil also resend. Nevertheless, I have requested from the Tax to send a formal letter which breaks everything out in detail.

4. What other obligations are outstanding that you expect to be satisfied before allowing a deal to move forward?

The sales tax and

Niral

On Oct 17, 2017, at 4:20 PM, sheronceh@aol.com wrote:

Sent from AOL Mobile Mail

_____

From: Sherrance Henderson <sherrancehenderson@gmail.com>
Date: Tuesday, October 17, 2017
Subject: Fwd: Golden Corral
To: Sherrance <sheronceh@aol.com>

---------- Forwarded message ----------
From: "Harnett, Kenneth (LABOR)" <Kenneth.Harnett@labor.ny.gov>

3

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Saturday, March 23, 2019 2:52 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: RE: Poughkeepsie, Golden Corral |

Just print email

-----Original Message-----
From: William Kugelman <wkugelman@lawppl.com>   *NJ Lawyer*
To: Niral Patel <npatel@northeastdl.com>
Cc: Sherrance Henderson <sheronceh@aol.com>
Sent: Thu, Apr 6, 2017 11:07 AM
Subject: RE: Poughkeepsie, Golden Corral

Mr. Patel,


Attached please find additional lease documents and the Option to Purchase the realty. The attachment consists of (1) Memorandum of Lease, (2) Amendment to Lease, and (3) Option agreement. I do not know the answer of your question regarding the C.O. and assessment off hand but will find out that information for you.


Regards,


William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel: (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com


30 Wall Street – 8th Floor

New York, NY 10005

1

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** Niral Patel [mailto:npatel@northeastdl.com]
**Sent:** Wednesday, April 05, 2017 6:13 PM
**To:** William Kugelman <wkugelman@lawppl.com>
**Cc:** Sherrance Henderson <sheronceh@aol.com>
**Subject:** Re: Poughkeepsie, Golden Corral

Hi William,

Thank you for the lease. Are there any addendum or amendments that I should have a well? Miss Henderson had previously advised me that there is an "Option to Buy" which I didn't see during my review. Please forgive me if I missed it while reading it on my iPhone. Furthermore, I know the facility didn't receive a C/O until late 2016 so the final assessment should have been made last month. Do you know if this is available yet?

Thanks,

Niral Patel

On Apr 5, 2017, at 4:46 PM, William Kugelman <wkugelman@lawppl.com> wrote:

Dear Mr. Patel:

Pursuant to your request attached you will find the Lease Agreement for the Poughkeepsie property.  Please feel free to contact me if you have any questions.

2

Regards,

William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel: (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com

30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** Niral Patel [mailto:npatel@northeastdl.com]
**Sent:** Wednesday, April 05, 2017 4:31 PM
**To:** Sherrance Henderson <sheronceh@aol.com>
**Cc:** William Kugelman <wkugelman@lawppl.com>
**Subject:** Re: Poughkeepsie, Golden Corral

Thank you. I look forward to reviewing the documents associated with this potential transaction.

On Apr 5, 2017, at 4:17 PM, sheronceh@aol.com wrote:

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Saturday, March 23, 2019 2:55 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: RE: FW: Attorney Letter  Poughkeepsie NY |

-----Original Message-----
From: William Kugelman <wkugelman@lawppl.com>
To: sheronceh@aol.com <sheronceh@aol.com>
Sent: Wed, May 31, 2017 11:13 AM
Subject: RE: FW: Attorney Letter Poughkeepsie NY

Perfect.  I spoke with TD's counsel again this morning and left a voicemail with Patel's.  I also made the introduction to them by e-mail.

William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com

30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001

This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

1

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Wednesday, May 31, 2017 11:03 AM
**To:** William Kugelman <wkugelman@lawppl.com>
**Subject:** RE: FW: Attorney Letter Poughkeepsie NY


Done

Sent from AOL Mobile Mail


———————————————————————————————————————

On Wednesday, May 31, 2017 William Kugelman <wkugelman@lawppl.com> wrote:

Send it to your insurance carrier today.


William R. Kugelman, Esq.

Powell & Roman, LLC

131 White Oak Lane

Old Bridge, NJ 08857

Tel:  (732) 679-3777

Fax: (732) 679-6433

www.lawppl.com


30 Wall Street – 8th Floor

New York, NY 10005

Tel: (212) 742-0001


This e-mail and any attachments contain information from the law firm of Powell & Roman, LLC which may be privileged and/or confidential and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please e-mail the sender immediately and delete this message and all attachments from your system.

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Wednesday, May 31, 2017 9:59 AM
**To:** William Kugelman <wkugelman@lawppl.com>
**Subject:** Fwd: FW: Attorney Letter Poughkeepsie NY

How do I deal with This?

Sent from AOL Mobile Mail

_____

From: Apgar, Jamie <jamie.apgar@GoldenCorral.net>
Date: Wednesday, May 31, 2017
Subject: FW: Attorney Letter Poughkeepsie NY
To: Henderson, Sherrance (sheronceh <sheronceh@aol.com>, Joyner, Darren <chipjoyner@gmail.com>

Good Morning,

Please see the attached letter in regard to Poughkeepsie, NY location.

Thank you!

**Jamie Apgar**

Division Administrator, Division 2

**golden corral corporation**

Phone:  (513) 745-0256

jamie.apgar@goldencorral.net

1    Sherrance Henderson

2    6600 Sugarloaf PKY, 400-343

3    Duluth, GA 30097

4    Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13              Exhibit GC11

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 1

2.2.   Development Fee Credit Towards Franchise Fee: If Area Developer is in full compliance with the Development Schedule described in Section I.1 hereof and set forth in Exhibit A, attached hereto, Twenty Thousand Dollars ($20,000) of the development fee for each restaurant shall be credited toward the initial franchise fee payable at the time each Franchise Agreement is executed pursuant to the Development Schedule, which initial franchise fee payment credit shall be fully earned when credited and non-refundable.

