Sherrrance Henderson

385 Highland Ave

Newark, NJ 07104

August 22, 2019

Southern District Federal Court White Plains New York

Honorable Chief Judge Colleen McMahon

300 Quarropas Street

Clerk of the Court Office

White Plains, New York 10601

# Re: 19-CV-2878(CM)

Honorable Chief Judge Colleen McMahon:

As per your letter dated on April 12, 2019, requesting an explanation to the following..

1. NCD construction
2. Eric Sanders, esq. and The Sander's Firm
3. Amended Complaint in accordance with court civil rule 8

1. NCD is define as the Golden Corral Authorized Contractor. ALL liens by lead contractor (NCD) and subcontractors have been fully satisfied by the defendant Anthony Segretiti when TD Bank sold him my bank required of Segretiti was to pay all leans from both Contractor (NCD) and all sub-contractors.

There is no legal on going relationship with NCD or any of the sub- contractors with me on any business entity I own or have any finical relationship with at this time. My filing of case 19-CV-2878 is not consolidated case of any of my past cases regarding of NCD and I am not seeing this type of resolution.

2019 AUG 22  PM 4: 58

SDNY DOCKET UNIT

RECEIVED

2.  Eric Sanders and The Sanders Firm was simply employed to represent me in case 19-CV-2878
    (CM). Eric Sanders and The Sander's firm was terminated. The Sander's Firm and or Eric
    Sanders DID not file any case on my behalf, send one (1) letter, make one (1) call, do one (1)
    motion and order on my behalf. Currently, my filing "Henderson vs. Eric Sanders and The
    Sander's Firm is in Southern District New York City (Manhattan) with a federal lawsuit as a
    Plaintiff. As a result of the highlighting in your notes which, of course your honor as all rights to
    query, the notation has caused  African American Civil Rights lawyers who were sought after  to
    feel uncomfortable and have reservations in representing me in the above case 19-CV-2878.  The
    Sander's firm and Etic Sanders federal case I am not seeking this case to be consolidated and thus
    my other lawsuits should not be review as a "Bankruptcy " application or lawsuit and the other
    past and or present lawsuits are not joint and should not be viewed as a join or historical filing.


3.  Amended complaints thank you graciously for the opportunity to satisfied the expectations of the
    Southern District Court of New York. Please accept the enclosed filling.



Sincerely,



Sherrance Henderson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

SHERRANCE HENDERSON,

                 Plaintiff,               **19-CV-2878 (CM)**

    -against-                       **COMPLAINT AND**
                                            **JURY DEMAND**

GOLDEN CORRAL SYSTEMS, INC.,
TD BANK, SMALL BUSINESS ADMINSTRATION, LANCE TRENARY, JHON
CRIAG, NITRAL PETAL, ANTHONTY SEGRETITI AND JANE AND JOHN DOE,
et al
                 Defendants.

-------------------------------------------------------------------------x

      Plaintiff Sherrance Henderson, *pro se*, files this complaint against the seven

(7) Defendants Golden Corral Systems, Inc., TD Bank, Small Business

Administration  Lance Trenary, John Craig, Nitral Petal, Anthony Segretiti, and

Jane and John Doe, et al  alleges the following:

<div align="center">I.</div>

<div align="center">Nature of the Case</div>

    1.    This is a case for breach of contract, intentional infliction of emotional

distress, Racketeer Influenced and Corrupt Organizations Act (RICO) and

violations of civil rights under 42 U.S.C. §1981 and §1985.

<div align="center">FIRST AMENDED COMPLAINT</div>

## II.

## Parties

2.      Plaintiff Sherrance Henderson (hereinafter referred to as "Plaintiff") is and at all times hereinafter mentioned is a resident and citizen of Essex County-city of Newark, State of New Jersey.   She is an African-American female, disable, and a single parent to two children who have been great impacted with autism.

3.      Defendant Golden Corral Systems, Inc. (hereinafter referred to as "GC") is a North Carolina corporation organized with a principal place of business in North Carolina.

4.      TD Bank is headquartered in New Jersey.

## III.

## Jurisdiction

5.      Jurisdiction is conferred on this court by 28 U.S.C. §1332 (diversity of citizenship).

6.      The amount in controversy exceeds the sum or value of $75,000.

7.      Jurisdiction is also founded on 28 U.S.C. §1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

## IV.

## Factual Background

52

53

54    6.    On or about March 2013, Defendant Golden Corral Systems, Inc.

55  presented Plaintiff Henderson, with a written franchise agreement known to the

56  Plaintiff as the Franchise Disclosure Document (hereinafter referred to as "FDD").

57    7.    Plaintiff, without sufficient legal knowledge and without the advice of

58  any counsel, accepted the FDD and signed the agreement.

