UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/21/2023
```

SHERRANCE HENDERSON and CORNUCOPIA
QUEEN, INC.,

                           Plaintiffs,

                 v.

GOLDEN CORRAL FRANCHISING SYSTEMS,
INC.,

                           Defendant.

19 CV 2878 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

 Plaintiffs Sherrance Henderson ("Plaintiff Henderson") and Cornucopia Queen, Inc.

("Plaintiff Cornucopia") (collectively, "Plaintiffs"), bring this action against Defendant Golden

Corral Franchising Systems, Inc. ("Golden Corral," or "Defendant"), alleging violation of 42

U.S.C. § 1981, breach of contract, breach of the implied covenant of good faith and fair dealing,

fraudulent inducement and fraudulent omission, and punitive damages, stemming from

Plaintiffs' endeavors to open and operate a Golden Corral restaurant franchise in Poughkeepsie,

New York. Before the Court is Golden Corral's motion to dismiss Plaintiffs' Second Amended

Complaint (ECF No. 69), which Plaintiffs opposed (ECF No. 75).

 For the following reasons, the Court GRANTS in PART and DENIES in PART Golden

Corral's motion to dismiss. Specifically, Defendant's motion to dismiss is GRANTED with

respect to Plaintiff Henderson's claims for violation of 42 U.S.C. § 1981, breach of contract,

breach of the implied covenant of good faith and fair dealing, fraudulent inducement and

fraudulent omission, and punitive damages, which are dismissed for lack of standing.

Defendant's motion to dismiss is also GRANTED with respect to Plaintiff Cornucopia's claims

for breach of contract, breach of the implied covenant of good faith and fair dealing, and

fraudulent inducement and fraudulent omission, which are dismissed for failure to state

plausible claims upon which relief could be granted. However, Defendant's motion to dismiss

is DENIED with respect to Plaintiff Cornucopia's claims for violation of 42 U.S.C. § 1981 and punitive damages.

## BACKGROUND

The facts herein are mainly drawn from Plaintiffs' Second Amended Complaint ("SAC") (ECF No. 64). The Court "accepts all well-pleaded facts in the Complaint and Supplemental Pleading as true for the purpose of ruling on a motion to dismiss." *Jackson v. NYS Dep't of Labor,* 709 F.Supp.2d 218, 222 (S.D.N.Y. 2010).

### I.    Factual Allegations

Plaintiff Cornucopia is an African American, woman, and disabled-owned corporation, incorporated in New York and with its principal place of business in New York, New York. (SAC ¶ 3.) Plaintiff Henderson is a disabled African American woman. (*Id.* ¶ 4.)

#### A.    Franchise Agreement

On or about March of 2013, Golden Corral presented Plaintiff Henderson with a written Franchise Disclosure Document ("FDD" or "Franchise Agreement"). (SAC ¶ 18.) Plaintiff alleges that at this time, the Vice President of Franchise Sales (who is never named in the SAC) asked Plaintiff Henderson whether she was married and/or had children. (*Id.* ¶ 20.) He also instructed her to find two other people, preferably men with restaurant experience, to share her franchise license on the basis that Plaintiff Henderson could not help to manage the business because of her disability and her background as "a woman who [ ] never operated a business of this type." (*Id.* ¶¶ 20, 22.) Plaintiff Henderson further claims that, because of the Vice President of Franchise Sale's instruction, she issued Darren "Chip" Joyner ("Joyner") and Milton A. Dewar ("Dewar") five percent (5%) each of her Golden Corral franchise license, retaining ninety percent (90%) ownership. (*Id.* ¶ 21.)

B.       *Allegations of Discrimination Prior to Cornucopia Queen Assignment*

After Golden Corral's sales pitch,[1] Plaintiff Henderson alleges that she acquired a Golden Corral franchise license in reliance on Golden Corral's conduct and statements pertaining to the opening of a Golden Corral franchise in Newark, New Jersey that would serve a predominantly African American community.[2] (*Id.* ¶ 23.) However, Plaintiff was subsequently told that the Newark location was being removed from the "approved area list." (*Id.* ¶ 31.)

When Plaintiff Henderson found a comparable in-line location on Golden Corral's approved area list, as Golden Corral purportedly directed, Senior Vice President of Franchising Irwin Roberts ("Roberts") told Plaintiff Henderson that she did not have the ability to manage an in-line store in a strip mall because she was a new franchisee. (*Id.* ¶¶ 32-34.) Plaintiffs allege that other "new" male franchisees were allowed to own in-line Golden Corral franchises.  (*Id.* ¶ 35.) Subsequently, Plaintiff Henderson chose South Orange, New Jersey from the authorized list because the location was similar to the original Newark location: both locations allegedly afforded her new franchise tax abatements, a community where 90% of the population belonged to a minority group, and professional relationships with local elected officials. (*Id.* ¶¶ 35-37).

Plaintiff Henderson was purportedly initially approved for the South Orange location; however, Golden Corral ultimately removed this location from its approved list, citing the insufficient size of the area, and informed Plaintiff Henderson that she was required to again choose a new location. (*Id.* ¶ 38.) Golden Corral then directed Plaintiff Henderson to choose a franchise location on Long Island. (*Id.* ¶ 39.) However, Plaintiff Henderson claims that the

---

[1] The SAC does not specify when this sales pitch occurred, but it seems likely that it occurred around March of 2013 when plaintiff was presented with the Franchise Agreement.
[2] Plaintiffs do not specify when Plaintiff Henderson initially acquired the Golden Corral Franchise; however, the Franchise Agreement is dated November 24, 2014. (ECF No. 71-5, at 8.)

costs associated with Long Island locations, such as prospective lease prices, "far exceeded" her financial ability. (*Id.* ¶ 40.)