3.   **DEVELOPMENT OBLIGATIONS**

3.1.   Execution of Franchise Agreement: Area Developer shall execute the then current form of Franchise Agreement for each restaurant site approved by Franchisor in the Development Area as hereinafter provided.  The Franchise Agreement for each restaurant developed hereunder shall be the then current form of Franchise Agreement and the amendment(s) thereto, if any, being offered generally by Franchisor for such restaurant design at the time each such Franchise Agreement is executed.  The current form of Franchise Agreement being offered by Franchisor as of the date hereof is the Franchise Agreement attached hereto as Exhibit B.  The Franchise Agreement for each restaurant shall be executed by Area Developer and submitted to Franchisor within the later of fifteen (15) days of: (1) receipt of Franchisor's notice of Phase I site approval, as provided in Section 3.2 hereof, or (2) receipt of the applicable Franchise Agreement.

3.2.   Site Selection and Management Orientation: Prior to submitting a request for site approval for the first restaurant to be developed pursuant to this Agreement, Area Developer (or, if Area Developer is a corporation or other entity, the individual approved by Franchisor as the principal of Area Developer) shall attend the franchise orientation program established by Franchisor.  Thereafter, and prior to Area Developer's acquisition by lease or purchase of any site for a restaurant, Area Developer shall submit to Franchisor, in the form(s) specified by Franchisor, a completed Site Evaluation Questionnaire and Feasibility Study, the description of the proposed site and such information or materials as Franchisor may reasonably require, together with a letter of intent or other evidence satisfactory to Franchisor which confirms Area Developer's favorable prospects for obtaining the site.  Franchisor shall have sixty (60) days after receipt of such Site Evaluation Questionnaire and Feasibility Study, the description of the proposed site and other information and materials to approve or disapprove, in its sole discretion, each proposed site for a restaurant.  Area Developer must submit to the Franchisor the aforementioned Site Evaluation Questionnaire and Feasibility Study and other required information regarding the first site to be developed pursuant to this Agreement within ninety (90) days after the execution of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, Area Developer must acquire by lease or purchase a location approved by Franchisor at the earlier of 180 days after the execution of this Agreement or six months before the scheduled opening date of the first restaurant as set forth in the attached Exhibit A, and thereafter must acquire a location approved by Franchisor not less than six months prior to the date each respective restaurant is required to be opened pursuant to the development schedule.

April 2013

3.3.   Lease: If Area Developer will occupy the premises at which a restaurant is operated under a lease, Area Developer shall, prior to the execution thereof, submit such lease to Franchisor, for its written approval. Franchisor's approval of the lease may be conditioned upon the inclusion in the lease of such provisions as Franchisor may reasonably require, including, without limitation:

3.3.1.   A provision which restricts the use of the premises during the term of the Franchise Agreement solely to the operation of the business franchised under the Franchise Agreement.

3.3.2.   A provision which prohibits Area Developer from subleasing or assigning all or any part of its occupancy rights or extending the term of or renewing the lease, without Franchisor's prior written consent.

3.3.3.   A provision that the landlord consents to Area Developer's use of such Proprietary Marks and signage as Franchisor may prescribe for the franchised business;

3.3.4.   A provision giving Franchisor the right to enter the premises without assuming the lease to make modifications necessary to protect the Proprietary Marks and the System or cure any default under the Franchise Agreement;

3.3.5.   A provision that the initial term of the lease, or the initial term together with any renewal terms (for which the rent shall be set forth in the lease), shall be for not less than fifteen (15) years;

3.3.6.   A provision which requires the landlord concurrently to provide Franchisor with a copy of any written notice of breach or default under the lease sent to Area Developer; and which grants to Franchisor, in its sole discretion, the right (but not the obligation) to cure any breach or default under the lease, should Area Developer fail to do so, within fifteen (15) days after the expiration of the period in which Area Developer may cure the breach or default; and

3.3.7.   A provision that provides that upon Area Developer's default under the lease or under the Franchise Agreement, Franchisor shall without the landlord's further consent have a continuing right of entry into the premises, the right to operate a Golden Corral restaurant therein, the right but not the obligation to assume Area Developer's interests under the existing terms, conditions and covenants of the lease, and should Franchisor assume Area Developer's position under the lease, the right to assign the lease or sublet the premises to a third party which will operate on the premises a Golden Corral restaurant.

3.4.   Pre Condition to Site Approval: Notwithstanding anything else contained in this Agreement to the contrary, Franchisor may withhold approval of a site and/or the issuance of a Franchise Agreement for an approved site (collectively, "**Development Approval**") if, at the time that Area Developer requests a Development

# ITEM 7
## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

A. Franchisees

| Type of Expenditure | Amount | | | Method of Payment | When Due | To Whom Payment is to be Made |
| --- | --- | --- | --- | --- | --- | --- |
| | GC-10 | GC-11M | GC-11S | | | |
| Initial Franchise Fee 1/ | $50,000 | $50,000 | $50,000 | Installments | Periodically. See Item 5. | Golden Corral |
| Purchase of Land 2/ | $1,200,000 to $1,800,000 | $900,000 to $1,800,000 | $400,000 to $1,000,000 | As arranged | As arranged | Seller |
| Construction, Contractor Site Preparation, Leasehold Improvements 3/ | $1,270,000 to $2,475,000 | $1,260,000 to $2,400,000 | $897,000 to $1,800,000 | As arranged | As arranged | Contractors, our affiliates |
| Signage 4/ | $47,000 to $94,000 | $45,000 to $88,000 | $45,000 to $77,000 | As arranged | As arranged | Vendors, our affiliates |
| Furniture and Equipment 5/ | $708,000 to $830,970 | $715,470 to $761,190 | $572,370 to $603,542 | As arranged | As arranged | Vendors, our affiliates |
| Opening Advertising 6/ | $10,000 to $15,000 | $10,000 to $15,000 | $10,000 to $15,000 | As arranged | As arranged, but before or within 90 days after opening | Vendor |
| Initial Training 7/ | $49,580 to $142,650 | $49,580 to $142,650 | $49,580 to $142,650 | As arranged | As incurred | Suppliers of transportation, food & lodging |