59    8.    Irwin Roberts, Vice President of Franchise Sales for GC produced the

60  FDD at the hotel lobby at Atlanta airport Marriott,  (hereinafter referred to as

61  "Roberts") with GC told/informed/instructed Plaintiff to acquire two other people,

62  preferably men, to share her franchise license with Restaurant experience because

63  Plaintiff could not aid in managing the business due to her disability and because

64  she is a woman who has never operated a business of this type. Roberts asked

65  Plaintiff if she was married, if she has children at the time of the exchange of the

66  FDD. As a result of Roberts' instruction, Plaintiff issued five percent (5%)

67  ownership of her franchise GC license to each Darren "Chip" Joyner (hereinafter

68  referred to as "Joyner") and Milton A. Dewar (hereinafter referred to as "Dewar").

69  Plaintiff retained ninety percent (90%) ownership.

70    24.    On or about September 2014, Plaintiff, Joyner, and Dewar were in an

71  informal meeting in GC's boardroom with GC's lead legal counsel, Chappell Phillip,

72  Esq. (hereinafter referred to as "Phillip"). Plaintiff was asked by Phillip why she

73  and Dewar had not married and were cohabiting as a common law married couple.

74       25.      Upon information and belief, on or about May 5, 2016, Plaintiff

75  requested to be trained to become a GC Certified manager and was clearly informed

76  by Toney Sewell that they were not training owners and it would be too difficult for

77  Plaintiff due to her disability and her use of a single prong cane.

78       26.      From May 2016 through November 2016 Plaintiff communicated with

79  several GC store owners about receiving training.

80       27.      On or about August 11, 2016, Patel, an employee of GC, offers Kitchen

81  and General Managers continued training/real life work experience one at his

82  Buffalo stores and General Manager training at the Saratoga Store.

83       28.      On or about October 21, 2017, Patel denied offering kitchen manager

84  full time employment during the downtime and at said store in Poughkeepsie, Patel

85  offered Kitchen Manager full-time permanent employment at his Buffalo store.

86  Patel also offered to train Plaintiff with a customized training package which will

87  "NOT" offer the opportunity to be a certified store manager at GC.

88       29.      Plaintiff had the GC store built from raw land from ground up.

89       30.      On or about January 2017 Plaintiff opened her store at 2345 South

90  Road, Poughkeepsie, New York.

91       31.      On or about February 11, 2017, Plaintiff e-mailed GC requesting help

92  to retrain the team members and express her concerns that John Craig's GC North

FIRST AMENDED COMPLAINT

4

93    East Franchise Field Specialists had instructed Plaintiff's kitchen manager to order

94    items that were unnecessary, not supported by the market of Poughkeepsie and/or

95    the store readiness, while ignoring items that were in line for the grand opening.

96         32.     John Craig, franchisee field specialist for the Northeast region

97    (hereinafter referred to as "JC") ordered Plaintiff's kitchen manager, Adam Toliver

98    (hereinafter referred to as "Toliver"), to order 200 plus pork butts and $16,000.00

99    worth of fruits and vegetables. JC then instructed Toliver to store said fruits and

100   vegetables within a freezer. The excess pork butts and the fruits and vegetables

101   that Toliver was instructed to store the freezer spoiled. JC instructed Toliver to

102   spend $46,000.00 to $50,000.00 or more every 4 ½ days. This action caused a

103   financial hardship on Plaintiff and her GC store at 2345 South Road, Poughkeepsie,

104   New York.

105        33.     JC instructed Plaintiff's store managers to schedule all workers (144)

106   One hundred and forty-for- forty (40) plus hours, which caused a financial hardship

107   on Plaintiff and said GC store at 2345 South Road, Poughkeepsie, New York.

108        34.     JC gave his cellphone number to workers and managers at the store

109   and encouraged them to call him. This was part of a strategy to undermine

110   Plaintiff's authority in her own store.

111        35.     JC led kitchen manager Anthony Crocc to communicate with him daily

112   about the kitchen, such as if any of the Poughkeepsie workers had any issues of

113   concern.

114     36.    JC worked to undermine Plaintiff's authority within her own business.

115 JC fueled jealousy among Plaintiff's workers and even with Joyner. JC empowered

116 bad disrespectful behavior with workers by skillful leadership of manipulation. JC

117 supported the "A" team leader actions of going to Plaintiff's store register to pay the

118 "A" team their weekly pay. JC had activated a disease of disrespect for the

119 leadership of the Poughkeepsie GC store.