Following these unsuccessful attempts to find a suitable location, Plaintiff Henderson met with Franchise Area Development Vice President Richard Chase ("Chase") for approximately twelve consecutive hours. (*Id.* ¶ 41.) Chase initially requested that Plaintiff Henderson call him "Dick," but then demanded that she call him "Big Dick" with her "sexy radio voice" in order to receive his assistance. (*Id.* ¶¶ 42-43.)

C.     *Assignment to Cornucopia Queen*

On or about July 31, 2015, Plaintiff Henderson assigned her rights in her Golden Corral franchise to her "holding company," Plaintiff Cornucopia, via an assignment agreement (the "Assignment Agreement"). (ECF No. 76, at 4.) Nevertheless, Plaintiff avers that, due to the costs associated with her purchase, physical construction, and operation of the Golden Corral franchise, she is now personally destitute. (SAC ¶ 61.).

D.     *Construction of Poughkeepsie, New York Golden Corral Restaurant*

Golden Corral purportedly required Plaintiffs to build their franchise's restaurant from the ground up at their sole expense. (SAC ¶ 53.) Indeed, Plaintiffs were allegedly solely responsible for the construction of the franchise's restaurant and all operational costs, including the employment of a licensed architect and qualified general contractor. (*Id.* ¶¶ 54-58.) Plaintiffs also claim Golden Corral directed them to offer Plaintiff Henderson's primary residence as collateral to finance the franchise, and that Golden Corral knew or should have known that doing so would cause Plaintiffs' financial hardship given Golden Corral's knowledge of Plaintiffs' financial situations. (*Id.* ¶ 59.). Further, Plaintiffs allege that similarly situated new non-minority owners/operators were granted licenses for in-line strip mall locations, and thus were not immediately required to build a new restaurant or remodel an

existing one to operate their franchises; Plaintiffs, however, do not identify any specific franchisees who were treated more favorably in this manner. (*Id.* ¶ 57.)

Prior to the opening of Plaintiffs' restaurant in January of 2017 at 2345 South Road, Poughkeepsie, New York, Plaintiff Henderson requested that she receive the managerial training referenced in the Franchise Agreement.[3] (*Id.* ¶ 65.) However, when Plaintiff Henderson requested to participate in Golden Corral's training to become a Golden Corral Certified Manager, Golden Corral executive Toney Sewell ("Sewell") informed her that Golden Corral was not training owners and that, in any case, Plaintiff Henderson could not participate in any training due to her disability. (*Id.* ¶ 64.)

E.      *Poughkeepsie, New York Golden Corral Restaurant Opening Through Closure*

As discussed below, Plaintiffs allege that Golden Corral engaged in a variety of discriminatory practices against them in order to "churn" their franchise. Churning refers to the creation of a franchise that is intended to fail for the franchisor to reclaim and resell the business to obtain greater profits. (*Id.* ¶ 29.)

Within one month of opening the franchise location in January of 2017, Plaintiffs requested corporate assistance for operational concerns that were expressed to Golden Corral's Northeast Franchise Field Specialist John Craig ("Craig"). (*Id.* ¶ 69.) Craig was subsequently assigned to assist Plaintiffs at their franchise location. (*Id.*) However, Plaintiffs allege that instead of helping to remedy the operational concerns, Craig instructed Plaintiffs' Kitchen manager Adam Toliver ("Toliver") to order and overpay for unnecessary items in lieu of items that were required for the grand opening of the franchise location. (*Id.* ¶¶ 70-74.) Plaintiffs allege that these instructions, coupled with Craig's instructions to Plaintiffs' store managers to

---

[3] Section 15 of the Franchise Agreement provides, "You (Franchisee) must devote full time, energy and best efforts to the management and operation of the restaurant, or in the case of a developer, to the management of the business… and must attend and satisfactorily complete Golden Corral's training program for certified managers." (*Id.* ¶ 63.)

5

schedule all 144 employees for full-time work regardless of demand, caused Plaintiffs financial hardship. (*Id.* ¶¶ 76-78.)

Additionally, Plaintiffs claim that Craig undermined their authority when he gave his cellphone number to Plaintiffs' employees and encouraged them to call him for instructions or inform him of any concerns about the franchise, as well as required Plaintiffs' Lead Kitchen Manager Anthony Crocc ("Crocc") to communicate with Craig daily about the kitchen. (*Id.* ¶¶ 78-79.) And, finally, Plaintiffs allege that Craig encouraged team leaders to obtain their weekly pay directly from the cash register rather than through the established payroll system, which resulted in theft and accounting issues. (*Id.* ¶ 81.)

On or about February 1, 2017, Plaintiff Henderson contacted Golden Corral Vice President of Franchise Development Darryl Webb ("Darryl Webb") to request a temporary allocation of "A-Team" personnel to support the franchise for a few weeks. (*Id.* ¶ 82.) That same day, Golden Corral Vice President of the Northeast Franchise Development Dave Webb ("Dave Webb") instructed Plaintiffs to accept 20-year Golden Coral veteran Jayme Aimalefoa ("Aimalefoa") to work with Plaintiffs' franchise. (*Id.* ¶ 83.) Plaintiffs allege that, instead of supporting their franchise, Aimalefoa gave her telephone number to Plaintiffs' staff with the intention of undermining Plaintiffs as well as engaged in an on-site extramarital, romantic relationship with a visiting manager. (*See id.* ¶¶ 84-90.)