*Restaurant Design* (handwritten annotation: Store 7 / 115 Diners)

04/15/13

11

| Type of Expenditure | Amount | | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|---|
| | Restaurant Design | | | | | |
| | GC-10 | GC-11M | GC-11S | | | |
| On-Site Assistance Costs 7/ | $24,600 to $91,500 | $24,600 to $83,200 | $18,400 to $75,000 | As arranged | Before to and upon opening | employees Suppliers of transportation, food & lodging, employees |
| Inventory 8/ | $55,000 to $90,000 | $50,000 to $80,000 | $40,000 to $75,000 | As arranged | Before opening | Suppliers |
| Insurance 9/ | $14,000 to $25,000 | $12,000 to $22,500 | $10,000 to $15,000 | As arranged | As arranged | Insurers |
| Additional Funds 10/ (Estimated expenditures during the first 3 months of operation) | $19,000 to $113,000 | $19,000 to $110,000 | $19,000 to $110,000 | As arranged | As incurred | Various |
| TOTAL | $3,447,180 to $5,727,120 | $3,135,650 to $5,552,540 | $2,111,350 to $3,963,192 | | | |

12

04/15/13

Golden Corral 2013 FDD/PK 65899

1    Sherrance Henderson

2    6600 Sugarloaf PKY, 400-343

3    Duluth, GA 30097

4    Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13    # Exhibit H

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 1

**usa0287@fedex.com**

**From:** sheronceh@aol.com
**Sent:** Thursday, March 21, 2019 4:04 PM
**To:** usa0287@fedex.com
**Subject:** [EXTERNAL] Fwd: Fwd: Yesterday mins

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: npatel <npatel@northeastdl.com>
Sent: Thu, Dec 14, 2017 11:00 AM
Subject: Fwd: Yesterday mins

Patel this is for your information only. I will get this and of course we both can listen to it. I'm trying to find out how I can get it transcribed so I can submit it to the board in Georgia.

Sent from AOL Mobile Mail

-----Original Message-----
From: Amanda Hirsch <ahirsch@joneswalden.com>
To: Leslie Pineyro <lpineyro@joneswalden.com>
CC: sheronceh <sheronceh@aol.com>
Sent: Thu, Dec 14, 2017 09:22 AM
Subject: RE: Yesterday mins

Ms. Henderson,

A CD transcript of the hearing can be requested. It costs $31 dollars. You will need a computer to listen to the transcript. There is a specific software program required to listen to the transcript. It can be downloaded at www.fortherecord.com and its free. Would you like to proceed with the request? Let us know.

Thanks,

Amanda R. Hirsch

*Paralegal*

**Jones & Walden, LLC**

21 Eighth Street, NE

1

Atlanta, GA 30309

P: 404-564-9300

F: 404-564-9301

www.joneswalden.com

NOTICE: THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION AND ANY DOCUMENTS ATTACHED HERETO MAY CONTAIN CONFIDENTIAL INFORMATION WHICH IS LEGALLY PRIVILEGED AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM THE TRANSMISSION IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE PERSON RESPONSIBLE FOR CONVEYING THE INFORMATION TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF ANY INFORMATION CONTAINED IN THIS TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR REPLY BY E-MAIL AND DESTROY THIS TRANSMISSION. THANK YOU.

**From:** Leslie Pineyro
**Sent:** Thursday, December 14, 2017 8:40 AM
**To:** Amanda Hirsch
**Cc:** sheronceh@aol.com
**Subject:** Fwd: Yesterday mins

Amanda can help you. A c.d. Is the least expensive way to go!

Sent from my iPhone

Leslie Pineyro, Esq.

Jones & Walden, LLC

21 Eighth Street NE

Atlanta, GA 30309

404-564-9300

lpineyro@joneswalden.com

NOTICE: THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION AND ANY DOCUMENTS ATTACHED HERETO MAY CONTAIN CONFIDENTIAL INFORMATION WHICH IS LEGALLY PRIVILEGED AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM THE TRANSMISSION IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE

2

PERSON RESPONSIBLE FOR CONVEYING THE INFORMATION TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF ANY INFORMATION CONTAINED IN THIS TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR REPLY BY E-MAIL AND DESTROY THIS TRANSMISSION. THANK YOU.


Begin forwarded message:

**From:** <sheronceh@aol.com>
**Date:** December 14, 2017 at 8:28:11 AM EST
**To:** <lpineyro@joneswalden.com>, <Mtokajer@joneswalden.com>
**Subject: Yesterday mins**

How can I order the mins from yesterday trial? Thanks
Sent from AOL Mobile Mail

3

1    Sherrance Henderson

2    6600 Sugarloaf PKY, 400-343

3    Duluth, GA 30097

4    Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13

14                    Exhibit 1B

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 2

## 6. DEFAULT

6.1. <u>Termination Without Notice and Without Opportunity To Cure</u>: Area Developer shall be deemed in default under this Agreement, and all rights granted herein shall automatically terminate, without notice to Area Developer, if Area Developer shall become insolvent or makes a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Area Developer or such a petition is filed against and not opposed by Area Developer; or if Area Developer is adjudicated a bankrupt, or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Area Developer or other custodian for Area Developer's business or assets is filed and consented to by Area Developer; if a receiver or other custodian (permanent or temporary) of Area Developer's business or assets or any part thereof is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Area Developer; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); if execution is levied against Area Developer's business or assets, or if suit to foreclose any lien or mortgage against the premises or equipment is instituted against Area Developer and not dismissed within thirty (30) days; or if the real or personal property of any of Area Developer's restaurants shall be sold after levy thereupon by any sheriff, marshall or constable.