120     37.    Upon information and belief, on or about February 1, 2017, Plaintiff

121 communicated with GC Vice President of Franchise Development Darryl Web

122 (hereinafter referred to as "Web") and requested some of the "A" team to support the

123 Poughkeepsie store a couple more weeks.

124     38.    On or about February 1, 2017, Dave Webb (hereinafter referred to as

125 "Webb"), Vice President of the North East franchise development instructed to

126 accept 20 year GC veteran Jaymie Aimalefoa (hereinafter referred to as

127 "Aimalefoa") to work with Plaintiff's GC in Poughkeepsie, New York.

128     39.    From about February 1, 2017 until March 15, 2017, Aimalefoa did not

129 offer support of the Poughkeepsie GC store. Aimalefoa was cynical, distrustful, and

130 reported all unfavorable reports back to GC which offered untruth and biased

131 ammunition to enhance GC's professional racketious business plan model.

132 Aimalefoa worked as a direct spy for GC during her tenure at Plaintiff's

133 Poughkeepsie GC store. She also gave workers her telephone number and even

134 went as far to have a love affair with one of the visiting managers.

<div align="center">FIRST AMENDED COMPLAINT</div>

135    40.    From about February 1, 2017 until February 15, 2017, Aimalefoa

136    would kiss and make other romantic actions to the visiting manager from the

137    Connecticut. When Plaintiff requested that she control her actions with the

138    hospitality manager, Aimalefoa became hostile and withdrawn with Plaintiff.

139    41.    Shortly after the closing of Plaintiff's store, Aimalefoa was rewarded

140    with owner the operator/General Manager position in North Carolina with an

141    increase in pay of six figures.

142    42.    Poughkeepsie GC was inundated with personal shoppers/secret

143    shoppers activated by GC headquarter. On or about February 2017, an African

144    American customer spoke to Plaintiff and informed her that she was a secret

145    shopper and worked as a sub contractor to review neighborhood restaurants. The

146    secret shopper further stated that she wanted to inform Plaintiff that her GC was

147    inundated with fake customers. The secret shopper wanted to give Plaintiff a "heads

148    up" because she felt a sense of pride because like her, Plaintiff is also African

149    American.

150    43.    On or about February 4, 2017 through March 21, 2017, the

151    Poughkeepsie GC location was inundated with complaints. Jamie Apgar, the

152    Division Administrator for Lance Trenary, CEO of Golden Corral Systems, Inc.

153    (hereinafter referred to as "Apgar"), would forward 5 plus company's daily to Web,

154    Webb, JC, Joyner, and Plaintiff.

155      44.    Apgar aggressively verbally badgered Plaintiff with insults and

156 threats. Apgar informed customers that the Poughkeepsie GC would issues refunds

157 "even without a receipt". If Plaintiff did not enforce this request from Apgar, Apgar

158 would threaten Plaintiff by saying the GC Store was going to be closed down and

159 the Poughkeepsie store was the worst store and the Poughkeepsie store sales were

160 the lowest in GC franchise store history.

161      45.    The Poughkeepsie store total income for fifty-one (51) days was

162 $771,664.47. On or about January 2017 through March 21, 2017, Apgar informed

163 any and all customers that a cash refund would be issued by the store if they were

164 not satisfied, pleased, and/or content. That on or about January 2017 through

165 March 21, 2017, the news got out that the Poughkeepsie GC was basically giving

166 free food away as long as the customer complained.

167      46.    Plaintiff requested to speak with Lance Trenary, CEO of Golden Corral

168 Systems, Inc. (hereinafter referred to as "Trenary"), and her request fell upon deaf

169 ears. Trenary refused to communicate with her. Plaintiff called Trenary on his

170 personal cell phone and left numerous messages and Trenary ignored her calls and

171 failed and refused to assist her in any way.

172      47.    On or about March 28, 2017, Plaintiff, the kitchen manager, and the

173 hospitality manager came in person to Golden Corral headquarters to speak with

174 Trenary. Apgar took notes and informed Plaintiff and her managers that Trenary

175 was not available. Apgar clearly informed Plaintiff and her managers that Trenary

176  had received information from Aimalefoa, JC, Webb, and Web and understood the
177  scope of the Poughkeepsie store.

178  48.  On or about February 12, 2017, GC Vice President of Franchise
179  Development Darryl Web (hereinafter referred to as "Web") and David Webb
180  (hereinafter referred to as "Webb") Division President issued Plaintiff a first and
181  final warning. See attached Exhibit CC.

182  49.  On or about March 20, 2017 Plaintiff emailed Webb as per the
183  instruction of Aimalefoe, a 20 plus year GC General Manager Vet who was sent to
184  the Poughkeepsie store to offer assistance but was later discovered that Aimalefoe
185  was reporting exaggerated reports to GC about the conditions of Plaintiff's store.
186  See attached Exhibit "F."