Plaintiffs allege that another Golden Corral corporate employee, Jamie Apgar ("Apgar") (who was Division Administrator for Golden Corral's CEO Lance Trenary), engaged in daily, electronic harassment of Plaintiff Henderson via insulting and threatening daily reports that were forwarded to Dave and Darryl Webb, Craig, Joyner, and Plaintiff Henderson. (*Id.* ¶¶ 91-95.) From January through March of 2017, Apgar also instructed Plaintiffs to provide refunds to dissatisfied customers regardless of whether these customers had a receipt, which produced an increase in the number of complaints for free food. (*Id.* ¶¶

96-97.) Moreover, Plaintiffs allege that Golden Corral further attempted to damage their franchise by implanting biased secret shoppers, who filed frivolous complaints for which Plaintiffs needed to issue additional refunds. (See *id.* ¶¶ 107-110.)

Finally, Plaintiffs allege that they attempted to contact Golden Corral's CEO Lance Trenary (Trenary) to help remedy the myriad issues with their franchise, but never received a response. (*Id.* ¶¶ 98-106.) Plaintiffs were only permitted to speak with Apgar, who informed them that they already had received sufficient assistance from Aimelefoa, Craig, and Dave and Darryl Webb. (*Id.*)

F.      *Termination of Plaintiffs' Franchise License*

On or about February 16, 2017, Darryl and Dave Webb issued Plaintiff a "Notice of Default and Termination" ("Notice of Default"). (*Id.* ¶ 11.) The Notice of Default cited multiple violations pertaining to outstanding fees and provided Plaintiffs an opportunity to cure within 30 days. (*See id.* ¶ 112.)  Plaintiffs allege they discovered that the cited violations stemmed from a TD Bank scrivener error. (*See id.* ¶¶ 112-115.)

However, on or about March 21, 2017, Plaintiffs were notified via telephone that their franchise license was terminated and received Golden Corral's "Notice of Default and Termination Without Opportunity to Cure" ("Notice of Termination") a few days later. (*Id.* ¶¶ 116-117.) Plaintiffs allege that the Notice of Termination included: (1) multiple first-time violations that mostly arose from an internal inspection Golden Corral conducted on or about March 8, 2017; (2) a misstated violation resulting from Plaintiffs' Associate Manager Adam Tolliver's alleged assault of Plaintiff Henderson with a deadly weapon; (3) failure to timely pay A-Team members; (4) failure to have enough managers on staff; and (4) a spurious claim that the amount of customer complaints posed an imminent danger to the public (*Id.* ¶¶ 118-123.)

Plaintiffs assert that the alleged defaults were largely inaccurate, first-time violations that they had no meaningful opportunity to cure, and which enabled Golden Corral to terminate Plaintiffs' franchise license after only fifty-one (51) days of their restaurant's operation, despite Plaintiffs' investment of over seven million ($7,000,000.00) dollars in their franchise. (*Id.* ¶¶ 124-128.) Further, Plaintiffs allege that similarly situated non-minority owners were given actual notice of defaults with meaningful opportunities to cure them; Plaintiffs cite to Golden Corral's more lenient approach to Golden Corral franchises in New York, Michigan, and Florida that had issues comparable to those that Plaintiffs' franchise experienced. (*See id.* ¶¶ 128-143.)

G.    *Patel's Failed Purchase of Plaintiffs' Franchise*

Plaintiffs allege that they were forced to accept the Notice of Termination and attempt to sell their franchise because they had no opportunity to cure the alleged defaults and there was no process in place for them to dispute the allegations in the Notice of Termination. (*Id.* ¶ 153.)

Subsequently, on or about April 2, 2017, Golden Corral purportedly approved Niral Patel ("Patel") as the buyer of Plaintiffs' store in Poughkeepsie. (*Id.* ¶ 154.) Plaintiffs were instructed to work with Patel and share business plans and financial documents with him, and Chase provided Patel with various sales and operational studies undertaken at Plaintiffs' expense. (*Id.* ¶¶ 153-160.) Additionally, numerous meetings between Patel, Plaintiffs, Golden Corral, Plaintiffs' bankruptcy lawyers, and Plaintiffs' bank were held, which Plaintiffs believed indicated that Patel would purchase their store. (*See id.* ¶¶ 160-165.)

However, on or about December 6, 2017, TD Bank's attorney Kenneth B. Franklin ("Franklin") stated in Atlanta, Georgia's federal court that Golden Corral never authorized Patel to purchase Plaintiffs' store and that he was "only a manager" who never owned a Golden Corral franchise (*Id.* ¶ 166.) Although the Complaint does not expressly state that Patel never

purchased Plaintiffs' store, based on Franklin's statements the Court presumes that Patel never did so.

Due to the foregoing circumstances, Plaintiff filed for bankruptcy on or about July 31st, 2017. (*Id.* ¶ 165.)

## II.    Procedural History

Plaintiff Henderson filed this action on March 28, 2019. (ECF No. 2.) Her request to proceed i*n forma pauperis* (ECF No. 1) was granted. (ECF No. 4). The Court issued an order directing Plaintiff Henderson to file an amended complaint. (ECF No. 5.) Plaintiff Henderson filed her Amended Complaint on August 23, 2019. (ECF No. 8.) The Court issued an order of service, directing the U.S. Marshals Service and the Clerk of Court to effect service on Plaintiff's behalf. (ECF No. 13.) Golden Corral moved for leave to file its motion to dismiss (ECF No. 41), which the Court granted. (ECF No. 44.) Golden Corral filed this motion (ECF No. 53), which Plaintiff Henderson opposed (ECF No. 53-5); Plaintiff Henderson withdrew her claims against Defendants Lance Trenary, Anthony Segreti, Niral Patel, TD Bank, and John Craig in her opposition. (*Id.*)

The Court granted Golden Corral's motion to dismiss, dismissing Plaintiff's claims without prejudice for lack of standing. (ECF No. 59.) Specifically, the Court held that Plaintiff Henderson's claims for: (1) breach of contract stemming from Golden Corral's alleged breach of the franchise agreement; and (2) discrimination pursuant to 42 U.S.C. §1981 largely resulting from Golden Corral's alleged mistreatment of Plaintiffs' store were dismissed without prejudice for lack of standing because the alleged injuries were to the franchisee, Cornucopia, and not Plaintiff Henderson, given Plaintiff Henderson's assignment of her franchise rights to Plaintiff Cornucopia in 2015. (*Id.*) Thus, the Court granted Plaintiff leave to retain counsel and file a second amended complaint, naming Cornucopia as the plaintiff, if she wished to pursue

claims against Golden Corral on behalf of Plaintiff Cornucopia consistent with the Court's Opinion. (*Id.*)

Subsequently, Plaintiff Henderson filed the Second Amended Complaint on January 18, 2022, naming herself and Cornucopia as plaintiffs. (ECF No. 64.) On February 24, 2022, the Court granted leave for Golden Corral to file a motion to dismiss and supporting papers, and Golden Corral moved to dismiss Plaintiffs' SAC on March 12, 2022. (*See* ECF Nos 69-73.) Plaintiffs opposed Golden Corral's motion. (*See* ECF Nos. 74-77.) Before the Court is Golden Corral's motion to dismiss Plaintiffs' SAC.