6.2: <u>Termination With Notice But Without Opportunity To Cure</u>: Area Developer shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Area Developer any opportunity to cure the default, effective immediately upon receipt of notice by Area Developer if Area Developer or any principal or officer of Area Developer a) is convicted, or enters a plea with adjudication of guilt withheld or suspended, involving a felony, a crime involving moral turpitude; or b) engages in conduct that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein.

6.3. <u>Termination for Default Under Development Schedule</u>: If Area Developer fails to comply with the development schedule set forth in Exhibit A attached hereto, such action shall constitute a default under this Agreement, upon which Franchisor, in its discretion, may (1) terminate the credit granted in Section 2.2. hereof and/or (2) terminate this Agreement and all rights granted hereunder without affording Area Developer any opportunity to cure the default, effective immediately upon receipt by Area Developer of written notice. If Area Developer fails to comply with the terms and conditions of any franchise agreement or development agreement between Area Developer and Franchisor, or makes or attempts to make a transfer or assignment in violation of Section 7.2. hereof, such action shall constitute a default under this Agreement. Upon such default, Franchisor, in its discretion, may terminate this Agreement and all rights granted hereunder without affording Area Developer any opportunity to cure the default, effective immediately upon receipt by Area Developer of written notice.

6.4. <u>No Right to Establish or Operate New Restaurants</u>: Upon termination of the Agreement, Area Developer shall have no right to establish or operate any Golden

April 2013

9

PK 66148

1   Sherrance Henderson, Pro Se
    6600 Sugarloaf Parkway, 400-343
2   Duluth, GA 30097
    Phone 404-220-9517
3   Email: SherranceHenderson@gmail.com

4

5

6

7

8

9

10

11

12

13              # Exhibit E

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Sherrance Henderson, Pro Se
     PLEADING TITLE - 6

INDEX NO. 2017-51219

RECEIVED NYSCEF: 06/29/2017

**FILED: DUTCHESS COUNTY CLERK 06/29/2017 01:16 PM**

NYSCEF DOC. NO. 7

# golden corral® Franchising Systems, Inc.

*#1 Grill-Buffet Chain in U.S.* ▪ *Nation's Restaurant News®*
*#1 Family Steakhouse Franchisor in U.S.* ▪ *Entrepreneur® Magazine*

COPY

March 20, 2017

Ms. Sherrance Henderson, President
CORNUCOPIA QUEEN, INC.
2760 Pebble Hill Trace
Duluth, GA 30097

<u>VIA CERTIFIED MAIL WITH</u>
<u>RETURN RECEIPT REQUESTED</u>

RE:   **NOTICE OF DEFAULT AND TERMINATION WITHOUT OPPORTUNITY TO CURE**
Restaurant Location: 2345 South Road, Poughkeepsie, New York
Golden Corral® No. 2683

Dear Ms. Henderson:

This letter constitutes Notice of Default and Termination pertaining to the above location as provided under the Franchise Agreement dated November 24, 2014, between Golden Corral Franchising Systems, Inc. ("Golden Corral" or "Franchisor") as Franchisor and, by way of an Assignment of Franchise Agreement dated July 31, 2015, Cornucopia Queen, Inc. (hereinafter "you" or "Franchisee") as Franchisee.

The defaults of which you were notified in the Notice of Default and Termination dated February 16, 2017 (the "February 2017 Notice") followed by the number and seriousness of the defaults described herein are completely unacceptable to Golden Corral.  Golden Corral can no longer tolerate Franchisee's inability and/or unwillingness to meet consistently its obligations under the Franchise Agreement.  Therefore, pursuant to Sections 14.2.9 and 14.2.10 of the Franchise Agreement, Golden Corral hereby terminates the Franchise Agreement without affording Franchisee the opportunity cure such defaults.

First, you are in default for failing, refusing or neglecting to meet your obligations under Section 6.5 of the Franchise Agreement for the failure to maintain the required number of certified management staff. You are required to maintain at all times a certified, full-time management staff of at least three (3) managers at the Restaurant. However, with the recent resignation of associate manager Adam Tolliver on or about March 8, 2017, you have only two (2) certified managers working at the Restaurant.

Second, you are in default for failing to operate the Restaurant in strict conformity with the standards, specifications, systems and procedures prescribed by Franchisor as required by Section 6.8, including without limitation, (1) failing to maintain in sufficient supply, and use at all times, only such products, materials, ingredients, supplies, and paper goods as conform to Franchisor's standards and specifications as required by Section 6.8.1; and (2) failing to purchase supplies and food from sources approved by Franchisor as required by Section 6.8.2 and 6.9.  You have previously received documentation describing many of the matters causing such defaults.

INDEX NO. 2017-51219

RECEIVED NYSCEF: 06/29/2017

FILED: DUTCHESS COUNTY CLERK 06/29/2017 01:16 PM

NYSCEF DOC. NO. 7

Notice of Default and Termination to Cornucopia Queen, Inc.
March 20, 2017
Page 2

As reflected in the March 8, 2017 Pleasurable Dining Experience Evaluation, a copy of which is attached hereto as "Exhibit A," the Restaurant received failing and unacceptably low scores of only 11.1 % for "Making It Friendly", 72.3% for "Keeping It Clean", 47.8% for "It's the Food", and an overall **failing score of only 51.4%** (73% being the lowest possible overall passing score). Golden Corral even pre-announced the inspection to enable you and your operations team ample time to prepare. The poor Keeping It Clean and It's the Food scores are especially concerning because they indicate conditions in the Restaurant that are damaging the Golden Corral® brand reputation and goodwill, and, much more importantly, pose an imminent threat to the health and/or safety of guests. For example, but not by limitation, the Pleasurable Dining Experience Evaluation indicated:

- "No temp checks" and "Sanitation checklist not used"
- Baked chicken being served at 130°, well below the 150° F minimum.
- Potato salad (43°) and slaw (46°) being served well above the 40° F maximum.
- Multiple incidents of foods not being properly date-labeled.
- Smoked chicken being served past its shelf life.
- Chicken being served that was purchased locally from unapproved supplier.
- Multiple incidents of required 10 To Win matrix products not being offered for sale (either not served or consistently running out).
- Multiple incidents of foods not being properly prepared and served.
- Less than all co-workers being trained in SafeTracks.