187  50.  On or about March 20, 2017, Toliver threatened to cause Plaintiff
188  bodily harm.  Toliver was terminated by Plaintiff on March 20, 2017.

189  51.  On or about March 21, 2017, Webb called Plaintiff around 8:01 a.m.
190  and informed her that her franchise license was terminated and that the
191  Poughkeepsie store could not be opened.

192  52.  GC confirmed termination of franchisee license with a fabrication, a
193  deceptional lie and misuse use of FDD contract with Plaintiff.

194  53.  Golden Corral breached the Franchise agreement by not granting
195  Plaintiff the opportunity to improve/cure Henderson Poughkeepsie GC.

196    54.    Plaintiff, under the Franchise Agreement, was entitled to correct the

197    Poughkeepsie GC infancy growing pains as it was in business for only 51 days.

198    55.    The Middletown, NY/ Town of Wallkill GC store presented similar

199    challenges, but was afforded a 300-plus days opportunity to remedy the store issues.

200    56.    The owners of the Middletown, NY/Wallkill, Golden Corral location are

201    white/non-black. Middletown, NY/ Wallkill, NY was opened 2016 and was closed on

202    or about January 10, 2019. Middletown, NY/Wallkill, NY store did not have over 21

203    news articles written locally and or nationally as plaintiff's store did.

204    57.    The Holland, Michigan store owned by a 20 year Golden Corral

205    restaurant employee and married to a Golden Corral executive and was opened in

206    December of 2016. This store experienced growing pains. The Holland, Michigan

207    store was owned by "Owner Operated" and part of the purchase was paid by Golden

208    Corral Systems, Inc. the Holland, Michigan store was owned by a non-black/African-

209    American. The store is owned by a "White Couple" In December 2018 the store was

210    closed and Golden Corral Systems afforded this group 300 days to remedy any

211    restaurant management issues.

212    58.    The Golden Corral in Cape Coral, FL was closed down by the

213    department of health for observing eighteen (18) live roaches five (5) times during

214    the store's tenure but has always been granted "reopening" opportunities. This store

215    was owned by a Non-African American, white male.

FIRST AMENDED COMPLAINT

216      59.    On January 23, 2017, four (4) Golden Corrals shut down in Florida
217 City, Pompano Beach, Royal Palm, Palatka, from customer complaints. Some of the
218 complaints were live and dead roaches, grease buildup, sewage seeping into the
219 utility dishwashing room, food temperatures not meeting department of health
220 standards, dirty dishes being placed out for dinner use, and last but definitely not
221 least, workers not cleaning their hands. These locations are all owned by non
222 African-Americans. Ownership of these Florida Golden Corrals was primarily by
223 white males.

224      60.    Golden Corral Systems, Inc has over 600 plus stores with over 50
225 thousand hourly workers and had only one (1) Female Single Black/African
226 American franchisee, the Plaintiff, Sherrance Henderson. Plaintiff is **not an owner
227 operator**.

228      61.    Plaintiff invested over 1.5 million dollars in cash and 1.7 million
229 dollars of her primary residency that was pledged for a loan for the store.

230      62.    On or about April 2, 2017, Nitral Patel (hereinafter referred to as
231 "Patel") and GC propelled himself as the GC approval and authorized buyer of the
232 store and to "save" Plaintiff's house for her disabled children.

233      63.    From June 2016 to December 2017, Patel had been intrinsically
234 involved in Plaintiff's business opportunity with GC even though he is not a
235 business partner. Richard Chase (hereinafter referred to as "Chase"), Vice President

236  of Area Development shared Plaintiff's business plan with Patel without Plaintiff's

237  permission during the time period of 2015 through 2016.

238       64.    During the time from January 2013 through January 2016, Plaintiff

239  originally entered into a franchise agreement to hold a license. On or about the time

240  period of January 2103 through January 2014, Plaintiff was informed that Newark,

241  NJ was being removed from the approved area list. Plaintiff was then told to find a

242  comparable location from the approved area list. During a time between January

243  2014 and June 2014, Plaintiff was informed by Irwin Roberts, Senior Vice President

244  of Franchising that Plaintiff could not handle a store in a strip mall/in-line because

245  she was a new franchisee, lack the experience and Henderson financial status only

246  afforded her with the more expensive GC 11.

247       65.    Male franchisees, and "new" owners were offered and have in-line

248  stores that are also "male/men". Plaintiff chose from the authorized list, South

249  Orange, New Jersey. Both Newark and Orange afforded her new franchise/store tax

250  abatements, 90% minority majority community and she had close community

251  relationships with both Mayors. After being approved by GC, they took Newark, NJ

252  off that approved list and stated because there was not a location of five (5) acres.