## LEGAL STANDARD

### I.   Dismissal Standard Under Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted).

II.     **Dismissal Standard Under Federal Rule of Civil Procedure 9(b)**

Although the rules of federal pleading typically require "a short and plain statement," *see* Fed. R. Civ. P.  8, fraud claims have heightened pleading requirements under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). To satisfy Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker, (3) state where and when the statements were, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

## DISCUSSION

I.     **Standing of Plaintiff Henderson**

As noted above, Plaintiff Henderson's claims for: (1) breach of contract stemming from Golden Corral's alleged breach of the franchise agreement; and (2) discrimination pursuant to 42 U.S.C. §1981 resulting from Golden Corral's alleged mistreatment of Plaintiffs' store were dismissed without prejudice for lack of standing because the alleged injuries were to the franchisee, Plaintiff Cornucopia, and not Plaintiff Henderson, given Plaintiff Henderson's assignment of her franchise rights to Plaintiff Cornucopia in 2015. (ECF No. 59.) Plaintiff, however, attempts to use the SAC to bring substantially similar claims against Golden Corral to those the Court dismissed for lack of standing in its prior opinion on behalf of both her and Cornucopia as Plaintiffs. For the following reasons, Plaintiff Henderson's claims against Golden Corral, in so far as they are brought on behalf of her and not Cornucopia, are again dismissed for lack of standing.

A.     *Discrimination Pursuant to 42 U.S.C. §1981*

Plaintiffs' first cause of action is a claim for discrimination pursuant to 42 U.S.C. § 1981 ("Section 1981") alleging that Golden Corral violated Section 1981 "by denying Plaintiffs

the same opportunities made available to non-minority franchisees." (SAC ¶ 175.) Yet, as the Court articulated in its prior opinion (and as is unchanged in Plaintiffs' SAC), Plaintiffs' allegations of discrimination mainly relate to alleged mistreatment by Golden Corral of Plaintiffs' franchise after Plaintiff Henderson's franchise rights were assigned to Plaintiff Cornucopia in 2017. These allegations include, *inter alia*, Golden Corral's failure to provide training to Plaintiff Henderson or an opportunity to cure defects before closing the store, and threatening email correspondence from Apgar directed at Plaintiff Henderson, which constitutes mistreatment that Plaintiffs allege they suffered because their franchise was owned by a disabled African American woman. (*See* SAC ¶¶ 108-123). However, "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not someone else's." *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 473 n. 1 (2006). The Court must, therefore, again dismiss Plaintiff Henderson's claim for discrimination pursuant to Section 1981 for lack of standing.

### B.    *Bad Faith Breach of Contract*

Plaintiffs' second cause of action is a claim for "bad faith breach of contract,"[4] alleging that Golden Corral breached Sections 6.12 and 6.13 of the Franchise Agreement and breached the implied covenant of good faith and fair dealing. (SAC ¶¶ 181-184.) Plaintiff Henderson, however, no longer had rights in the Franchise Agreement following her assignment of these rights to Plaintiff Cornucopia. (ECF No. 76, at 4.) And as the Court recognized in its prior opinion, "an unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." *Aaron Feder & Sons*

---

[4] Although Plaintiff Henderson describes this claim as a "bad faith breach of contract" claim, the Court discusses below how such a claim does not exist under New York law and recognizes that Plaintiffs in fact advance claims for breach of contract and breach of the implied covenant of good faith and fair dealing under the "bad faith breach of contract" label. Regardless, and as noted in this Section, Plaintiff Henderson does not have standing to bring either a claim for breach contract or a claim for the implied covenant of good faith and fair dealing.

*Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984). Thus, the Court must dismiss Plaintiff Henderson's bad faith breach of contract claim for lack of standing.

        *C.*       *Fraudulent Inducement and Fraudulent Omission*

Plaintiffs' third cause of action is for fraudulent inducement and fraudulent omission in connection with Golden Corral's alleged misrepresentations to Plaintiffs regarding the Franchise Agreement and general franchise arrangement. (*See* SAC ¶¶ 189-196.)

As the Court recognized above, Plaintiff Henderson cannot advance any claim in connection with an alleged violation of, or interference with, her rights in the Franchise Agreement, given that she extinguished these rights when she assigned them to Plaintiff Cornucopia in July of 2015. *See Aaron Feder*, 731 F.2d, at 125. Therefore, to the extent Plaintiff Henderson's fraud claims concern fraudulent misrepresentations or omissions pertaining to rights granted to her via the Franchise Agreement, the Court must dismiss them for lack of standing.