Also, as reflected the March 17, 2017 Ecosure Food Safety Audit, a copy of which is attached hereto as "Exhibit B" and that was acknowledged in writing by your manager on duty Jonathan Torres, the Restaurant was cited for **16 "Critical" violations** and 12 non-Critical violations. The findings in the Food Safety Audit demonstrate that the conditions in the Restaurant continue to pose an imminent threat to the health and/or safety of the dining public. Among the many Critical violations described in the audit were:

- Baked fish (111°) and ham (110°) being served well below the 140° F minimum.
- Hamburgers (44°) being held in cooler above the 41° F maximum
- Pepperoni (54°) and fish (60°) being stored well above the 41° F maximum
- Multiple incidents of foods not being properly date-labeled.
- Utensils not be properly washed.
- Encrusted food residue on food contact area of equipment.
- Multiple incidents of foods not being properly prepared and served by co-workers (e.g., prepping salad without gloves, cutting meat without protective cutting gloves).

Furthermore, the multiple ways in which you have failed to conform to the requirements of Section 6.8 of the Franchise Agreement as documented in the Pleasurable Dining Experience Evaluation and the Ecosure Food Safety Audit are also being reported by your customers at the Restaurant and recorded in the Customer Comment and Complaint system ("CCOMM system"). Attached as "Exhibit C" to this letter is a March 9, 2017 print-off of complaints from the CCOMM system, which print-off constitutes some but not all of the complaints customers made about their experience at the

INDEX NO. 2017-51219
RECEIVED NYSCEF: 06/29/2017

FILED: DUTCHESS COUNTY CLERK 06/29/2017 01:16 PM
NYSCEF DOC. NO. 7

Notice of Default and Termination to Cornucopia Queen, Inc.
March 20, 2017
Page 3

Restaurant. In less than 2 months since the Restaurant opened, well over 100 customers have filed a complaint about their experience at the Restaurant, and the greatest number of complaints pertain to Food Quality. Since opening in January of this year, your Restaurant has by far received the highest number of CCOMM system complaints of any restaurant in the entire Golden Corral system (franchise or company operated). Equally appalling is what customers are saying about the conditions in the Restaurant (many of whom indicate that they will never go back to the Restaurant). Clearly, the conditions in the Restaurant are posing an imminent danger to the dining public and causing irreparable damage to Golden Corral's reputation and brand.

Third, but not by way of limitation, you are in default for failing to pay when due as required under Section 3.5 of the Franchise Agreement the costs for food, lodging, and wages for employees providing training assistance at the Restaurant. Although you were required to pay all A-Team members within 4 days of their departure from the Restaurant, many of the A-Team members did not receive final payment from you until 28 days had passed.

As you will recall, in the February 2017 Notice you were advised that Section 14.2.9 of the Franchise Agreement provides that if Franchisee, after receipt of a writing from Golden Corral advising Franchisee that a default has occurred, commits another default under the Franchise Agreement within 24 months following such Notice of Default and Termination, then, Golden Corral may, at its option, terminate the Franchise Agreement without affording Franchisee the opportunity to cure any such subsequent default. This letter describes various defaults you have committed in fewer than 35 days since you received the February 2017 Notice.

Also, Section 14.2.10 of the Franchise Agreement provides that "if an imminent threat or danger to the public health or safety results from the operation of the Restaurant," then, Golden Corral may, at its option, terminate the Franchise Agreement without affording Franchisee the opportunity to cure the default. The excessive number of critical food safety-related findings described in the March 8, 2017 Pleasurable Dining Experience Evaluation and the March 17, 2017 Ecosure Food Safety Audit clearly evidence that the conditions in the Restaurant pose an imminent threat to the health and/or safety of the public.

As previously mentioned, and pursuant to Section 14.2 of the Franchise Agreement, this letter serves as Notice of Termination of the Franchise Agreement and of all of Franchisee's rights thereunder, effective immediately upon Franchisee's receipt of this letter. Furthermore, Golden Corral does not provide Franchisee any opportunity to cure the defaults resulting in this Notice of Termination.

In connection with such termination, Golden Corral hereby demands that you immediately cease to operate the franchised business and comply with all of the post-termination obligations of Franchisee as set forth in Section 15 of the Franchise Agreement.

INDEX NO. 2017-51219

RECEIVED NYSCEF: 06/29/2017

FILED: DUTCHESS COUNTY CLERK 06/29/2017 01:16 PM

NYSCEF DOC. NO. 7

Notice of Default and Termination to Cornucopia Queen, Inc.
March 20, 2017
Page 4

If you have any questions about the termination of the Franchise Agreement or any of your post-termination obligations, please feel free to contact Mr. David Webb, Division President.