253  GC then informed Plaintiff on or about July 2014 to October 2014 that she had to

254  change her area again. Plaintiff was told to pick Long Island. That on or about July

255  2014 through November 2014 available property for lease exceeded the price point

256  of $7,000.00. The highest lease amount approved by GC was $8,000.00. The lease

257 price of the available land in the approved areas in Long island was around triple

258 that amount, approximately $20,000.00 - $25,000.00 per month.

259       66.    Plaintiff then met with Franchise Area Development Vice President

260 Chase from about 8:00 a.m. to 7:30 p.m. Chase informed Plaintiff that if she wanted

261 any area approved she had to call him "DICK." It seemed proper because Richard is

262 Chase's first name and Dick is the nickname for Richard. However,

263   67.   Chase required Plaintiff to call him "Big Dick" and to say it in what
264   Chase called her "sexy radio voice". Plaintiff complied. When she need help with any
265   question on GC Pro Forma report she had to call him Big Dick. She was humiliated
266   and sexually harassed, devalued and feared if she expressed her discomfort, she
267   would surely lose any chance of building her GC. Chase shared Plaintiff's business
268   plan with Patel and instructed Plaintiff to work with him on the GC Pro Forma.
269   Patel had all copies of photos, Profit and Loss (P&L) statement, community
270   restaurant sales of the Poughkeepsie area, kept contact information of decision
271   makers at the local university cafeterias, cost and engineering and their bids for
272   building out the GC, traffic studies (cost $22,000.00), Geology studies (cost
273   $17,000.00), and supplemental information.

274   68.   On or about April 28, 2017 to December 2017, Patel communicated
275   with Plaintiff's New Jersey Commercial and GA Bankruptcy Lawyer to map out
276   plans to purchase Plaintiff's store location in Poughkeepsie. See attached Exhibit
277   "H." That on or about May 12, 2017 to December 2017, Patel queried about debt of
278   Plaintiff's Poughkeepsie store location, gathered information about Plaintiff's legal
279   activities, and offered Plaintiff a false sense of hope.

280   69.   During the term of 2014 through 2017, Plaintiff was the ONLY Female
281   African American Single parent Franchise owner out of 600 plus stores. Plaintiff
282   was the only woman that was a single parent and a franchisee in GC's history.

283    70.    GC failed to adhere to their engagement of their FDD rules of why a

284    franchisee license can be terminated. GC's FDD failed to state "when" and "what

285    time period" can a franchisee license can be terminated.

286    71.    GC Treated and communicated with Plaintiff like she was an employee

287    and not as an owner, license and/or partner with the brand. It is unusual for an

288    organization to break their own rules of engagement within the FDD, to be hostile,

289    and to set traps to work as a team to cause harm. Golden Corral Systems

290    unconscionably is within violations of Unfair Business Practices, Violations of title

291    VII, breach of a 20-year franchise licensing agreement, ignored ALL rules of the

292    FDD to satisfy the thirst to be racist. Plaintiff was severed loan default paperwork

293    from SBA on or about November 22, 2018 within Gwinnett County Court requesting

294    for payment of 3.7 millions and stated the loan had not been satisfied and an open

295    judgment was still active.

296                                        **V.**

297            **First Cause of Action: For Violations Of Sections 1962(c) And**

298                                   **(d) Of RICO**

299    57.    Plaintiff incorporates by reference paragraphs one through 56,

300    inclusive.

301    58.    This claim arises under §1964(c) of RICO and plaintiff seeks to recover

302    actual and treble damages based upon defendants' violations of 18 U.S.C. §1962(c)-

303    (d), as described more fully below.

304    59.    At all times relevant hereto, the plaintiff and the defendants

305    constituted "persons" within the meaning of 18 U.S.C. §1961(3).

306    60.    Defendants are engaged in interstate acts of commerce and the acts

307    alleged herein have a demonstrable effect on interstate commerce.

308    61.    Section 1961(4) of RICO defines the term "enterprise" to include "any

309    individual, partnership, corporation, association, or other legal entity, and any

310    union or group of individuals associated in fact although not a legal entity." 18

311    U.S.C. §1961(4).

312    62.    At all times relevant hereto, pursuant to the numerous agreements

313    that were negotiated and executed between the defendants, they have formed a

314    series of association-in-fact enterprises within the meaning of 18 U.S.C. §1961(4) for

315    the purpose of committing numerous acts of racketeering activity, including theft of

316    property worth more than $15,000, violation of 18 U.S.C. § 1344, which has a

317    **maximum prison term of thirty years** and is expressly included in the RICO

318    statute as a predicate act.