Additionally, even if Plaintiff Henderson has standing to advance fraud claims against Golden Corral that arose prior to her assignment of her rights in the Franchise Agreement to Plaintiff Cornucopia, and which do not relate directly to rights established in the Franchise Agreement (such as Plaintiffs' claim that Plaintiff Henderson was baited into Golden Corral's franchising scheme with the promise of a prime location), Golden Corral was released from such claims under the Assignment Agreement.

Pursuant to Section 9 of the Assignment Agreement, Plaintiff Henderson released any legal claims she held against Golden Corral prior to and including the date of assignment (i.e., July 31, 2015). Section 9 of the Assignment Agreement establishes, in relevant part, that Plaintiff Henderson releases, "any and all claims… known and unknown, vested or contingent, which [she] now own(s) or hold(s), or has at any time heretofore owned or held, or may at any time own or hold… prior to and including [July 31, 2015]." (ECF No. 71-2, at 3-4.) Release

13

clauses of this type are generally enforced under New York law against fraud claims that are later brought on behalf of the assignor, and which were unknown at the time of assignment. *See, e.g.*, *Est. of Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, No. 19 CIV. 2742 (NRB), 2019 WL 6311520, at *4 (S.D.N.Y. Nov. 25, 2019) (recognizing, "generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release [and] a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made") (internal citations omitted). Additionally, the release does not need to specifically refer to fraud claims to encompass such claims. *See Centro Empresarial Cempresa S.A. v. American Movil, S.A.B. de CV*, 901 N.Y.S.2d 618, 625 (N.Y. App. Div., 1st Dep't 2010) ("Centro I"), *aff'd*, 952 N.E.2d 995 (N.Y. 2011) (noting, "a release that, by its terms, extinguishes liability on any and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud and was not granted in settlement of an actually asserted fraud claim"). Thus, to the extent Plaintiff Henderson's fraud claims concern fraudulent misrepresentations or omissions that arose prior to her assignment of her rights in the Franchise Agreement to Plaintiff Cornucopia, the Court must dismiss them for failure to state a claim upon which relief could be granted, given that Plaintiff Henderson released Golden Corral from such claims under Section 9 of the Assignment Agreement. Overall, then, Plaintiff Henderson's claims for fraudulent inducement and fraudulent omission against Golden Corral are dismissed for lack of standing as well as for failure to state a claim upon which relief could be granted.

## II.     Claim for Discrimination Pursuant to 42 U.S.C. § 1981 on Behalf of Plaintiff Cornucopia

### A.  *Legal Standard for Section 1981 Discrimination Claims*

Section 1981 provides, in relevant part,

> "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

42 U.S.C. § 1981(a).  Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." The phrase "make and enforce contracts," as used in § 1981, encompasses "the making performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp.3d 396, 410 (S.D.N.Y. 2014) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004)). The purpose of 42 U.S.C. § 1981 is "to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination because of their ancestry or ethnic characteristics." *Reyes v. Erickson*, 238 F.Supp.2d 632, 638 (S.D.N.Y. 2003) (quoting *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)));  *see also Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir.1988) (*en banc*) ("essential to an action under Section 1981 are allegations that the defendant's acts were purposefully discriminatory and racially motivated") (citations omitted). Both natural persons and corporations may raise a race discrimination claim under Section 1981. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 473 n. 1 (2006) (recognizing that "the Courts of Appeals to have considered the issue have concluded that corporations may raise [42 U.S.C.] § 1981 claims" for injuries due to race discrimination).

To establish a claim for racial discrimination pursuant to Section 1981, a plaintiff must allege: (1) that he or she is a member of a protected class; (2) the defendant's intent to

discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999). Additionally, "a plaintiff must ... prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.Ct. 1009, 1019 (2020). A claim of discrimination pursuant to Section 1981 requires a showing of intentional discrimination. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). Therefore, at the pleading stage, a plaintiff must "specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent.'" *Wade v. Kay Jewelers, Inc.*, No. 3:17-cv-990 (MPS), 2018 WL 4440532, at *7 (D. Conn. Sept. 17, 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994)). The Second Circuit has also recognized that, to prevail on a claim for discrimination pursuant to Section 1981, a plaintiff must allege at least one instance in which she was treated differently from a similarly situated non-minority. *Hu v. City of New York*, 927 F.3d 81, 101 (2d Cir. 2019).

### B.  Application to Plaintiff Cornucopia's Discrimination Claim

Plaintiff Cornucopia alleges that Golden Corral intentionally discriminated against it by denying it the same opportunities given to non-minority owned franchisees, including the opportunity to remedy alleged operational, health, and safety inspection violations. (ECF No. 75, at 10.) Specifically, Plaintiff Cornucopia argues that whereas non-minority franchisees were permitted to operate for many months after alleged violations incurred during a first internal inspection on March 8, 2022, Plaintiff Cornucopia's restaurant was permanently shut down following Golden Corral's discovery of violations in its first internal inspection. (*Id.*, at 10.)

16

Here, the parties dispute only the second element of a Section 1981 claim– whether the alleged facts give rise to an inference of discrimination.[5] At the pleading stage, the plaintiff bears only a "minimal burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Courts frequently address this inference in the context of the employer-employee relationship, which bears similarities to the franchisor-franchisee relationship at issue here,  and "can arise from circumstances including ... the employer's criticism of the plaintiff's performance in ethically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.*, at 312.

Plaintiff Cornucopia does not allege that any representatives of Golden Corral made statements concerning the race of its owner, Plaintiff Henderson, and instead argues that the Court should infer discrimination because it was given less opportunities than similarly situated non-minority owned franchises. To establish an inference of discrimination on these grounds, a plaintiff must plausibly allege that the franchisor treated them less favorably than a similarly situated franchisee outside of their protected group (here, non-minority franchisees) and that they were similarly situated to the individuals with whom they seek to compare themselves. *See Littlejohn*, 795 F.3d at 312 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)); *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) ("An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." (internal quotation marks omitted) (citation omitted)).