Sincerely,

R. Chappell Phillips
Assistant General Counsel

Attachments

cc:     Darryl Webb, David Webb, John Craig (Via Email)

        TD BANK, N.A. (Via Certified Mail)
        Attn: SBA Division Building "A"
        PO Box 1029
        Greenville, SC 29602

# golden corral® Franchising Systems, Inc.

*#1 Grill-Buffet Chain in U.S.* ▪ *Nation's Restaurant News®*
*#1 Family Steakhouse Franchisor in U.S.* ▪ *Entrepreneur® Magazine*

February 16, 2017

<u>VIA FEDEX AND HAND DELIVERY</u>

Ms. Sherrance Henderson, President
CORNUCOPIA QUEEN, INC.
2760 Pebble Hill Trace
Duluth, GA 30097

RE:   **NOTICE OF DEFAULT AND TERMINATION**
Location: 2345 South Road, Poughkeepsie, New York
Golden Corral® No. 2683

Dear Ms. Henderson:

This letter constitutes Notice of Default and Termination pertaining to the above location as provided under the Franchise Agreement dated November 24, 2014, between Golden Corral Franchising Systems, Inc. ("Golden Corral") as Franchisor and, by way of an Assignment of Franchise Agreement dated July 31, 2015, Cornucopia Queen, Inc. (hereinafter "you" or "Franchisee") as Franchisee.

Section 14.3 of the Franchise Agreement provides that if you fail to remedy the defaults herein described and fail to provide evidence that you have so remedied each default to Golden Corral within thirty (30) days after your receipt of this Notice of Default and Termination, the Franchise Agreement will automatically terminate without further notice to you.

First, but not by way of limitation, you are in default for failure to pay Golden Corral the final $15,000 installment of the initial franchise fee as required under Section 4.1.3 of the Franchise Agreement.

Second, but not by way of limitation, you are in default for failure to pay all of the weekly royalty fees as required under Section 4.2 of the Franchise Agreement. In fact, to date you have failed to pay Golden Corral any of the weekly royalties that have come due since the restaurant first opened on January 27, 2017. Also, you have received several emails since January 27th from Suzanna Wooten of Golden Corral requesting you to complete the Automated Debit Authorization Agreement for Prearranged Payments (Debits) form, but you have failed to complete and return such form, which failure also constitutes a breach of Section 4.4 of the Franchise Agreement.

Third, but not by way of limitation, you are in default for failure to contribute weekly on advertising as required by Section 4.3 of the Franchise Agreement. Section 4.3 also requires that you make such payments to Golden Corral or to an account specified by Golden Corral by electronic fund transfer or pre-authorized auto-draft arrangement, neither of which you have done.

You are further advised that Section 14.2.9 of the Franchise Agreement provides that if Franchisee, after receipt of a writing from Golden Corral advising Franchisee that a default has occurred, commits

Notice of Default and Termination to Cornucopia Queen, Inc.
February 16, 2017
Page 2

another default under the Franchise Agreement within 24 months following this Notice of Default and Termination, then, Golden Corral may, at its option, terminate the Franchise Agreement without affording Franchisee the opportunity to cure any such subsequent default. Accordingly, it is imperative that you not allow another default to occur under the Franchise Agreement within such 24-month period.

Again, under the aforementioned Section 14.3 of the Franchise Agreement, you have thirty (30) days after your receipt of this Notice of Default and Termination in which to remedy the defaults. Should the defaults not be cured within that time period, your Franchise Agreement shall terminate effective immediately upon expiration of such period without further notice to you.

Lastly, this is to remind you that, pursuant to the Lender Notification Agreement dated August 6, 2015 signed by Franchisee, Golden Corral and your lender TD Bank, Golden Corral will be providing to TD Bank a copy of this this Notice of Default and Termination.

I, therefore, urge you to promptly correct your defaults to avoid termination of the Franchise Agreement.

Sincerely,

R. Chappell Phillips
Assistant General Counsel and Assistant Secretary

cc:    Chip Joyner, Darryl Webb, David Webb, John Craig

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

The following table lists certain important provisions of the Franchise Agreement, Area Development Agreement, and Coastal Equipment Purchase and Sale Agreement. You should read these provisions in the agreements attached to this disclosure document as Exhibits C, D and H.

| Provision | Section in Agreements | Summary |
|---|---|---|
| a.  Length of the franchise term | § 2 of Franchise Agreement. § 4 of Area Development Agreement. Not applicable to Coastal Agreement. | From date of Agreement execution through the 15th anniversary date of the Restaurant's opening.  Depends upon Development Schedule (may be 2-5 years). |
| b.  Renewal or extension of the term | § 2 of Franchise Agreement. Not applicable to other agreements. | Your renewal right gives you the opportunity to continue to be a franchisee in our System after the initial term of your Franchise Agreement expires. You have two renewal terms of 5 years each, subject to contractual prerequisites described in c. below; however, we will not be obligated to renew your Agreement if we have determined in good faith to cease offering new and renewal franchises within the state where your Restaurant is located, subject to certain pre-conditions descried in Agreement Section 3.2. |

51

04/15/13

| Provision | Section in Agreements | Summary |
|---|---|---|
| c. Requirements for you to renew or extend | § 2 of Franchise Agreement. Not applicable to other agreements. | Notice, renovation, satisfaction of monetary obligations, compliance with Franchise Agreement, and others. You must sign our then-current form of franchise agreement, and this new agreement will likely contain materially different terms and conditions than the original contract. |
| d. Termination by you | Not applicable to any agreement. | Not applicable |
| e. Termination by us without cause | Not applicable to any agreement. | Not applicable |
| f. Termination by us with cause | § 14 of Franchise Agreement. § 6 of Area Development Agreement. Not applicable to Coastal Agreement. | Breach of Agreement and other grounds. |
| g. "Cause" defined – curable defaults | § 14 of Franchise Agreement. § 6 of Area Development Agreement. Not applicable to Coastal Agreement. | Failure to pay monies owed to us, failure to obtain our consent as required, failure to maintain standards and procedures, and other reasons. |
| h. "Cause" defined – non-curable defaults | § 14 of Franchise Agreement. § 6 of Area Development Agreement. Not applicable to Coastal Agreement. | Bankruptcy (this provision may not be enforceable under the U.S. Bankruptcy Code 11 U.S.C. § 101 *et seq.*), voluntary abandonment, if you or a principal is convicted or enters a plea with adjudication of guilt withheld or suspended of a felony or a crime involving moral turpitude or engages in conduct which is reasonably likely to adversely affect key components of our business, improper transfer, violation of non-compete obligations, and other reasons. |