319    63.    These enterprises are identified as follows:

320         TD Bank

321         Golden Corral Systems, Inc.

322    64.    Defendants have engaged in a pattern of racketeering activity, as

323    defined in §1961(5) of RICO, by committing and/or aiding and abetting at least two

324    such acts of racketeering activity within the past 10 years. Each such act of

325 racketeering activity was related, had similar purposes, involved the same or

326 similar participants and methods of commission, and had similar results impacting

327 upon similar victims, including plaintiff.

328    65.    Section 1961(1) of RICO provides that a "person" commits and act of

329 "racketeering activity" by engaging in (a) "any act or threat involving . . . theft . . .

330 which is chargeable under State law and punishable by imprisonment for more than

331 one year," 18 U.S.C. §1961(1)(A), and/or (b) "any act which is indictable under" any

332 of a number of provisions of Title 18, U.S. Code, 18 U.S.C. §1961(1)(B).

333    66.    Defendants have either engaged in and/or aided and abetted predicate

334 acts of racketeering activity in violation of state and federal law.

335    **67.    TD Bank agreed to pay a $37.5 million civil money penalty to**

336 **the Financial Crimes Enforcement Network (FinCEN) and an additional**

337 **$15 million penalty to the Securities and Exchange Commission in**

338 **September, 2013 for violations of the Bank Secrecy Act, often called the**

339 **"anti-money laundering (AML) law."**

340    68.    In addition to the defendants' acts as alleged herein, it also committed

341 the following predicate acts:

342        i.  Theft, ("A person commits the offense of theft if he or she

343            unlawfully takes, uses or consumes the property or services of

344            another with intent to permanently deprive the owner of his or

345            her rights to the property or services."). By either knowingly,

346     recklessly disregarding or reasonably being in a position to know

347     the underlying acts of racketeering activity as described above

348     committed by the defendants and/or its agents, but neither

349     preventing nor reporting said conduct and in fact profiting

350     thereby.

351         ii.   Fraud; Violations of the Securities and Exchange Act as

352             explained above.

353     69.    TD Bank and CG and its subsidiaries engaged in multiple acts of

354 racketeering activity committed and/or aided and abetted by defendants, as

355 described above, were related to each other and amounted to or posed a threat of

356 continued racketeering activity, and, therefore, constitute a "pattern of racketeering

357 activity," as defined in 18 U.S.C. §1961(5).

358     70.    In violation of 18 U.S.C. §1962(c), the defendants conducted or

359 participated, either directly or indirectly, in the conduct of each of the above-

360 referenced enterprises' affairs through a pattern of racketeering activity, as

361 described above.

362     71.    Defendants, and its co-conspirators, agreed and conspired amongst

363 each other to conduct or participated, directly or indirectly, in the conduct of the

364 above-referenced enterprises' affairs through a pattern of racketeering activity, in

365 violation of 18 U.S.C. §1962(d).

366    72.    Defendants conspired to cancel plaintiff's contract with CG and to take

367    her home that served as security for the loan for construction.

368    73.    As a direct and proximate result of defendants' violations of 18 U.S.C.

369    §§1962(c) and (d), plaintiff has been injured in his business or property. Pursuant to

370    18 U.S.C. §1964(c), plaintiff is entitled to bring this action and to recover herein

371    actual and treble damages, the costs of bringing this suit and attorneys' fees.\

372    74.    As a direct and proximate result of defendants' violations of 18 U.S.C.

373    §§1962(c) and (d), plaintiff suffered a loss of $1.79 million, the value of her home

374    that was taken from her by defendants.

375                              **VI. Second Cause of Action:**

376                **Violations Of Sections 1962(a) And (d) Of RICO**

377    75.    Plaintiff incorporates by reference paragraphs one through 74,

378    inclusive.

379    76.    This claim for relief arises under §1964(c) of RICO and seeks to recover

380    actual and treble damages based on defendant's violations of §1962(a) and (d) of

381    RICO.

382    77.    In violation of §1962(a) and (d) of RICO, defendants conspired to

383    derive, and did derive, substantial proceeds through the above-described pattern of

384    racketeering activity and conspired to use or invest, and used or invested, such

385    proceeds in the operation of the association-in-fact enterprises detailed in above.

386     78.     As a direct and proximate result of defendants' violations of §1962(a)

387   and (d) of RICO, plaintiffs have been injured in their business or property. Pursuant

388   to §1964(c) of RICO, plaintiff is entitled to bring this action and to recover herein

389   actual and treble damages, the costs of bringing this suit and attorneys' fees.