---

[5] The parties do not dispute either that Plaintiff Cornucopia, as an African American-owned franchisee, is a member of a protected class under Section 1981, or that the alleged discrimination concerns one of Section 1981's enumerated activities (i.e., Plaintiff Cornucopia alleges racial discrimination with respect to the enjoyment of the benefits, privileges, terms, and conditions of the Franchise Agreement between it and Golden Corral) (*See e.g.*, SAC ¶¶ 172-200.)

Plaintiff Cornucopia provides sufficient allegations indicating that Golden Corral treated it less favorably than similarly situated non-minority franchisees to meet its "minimal burden" of showing facts that suggest an inference of discriminatory motivation. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). For instance, Plaintiff Cornucopia alleges that: (1) a white-owned Golden Corral franchise in Cape Coral, Florida, was granted "reopening" opportunities despite receiving at least five repeated health violations from Florida's department of health; (2) four non-minority, largely white male-owned franchises in Florida were closed only after there were repeated, sustained instances of customer complaints and health inspector reports regarding, *inter alia*, live and dead roaches, grease buildup, and sewage seeping into the dishwashing area; and (3) a non-minority owned franchise in Middleton, New York received over three hundred (300) days to cure defaults similar to Plaintiff Cornucopia's alleged defaults. (*See* SAC ¶¶ 129-143.) Conversely, Plaintiff Cornucopia alleges that Golden Corral closed its restaurant and terminated its franchise less than two weeks after the first and only internal Golden Corral inspection on March 8, 2022 found minor staffing and health-related violations (including, *inter alia*, having two managers instead of three), which prevented Plaintiff Cornucopia from having any real opportunity to cure these deficiencies. (*See* SAC ¶¶ 114-116.)

By alleging multiple instances of Golden Corral's more favorable treatment of similarly situated, non-minority franchisees, where such franchisees were purportedly given opportunities to cure comparable operational and health defaults that were not afforded to Plaintiff Cornucopia, Plaintiff Cornucopia has met its minimal burden to demonstrate facts suggesting an inference of discriminatory motivation. *See Kwan v. Schlein*, 441 F.Supp.2d 491, 500 (S.D.N.Y. 2006) (denying the defendant's motion to dismiss the plaintiff's claim for discrimination pursuant to Section 1981 where an Asian plaintiff, who was a co-author of a published non-fiction book, pled that her co-author and publishing executives denied her

ongoing participation in later editions of the book because she was Asian, "while treating all other similarly situated non-minority participants differently"); *see also Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (setting the pleading standard for a Section 1983 action). Thus, Golden Corral's motion to dismiss is denied with respect to Plaintiff Cornucopia's claim for racial discrimination pursuant to Section 1981.

### III.   Bad Faith Breach of Contract on Behalf of Plaintiff Cornucopia

Plaintiff Cornucopia's second cause of action is ostensibly for "bad faith breach of contract." However, such a claim does not exist under New York law, and Plaintiffs appear to assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing within their "bad faith breach of contract" claim. *See Sichel v. UNUM Provident Corp.*, 230 F.Supp.2d 325, 331 (S.D.N.Y. 2002) (noting that there is no independent cause of action for bad faith breach of contract under New York law); *see also Pittston Warehouse Corp. v. Am. Motorists Ins. Co.,* 715 F.Supp. 1221, 1227 (S.D.N.Y. 1989) (acknowledging, "New York does not recognize a 'tort of bad faith breach of contract' except in the insurance context."). Plaintiff Cornucopia, for instance, argues that Golden Corral breached Sections 6.12 and 6.13 of the Franchise Agreement, as well as the implied covenant of good faith and fair dealing, mainly by denying Plaintiff Cornucopia the opportunity to cure deficiencies detected during the first inspection of Plaintiff Cornucopia's premises on March 8, 2022. (*See* SAC ¶¶ 182-188.) Below, the Court addresses Plaintiff Cornucopia's separate claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

#### A.  Breach of Contract: Sections 6.12 and 6.13 of the Franchise Agreement

Plaintiff Cornucopia contends that Golden Corral breached Sections 6.12 and 6.13 of the Franchise Agreement by, *inter alia*, allegedly granting Plaintiff Cornucopia less opportunities than non-minority owned franchisees to cure purported defaults and excluding it from growth opportunities given to non-minority franchisees. (SAC ¶ 184.)

Under New York law, there are four elements to a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). To plead these elements "a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 171 F.Supp.2d 354, 358 (S.D.N.Y.2001) (dismissing the plaintiffs' breach of contract claim because the plaintiffs failed to identify the contractual provisions that the defendant breached). Moreover, "[s]tating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract." *Berman v. Sugo L.L.C.*, 580 F.Supp.2d 191, 202 (S.D.N.Y.2008) (citing *Posner v. Minn. Mining & Mfg. Co.*, 713 F.Supp. 562, 563–64 (E.D.N.Y.1989)). In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). "Courts should read an integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous." *Abakan, Inc. v. Uptick Cap.*, LLC, 943 F.Supp.2d 410 (S.D.N.Y. 2013).

Here, Plaintiff has failed to demonstrate that Golden Corral breached either Section 6.12 or Section 6.13 of the Franchise Agreement. Section 6.12 of the Franchise Agreement, for instance, reads as follows:

> "Franchisee shall grant Franchisor, its agents and its representatives, the right to enter upon the Restaurant premises at any reasonable time for the purpose of conducting inspections; cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, ***upon notice from Franchisor*** or its agents or representatives, and without limiting Franchisor's other rights under this Agreement, require such steps to be taken as may be necessary to ***correct immediately the deficiencies detected during such inspection***, including,

20

without limitation, immediately desisting from the further use of any equipment, advertising materials, products, ingredients, supplies, or other items that do not conform to Franchisor's then-current specifications, standards, or requirements."