52

04/15/13

| Provision | Section in Agreements | Summary |
|---|---|---|
| i. Your obligations on termination or non-renewal | § 15 of Franchise Agreement. § 6 of Area Development Agreement. Not applicable to Coastal Agreement. | Discontinue development or operations; pay amounts due; including, for an early termination caused by your default, future royalty fees that would have been paid throughout the remainder of the term; give us all domain names and websites associated with the Restaurant; and others. |
| j. Assignment of contract by us | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | No restriction on our right to transfer. |
| k. "Transfer" by you - defined | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | Covers transfer of interest in either Agreement, the Restaurant, the assets of your business, and others. Area developers may not make any partial assignments. |
| l. Our approval of transfer by you | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | We have the right to approve transfers. |
| m. Conditions for our approval of transfer | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | Payment of amounts due; non-default; general release; transferee qualifications; presence of approved Operations Principal, if required by us; continuing liability; others. |
| n. Our right of first refusal to acquire your business | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | We can match any offer. |

53

04/15/13

| Provision | Section in Agreements | Summary |
|---|---|---|
| o. Our option to purchase your business | § 15 of Franchise Agreement. Not applicable in Area Development Agreement. Not applicable to Coastal Agreement. | We may purchase the Restaurant. |
| p. Your death or disability | § 13 of Franchise Agreement. § 7 of Area Development Agreement. Not applicable to Coastal Agreement. | Agreement must be assigned to approved transferee within 6 months. |
| q. Non-competition covenants during the term of the franchise | § 16 of Franchise Agreement. § 8 of Area Development Agreement. Not applicable to Coastal Agreement. | Prohibition on owning, operating, or having any direct or indirect association with other restaurants without Golden Corral's consent; restrictions on employing, directly or indirectly yourself or through an affiliate or subsidiary, individuals currently or previously employed by Golden Corral, its affiliates or subsidiaries, or other franchisees, and diverting business. |
| r. Non-competition covenants after the franchise is terminated or expires | § 16 of Franchise Agreement. § 8 of Area Development Agreement. Not applicable to Coastal Agreement. | Includes a 2 year prohibition for restaurants whose food offerings are similar to those served by a Restaurant or which are cafeteria-style or buffet restaurants, and which are located at or within 10 miles of your former Restaurant or any other Golden Corral Restaurant located in the same Designated Market Area for which we have formed an advertising cooperative; and a 1 year prohibition for the above-described competing restaurants located within 10 miles of any other Golden Corral restaurant in the United States. |

04/15/13

| Provision | Section in Agreements | Summary |
|---|---|---|
| s.  Modification of the agreement | § 22 of Franchise Agreement § 12 of Area Development Agreement. § 10 (f) of Coastal Agreement. | Must be in writing and signed by both parties. |
| t.  Integration/merger clause | § 22 of Franchise Agreement § 12 of Area Development Agreement. § 10 (f) of Coastal Agreement. | Only the terms of the Franchise Agreement and Development Agreement are binding (subject to state law). Any other promises may not be enforceable. However, this clause will not be treated as a disclaimer of our representations in this disclosure document. |
| u.  Dispute resolution by arbitration or mediation | Not applicable in any agreement. | Not applicable |
| v.  Choice of forum | § 23.2 of Franchise Agreement. § 13.2 of Area Development Agreement. § 10 (d) of Coastal Agreement. | Where we have our principal place of business at the time the litigation begins. Currently, North Carolina (subject to state law). See Notes 1 and 2. |
| w.  Choice of law | § 23.1 of Franchise Agreement. § 13.1 of Area Development Agreement. § 10 (d) of Coastal Agreement. | North Carolina (subject to state law). See Notes 1 and 2. |

Notes:

1.    In addition to the provisions noted in the preceding table, the Franchise Agreement and Area Development Agreement contain a number of provisions that may affect your and our legal rights in any dispute between us, such as a mutual waiver of a jury trial, a mutual waiver of punitive or exemplary damages, and a reduced time frame within which either of us may initiate proceedings against the other. See Franchise Agreement Section 23 and Area Development Agreement Section 13. One or more of the three above-described provisions may not be enforceable under the laws of your state. We recommend that you carefully review all of these provisions, and the entire agreements, with your attorney. Please also refer to the State-Specific Disclosures and Agreement Amendments in Exhibit M for further details.

2.    Some states have laws that will supersede the choice of forum and/or choice of law provisions of these agreements.  Please refer to the State-Specific Disclosures and

04/15/13

1   Sherrance Henderson

2   6600 Sugarloaf PKY, 400-343

3   Duluth, GA 30097

4   Email Address:SherranceHenderson@gmail.com

5

6

7

8

9

10

11

12

13

14                    Exhibit 1BB

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEADING TITLE - 2

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 3:51 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Re: Vonage Visual Voicemail from 19196101605 - New Voicemail Received - Not Transcribed |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: Sophia.Davis <Sophia.Davis@sba.gov>
Sent: Wed, Jun 27, 2018 04:06 PM
Subject: Re: Vonage Visual Voicemail from 19196101605 - New Voicemail Received - Not Transcribed

I'm unsure where you got that number from but it's never been a number that belong to me. I will give you a call and the best number to reach me at 646-256-8340. I'm unsure also why you didn't make an effort to email me if you wanted to communicate and the cell number was non-working.
Sherrance Henderson

Sent from AOL Mobile Mail

-----Original Message-----
From: Davis, Sophia (Off. Inspector Gen.) (Off. Inspector Gen.) <Sophia.Davis@sba.gov>
To: sheronceh <sheronceh@aol.com>
Sent: Mon, Jun 25, 2018 02:26 PM
Subject: RE: Vonage Visual Voicemail from 19196101605 - New Voicemail Received - Not Transcribed

Ms. Henderson.