390     79.     Defendants committed the acts alleged herein maliciously,

391   fraudulently and oppressively with the wrongful intention of injuring plaintiff, in an

392   improper motive amounting to malice, in conscious disregard of plaintiff's rights.

393   Plaintiff is thus also entitled to recover exemplary damages from defendant in an

394   amount to be established at trial but relating to the total monies obtained by

395   defendants as a result of their participation in this illegal and oppressive scheme.

396                                **VII.**

397           **Third Cause of Action:  Breach of Contract**

398     80.     Plaintiff incorporates by reference paragraphs one through 79,

399   inclusive.

400     81.     Plaintiff and Defendant CG entered into a contract concerning

401   operation of a Golden Corral franchise.

402     82.     Plaintiff substantially complied with all terms and conditions of the

403   contract.

404     83.     Defendant CG breached the contract by terminating it with due

405   process.

406  84.   Defendant CG failed to give plaintiff the opportunity to make changes

407  and improvements.

408  85.   As a direct and proximate result of defendant's breach of contract,

409  plaintiff suffered a loss of her investment of $3.7 million.

410  **VIII.**

411  **Fourth Cause of Action:  Violations of 42 U.S.C. §1981 and §1985**

412  86.   Plaintiff incorporates by reference paragraphs one through 85,

413  inclusive.

414  87.   42 U.S.C. § 1981(a) provides: "All persons within the jurisdiction of

415  the United States shall have the same right in every State and Territory to make

416  and enforce contracts . . . as is enjoyed by white citizens. . . . [T]he term 'make and

417  enforce contracts' includes the making, performance, modification, and termination

418  of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of

419  the contractual relationship."

420  88.   42 U.S.C § 1981 (b) provides, "For purposes of this section, the term

421  "make and enforce contracts" includes the making, performance, modification, and

422  termination of contracts, and the enjoyment of all benefits, privileges, terms, and

423  conditions of the contractual relationship."

424  89.   42 U.S.C. § 1981 (c) provides "The rights protected by this section are

425  protected against impairment by nongovernmental discrimination and impairment

426  under color of State law.

427    90.    42 U.S.C. Sections 1981 and 1985 apply to franchisors.  See *Selective*

428  *Enforcement of Franchise System Terms and Standards*, 23 Franchise L.J. 110 (Fall

429  2003).

430    91.    GC and TD Bank committed nongovernmental discrimination in

431  violation of 42 U.S.C. § 1981(c) by discriminating against plaintiff on account of her

432  race and gender and by disparately treating her compared to white and male

433  franchisees.

434    92.    42 U.S.C. § 1985 outlaws conspiracies to deprive individuals of their

435  civil rights.

436    93.    The defendants, and their employees, conspired to deprive plaintiff of

437  her civil rights by forcing her out of her Golden Corral franchise on account of her

438  race and gender.

439                                            **IX.**
440
441  **Fifth Cause of Action: Intentional Infliction of Emotional Distress**
442
443    94.    Plaintiff incorporates by reference paragraphs one through 93,

444  inclusive.

445    95.    Defendants, knowing that Plaintiff was psychologically and financially

446  vulnerable, and solely for their own personal gratification, intentionally inflicted

447  egregious emotional trauma upon Plaintiff.

448    96.    Under *D'Arcy v. Union Oil Co.*, 1991 U.S. App. LEXIS 15779 (9th Cir

449  July 11, 1991), the Ninth Circuit Court of Appeals found Union Oil Company guilty

450  of infliction of emotional distress in its termination of the franchisee's lease as "from

451  the beginning of the franchise relationship, Union Oil expressed an intent to

452  terminate D'Arcy's lease by any means possible." D'Arcy was also told by the Union

453  Oil retail representative "that one of his responsibilities was to eliminate D'Arcy as

454  a Union dealer...and that] he was going to make D'Arcy's life miserable." *Id.* at *9.

455      97.    Like in the *D'Arcy* case, Golden Corral and TD Bank and its

456  representatives have intentionally harassed, humiliated and undermined Plaintiff

457  at every opportunity so as to ensure her franchise failed.

458      98.    As a direct and proximate result of Defendants' actions, Plaintiff

459  sustained a serious psychological injury. Defendants' actions caused extreme

460  emotional trauma.