(SAC ¶ 182) (emphasis in original). Section 6.12 thereby prescribes the obligations of the franchisee and the rights of the franchisor concerning inspections of the franchise's premises. Thus, and as Golden Corral rightly argues, only Plaintiff Cornucopia can breach Section 6.12 because this Section grants *rights* to Golden Corral as the franchisor and establishes the *duties* of Plaintiff Cornucopia as the franchisee with respect to inspections of Plaintiff Cornucopia's premises. (*See* ECF No. 70, at 17.)

Likewise, Section 6.13 of the Franchise Agreement reads:

"Franchisee shall implement Franchisor's approved customer feedback program as such program may exist from time to time, and obtain at Franchisee's expense, from a vendor approved by Franchisor, periodic "customer feedback" reports and supply Franchisor, at Franchisee's expense, with copies of such completed customer feedback reports, at the time, and in the form and manner as shall be prescribed by Franchisor in the Manuals or otherwise in writing. Franchisee shall respond to customer complaints in a prompt and reasonable manner designed to protect the goodwill of the System regardless of whether the complaint was received through the customer feedback program or otherwise."

(SAC ¶ 183). Again, Plaintiff Cornucopia incorrectly asserts that Golden Corral breached a provision that establishes the *rights* of Golden Corral as the franchisor and the *duties* of Plaintiff Cornucopia as the franchisee, here with respect to Plaintiff Cornucopia's obligations to provide Golden Corral with customer feedback reports and respond promptly to customer complaints.

Given Section 6.12 and 6.13's clear delegation of rights to Golden Corral and duties to Plaintiff Cornucopia, as outlined above, Golden Corral's motion to dismiss Plaintiff Cornucopia's breach of contract claims is granted.

### B. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Plaintiff Cornucopia further argues that Golden Corral violated the implied covenant of good faith and fair dealing that is implied in all contracts under New York law for much the same reasons it alleges that Golden Corral breached Sections 6.12 and 6.13 of the Franchise Agreement. Specifically, Plaintiff Cornucopia alleges that Golden Corral engaged in targeted, discriminatory behavior that, *inter alia*, included depriving Plaintiff Cornucopia of an opportunity to cure purported defaults and the right and opportunity to respond to customer's complaints. (*See* SAC ¶¶ 186-188.)

"Under New York law, implicit in all contracts is a covenant of good faith and fair dealing in the course of the contract performance." *DBT Gmbh v. J.L. Mining Co*., 544 F.Supp.2d 364, 384 (S.D.N.Y.2008) (internal quotation marks omitted). The Second Circuit has explained that under this doctrine,

> "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, this covenant only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract. For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties. However, the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir.2006) (citations and internal quotation marks omitted); *see also Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir.2011) ("'This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500 (2002))). "The implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir.2005) (citation, alteration, and internal quotation marks omitted). Thus, Plaintiff Cornucopia bears "a heavy burden" in bringing its claim for breach of the implied covenant of good faith and fair dealing, because it must prove "not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *DBT*, 544 F.Supp.2d at 384 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566, 570 (1978)).

As noted above, Plaintiff Cornucopia argues that Golden Corral breached the implied covenant of good faith and fair dealing by, in essence, giving it far less opportunities than non-minority owned franchisees to build a successful franchise. (SAC ¶ 186.) Given that Plaintiff Cornucopia supports its allegation that Golden Corral breached the implied covenant of good faith and fair dealing with nearly identical arguments to those it used to support its breach of contract claim, the Court must dismiss its claim for breach of the implied covenant of good faith and fair dealing as redundant. (*See id.* ¶¶ 182-188.) "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract," and a claim for breach of the implied covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the

predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir.2002) (citations and internal quotation marks omitted); *see also Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir.2005) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." (internal quotation marks omitted)); *Toledo Fund, LLC v. HSBC Bank*, No. 11–CV–7686, 2012 WL 364045, at *5 (S.D.N.Y. Feb. 3, 2012) (dismissing Plaintiff's "separate claim for breach of the implied covenant of good faith and fair dealing [because it was] entirely redundant of the breach of contract claim"). Thus, Golden Corral's motion to dismiss Plaintiff Cornucopia's claim for breach of the implied covenant of good faith and fair dealing is granted.

## IV.   Fraudulent Inducement and Fraudulent Omission on Behalf of Plaintiff Cornucopia

Plaintiff Cornucopia's third cause of action, styled as "fraudulent inducement and fraudulent omission," alleges that Golden Corral misrepresented and/or failed to disclose material information pertaining to, *inter alia*, "baiting" Plaintiff Cornucopia into its franchising scheme with the promise of prime locations that were unavailable and its intention to terminate Plaintiff Cornucopia's franchise without an opportunity to cure alleged violations. (SAC ¶ 190.) Plaintiff Cornucopia attests that, due to these purported misrepresentations, it and Plaintiff Henderson lost over seven million dollars ($7,000,000). (SAC ¶ 195.)

The elements of claims for fraudulent inducement and fraudulent omission are nearly identical under New York law. Claims for fraudulent inducement require a plaintiff to prove: "(1) a material misrepresentation or omission of fact, (2) made by defendant with knowledge of its falsity[,] (3) and an intent to defraud[,] (4) reasonable reliance on the part of the plaintiff[,]

and (5) resulting damage to the plaintiff." *Yoomi Babytech, Inc. v. Anvyl, Inc.*, No. 20 CIV. 7933 (ER), 2021 WL 4332258, at *12 (S.D.N.Y. Sept. 22, 2021) (quoting *Hindsight Sols., LLC v. Citigroup Inc.*, 53 F.Supp.3d 747, 772 (S.D.N.Y. 2014) and citing *Bruce v. Martin*, Nos. 87 Civ. 7737 (RWS), 90 Civ. 0870 (RWS), 90 Civ. 4651 (RWS), 1993 WL 148904 (S.D.N.Y. Apr. 30, 1993)). Similarly, claims for fraudulent omission require a plaintiff to prove: "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-91 (2d Cir. 2005). For both fraudulent inducement and fraudulent omission claims, a duty to disclose arises "where the parties enjoy a fiduciary relationship" or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Lerner v. Fleet* Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).