I believed I had left you a message at 347-698-8408 to contact me a while back.  I never heard anything.  I am not sure if this is still a good number for you.

I just now tried that number again.  The phone was answered but no one spoke.

Please contact me at either number below to discuss.

Thanks.

1



Sophia Davis

Assistant Special Agent in Charge

Office of Inspector General

U.S. Small Business Administration

W: (215) 597-3850 x 304

C: (215) 239-7041

**From:** sheronceh@aol.com [mailto:sheronceh@aol.com]
**Sent:** Sunday, June 24, 2018 8:38 PM
**To:** Davis, Sophia (Off. Inspector Gen.)
**Subject:** Re: Vonage Visual Voicemail from 19196101605 - New Voicemail Received - Not Transcribed

Sophia Davis,

Would you please be so kind to acknowledge this email and be professional and offer me an update if my complaint was ever investigated or it was decided not to be investigated. It's been close to a year or rather over a year and I was not given the courtesy or the professionalism from your organization.. SBA to offer me some form of insight information. Thanks so much and I graciously await your reply!

Sherrance Henderson

On Sunday, January 21, 2018 Davis, Sophia (Off. Inspector Gen.) (Off. Inspector Gen.) <Sophia.Davis@sba.gov> wrote:

Hi.

As explained your complaint was taken. It will need to be evaluated and then a determination will be made if any further action will be taken by our office. There is no time frame as to when this will occur. There is no investigation at this time. You should contact your attorney for guidance.

2

Also due to the government shutdown I am furloughed. I am not allowed to work during this time and I am unable to respond any further.

Thanks.

Sophia Davis

Sent from my iPhone

On Jan 20, 2018, at 9:14 AM, "sheronceh@aol.com" <sheronceh@aol.com> wrote:

Good morning Ms. Davis,
I believe this is important information. I had clearly informed you that join my trial in the bankruptcy court said under oath that the landlord was going to pay all of the liens and purchase the property for $500,000. I received a phone call yesterday from my general contractor and the message is attached. We spoke and he informed me that the bank is not going to pay him and the landlord is not going to pay him. He is asking me to be his witness for legal reasons. Are you investigating this particular case that I present it to you last week? Do you need any more information that I can provide? Please instruct so I may satisfy your request.

Sherrance Henderson
Sent from AOL Mobile Mail


-----Original Message-----

From: 19196101605 <19196101605@vm.vonage.com>
To: sheronceh <sheronceh@aol.com>
Sent: Fri, Jan 19, 2018 10:19 AM
Subject: Vonage Visual Voicemail from 19196101605 - New Voicemail Received - Not Transcribed

Date  : Jan 19 2018 10:19:17 AM
From : Cell Phone NC (19196101605)
To      : sherrance henderson (17704970886)


This message was not transcribed due to a problem with your account status. Please log in to your Online Account at Vonage.com to check your voicemail and to bring your account up to date.

Este mensaje no se transcribió bido a un problema con tu estado de cuenta. Entra a tu cuenta por Internet en Vonage.com para revisar tu correo de voz y actualizar tu cuenta.

3

--- Brought to you by Vonage (Proporcionado por Vonage) ---

This email was sent from a mailbox that does not accept replies.

If you require assistance from Customer Care, please visit our Contact Us page at
http://www.vonage.com/help_contactUS.php

Este email fue enviado desde una casilla que no acepta respuestas.

Si necesitas asistencia de Atención al cliente, visita nuestra página de contacto en
http://espanol.vonage.com/help_contactUS.php

<voice-message.wav>

3/21/2019

Dear Clerk of the Court:

Please accept my case filings. I am disable and poor.

I have notarize appelarit "poor person" filing application. Please call me with any questions at 404-747-38xx

Thank You graciously,

SHERRANCE HENDERSON

1 | Sherrance Henderson, Pro Se
6600 Sugarloaf Parkway, 400-343
2 | Duluth, GA 30097
Phone: 404-747-3847
3 | Email

4

5

UNITED STAES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

6

7

8

9 | SHERRANCE HENDERSON                    Case No.: Number

10 |          PLAINITIFF

11 |              V.                        SUMMONS IN A CIVIL ACTION

12 | GOLDEN CORRAL SYSTEMS, INC., TB BANK,  JURY TRIAL REQUESTED (YES)

13 | SAMLL BUSINESS ADMINISTRATION OFFICE,

14 | LANCE TRENARY, ANTHONY SEGRETI, JOHN

15 | CRIAG AND JANE AND JOHN DOE, *Niraj Patel*

16 |          Defendant

17

18

19

20

21

22

23

24

25

26

27

28

SUMMONS IN A CIVIL ACTION - 1



PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL®

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

9114 9999 4423 8515 1929 97

P S 0000 1000 014

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

* Domestic only.

* For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.

• Date of di
• USPS TRA
  internation
• Limited int
• Pick up av
• Order supp
• When used internationally, a customs
  declaration label may be required.

* Domestic only

USPS.COM/PICKUP

To schedule free
Package Pickup,
scan the QR code.

PRIORITY
★ MAIL ★

UNITED STATES
POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

FROM:
6600 Sugarloaf
400-343
Duluth, Ga 30097

TO: Sherrance Henderson
6600 Sugarloaf Pkwy
400 -343
Duluth, Ga. 30097

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018; All rights reserved.