461

462

463

464

465

466

467

468

469

470

FIRST AMENDED COMPLAINT

23

## VIII.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

(a)    Award plaintiff actual damages of $100 million for breach of contract;

(b)    Award plaintiff actual damages of $6.99 mil under RICO;

(c)    Award plaintiff treble RICO damages or additional $100 million;

(d)    Award plaintiff damages under the Civil Rights laws of $100 million;

(e)    Award plaintiff actual damages for intentional infliction of emotional distress of $100 million;

(f)    Award plaintiff punitive damages for intentional infliction of emotional distress and civil rights violations of nine-time actual damages or $62.91 million;

(g)    Award total damages listed above for $369.9 million;

(h)    Award plaintiff costs and attorneys' fees;

(i)    Order defendant to end discrimination against African-Americans females, by ordered defendant Golden Corral to create a proportionate number of franchises of Golden Corral for women/females African Americans;

(j)    For all causes of action interest from the date of judgment and the costs and disbursements of this action.

491      (k)     For such other and further relief as may be just and proper with pre

492 and post court interest imposed if judgement is not paid in full at time of judgment

493 or when appalled is requested by defendants in cash bond at South District Federal

494     Dated: ___8/22/2019___

499     Sherrance Henderson, Plaintiff

500     *Pro Se*

FIRST AMENDED COMPLAINT

25

507                                    JURY DEMAND

508       Plaintiff demands a trial by jury.

509
510                                               Sherrance Henderson, Plaintiff
511                                               *Pro Se*
512

513

514

FIRST AMENDED COMPLAINT

Sherrance Henderson
6600 Sugarloaf PKY, 400-343
Duluth, GA 30097
Email Address:SherranceHenderson@gmail.com

# Exhibit H

**usa0287@fedex.com**

| | |
|---|---|
| **From:** | sheronceh@aol.com |
| **Sent:** | Thursday, March 21, 2019 4:04 PM |
| **To:** | usa0287@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Fwd: Yesterday mins |

-----Original Message-----
From: sheronceh <sheronceh@aol.com>
To: npatel <npatel@northeastdl.com>
Sent: Thu, Dec 14, 2017 11:00 AM
Subject: Fwd: Yesterday mins

Patel this is for your information only. I will get this and of course we both can listen to it. I'm trying to find out how I can get it transcribed so I can submit it to the board in Georgia.

Sent from AOL Mobile Mail

-----Original Message-----
From: Amanda Hirsch <ahirsch@joneswalden.com>
To: Leslie Pineyro <lpineyro@joneswalden.com>
CC: sheronceh <sheronceh@aol.com>
Sent: Thu, Dec 14, 2017 09:22 AM
Subject: RE: Yesterday mins

Ms. Henderson,

A CD transcript of the hearing can be requested. It costs $31 dollars. You will need a computer to listen to the transcript. There is a specific software program required to listen to the transcript. It can be downloaded at www.fortherecord.com and its free. Would you like to proceed with the request? Let us know.

Thanks,

Amanda R. Hirsch

*Paralegal*

**Jones & Walden, LLC**

21 Eighth Street, NE

1

Atlanta, GA 30309

P: 404-564-9300

F: 404-564-9301

www.joneswalden.com

NOTICE: THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION AND ANY DOCUMENTS ATTACHED HERETO MAY CONTAIN CONFIDENTIAL INFORMATION WHICH IS LEGALLY PRIVILEGED AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM THE TRANSMISSION IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE PERSON RESPONSIBLE FOR CONVEYING THE INFORMATION TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF ANY INFORMATION CONTAINED IN THIS TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR REPLY BY E-MAIL AND DESTROY THIS TRANSMISSION. THANK YOU.

From: Leslie Pineyro
Sent: Thursday, December 14, 2017 8:40 AM
To: Amanda Hirsch
Cc: sheroncch@aol.com
Subject: Fwd: Yesterday mins

Amanda can help you. A c.d. Is the least expensive way to go!

Sent from my iPhone

Leslie Pineyro, Esq.

Jones & Walden, LLC

21 Eighth Street NE

Atlanta, GA 30309

404-564-9300

lpineyro@joneswalden.com

NOTICE: THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION AND ANY DOCUMENTS ATTACHED HERETO MAY CONTAIN CONFIDENTIAL INFORMATION WHICH IS LEGALLY PRIVILEGED AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM THE TRANSMISSION IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE

PERSON RESPONSIBLE FOR CONVEYING THE INFORMATION TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF ANY INFORMATION CONTAINED IN THIS TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR REPLY BY E-MAIL AND DESTROY THIS TRANSMISSION. THANK YOU.

Begin forwarded message:

> **From:** <sheronceh@aol.com>
> **Date:** December 14, 2017 at 8:28:11 AM EST
> **To:** <lpineyro@joneswalden.com>, <Mtokajer@joneswalden.com>
> **Subject: Yesterday mins**
>
> How can I order the mins from yesterday trial? Thanks
> Sent from AOL Mobile Mail