Additionally, as noted above, claims for fraud have heightened pleading requirements at the motion to dismiss stage. *See* Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker, (3) state where and when the statements were, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Plaintiff Cornucopia has not met Rule 9(b)'s heightened pleading standard for fraud claims, in light of its failure to sufficiently identify both the statements it alleges were fraudulent and the individuals who made them. Plaintiff Cornucopia's central allegation of fraud concerns Golden Corral's purported "baiting" of Plaintiff Cornucopia into a franchising scheme with the promise of prime locations that Golden Corral knew were unavailable. (SAC ¶ 190.) Yet, even if the Court ignores that Plaintiff Cornucopia was not assigned the rights to its franchise until more than two years after the location promise was purportedly made (which

suggests that it was not fraudulently induced by this promise into signing the Franchise or Assignment Agreements), Plaintiff Cornucopia fails to either describe Golden Corral's conduct and statements regarding the franchise location promise with any specificity or identify which representatives from Golden Corral were responsible for them. Plaintiff Cornucopia only alleges that it "believe[ed] and rel[ied] on Golden Corral's conduct and statements pertaining to the opening of a Golden Corral franchise location in Newark," and asserts that Golden Corral later removed this location from its list of approved franchise locations. (SAC ¶¶ 4, 23-32.) These allegations are too vague and underdeveloped to satisfy the requirements of Rule 9(b).

Plaintiff Cornucopia's alternative allegations in support its fraud claims are similarly spare. Plaintiff Cornucopia, for instance, alleges that Golden Corral failed to disclose that Golden Corral would apply harsher grading standards to Plaintiff Cornucopia's restaurant than the standards it imposes on the restaurants of nom-minority franchisees, but Plaintiff Cornucopia does not identify any specific statements that Golden Corral made about grading standards, let alone allege who made them. (SAC ¶ 190.) Likewise, although Plaintiff Cornucopia claims that Golden Corral "represent[ed] that Plaintiffs would be given equal opportunity to succeed in the franchise," it fails to allege that any representative of Golden Corral made a single statement to Plaintiff Cornucopia regarding equal opportunity. (*Id.*)

Given Plaintiff Cornucopia's failure to meet Rule 9(b)'s heightened pleading standard, as described in detail above, Golden Corral's motion to dismiss Plaintiff Cornucopia's claims for fraudulent inducement and fraudulent omission is granted.

## V.    Punitive Damages

Plaintiff Cornucopia's fourth and final claim is for punitive damages. In support of this claim, Plaintiff Cornucopia offers the allegation that Golden Corral engaged in willful and reckless "discriminatory practices and fraudulent conduct" that resulted in substantial, irreparable damages to Plaintiff Cornucopia. (SAC ¶ 199.)

However, punitive damages are a form of relief rather than a separate cause of action, and "motions to dismiss are properly directed to claims, not to forms of relief." *Henkels & McCoy Grp., Inc. v. Verizon Sourcing, LLC*, No. 21-CV-9576, 2022 WL 1185817, at *5 (S.D.N.Y. Apr. 21, 2022). Plaintiff Cornucopia's claim for punitive damages, then, is more appropriately addressed on a motion for summary judgment as a request for relief in connection with its claim for discrimination pursuant to Section 1981. *See Santos v. Costco Wholesale, Inc.*, 271 F.Supp 2d 565, 575–76 (S.D.N.Y. 2003) (denying the defendant's motion to dismiss the plaintiff's claim for punitive damages where the plaintiff sought punitive damages in connection with its Section 1981 claim, on the basis that the issue of punitive damages was more appropriately determined in a motion for summary judgment than in a motion to dismiss). Thus, Golden Corral's motion to dismiss Plaintiff Cornucopia's punitive damages claim is denied, as the issue of punitive damages is more appropriately determined in a motion for summary judgment than in a motion to dismiss.[6]

## CONCLUSION

For the foregoing reasons, Defendant Golden Corral's motion to dismiss Plaintiffs' claims for violation of 42 U.S.C. § 1981, breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement and fraudulent omission, and punitive damages is GRANTED in PART and DENIED in PART.

Specifically, Defendant's motion to dismiss is GRANTED with respect to Plaintiff Henderson's claims for violation of 42 U.S.C. § 1981, breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement and fraudulent omission, and punitive damages, and these claims are dismissed with prejudice.

---

[6] However, Court notes that Golden Corral's motion to dismiss Plaintiff Henderson's claim for punitive damages is granted, given that (as noted above) punitive damages are a form of relief rather than a separate cause of action, and Plaintiff Henderson has no remaining claims through which to seek any form of relief.

Defendant's motion to dismiss is also GRANTED with respect to Plaintiff Cornucopia's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent inducement and fraudulent omission, and these claims are also dismissed with prejudice.

However, Defendant's motion to dismiss is DENIED with respect to Plaintiff Cornucopia's claims for violation of 42 U.S.C. § 1981 and punitive damages. Defendant Golden Corral is thereby granted leave to file an answer on or before April 20, 2023.

The Clerk of the Court is kindly directed to terminate the motion at ECF No. 69, and to terminate Plaintiff Sherrance Henderson from this action.

Dated: March 21, 2023                                   SO ORDERED:
      White Plains, New York

                                                NELSON S. ROMÁN
                                    United States District Judge